**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

STATE OF TEXAS, *et al*,

      Plaintiffs,

      v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, *et al*,

      Defendants.

No. 3:15-cv-162

---

**APPENDIX TO STATES' MOTION FOR A NATIONWIDE PRELIMINARY
INJUNCTION ENJOINING THE EFFECTIVENESS, IMPLEMENTATION, AND
ENFORCEMENT OF THE 2015 WOTUS RULE and RESPONSE TO
AGENCIES' AND INTERVENORS' MOTIONS TO HAVE THIS COURT
DELAY CONSIDERATION OF THE PRELIMINARY INJUNCTION**

APPENDIX INDEX:

Tab A – State Petitioners' Motion for Stay Pending Review

Tab B – Opposition of Respondent-Intervenors Natural Resources Defense Counsel,
      National Wildlife Federation, One Hundred Miles, and South Carolina Coastal
      Conservation League to Motion for Stay Pending Review

Tab C – Respondents' Opposition to State Petitioners' Motion for Stay of Clean Water
      Rule Pending Review

Tab D – State Petitioners' Reply in Support of Motion for a Stay Pending Review

Tab E – Order of Stay

# Tab A

## State Petitioners' Motion for Stay Pending Review

**Nos. 15-3799, 15-3822, 15-3853, 15-3887**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| STATE OF OHIO, *ET AL.*, <br>      Petitioners, <br>      v. <br> U.S. ARMY CORPS OF ENGINEERS, *ET AL.*, <br>      Respondents. | : <br> : <br> : <br> : <br> : <br> : | No. 15-3799 |
| STATE OF OKLAHOMA, <br>      Petitioner, <br>      v. <br> U.S. E.P.A., *ET AL.*, <br>      Respondents. | : <br> : <br> : <br> : <br> : <br> : | No. 15-3822 |
| STATE OF TEXAS, *ET AL.*, <br>      Petitioners, <br>      v. <br> U.S. E.P.A., *ET AL.*, <br>      Respondents. | : <br> : <br> : <br> : <br> : <br> : | No. 15-3853 |
| STATE OF GEORGIA, *ET AL.*, <br>      Petitioners, <br>      v. <br> U.S. E.P.A., *ET AL.*, <br>      Respondents. | : <br> : <br> : <br> : <br> : <br> : | No. 15-3887 |

## STATE PETITIONERS' MOTION FOR STAY PENDING REVIEW

The Rule purporting to define "waters of the United States" ("WOTUS Rule") is clearly illegal and is currently imposing irreparable harm on the States. It unlawfully asserts federal authority over millions of acres of intrastate waters and sometimes wet lands, in violation of the Clean Water Act ("CWA"), the Administrative Procedure Act ("APA"), Supreme Court precedent, and the

Constitution. The Rule is causing irreparable harm to the States by seizing their sovereign authority over intrastate waters and by imposing substantial costs under the CWA's state-administered programs.[1]

Although statute and precedent reflect that jurisdiction to redress the Rule's harms lies with the district courts, *see* States' Motion to Dismiss, the Agencies and some district judges disagree. The District of North Dakota correctly concluded that district courts, not courts of appeals, have jurisdiction over the Rule, and preliminarily enjoined the Rule in thirteen States. Other district courts have refused to issue similar preliminary injunctions sought by other States, either concluding jurisdiction was not proper in district court or that considerations of jurisdiction and/or potential consolidation required a stay.

Given the Rule's manifest illegality and harms to the States, this inconsistent application of the WOTUS Rule should not be allowed to stand. This Court should stay the Rule, on a nationwide basis, pending completion of its review.

## STATEMENT OF FACTS

A. Under the CWA, Congress recognized the State's traditional power over land and water use. The CWA provides that "[i]t is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States . . . to plan the development and use . . . of land and water resources." 33 U.S.C.

---

[1] On July 28, 2015, the States requested that the Agencies stay the Rule pending litigation. The Agencies have not granted this request.

§ 1251(b). Congress thus left to the States authority over intrastate waters, while giving the Agencies regulatory authority only over "navigable waters," defined as "waters of the United States, including the territorial seas." *Id.* § 1362(7).

The definition of "waters of the United States" delineates the scope of numerous provisions in the CWA, including obligations imposed upon the States. A party that causes discharges into "waters of the United States" must obtain a permit under the National Pollutant Discharge Elimination System ("NPDES") program, *id.* § 1342, or under Section 404 for discharge that is dredge and fill, *id.* § 1344. The States are directly involved in administering the NPDES and Section 404 permitting programs, as well as the CWA's Water Quality Standards ("WQS") program. *Id.* §§ 1313, 1341, 1342; 40 C.F.R. § 130.7.

B. On June 29, 2015, the Agencies published the final Rule, which differed from the proposed version of the Rule in several material respects, as described below. *See infra* pp. 7-10. The final Rule, effective August 28, 2015, defines primary waters to encompass "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce," as well as "[a]ll interstate waters, including interstate wetlands," and the "territorial seas." 33 C.F.R. § 328(a). The Rule then declares additional waters as CWA jurisdictional, including three sweepingly broad categories relevant for this motion.

*First*, the Rule claims automatic federal jurisdiction over "[a]ll tributaries," 33 C.F.R. § 328.3(a)(5), defined as any "water that contributes flow, either directly or through another water" to a primary water and is "characterized by the presence of the physical indicators of a bed and bank and an ordinary high water mark ['OHWM']," *id.* § 328.3(c)(3).  By the Agencies' own characterization, this definition includes usually dry channels that provide "intermittent or ephemeral" flow through "any number" of links.  80 Fed. Reg. at 37,076.

*Second*, the Rule asserts automatic federal jurisdiction over all waters "adjacent" to primary waters and their "tributaries."  33 C.F.R. § 328.3(a)(6).  The Rule defines "adjacent" to include: (1) "all waters" any part of which is located within 100 feet of the OHWM of a primary water or "tributary"; (2) "all waters" within 1,500 feet of the OHWM of a primary water or "tributary" and within its 100-year floodplain; and (3) all waters any part of which is within 1,500 feet of the high tide line of a primary water.  33 C.F.R. § 328.3(c)(2).

*Third*, the Rule grants the Agencies authority over additional waters if they are determined to have a "significant nexus" to a primary water, including all waters any part of which is within 4,000 feet of the high tide line or OHWM of a primary water, impoundment, or "tributary."  *Id.* § 328.3(a)(8).  Under the Rule, a water is deemed to have a "significant nexus" to a primary water if that water, "either alone or in combination with other similarly situated waters in the region,

4

significantly affects the chemical, physical, *or* biological integrity of a [primary water]" based on "any single function or combination of functions performed by the water." *Id.* § 328.3(c)(5) (emphasis added).

C.  After the Rule was published in the Federal Register, thirty-one States sued to stop the Rule in federal district courts around the country.  Many of these States sought preliminary injunctions to stop the Rule before it became effective on August 28, 2015.   The Southern District of Georgia denied a preliminary injunction because it concluded that the court of appeals was the proper venue for a lawsuit challenging the Rule.  Doc. No. 77, No. 2:15-cv-00079 (S.D. Ga. Aug. 27, 2015).  The Northern District of Oklahoma stayed the action, also pointing to the possibility of court of appeals jurisdiction.  Doc. No. 22 at 8, No. 4:15-cv-0381 (N.D. Okla. July 31, 2015).  The Southern District of Ohio and Southern District of Texas have similarly stayed those actions.  Doc. 27 at 7, No. 2:15-cv-2467 (S.D. Ohio Sept. 1, 2015); Doc. 15 at 1, No. 3:15-cv-0162 (S.D. Tex. Aug. 14, 2015).[2]

In contrast, the District of North Dakota properly held that jurisdiction to review the WOTUS Rule lies in the district courts, and then granted a preliminary injunction.  Doc. No. 70, *North Dakota v. EPA*, No. 3:15-cv-00059 (D. N.D.) ("ND PI").  Chief Judge Erickson concluded that the Rule is likely illegal because, *inter*

---

[2] Yesterday, September 8, 2015, the plaintiff States in the Southern District of Texas action filed motions seeking a partial lifting of the stay, expedited treatment and a preliminary injunction.  Doc. 17, No. 3:15-cv-0162.

*alia*, the rule violated the APA's notice-and-comment and reasoned decision making requirements, and the CWA. *Id.* at 6-15. The court determined an injunction was necessary because the Rule irreparably diminishes the States' sovereign power over their waters and requires the States to incur unrecoverable expenses. *Id.* at 16-17. Last Friday, September 4, the court held that its preliminary injunction only applied to the thirteen States in the North Dakota litigation. ND Doc. No. 79.

The States also filed protective petitions for review in courts of appeals throughout the country, making clear that those petitions should be dismissed for lack of jurisdiction as falling outside of the narrow bounds of 33 U.S.C. § 1369. *See Lake Cumberland Trust, Inc. v. EPA*, 954 F.2d 1218, 1222-24 (6th Cir. 1992). Pursuant to 28 U.S.C. § 2112, those petitions were consolidated in this Court.

## ARGUMENT

In reviewing a motion for a stay, this Court considers: (1) the likelihood that the movant will prevail on the merits; (2) the prospect of irreparable harm if relief is withheld; (3) the possibility of substantial harm to others if relief is granted; and (4) the public interest. *See Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991). "These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Id.* All four factors favor a stay in this case.

6

## I.   Petitioners Are Likely To Prevail On The Merits

Petitioners need only show "a sufficient probability of success on the merits." *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 155 (6th Cir. 1991). "[A] movant need not always establish a high probability of success on the merits," *id*. at 153, because the "strength of the likelihood of success on the merits that needs to be demonstrated is inversely proportional to the amount of irreparable harm that will be suffered if a stay does not issue." *Baker v. Adams Cnty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 928 (6th Cir. 2002).

### A.   The Agencies Adopted The WOTUS Rule In Violation Of The APA's Notice And Comment Requirements

To comply with the APA's notice-and-comment requirement, an agency's final rule must be a "logical outgrowth" of the proposal. *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007). The question is whether the public "should have anticipated that [the] requirement" embodied in the final rule might be adopted. *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983). Thus, in *Small Refiner*, EPA proposed to define "small refinery" as a refinery that was not owned by a large refiner and then asked the public generically for changes to this definition. The agency also asked "whether a 2.50 [grams of lead per gallon] standard [for small refineries] was too generous and whether a standard such as 2.15 . . . may be more appropriate." *Id.* at 513 (quotations omitted). In the final rule, EPA revised the definition of "small

refinery" by adding a date-of-ownership limitation and set an interim standard of 1.90 grams of lead per gallon for those refineries. *Id.* at 513-14. The D.C. Circuit held that neither change was a "logical outgrowth[]" of the proposal because the agency had not provided to the public "the range of alternatives being considered with reasonable specificity." *Id.* at 542-44, 548-49; *accord CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1078 (D.C. Cir. 2009).

The final WOTUS Rule violates the notice-and-comment requirement in at least two critical respects, each of which suffices to require the Rule's vacatur:

*First*, with regard to adjacent waters, the proposed version of the Rule defined "adjacent waters" as all waters and sometimes wet lands in a so-called "riparian area" or "flood plain." 79 Fed. Reg. 22,188, 22,269 (Apr. 21, 2014). The final Rule changed course entirely, relying upon distance-based concepts such as location within a 100-year floodplain *and* within 1,500 feet of a primary water, impoundment, or tributary; or 1,500 feet from a high tide line of a primary water. As the District of North Dakota held, these definitions "are different in degree and kind and wholly removed from" the proposal, such that they are a "transmogrify[ication]" of the Rule. ND PI, at 15.

*Second*, as to case-by-case waters, the proposal established a catchall category of waters potentially subject to the Agencies' authority if they "significantly affect[] the chemical, physical, or biological integrity" of a primary

water.  79 Fed. Reg. at 22,269.  The final Rule unexpectedly focused the Agencies' "significant nexus" inquiry on waters within the 100-year floodplain of a primary water, as well as waters within 4,000 feet of a primary water, impoundment, or tributary.  33 C.F.R. § 328.3(a)(8).  The Agencies provided no suggestion that they were considering distance parameters as to case-by-case waters, seeking comment only in a generic fashion on *anything* that could "lead to greater clarity, certainty, and predictability."  79 Fed. Reg. at 22,214-17.  Again, the Agencies failed to inform the public of "the range of alternatives being considered with reasonable specificity."  *Small Refiner*, 705 F.2d at 549.

The Agencies' notice-and-comment failure here is more significant than in *Small Refiner*, or any other case of which the States are aware.  In the WOTUS Rule, the Agencies seek to apply entirely unexpected approaches to defining both adjacent and case-by-case waters *for all of the waters and lands in the United States*.  Defining the scope of the CWA is one of the most consequential and complicated decisions that the federal bureaucracy can make, making articulation of the "range of options" essential to ensure meaningful public comment.

As illustrated by documents published by the U.S. House of Representatives Committee on Oversight and Government Reform, the lack of notice deprived the States of the opportunity to build a record against or explain the consequences of the unexpected distance limitations.  In those internal documents created when the

Agencies were drafting the final Rule, the Corps took issue with several of the distance-based approaches that EPA ultimately adopted, arguing that those approaches have "no basis in science or law, and thus [are] 'arbitrary,'" and "depart significantly from the version provided for public comment."[3]

### B. Central Aspects Of The WOTUS Rule Are Arbitrary And Without Any Record Support

A final rule must be "set side" if that rule is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). The agency must show a rational connection between the facts it relies upon and its final rule, such that the rule is the "product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 & 52 (1983); *accord Cincinnati Bell Tel. Co. v. FCC*, 69 F.3d 752, 767-68 (6th Cir. 1995).

The distance-based definitions that are the heart of the Rule's adjacency and case-by-case waters fail this basic APA requirement. The Agencies' only explanation of their distance-based approach is that the various distances are "reasonable and practical boundar[ies]," consistent with unspecified "experience" and "the implementation value of drawing clear lines," 80 Fed. Reg. at 37,085-91. But the Agencies' own experts specifically *rejected* the Agencies' distance-based approach, explaining that "the available science supports defining adjacency or

---

[3] Doc. No. 62-3 at 2, *Georgia v. McCarthy*, No. 2:15-cv-00079 (S.D. Ga.); Doc. No. 62-2 at 1, *Georgia v. McCarthy*, No. 2:15-cv-00079 (S.D. Ga.); *id.* at 5 ("1500-feet limitation is not supported by science or law").

determination of adjacency on the basis of functional relationships, not on how close an adjacent water is to a navigable water." Letter from Science Advisory Board to Gina McCarthy, EPA-SAB-14-007, at *2-3 (Sept. 30, 2014). Nothing in the record explains, for example, why a 1,500 or "a 4,000 foot standard is scientifically supportable." ND PI, at 13. As the District of North Dakota explained, "[w]hile a 'bright line' test is not in itself arbitrary, the Rule must be supported by some evidence why a 4,000 foot standard is scientifically supportable. On the record before the court, it appears that the standard is the right standard because the Agencies say it is." *Id.*

The lack of any record discussion of the Rule's distance limitations is also further proof of the notice-and-comment failure discussed earlier. Because the Agencies sprung the Rule's distance-based approach on the public when they announced the final Rule, they deprived the public of the meaningful right to submit comments, studies, and maps that would have facilitated an on-the-record assessment of the Rule's rationality.

## C.     The WOTUS Rule Violates The CWA In Multiple Respects

In *Rapanos v. United States*, 547 U.S. 715 (2006), the Court rejected the Corps' assertion of CWA authority over intrastate wetlands that are not significantly connected to navigable, interstate waters. The Court's majority consisted of a four-Justice plurality opinion and Justice Kennedy's opinion

concurring in the judgment. The plurality opinion concluded that only relatively permanent waters truly adjacent to traditional interstate waters and waters with a "continuous surface connection" to such waters fall within the CWA. *Id.* at 742. Justice Kennedy wrote separately and explained that the Agencies only have authority over waters that are navigable-in-fact and waters with a "significant nexus" to navigable waters. *Id.* at 779. The WOTUS Rule violates the CWA, as articulated by Justice Kennedy in *Rapanos*, in at least three respects.[4]

1. *Per Se* Coverage Of "Tributaries." The Rule's conclusion that all "tributaries" are jurisdictional violates the CWA. Under the Rule, a tributary has "a bed and banks and an [OHWM]" and "contributes flow"—no matter how ephemeral—"either directly or through another water" to a primary water. 33 C.F.R. § 328.3(c)(3). The WOTUS Rule sweeps in *all* such channels, including typically dry land features that ever contribute even the smallest trickle into a navigable water, either directly or indirectly. 80 Fed. Reg. at 37,076.

But in *Rapanos*, Justice Kennedy reasoned that while having an OHWM "presumably provides a rough measure of the volume and regularity of flow," that characteristic alone is insufficient for asserting the significant nexus necessary for

---

[4] Although this Court has not yet decided whether CWA jurisdiction should be assessed only against Justice Kennedy's test, *see United States v. Cundiff*, 555 F.3d 200, 208-09 (6th Cir. 2009), that is the basis on which the Agencies have justified the Rule, so any other argument is foreclosed, *see SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943).

CWA jurisdiction over "drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water volumes toward it." *Id.* at 781. Moreover, Justice Kennedy explained that the CWA cannot cover all "continuously flowing stream[s] (however small)" or waters sending only the "merest trickle[s]" into navigable waters. *Id.* at 776-77 & 769. As the District of North Dakota held, "the breadth of the definition of a tributary set forth in the Rule allows for regulation of any area that has a trace amount of water so long as the physical indicators of a bed and banks and an OHWM exist. This is precisely the concern Justice Kennedy had in *Rapanos*, and indeed the general definition of tributary is strikingly similar." ND PI, at 11 (quotation and footnotes omitted).

2. *Per Se* Coverage Of All "Adjacent" Waters. The Rule's assertion of *per se* jurisdiction over all "adjacent waters" similarly violates the CWA. In *Rapanos*, Justice Kennedy held that the Corps' "regulation of drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water volumes toward it . . . *precludes its adoption as the determinative measure of whether adjacent wetlands* are likely to play an important role in the integrity of an aquatic system comprising navigable waters as traditionally understood." *Id.* at 782 (emphasis added). But the Rule re-imposes much the same requirement, 33 C.F.R. § 328.3(a)(8), including asserting *per se* jurisdiction over various waters within the 100-year floodplain and 1,500 feet of "drains, ditches, and streams remote from

any navigable-in-fact water and carrying only minor water-volumes toward it." 547 U.S. at 782; *cf. Summit Petroleum Corp. v. EPA*, 690 F.3d 733, 744 (6th Cir. 2012) (*Rapanos* interpreted "adjacent" to mean more than "'merely 'nearby'"").

 3. Case-By-Case Coverage Based Upon A Speculative Nexus. The Rule's approach to case-by-case "significant nexus" determinations is illegal. Justice Kennedy required a rigorous analysis to determine CWA jurisdiction, permitting federal jurisdiction over an intrastate water only after a holistic analysis of the intrastate water's impact on the "chemical, physical, and biological integrity" of a primary water. 547 U.S. at 780. In sharp contrast, the Rule permits a finding of "significant nexus" based solely upon a single function, such as "contribution of flow" or "export of food resources." 33 C.F.R. § 328.3(c)(5). For example, the Rule asserts jurisdiction based upon "dispersal" (80 Fed. Reg. at 37,063, 37,072, 37,094)—a concept that involves "[p]lants and invertebrates" that "hitchhike" on waterfowl (EPA, Connectivity of Streams & Wetlands to Downstream Waters 5-5 (2015)). Such an expansive approach cannot be reconciled with *Solid Waste Agency of North Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) ("*SWANCC*"), which rejected CWA jurisdiction over isolated sand and gravel pits that hosted "approximately 121 bird species," including several that "depend upon aquatic environments for a significant portion of their life requirements." *Id.* at 164.

### D. The WOTUS Rule Violates The Constitution

The WOTUS Rule violates the Constitution by asserting authority over isolated, intrastate waters and displacing the States' sovereign rights. The Supreme Court in *SWANCC* rejected the Agencies' assertion that certain isolated waters were "waters of the United States" because, *inter alia*, this would "alter[] the federal-state framework by permitting federal encroachment upon" the States' "traditional and primary power over land and water use." 531 U.S. at 173-74. The WOTUS Rule covers not only the isolated waters at issue in *SWANCC*, but also many other isolated waters and sometimes wet lands. The Rule thus violates the States' sovereign rights under the Tenth Amendment to manage and protect their intrastate waters. *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001).

## II. The States Will Suffer Irreparable Injury Absent A Stay

The Agencies estimate that the Rule will increase CWA jurisdiction by 2.84 to 4.65 percent, 80 Fed. Reg. at 37,101, beyond pre-Rule practice. *See* Economic Analysis of the EPA-Army Clean Water Rule (May 2015). This includes, for example, a 17.1% increase in one significant category of waters that the Agencies themselves have described as "isolated," "intrastate," "non-navigable" waters. *Id.* at 7, 9. While the States believe this understates the Rule's reach, Stiles Decl. ¶6; Preston Decl. ¶7, the conceded increase will cause States two types of irreparable

harm, each of which is sufficient for a stay. *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991).

A. The WOTUS Rule deprives a sovereign State of control over its own waters and lands, and thus imposes irreparable harm for purposes of preliminary relief. *Kansas*, 249 F.3d at 1227. The States have the constitutional right to maintain "traditional and primary power over land and water use." *SWANCC*, 531 U.S. at 174. Consistent with this sovereign authority, the States manage and protect the lands and waters within their borders, while maintaining direct ownership over other intrastate land and waters.[5] But under the Rule, "the States will lose their sovereignty over intrastate waters that will then be subject to the scope of the Clean Water Act," thus satisfying the irreparable harm requirement. ND PI, at 16; *accord Wyoming v. Hoffman*, 423 F. Supp. 450, 453 (D. Wyo. 1976).

B. The Rule imposes costs on the States, and monetary harms imposed by federal rules are irreparable. "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). "[N]umerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable."

---

[5] *See, e.g.*, Ala. Code § 22-22-2; Ga. Code Ann. § 12-5-21(a); Ky. Rev. Stat. Ann. § 151.110(1)(a); Ohio Rev. Code § 6111.03; Tex. Water Code Ann. § 11.021(a); Utah Code Ann. § 73-1-1(3); W. Va. Code § 22-26-3.

*Odebrecht Constr., Inc. v. Sec., Fla. Dep't of Transp.*, 715 F.2d 1268, 1289 (11th Cir. 2013) (collecting cases); *Iowa Utils. Bd. v. FCC*, 109 F.3d 418 (8th Cir. 1996); *Texas v. United States*, 787 F.3d 733, 768 (5th Cir.2015); *Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011). "It is undeniable that if the States incur monetary losses as a result of an unlawful exercise of regulatory authority, no avenue exists to recoup those losses as the United States has not waived sovereign immunity from suits seeking these sorts of damages." ND PI, at 16.

The Rule requires States to expend resources immediately on three CWA programs, thus imposing irreparable harm upon the States. ND PI, at 16-17.

*First*, the Rule requires States to expend resources under the CWA's WQS program. Under this program, States must update WQS that establish the water quality goals for all "waters of the United States," 33 U.S.C. § 1313, including preparing biennial reports on all such waters, 40 C.F.R. § 130.7(d), which the States must begin working on immediately to meet their deadlines, Stiles Supplemental Decl. ¶ 5. The Rule's expansion of CWA jurisdiction will require States to identify newly jurisdictional waters, Pigott Decl. ¶8; Stiles Supplemental Decl. ¶ 5, to determine whether these waters meet an already existing WQS and what designated uses apply to those waters, Stiles Decl. ¶10; Goodmann Decl. ¶5. This is a "resource-intensive and time-consuming" process, which will cost the state of Kansas alone "significantly greater resources" than $300,000, Stiles Decl.

17

¶¶8, 10, and will require immediate expenditures, Stiles Supplemental Decl. ¶¶ 4-7. When a water fails to meet the goals established in the WQS, the State must create a Total Maximum Daily Load, indicating the amount of a pollutant that may be discharged into the water. 40 C.F.R. § 130.7; *see also* Stiles Decl. ¶11; McClary Decl. ¶7. Finally, States will need to expend resources to inventory and monitor the overall water quality of newly jurisdictional waters. Stiles Decl. ¶12; McClary Decl. ¶8. Failure to accomplish these tasks would severely delay citizens' ability to obtain Section 401 certifications necessary for federal permits, imposing harm on the States' citizens and businesses and delaying valuable projects. Stiles Supplemental Decl. ¶7.

*Second*, the Rule requires States to expend resources on state certifications under the Section 404 program. To discharge dredge and fill into "waters of the United States," a party must obtain a permit from the Corps under Section 404. 33 U.S.C. § 1344. The permit process requires the applicant to obtain a certification from the State, under Section 401, attesting that the discharge will comply with the applicable state WQS. *Id.* § 1341(a)(1). Because the Rule expands the number of "waters of the United States," States will be required to expend additional resources under the Section 404 program to process and issue additional Section 401 certifications. *See* Stiles Decl. ¶14; Pigott Decl. ¶9; Preston Decl. ¶8; Capp Decl. ¶5; McClary Decl. ¶10. The Agencies have estimated that the Rule will

impose upon the States additional obligations of between $798,000 and $1.3 million, per year, under the Section 404 program alone. Economic Analysis, at 19.

*Third*, the Rule requires "the State[s] to create, process, and issue additional NPDES permits." Stiles Decl. ¶13; *see also* McClary Decl. ¶6. To discharge pollutants into a "water[] of the United States," a party must obtain an NDPES permit. 33 U.S.C. § 1342. Every plaintiff-State administers the NPDES permit program within its borders.[6] Given that the Rule expands the number of "waters of the United States," more individuals and business will apply for NPDES permits, thereby requiring additional state expenditures to process those permits. Stiles Decl. ¶14. The Agencies have projected that the Rule will impose additional obligations of between $527,000 and $770,000, per year, upon the States. *See* Economic Analysis, at 25-29.

## III.  The Balance Of Harms And The Public Interest Strongly Favor A Stay

The public would benefit greatly from a stay of the WOTUS Rule. A stay would help ensure the Agencies do not illegally assert authority beyond that delegated by Congress. If the Rule remains in effect during this litigation, farmers, homeowners, and small businesses will spend years and hundreds of thousands of dollars, *Rapanos*, 547 U.S. at 721, acquiring permits under a rule likely to be

---

[6]  33 U.S.C. § 1342(b); U.S. Envtl. Prot. Agency, Specific State Program Status, http://water.epa.gov/polwaste/npdes/basics/NPDES-State-Program-Status.cfm.

declared invalid. The pre-Rule regime has been in place for six years and the public will not suffer unduly by continuing that regime through this litigation, especially since all States have full power to protect waters not under federal authority, 33 U.S.C. § 1370. The Agencies, moreover, have justified the Rule as providing greater predictability in Agency decision making—rather than cleaner waters or greater environmental protection. 80 Fed. Reg. at 37,073. But this predictability interest is manifestly diminished where the Rule is already enjoined in thirteen States, and is likely to be struck down in any event.

A nationwide stay, in particular, would promote the public interest of equal treatment under the law. Currently, the WOTUS Rule's illegal expansion of federal jurisdiction applies in thirty-seven States, while thirteen States remain immune. Waters and sometimes wet lands that have the same relationship to the same interstate waters receive different treatment. A nationwide stay would be consistent with basic APA principles, *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1408-10 (D.C. Cir. 1998), equitable jurisprudence, *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), and the uniform enforcement of federal law, *see Texas v. United States*, 787 F.3d 733, 768-69 (5th Cir. 2015).

## CONCLUSION

The States respectfully request that the Court grant the motion for a stay.

Respectfully Submitted,

**Case No. 15-3799**

*/s/ Daniel P. Bock*
BILL SCHUETTE
Michigan Attorney General

S. PETER MANNING
Division Chief
DANIEL P. BOCK
Assistant Attorney General
Environment, Natural Resources, and
Agriculture Division
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
517-373-7540; 517-373-1610 fax
manningp@michigan.gov

*Counsel for State of Michigan*

*/s/ Eric E. Murphy*
MICHAEL DEWINE
Attorney General of Ohio

ERIC E. MURPHY
State Solicitor
LEE ANN RABE
Assistant Attorney General
PETER T. REED
Deputy Solicitor
30 East Broad Street, 17th Floor
Columbus, OH 43215
614-466-8980; 614-466-5087 fax
eric.murphy@
  ohioattorneygeneral.gov

*Counsel for State of Ohio*

*/s/ Elizabeth P. McCarter*
HERBERT H. SLATERY III
Tennessee Attorney General and Reporter

BARRY TURNER
Deputy Attorney General
ELIZABETH P. McCARTER
Senior Counsel
Office of the Attorney General and Reporter
Environmental Division
P.O. Box 20207
Nashville, Tennessee 37202
615-532-2582; 615-741-8724 fax
lisa.mccarter@ag.tn.gov

*Counsel for State of Tennessee*

**Case No. 15-3822**

*/s/ P. Clayton Eubanks*
P. CLAYTON EUBANKS
Deputy Solicitor General
SARAH A. GREENWALT,
Assistant Solicitor General
Office of the Oklahoma Attorney General
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 522-8992; (405) 522-0608 fax
Clayton.Eubanks@oag.ok.gov
Sarah.Greenwalt@oag.ok.gov

*Counsel for State of Oklahoma*

**Case No. 15-3853**

*/s/ Megan K. Terrell*
JAMES D. "BUDDY" CALDWELL
Attorney General of Louisiana
TREY PHILIPS
First Assistant Attorney General
MEGAN K. TERRELL
Deputy Director – Civil Division
Chief – Environmental Section
Assistant Attorney General
Office of the Louisiana Attorney
General
1885 N. Third Street
Baton Rouge, Louisiana 70802
Tel:  (225) 326-6020
Fax: (225) 326-6099

*Counsel for State of Louisiana*

/s/ *Mary Jo Woods*
JIM HOOD
Attorney General of the State of
Mississippi
MARY JO WOODS
Special Assistant Attorney General
Mississippi Attorney General's
Office
Post Office Box 220
Jackson, Mississippi  39205
mwood@ago.state.ms.us
Tel:  (601) 359-3020
Fax: (601) 359-2003

*Counsel for State of Mississippi*

*/s/ Richard B. Farrer*
KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General
BERNARD L. McNAMEE
Chief of Staff
SCOTT A. KELLER
Solicitor General
JAMES E. DAVIS
Deputy Attorney General for Civil
Litigation
JON NIERMANN
Chief, Environmental Protection Division
RICHARD B. FARRER
Assistant Solicitor General
MATTHEW B. MILLER
Assistant Attorney General
Texas Bar No. 24074722
matt.miller@texasattorneygeneral.gov
Southern District Bar No. 2638649
LINDA B. SECORD
Assistant Attorney General
Texas Bar No. 17973400
linda.secord@texasattorneygeneral.gov
Southern District Bar No. 1850549
Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Tel.  (512) 463-2012
Fax. (512) 320-0911

*Counsel for State of Texas*

## Case No. 15-3887

/s/ Britt C. Grant
Samuel S. Olens
  *Attorney General*
Britt C. Grant
  *Solicitor General*
Timothy A. Butler
  *Deputy Solicitor General*
James D. Coots
  *Sr. Asst. Attorney General*
OFFICE OF THE ATTORNEY GENERAL
40 Capitol Square, S.W.
Atlanta, Georgia 30334
bgrant@law.ga.gov
(404) 651-9453
  *Counsel for State of Georgia*

/s/ Elbert Lin
Patrick Morrisey
  *Attorney General*
Elbert Lin
  *Solicitor General*
Misha Tseytlin
  *General Counsel*
Erica N. Peterson
  *Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
State Capitol
Building 1, Rm 26-E
Charleston, West Virginia 25305
Elbert.Lin@wvago.gov
(304) 558-2021
  *Counsel for State of West Virginia*

/s/ Andrew Brasher
Luther Strange
  *Attorney General*
Andrew Brasher
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, Alabama 36130
abrasher@ago.state.al.us
(334) 353-2609
  *Counsel for State of Alabama*

/s/ Allen Winsor
Pamela Jo Bondi
  *Attorney General*
Allen Winsor
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, Florida 32399-1050
Allen.winsor@myfloridalegal.com
(850) 414-3300
  *Counsel for State of Florida*

/s/ Thomas M. Fisher
Gregory F. Zoeller
  *Attorney General*
Thomas M. Fisher
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
302 West Washington Street

/s/ Craig A. Bromby
Sam M. Hayes
  *General Counsel*
Craig A. Bromby
  *Deputy General Counsel*
Andrew J. Norton
  *Deputy General Counsel*

Indiana Government Center - South, Fifth Floor
Indianapolis, Indiana 46204
(317) 232-6255
Tom.Fisher@atg.in.gov
*Counsel for State of Indiana*

NORTH CAROLINA DEPARTMENT OF ENVIRONMENT AND NATURAL RESOURCES
215 W. Jones Street
Raleigh, North Carolina 27603
sam.hayes@ncdenr.gov
craig.bromby@ncdenr.gov
andrew.norton@ncdenr.gov
(919) 707-8600
*Counsel for Petitioner North Carolina Department Of Environment and Natural Resources*

/s/ Jeffrey A. Chanay
Derek Schmidt
*Attorney General*
Jeffrey A. Chanay
*Chief Deputy Attorney General*
Burke W. Griggs
*Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
120 SW 10th Ave., 3d Floor
Topeka, Kansas 66612
jeff.chanay@ag.ks.gov
burke.griggs@ag.ks.gov
(785) 368-8435
*Counsel for State of Kansas*

/s/ James Emory Smith
Alan Wilson
*Attorney General*
Robert D. Cook
*Solicitor General*
James Emory Smith, Jr.
*Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
1000 Assembly Street, Room 519
Columbia, South Carolina 29201
bcook@scag.gov
(803) 734-3680
*Counsel for State of South Carolina*

/s/ Sean J. Riley
Jack Conway
*Attorney General*
Sean J. Riley
*Chief Deputy Attorney General*
OFFICE OF THE ATTORNEY GENERAL
700 Capitol Avenue, Suite 118
Frankfort, Kentucky 40601
sean.riley@ag.ky.gov
(502) 696-5650
*Counsel for State of Kentucky*

/s/ Parker Douglas
Sean D. Reyes
*Attorney General*
Parker Douglas
*Chief of Staff & Federal Solicitor*
OFFICE OF THE UTAH ATTORNEY GENERAL
Utah State Capitol Complex
350 North State Street, Suite 230
Salt Lake City, Utah 84114-2320
pdouglas@utah.gov
(801) 538-9600
*Counsel for State of Utah*

/s/ Karla Z. Keckhaver
 Brad D. Schimel
   *Attorney General*
Karla Z. Keckhaver
   *Assistant Attorney General*
WISCONSIN DEPARTMENT OF JUSTICE
17 West Main Street
Madison, Wisconsin 53707
keckhaverkz@doj.state.wi.us
(608) 264-6365
   *Counsel for State of Wisconsin*

**Nos. 15-3799, 15-3822, 15-3853, 15-3887**
## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| STATE OF OHIO, *ET AL.*,<br>    Petitioners,<br>  v.<br>U.S. ARMY CORPS OF ENGINEERS, *ET AL.*,<br>    Respondents. | : : : : : : : | No. 15-3799 |
| STATE OF OKLAHOMA,<br>    Petitioner,<br>  v.<br>U.S. E.P.A., *ET AL.*,<br>    Respondents. | : : : : : : : | No. 15-3822 |
| STATE OF TEXAS, *ET AL.*,<br>    Petitioners,<br>  v.<br>U.S. E.P.A., *ET AL.*,<br>    Respondents. | : : : : : : : | No. 15-3853 |
| STATE OF GEORGIA, *ET AL.*,<br>    Petitioners,<br>  v.<br>U.S. E.P.A., *ET AL.*,<br>    Respondents. | : : : : : : : | No. 15-3887 |

## STATE PETITIONERS' MOTION FOR STAY PENDING REVIEW
## ADDENDUM

# CONTENTS

Goodmann Declaration………………………………………………………………………..1

McClary Declaration…………………………………………………………………….....5

Pigott Declaration………………………………………………………………………..8

Preston Declaration………………………………………………………………………..11

Stiles Declaration……………………………………………………………………….....16

Stiles Supplemental Declaration………………………………………………………..25

ii

**IN THE**
**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT**
**OF GEORGIA**

STATE OF WEST VIRGINIA, *et al.*,

        Petitioners,

     v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.*,

        Respondents.

Case No.
2:15-CV-00079-LGW-RSB

## DECLARATION OF PETER T. GOODMANN

I, Peter T. Goodmann hereby declare as follows:

1. I am the Director of the Division of Water, in the Commonwealth of
Kentucky's Department for Environmental Protection, Energy and
Environment Cabinet. I have been employed by Department for
Environmental Protection since 1993, and have served in this capacity since
2013. As part of my duties, I am responsible for overseeing the
implementation of the Clean Water Act in Kentucky, including developing
Kentucky's Water Quality Standards (WQS), Monitoring and Assessing the
Kentucky's water resources, developing Total Maximum Daily Loads
(TMDL) and incorporating federal requirements to ensure the State's

1

National Pollutant Discharge Elimination System (NPDES) permitting program complies with the Clean Water Act (CWA). I also oversee the processing of state water quality certifications for all CWA permit applications pursuant to 33 U.S.C. § 1341(a)(1).

2. Based on my position, I have personal knowledge and experience to understand many of the steps the State will likely need to undertake in direct response to EPA and the Corps' *Clean Water Rule: Definition of "Waters of the United States"* (hereinafter "the Rule").

3. Based on the State's analysis I have determined that assessing the applicability of the Rule and the impacts on Kentucky's water quality programs is a complicated endeavor. Specifically, determining in general the potential for this rule to significantly expand the jurisdictional waters under the Clean Water Act, which is determined by the Corps on a case-by-case basis, is requiring this agency to expend additional resources, absent relief from this Court.

4. Under EPA and the Corps' own estimate, the Rule increases the number of waters that fall within the CWA by 2.84 to 4.65 percent, on a nationwide basis, beyond currently administered under the EPA's post-*Rapanos* guidance. U.S. Envtl. Prot. Agency & U.S. Dep't of the Army, Clean Water Rule: Definition of "Waters of the United States" 183 (2015).

2

P000002

5.  The State has already expended resources as a direct result of the Rule, and expects to expend additional resources in the coming weeks and months. Specifically, in order to comply with the statutory requirements triggered by the "waters of the United States" definition the State has begun the process of assessing which waters of the State not currently covered by the post-Rapanos guidance will become CWA jurisdictional waters under the Rule. The State is conducting legal, technical and programmatic analyses of the Rule to determine the Rule's impact on the Commonwealth, in particular whether any additional jurisdictional waters will the impact on the State's regulatory domain and workload, as well as whether the Rule conflicts with the sovereign authority of the Commonwealth to manage and protect its waters. All waters in Kentucky are recognized as Waters of the Commonwealth and all surface waters receive protection of their water quality by Kentucky Water Quality Standards in 401 KAR Chapter 10.

6.  Once the State has determined the legal applicability of the Rule, the State will attempt to estimate any additional miles of jurisdictional stream and acres of jurisdictional wetland. Such analysis is complicated by the fact that jurisdictional determinations are conducted by the USACE on a case-by-case basis; the State is by circumstance predetermining how the Corps will interpret and implement the rule. The State's efforts are limited to trying to

3

assess the overall (cf. specific) impacts. The State is developing a plan to address the implications of the Rule for the following programs administered by the State: (1) Water Quality Standards program conducted pursuant to 33 U.S.C. § 1313(c); (2) Monitoring and Assessment of waters undertaken pursuant to 33 U.S.C. § 1315(b); (3) the Total Maximum Daily Load program pursuant to 33 U.S.C. § 1313(d); and (4) the Water Quality Certification program pursuant to 33 U.S.C. § 1341(a)(1) in regards to the CWA dredge and fill permitting program pursuant to 33 U.S.C. § 1344(a).

7. The assessment of the Rule and the development of a plan is requiring staff to devote significant time and resources at the expense of other agency functions.

I declare under penalty of perjury that the foregoing is correct. Executed on this ___30th___ day of ___June___, at Frankfort, Kentucky.

Peter T. Goodmann

P000004

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA<br>ex rel. E. SCOTT PRUITT,<br>in his official capacity as Attorney<br>General of Oklahoma, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 15-CV-381-CVE-FHM |
| UNITED STATES<br>ENVIRONMENTAL PROTECTION<br>AGENCY, et. al. | ) ) ) ) | |

## DECLARATION OF SHELLIE CHARD McCLARY

I, Shellie Chard McClary, hereby declare as follows:

1. I am the Water Quality Division Director for the Oklahoma Department of Environmental Quality ("ODEQ"). I have been employed by ODEQ and predecessor state agencies since October 1992 and have been Director of the Water Quality Division of ODEQ since January 1, 2010.

2. The primary function of the ODEQ Water Quality Division ("WQD") is to maintain clean water for Oklahoma by regulating facilities that produce and distribute public drinking water and that treat, transport, store, and discharge wastewater. WQD is also responsible, in cooperation with other state agencies, for maintaining water quality standards in Oklahoma's lakes, rivers, and streams. ODEQ also manages the Total Maximum Daily Load program for the State of Oklahoma and incorporates federal requirements to ensure the State's NPDES permitting program complies with the Clean Water Act ("CWA"). Finally, ODEQ is the lead state agency that administers the CWA Section 401 certification program in Oklahoma. The purpose of these certification reviews is to determine whether a proposed discharge will comply with Oklahoma's water quality standards.

# EXHIBIT A

1

3. Based on my position I have personal knowledge and expertise in determining what steps the State will need to take in direct response to the Agencies Final Clean Water Rule; Definition of "Waters of the United States" ("Final Rule").

4. Under EPA's and the Corps' own estimate, the Final Rule increases the number of waters that fall within the CWA by at least 2.84 to 4.65, on a nationwide basis. See U.S. Envtl. Prot. Agency & U.S. Dep't of the Army, Economic Analysis of the EPA-Army Clean Water Rule (May 2015) at 12-13 ("Economic Analysis").

5. Under the CWA's certification program, Oklahoma must review each discharge and certify for all CWA permits that the discharge will comply with the State's water quality standards. 33 U.S.C. § 1341(a)(1). The Agencies estimate that the 2.84 to 4.65 percent increase in federal jurisdiction will cause a corresponding increase in costs to the States for implementation of this certification program.

6. Under the NPDES program, anyone who wishes to discharge certain pollutants into a "water of the United States" must first seek a permit from the State. 33 U.S.C. §§1311(a), 1342(a). As a result of the increase in federal jurisdiction, if an entity wishes to discharge to a jurisdictional water which was not previously deemed jurisdictional, the State could see an increase in the number of  permit applications, leading to an increase in administrative and compliance costs for the State.

7. When a "water of the United States" exceeds the water quality standard assigned to it, the State must list it as an "impaired" water. Once a water is listed as "impaired," the State will restrict the maximum amount of pollutant allowed to enter the water by establishing a "total maximum daily load" (TMDL) for that water. 33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. § 130.7. If there is an impairment to a new jurisdictional water, the State may be required to collect and review relevant data for each of the new waters determined to be jurisdictional. The State or an entity seeking to discharge into an impaired jurisdictional water could be required to establish a TMDL based on the available data.

2

P000006

8. Because the CWA requires that States report to EPA biennially on the quality of waters, parameter specific impairments of the water bodies, etc., the State may see an increase in workload and resources if additional waters are determined to be jurisdictional.

9. ODEQ and the State of Oklahoma already extensively regulate and protect the State's water resources through the statutorily defined "Waters of the State." *See* 27A § 1-1-201(20). "'Waters of the state' means all streams, lakes, ponds, marshes, watercourses, waterways, wells, springs, irrigation systems, drainage systems, storm sewers and all other bodies or accumulations of water, surface and underground, natural or artificial, public or private, which are contained within, flow through, or border upon this state or any portion thereof, and shall include under all circumstances the waters of the United States which are contained within the boundaries of, flow through or border upon this state or any portion thereof. Provided, waste treatment systems, including treatment ponds or lagoons designed to meet federal and state requirements other than cooling ponds as defined in the Clean Water Act or rules promulgated thereto and prior converted cropland are not waters of the state." *Id.*

10. While ODEQ does not have delegated authority over CWA Section 404 permitting, the expansion of jurisdictional waters could require ODEQ to issue additional State 401 certifications for CWA Section 404 applicants. 33 U.S.C. §1341 (a)(1). Under the dredge and fill program administered by the Corps, every applicant for a CWA Section 404 individual permit must obtain a certification from the state that the discharge will comply with the WQS of the State. If individual permit applications are filed on a previously non-jurisdictional water body that is now considered jurisdictional, additional staff, time, and resources will be required to complete these additional certifications.

I declare under penalty of perjury that the above statements are true and correct. Executed on the 23rd of July, 2015 in Oklahoma City, Oklahoma.

Shellie Chard McClary

3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| STATE OF GEORGIA, *et al.*, | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | ) Case No. 2:15-cv-00079-LGW-RSB |
| | ) |
| REGINA A. MCCARTHY, in her | ) |
| official capacity as Administrator of the | ) |
| UNITED STATES ENVIRONMENTAL | ) |
| PROTECTION AGENCY, *et al.*, | ) |
| | ) |
| Respondents. | ) |

## STATEMENT OF BRUNO L. PIGOTT

I, Bruno L. Pigott, hereby declare as follows:

1. I am the Assistant Commissioner of the Office of Water Quality ("OWQ") at the Indiana Department of Environmental Management ("IDEM"). I have been employed by IDEM for fifteen (15) years, and I have been Assistant Commissioner of OWQ for ten (10) years.

2. IDEM is an agency of the State of Indiana established by IC 13-13-1-1. Its mission is to implement federal and state laws and regulations to protect human health and the environment while allowing the environmentally sound operation of industrial, agricultural, commercial and governmental activities vital to a prosperous economy. OWQ is responsible for fulfilling IDEM's mission as to water quality.

3. As Assistant Commissioner of OWQ, I am responsible for interpreting state and federal rules and regulations and for helping establish state policy for a number of environmental programs, including those governed by the federal Clean Water Act ("CWA"). The programs administered by OWQ include: Water Quality Standards, Total Maximum Daily Loads, National Pollutant Discharge Elimination System ("NPDES") permits and the CWA Section 319 Non-Point Source Pollution Control program. As such, I am keenly aware of the requirements of the CWA and how it affects the State of Indiana.

4. Indiana values both its water quality and its businesses. As evidence, I offer the fact that Indiana has, by the United States Environmental Protection Agency ("USEPA") definition, no backlog of NPDES permits. IDEM issues permits on a timely basis with sound requirements that protect water quality.

5. I have reviewed the joint, final "Clean Water Rule: Definition of 'Waters of the United States'" ("Final Rule") recently issued by USEPA and United States Army Corps of Engineers' (USACE), which provides a new definition for the phrase "waters of the United States" ("WOTUS"). Based on my experience, I understand how the Final Rule will affect the State of Indiana in general, and IDEM and the regulated community in particular. Overall, the Final Rule represents a significant expansion of federal authority over Indiana's non-navigable intrastate waters and lands that were never before subject to the CWA.

6. The new definition of WOTUS in the Final Rule is vague and represents a significant overreach of federal authority. Under the Final Rule, waters subject to federal regulation will include not only primary waters, impoundments and tributaries, but also "adjacent," "bordering" and "neighboring" waters, and some waters located within 100-year floodplains, regardless of whether such waters are reasonably connected to navigable, interstate waters. For instance, the Final Rule expands WOTUS to include waters "located within 1,500 feet of the ordinary high water mark." This distance is arbitrary, and it is often very difficult to pinpoint the "ordinary high water mark."

7. IDEM already protects Indiana's water quality by virtue of its authority over waters of the state, which Indiana statutes define as follows:

*IC 13-11-2-265 "Waters" Sec. 265. (a) "Waters", for purposes of water pollution control laws and environmental management laws, means: (1) the accumulations of water, surface and underground, natural and artificial, public and private; or (2) a part of the accumulations of water; that are wholly or partially within, flow through, or border upon Indiana. (b) The term "waters" does not include: (1) an exempt isolated wetland; (2) a private pond; or (3) an off-stream pond, reservoir, wetland, or other facility built for reduction or control of pollution or cooling of water before discharge. (c) The term includes all waters of the United States, as defined in Section 502(7) of the federal Clean Water Act (33 U.S.C. 1362(7)), that are located in Indiana.*

8. Without relief from this Court, the overreach of the Final Rule will create significant and unnecessary burdens on both IDEM as regulator and Indiana's regulated community. The Final Rule imposes redundant and unclear regulatory requirements that will result in an inefficient use of limited regulatory resources by:

a. Requiring regulatory oversight over drainage features that are not "accumulations of water" and therefore not waters that should be considered WOTUS;

b. Demanding the time and attention of regulators to make the now-difficult determination of when and whether a feature is a WOTUS; and

c. Generating unnecessary administrative appeals and lawsuits to resolve jurisdictional disputes.

9. As an example of how the Final Rule will affect Indiana, anyone seeking to discharge dredge or fill material into a WOTUS is required to obtain a permit under Section 404 of the CWA from USACE. A prerequisite to a 404 permit is a Section 401 water quality certification. Because the Final Rule significantly expands the definition of WOTUS, the number of applications for Section 401 water quality certifications is likely to increase significantly. In situations where Section 401 certifications would have been necessary under current law, the scope of the impacted area will be significantly expanded by the Final Rule. As a result, the regulated community will need to seek more certifications, and IDEM will need to expend additional resources processing those applications. This is unacceptable in Indiana as a state that maintains a robust economy based on thriving industrial and agricultural business, and already regulates the quality of the waters at issue.

10. Indiana will be irreparably harmed by the implementation of the Final Rule due to the loss of unrecoverable resources of both time and money resulting from the inefficiencies that will result from the redundant, unnecessary and/or unclear regulatory requirements this overreach of authority imposes.

I declare under penalty of perjury that the above statements are true and correct. Executed on this 14 day of July, 2015, at Indianapolis, Indiana.

Bruno L. Pigott

## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF GEORGIA

STATE OF GEORGIA, EX REL. OWENS, *et al.*,

Petitioners,

v.

Case No. 2:15-cv-00079-LGW-RSB

REGINA A. MCCARTHY, *etc, et al.*,

Respondents.

## DECLARATION OF    __Heather Preston__

I, Heather Preston, hereby declare as follows:

1. I am the Director of the Water Quality Division for the South Carolina Department of Health and Environmental Control (SCDHEC). I have been employed by SCDHEC since 1993.

2. The South Carolina Department of Health and Environmental Control ("DHEC") has the broad power and authority to abate, control and prevent pollution of the water resources of the State. DHEC's power includes authority to study and assess waters of the State, adopt and enforce water classification standards, issue national pollutant discharge elimination system permits (NPDES), issue surface water withdrawal permits and registrations, and issue Section 401 water quality certifications. NPDES permits are issued pursuant to the South Carolina Pollution Control Act (PCA) and Section 402 of the Federal Clean Water Act (CWA). State water quality certifications are issued pursuant to the PCA and Sections 401 and 404 of the CWA.

P000011

3. As part of my duties, I am responsible for the issuance of state water quality certifications in accordance with Section 401 of the Federal Clean Water Act for Federal 404 permits for activities that may result in the discharge of dredge or fill material.

4. I have personal knowledge and experience that allow me to understand the impacts to the State of South Carolina (the State) resulting from the EPA and the Corps' *Clean Water Rule: Definition of "Waters of the United States"* (hereinafter "the Rule" or "Final Rule").

5. Based on my experience, I have determined that the Rule will have impacts on the federal jurisdiction of South Carolina's waters, absent relief from this Court.

6. According to the EPA and the Corps' (the Agencies) own estimate, the Rule increases the number of waters that fall within the CWA jurisdiction by approximately 2.8 to 4.7 percent, on a nationwide basis, beyond what is currently administered under the EPA's post-*Rapanos* guidance. The Agencies' estimate is contained in U.S. Envtl. Prot. Agency & U.S. Dep't of the Army, Clean Water Rule: Definition of "Waters of the United States" 183 (2015).

7. Based upon my analysis, it is my opinion that the impact of the Rule to South Carolina waters has been underestimated and more waters than the Agencies acknowledge will become jurisdictional. I provide examples below to support this point.

    a. <u>*Per Se* Coverage of all Tributaries</u>

        The Rule includes, for the first time, a definition for tributaries, 40 C.F.R. § 230.3(s)(1)(v), that will extend CWA jurisdiction to tributaries that contribute flow to jurisdictional waters and have the presence of a bed and bank and an ordinary high water mark. This broad definition of tributaries will result in *all* ephemeral tributaries being *per se* jurisdictional. The Agencies continue to assert that the Rule will "maintain all previous exclusions" and will not result in any

P000012

new permitting requirements, but this assertion is belied by the facts. The Agencies have made a policy shift in the treatment of tributaries. Under the 2008 post-*Rapanos* guidance, ephemeral waters required a case specific analysis to determine jurisdiction. The fact that all tributaries are now *per se* jurisdictional represents an expansion of CWA jurisdiction that will result in new permitting requirements.

b.   Expanded Definition of Adjacent Waters

The Rule's "adjacent waters" category will extend CWA jurisdiction to several waters across the State that are not currently considered jurisdictional. The Rule expands the definition of "adjacent" waters in several respects. First, the current regulations refer to adjacent "wetlands" whereas the Rule now refers to adjacent "waters." The Rule also includes a new definition for "neighboring" waters that includes as *per se* jurisdictional all waters located within 100 feet of the ordinary high water mark of a jurisdictional water, all waters in the 100-year floodplain of jurisdictional waters (but not more than 1,500 feet from the ordinary high water mark of such waters), and all waters located within 1,500 feet of the high tide line of a jurisdictional water. Furthermore, the entire water will be considered adjacent and therefore jurisdictional if any portion is located within such boundary.

By comparison, the 2008 post-*Rapanos* guidance extended *per se* jurisdiction only to those wetlands adjacent to traditional navigable waters. The post-*Rapanos* guidance required a significant nexus analysis to determine jurisdiction for wetlands adjacent to non-navigable tributaries that are not relatively permanent

P000013

and those wetlands adjacent to, but not directly abutting, relatively permanent non-navigable tributaries.

c.  The New Definition for Significant Nexus will Result in CWA Jurisdiction for More Waters

The Rule includes a definition of significant nexus that is used to determine if other waters are jurisdictional on a case specific basis. The definition includes a list of functions relevant for the significant nexus evaluation including: sediment trapping, nutrient recycling, pollutant trapping, runoff storage, export of organic matter, export of food resources, etc. For determining CWA jurisdiction, the Final Rule states that, "A water has a significant nexus when any single function or combination of functions performed by the water, alone or together with similarly situated waters in a region, contributes significantly to the chemical, physical, or biological integrity of the nearest waters identified in paragraphs (1)(i) through (iii)." Thus, when evaluating other waters to determine if they are jurisdictional, any single one of these functions could be sufficient to determine that they have a significant nexus to a jurisdictional water and are therefore jurisdictional themselves. Given such broadly written language, it is my opinion that any waters could be found to have Federal jurisdiction.

8.  For the reasons outlined above, I believe the Rule clearly represents an expansion of Federal jurisdiction. The expansion of Federal jurisdiction will likely result in an increase in the number and scope of water quality certification reviews by SCDHEC staff. This will require more staff time and additional resources in order to maintain the same level of state program

P000014

oversight. Increased costs to the regulated community will be another likely result of the expansion of Federal jurisdiction.

I declare under penalty of perjury that the foregoing is correct. Executed on this _16th_ day of _July_, at _Columbia, South Carolina_

_Heather Preston_

Heather Preston

P000015

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| STATE OF GEORGIA, *et al.*,<br><br>*Petitioners*,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY, *et al.*,<br><br>*Respondents*. | Case No. 2:15-cv-00079-LGW-RSB |

## DECLARATION OF THOMAS C. STILES

I, Thomas C. Stiles, hereby declare as follows:

1.  I am the Chief of the Watershed Planning, Monitoring and Assessment Section for the Kansas Department of Health and Environment ("KDHE"). I have been employed by KDHE since 1998. As part of my duties, I am responsible for developing Water Quality Standards ("WQS") and Total Maximum Daily Loads ("TMDL") and interpreting their requirements to ensure the State's National Pollutant Discharge Elimination System ("NPDES") permitting program and the Section 319 Non-Point Source Pollution Control program are consistent with the Clean Water Act ("CWA").

1

2. I have personal knowledge and experience to understand many of the steps the State will need to undertake in direct response to the U.S. Environmental Protection Agency ("EPA") and U.S. Army Corps of Engineers' ("Corps") Clean Water Rule: Definition of "Waters of the United States" (hereinafter "the Rule").

3. Based on my work, I have determined that the Rule will force Kansas to expend substantial resources, absent relief from this Court.

4. The Rule will undercut Kansas in its sovereign role as the primary regulator of land and water resources within the State. It will impose Federal oversight of CWA requirements on marginal waters and divert Kansas' finite resources to address protection of those marginal waters, predominantly ephemeral streams, to the detriment of the critical waters that rightfully demand the attention of the Kansas agencies to restore and protect their water quality for the use of all Kansans.

5. All waters in Kansas are recognized as Waters of the State and receive protection of their water quality by Kansas Water Quality Standards, notably the general narrative criteria that apply to all waters, whether within or outside of CWA jurisdiction. Furthermore, State law (K.S.A. 82a-2001, *et seq*.) provides that any water receiving a discharge from a NPDES activity or facility becomes a classified water, i.e., a Water of the

2

U.S. Thereupon, numeric criteria may also be applied to that water and it is protected from any effects of the discharge by State authorities. The Rule will not extend any additional beneficial protection to such water.

6. Under EPA and the Corps' own estimate, the Rule increases the number of waters that fall within the CWA by 2.84 to 4.65 percent, on a nationwide basis, beyond those currently administered under the EPA's post-*Rapanos* guidance. U.S. Envtl. Prot. Agency & U.S. Dep't of the Army, Clean Water Rule: Definition of "Waters of the United States" 183 (2015). In Kansas, the transition from the current inventory of classified waters falling under the CWA to the potential inclusion of streams defined by the National Hydrography Database ("NHD") increases stream miles under Federal jurisdiction over five-fold, from 30,620 miles to over 174,000 miles.

7. Kansas currently protects all perennial and intermittent streams under the full provisions of the CWA, but, by State law, excludes ephemeral streams, those streams that only flow in response to random rainfall events. These ephemeral streams, which are identified under the NHD, constitute the majority of expanded waters placed under Federal jurisdiction. Again, these ephemeral streams are protected as Waters of the State, but otherwise represent marginal waters with limited capacity to support the designated

3

uses of Kansas, especially aquatic life, recreation and domestic water supply.

8.  At the beginning of the millennium, Kansas conducted hundreds of Use Attainability Analyses to affirm the designated uses of the classified waters in the Kansas Surface Water Register, at an annual cost of $300,000. With the order of magnitude expansion of Kansas classified streams induced by the Rule, the State will need to expend significantly greater resources to inventory the designated uses of these streams, many of which are dry a majority of the time.

9.  The Rule immediately and substantially increases the scope of three programs the State administers: (1) Water Quality Standards (303(c)); (2) Total Maximum Daily Loads (303(d)); and, (3) the National Water Quality Inventory (305(b)). All three programs are dependent upon monitoring programs with their appurtenant staff, logistical, laboratory and database resources.

10. The CWA requires States, including Kansas, to establish WQS for all "Waters of the United States." 33 U.S.C. § 1313; 40 C.F.R. § 130.3, § 131.3(i), 131.4(a). Because of the Rule, at a minimum, Kansas must determine which waters were added to CWA jurisdiction and, through the Use Attainability Analysis process, what designated uses apply to those

4

waters. Based on our experience 15 years ago, we know the process is resource-intensive and time-consuming.

11. For waters that fail to satisfy their WQS, the State must establish a TMDL for the water. 40 C.F.R. § 130.7. The TMDL outlines the maximum amount of a pollutant that can be discharged into the water so that the water complies with the WQS. The State must conduct a scientific analysis of the water in order to determine the maximum amount of individual pollutants that the water can sustain. The State must then implement the TMDL through its NPDES permitting and 319 non-point source pollution programs. Kansas establishes its TMDLs on a watershed basis and subjects all waters, jurisdictional or not, to appropriate controls to abate contributions of impairing pollutants from any tributary. With the Rule, there will be impetus to assess the newly jurisdictional waters. Since most of these waters are ephemeral and flow only in response to rain, the runoff comprising their flow will likely contain pollutants at levels above the WQS, even as the duration of the flows will be relatively short. Monitoring of those conditions will slate those streams as impaired, thereby demanding a TMDL. Dedication of staff and analytical resources to develop a TMDL on a marginal water diverts those resources away from priority waters needing restoration. If a marginal water contributes

5

impairing loads to a classified water in Kansas, it will be dealt with through the TMDL program. But the Rule raises the status of the marginal water to require its own TMDL, a waste of time and resources for no environmental gain.

12. Under CWA Section 305(b), EPA and, by extension, the States must inventory and report on the overall water quality of waters in the Nation (or the State). With the expanded number of stream miles now jurisdictional under the Rule, the demand for assessment data on those waters will place additional stress on the monitoring programs designed to evaluate status and trends of water quality in those waters. Once again, the diversion of limited resources to streams that are marginal diminishes the ability to characterize the water quality of critical waters in the State and does nothing to expand the knowledge of statewide water quality conditions, as expected by the CWA.

13. The Rule requires the State to create, process, and issue additional NPDES permits. 33 U.S.C. § 1342. Kansas administers the NPDES permitting program, in accordance with federal standards established by EPA. Any person or entity wishing to discharge a pollutant into "Waters of the United States" must obtain an NPDES permit from the State. In Kansas, any NPDES discharge to any stream invokes a status of classified water on that

6

P000021

stream, applying the full authority of the CWA. The Rule creates a redundancy that is not needed since any such waters are already protected under State law.

14. While not a program under KDHE authority, we expect more applications for 404 permits under the Rule and its expanded scope of jurisdictional waters. The Rule will also require KDHE to issue additional state 401 certifications for CWA 404 permit applicants. 33 U.S.C. § 1341(a)(1). Every applicant for a CWA 404 permit in Kansas, under the dredge and fill program administered by the Corps, must obtain a certification from the State attesting that the discharge will comply with the WQS. With the increase in the number of jurisdictional waters, more individuals will apply for dredge and fill permits. This will require the State to complete additional state certifications.

15. The State will be irreparably harmed because the State cannot recover diverted resources from the federal government. In the absence of the Rule's requirements, the State will deploy these resources to critical and priority waters to implement state laws and state programs. If this Court issues an injunction against the Rule, Kansas will immediately halt any plans to redesign its monitoring network and associated planning and

P000022

management activities to accommodate inclusion of environmentally marginal streams.

16. It needs to be noted that a majority of the impairments seen in Kansas waters are associated with non-point sources of pollution, reflecting the prevailing land uses in the watersheds of those waters. As such, the Federal government has no authority to extend protections to those waters against those sources that lie outside the scope of the CWA. Therefore, the expansion of waters into the jurisdiction of the CWA by the Rule does not extend any protection to those waters. The Rule merely expands the demands placed on the monitoring and planning capacity of Kansas to waters too marginal for environmental benefit.

17. One of the motivations for the Rule is protection of downstream waters. However, once again, Federal authority for extending that protection comes through either issuance of water quality standards or NPDES permits. Both of those vehicles are fully equipped in Kansas to protect water quality on jurisdictional streams as well as downstream waters. The Kansas TMDL program accounts for downstream impacts through the use of the watershed approach in implementing the TMDLs to all upstream contributing areas, whether jurisdictional or not. Finally, the CWA cannot impose controls on non-point sources of pollution, regardless of their

8

impact to downstream waters. Hence, expansion of streams under the Rule does nothing to extend additional safeguards for downstream waters beyond what is already authorized and implemented by Kansas with current programs applied to Waters of the State, including Waters of the U.S.

I declare under penalty of perjury that the foregoing is correct. Executed on this _10th_ day of June, 2015, at Topeka, Kansas.

Thomas C. Stiles

9

P000024

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA

STATE OF GEORGIA, *et al.*,

     *Petitioners*,

     v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.*,

     *Respondents*.

Case No. 2:15-cv-00079-LGW-RSB

## SUPPLEMENTAL DECLARATION OF THOMAS C. STILES

I, Thomas C. Stiles, hereby declare as follows:

1.  I am the Chief of the Watershed Planning, Monitoring and Assessment Section for the Kansas Department of Health and Environment ("KDHE"). I have been employed by KDHE since 1998. As part of my duties, I am responsible for developing Water Quality Standards ("WQS") and Total Maximum Daily Loads ("TMDL") and interpreting their requirements to ensure the State's National Pollutant Discharge Elimination System ("NPDES") permitting program and the Section 319 Non-Point Source Pollution Control program are consistent with the Clean Water Act ("CWA").

2.  I have personal knowledge and experience to understand many of the steps the State will need to undertake in direct response to EPA and the Corps' Clean Water Rule: Definition of "Waters of the United States" (hereinafter "the Rule").

3.  I submit this declaration to respond to certain points made regarding my original declaration in the opposition to the States' preliminary injunction motion filed by the Environmental Protection Agency and the Army Corps of Engineers ("the Agencies").

4. Kansas must and will begin immediate work as a direct result of the Rule.

5. As the Agencies point out in their opposition, Kansas must submit its biannual report, by April 1, 2016, including its inventory of water quality impaired waters which will require development of Total Maximum Daily Loads at some later date. *See* 33 U.S.C. § 1313(d)(2)   In order to properly prepare this inventory, the State will be required to determine what new waters are jurisdictional under the Rule,  and consider any existing and readily available information collected by other individuals and agencies pertaining to the water quality of such new waters in determining their status relative to water quality standards, and consequently, place such water in the inventory of water quality impaired waters or justify why such waters do not belong in that inventory. *See* 33 U.S.C. § 1315(b)(1).  This process will be a time-consuming endeavor and must begin immediately, if the State is to comply with the April 1, 2016 deadline.

6. As I explained in my original declaration, under the CWA's Water Quality Standards ("WQS") program, Kansas must immediately begin work to determine which waters will be added to CWA jurisdiction and, through the Use Attainability Analysis process, what designated uses apply to those waters. .

7. The Agencies in their opposition suggest that Kansas can simply refuse to conduct such a Use Attainability Analysis, and refuse to determine their status under Section 303(d), until this litigation is completed.  However, failure to take these steps would make it impossible for the State to certify compliance with the States' WQS under Section 401, which is necessary for any Federal permit.  Furthermore, any new or expanding NPDES wastewater discharge permit for a facility located on newly jurisdictional waters cannot

2

be issued if those waters are deemed water quality impaired until a wasteload allocation is established for that discharge and all sources causing or contributing to the impaired condition have schedules of compliance established. Accordingly, following the Agencies' suggested path would impose significant harms upon the State of Kansas and its citizens, including delaying citizens' ability to obtain Federal permits in a timely manner. The State of Kansas cannot and will not impose these harms upon its citizens and businesses.

8. The Agencies also argue that the State of Kansas can waive Section 401 certifications for Federal permits and activities. The Section 401 certification is a core right of the State of Kansas, as part of the CWA's cooperative federalism structure to assure its water quality standards are upheld. The State processes each Section 401 certification request, pursuant to standard procedures, and this process takes time and agency resources to complete. Since the Rule will increase the number of Federal licenses andpermit applications, it will increase the burden on the State to conduct its due diligence.

9. The Agencies also suggest that the State of Kansas could raise its permitting fees, to cover the additional permitting, monitoring and reporting obligations imposed by the Rule under the NPDES, Section 106 and Section 303(d) programs. Whether to charge its citizens a fee and how much to charge are sovereign decisions of the State of Kansas, which the Agencies cannot dictate. In any event, changes in fee structures would require new rules and legislation, which cannot be implemented immediately.

P000027

I declare under penalty of perjury that the foregoing is correct.

Executed on this 4th day of August, 2015, at Topeka, Kansas.

Thomas C. Stiles

P000028

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2015, I caused the foregoing Motion For Stay Pending Review to be served via the Court's CM/ECF system on all registered counsel.

**No. 15-3822**

*/s/ P. Clayton Eubanks*
P. CLAYTON EUBANKS
Counsel for State of Oklahoma

**No. 15-3799**

*/s/ Eric E. Murphy*
ERIC E. MURPHY
Counsel for State of Ohio

**No. 15-3887**

*/s/ Elbert Lin*
ELBERT LIN
Counsel for State of West Virginia

I hereby certify that on September 10, 2015, I plan to file the foregoing Motion For Stay Pending Review to be served via the Court's CM/ECF system on all registered counsel.

**No. 15-3853**

*/s/ Richard B. Farrer*
Richard B. Farrer
Counsel for State of Texas

# Tab B

**Opposition of Respondent-Intervenors Natural Resources Defense Counsel, National Wildlife Federation, One Hundred Miles, and South Carolina Coastal Conservation League to Motion for Stay Pending Review**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| STATE OF OHIO et al., | ) | |
|     Petitioners, | ) | |
| v. | ) | Case No. 15-3799 |
| U.S. ARMY CORPS OF ENGINEERS et al., | ) ) | |
|     Respondents. | ) | |
| STATE OF OKLAHOMA, | ) | |
|     Petitioner, | ) | |
| v. | ) | Case No. 15-3822 |
| U.S. EPA et al., | ) | |
|     Respondents. | ) | |
| STATE OF TEXAS et al., | ) | |
|     Petitioners, | ) | |
| v. | ) | Case No. 15-3853 |
| U.S. EPA et al., | ) | |
|     Respondents. | ) | |
| STATE OF GEORGIA et al., | ) | |
|     Petitioners, | ) | |
| v. | ) | Case No. 15-3887 |
| U.S. EPA et al., | ) | |
|     Respondents. | ) | |

## OPPOSITION OF RESPONDENT-INTERVENORS NATURAL RESOURCES DEFENSE COUNCIL, NATIONAL WILDLIFE FEDERATION, ONE HUNDRED MILES, AND SOUTH CAROLINA COASTAL CONSERVATION LEAGUE TO MOTION FOR STAY PENDING REVIEW

Respondent-Intervenors Natural Resources Defense Council, National
Wildlife Federation, One Hundred Miles, and the South Carolina Coastal
Conservation League (collectively, the Conservation Groups) respectfully request
that this Court deny petitioners' motion for a stay of the Clean Water Rule:
Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015)
(the Final Rule).

## ARGUMENT

### A. The Court must determine jurisdiction before ruling on the stay motion

Although the petitioner states seek the "extraordinary remedy" of
preliminary injunctive relief from this Court—a nationwide stay of a federal rule—
they simultaneously argue, in a separate motion, that the Court lacks subject matter
jurisdiction over these actions. The states make no attempt to reconcile these two
positions, which are inconsistent: a court without subject matter jurisdiction cannot
grant extraordinary equitable relief, nor take any other action beyond dismissal.
*Sheldon v. Vilsack*, 538 F. App'x 644, 647-48 (6th Cir. 2013) ("'Without
jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to
declare the law, and when it ceases to exist, the only function remaining to the
court is that of announcing the fact and dismissing the cause.'" (quoting *Steel Co.
v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998))). The Court should therefore
defer ruling on the petitioner states' stay motion until their jurisdictional motion is

2

resolved, following briefing in accordance with the schedule established by the
Court in its September 16, 2015 order.

**B.    The Court should deny petitioners' stay motion**

In determining whether a stay should be granted, the Court considers "the
same four factors that are traditionally considered in evaluating the granting of a
preliminary injunction." *Michigan Coal. of Radioactive Material Users, Inc. v.
Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991). Thus, to obtain relief here, the
states must clearly show "[1] that [they are] likely to succeed on the merits, [2] that
[they are] likely to suffer irreparable harm in the absence of preliminary relief, [3]
that the balance of equities tips in [the states'] favor, and [4] that an injunction is in
the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008);
*see also id.* at 24 (injunctive relief "is an extraordinary remedy never awarded as of
right"). The states have not satisfied any of these tests. In this response brief, the
Conservation Groups focus on the final factor and demonstrate that a stay would
not be in the public interest.

Because the Final Rule restores the protections of the Clean Water Act to
critical water bodies across the United States, the public-interest factor weighs
heavily against granting a stay. "In exercising their sound discretion, courts of
equity should pay particular regard for the public consequences in employing the
extraordinary remedy of injunction." *Winter*, 555 U.S. at 24; *see also Weinberger*

3

*v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). In some cases, the public interest and balance of the equities alone "require[] denial of the requested injunctive relief." *Winter*, 555 U.S. at 23. Here, the public-interest factor requires denial of the stay motion.

It is difficult to overstate the public interests served by the Final Rule. As a result of the legal uncertainty over the scope of the Clean Water Act following *Solid Waste Agency of Northern Cook County (SWANCC) v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001), and *Rapanos v. United States*, 547 U.S. 715 (2006)—and the informal agency policies adopted in their wake—important water bodies throughout the United States were left vulnerable to contamination and degradation. These water bodies include small, seasonal, and rain-dependent streams and their adjacent wetlands. Following *SWANCC* and *Rapanos*, and prior to promulgating the Final Rule, the Environmental Protection Agency (EPA) and the Army Corps of Engineers (the Corps) (collectively, the Agencies) had not rigorously enforced the Clean Water Act's protections with respect to many of these waters, and they had commonly relied on a time- and resource-consuming case-by-case analysis to determine which waters should be protected. The Final Rule restored guaranteed protections to many streams and wetlands by categorically protecting tributaries and adjacent waters, as those terms are defined in the Final Rule. It did so based on the Agencies' express finding, after reviewing

4

extensive scientific evidence, that waters in these categories have a significant

nexus to traditional navigable waters, interstate waters, or the territorial seas. 80

Fed. Reg. at 37,068-71.

In the continental United States, intermittent, ephemeral, or headwater

streams, which are now better protected under the Final Rule, make up 58 percent,

or 207,476 miles, of the stream miles that provide water for public drinking-water

systems. *See* EPA, Geographic Information Systems Analysis of the Surface

Drinking Water Provided by Intermittent, Ephemeral, and Headwater Streams in

the U.S., *available at* http://water.epa.gov/lawsregs/guidance/wetlands/surface_

drinking_water_index.cfm.[1] That means approximately 117 million people—over

one-third of the entire U.S. population—get some or all of their drinking water

from public drinking-water systems that rely at least in part on these vulnerable

streams. *Id.* Millions of people living in the states that are petitioners in these

actions depend on public drinking-water systems that draw at least in part from

intermittent, ephemeral, or headwater streams that are better protected under the

---

[1] The Court may take judicial notice of information published on EPA's
website. *See Nebraska v. EPA*, 331 F.3d 995, 998 & n.3 (D.C. Cir. 2003) (taking
judicial notice of EPA drinking-water data); *Rahman v. Schriro*, 22 F. Supp. 3d
305, 311 (S.D.N.Y. 2014) (taking judicial notice of fact sheet published on EPA's
website); *see also Stanifer v. Corin USA Ltd., Inc.*, No. 6:14-CV-1192-ORL, 2014
WL 5823319, at *3 (M.D. Fla. Nov. 10, 2014) (noting that courts regularly take
judicial notice of public records available on federal agency's website).

Final Rule.[2] The petitioner states' attempt to categorize the waters protected by the Final Rule as "marginal," *see* Stiles Declaration (attached to stay motion) at ¶¶ 4, 7, 11, 12, 15, 16, is therefore misleading.

The threat to these waters in the absence of the Final Rule is not speculative. Legal uncertainty over whether the Clean Water Act protects such waters has particularly hurt law enforcement. Major pollution investigations of companies that have contaminated lakes, rivers, and other waters have not been prosecuted. According to EPA enforcement staff, "[a]n estimated total of 489 enforcement cases (Sections 311, 402, and 404 combined) have been affected such that formal enforcement was not pursued as a result of jurisdictional uncertainty, case priority was lowered as a result of jurisdictional uncertainty, or lack of jurisdiction was asserted as an affirmative defense to an enforcement action." EPA Office of Inspector General, Report No. 09-N-0149, Congressionally Requested Report on

---

[2] EPA, Analysis of the Surface Drinking Water Provided By Intermittent, Ephemeral, and Headwater Streams in the U.S. Completed by U.S. EPA in July 2009 (Alabama – over 2.6 million people; Florida – over 1.8 million people; Georgia – over 4.9 million people; Indiana – over 1.7 million people; Kansas – over 1.5 million people; Kentucky – over 3.2 million people; Louisiana – over 1.8 million people; Michigan – over 1.4 million people; Mississippi – over 100,000 people; North Carolina – over 4.7 million people; Ohio – over 5.2 million people; Oklahoma – over 2.3 million people; South Carolina – over 1.9 million people; Tennessee – over 3.5 million people; Texas – over 11.5 million people; Utah – over 1.4 million people; West Virginia – over 1 million people; and Wisconsin – over 390,000 people), *available at* http://water.epa.gov/lawsregs/guidance/wetlands/upload/2009_12_28_wetlands_science_surface_drinking_water_surface_drinking_water_results_state.pdf.

Comments Related to Effects of Jurisdictional Uncertainty on Clean Water Act

Implementation 1 (2009), *available at* http://www.epa.gov/oig/reports/2009

/20090430-09-N-0149.pdf.

As a consequence of the legal morass, "enforcement efforts have shifted

away from small streams high in the watershed where jurisdiction is a potential

issue." EPA, Economic Analysis of Proposed Revised Definition of Waters of the

United States 10 (2014), *available at* http://www2.epa.gov/sites/production/files

/2014-03/documents/wus_proposed_rule_economic_analysis.pdf. Without the

Final Rule, those small streams would remain at risk. For example, in one case,

according to EPA, an operator of a Texas dairy farm discharged around 43,000

gallons of wastewater onto his property, where it flowed to a neighboring property

and then entered a creek that flowed into a large, navigable-in-fact waterway. *Id.* at

31. "Although EPA expended over 300 hours on *Rapanos*-related jurisdictional

analyses, the Assistant United States Attorney declined to prosecute the case

because of concerns about establishing jurisdiction in light of *Rapanos*." *Id.*

People depend on clean drinking water for their health. Many cases therefore

recognize the "profound" and "unusually compelling public interest" in protecting

public drinking-water systems. *See, e.g.*, *In re Methyl Tertiary Butyl Ether (MTBE)*

*Prod. Liab. Litig.*, 725 F.3d 65, 112 (2d Cir. 2013) (protection of public drinking-

water systems is "an unusually compelling public interest"); *United States v. Alisal*

7

*Water Corp.*, 431 F.3d 643, 656 (9th Cir. 2005) (protection of public drinking-water systems is "profound" public interest); *Town of Brookhaven v. Sills Rd. Realty LLC*, No. CV 14-2286 GRB, 2014 WL 2854659, at *10 (E.D.N.Y. June 23, 2014) (holding that while "the public interest would also be served by the construction of additional railroad facilities," those benefits "pale[d] in comparison to the interest in safeguarding the drinking water supply"); *United States v. 27.09 Acres of Land*, 760 F. Supp. 345, 354 (S.D.N.Y. 1991) ("[T]he imperative to assure pure drinking water for eight million people trumps the convenience of better mail delivery to one million.").

Here, the need to protect the drinking-water supply of 117 million people, or one out of every three Americans, trumps any purported injury to petitioners, especially because those claimed injuries are speculative and not imminent. As the Ninth Circuit put it, "there is no question that the public interest at stake here, the quality of public drinking water and the health and safety of the consumers, is fundamental." *Alisal Water Corp.*, 431 F.3d at 656.

The Final Rule also restores the protections of the Clean Water Act to important wetlands. "[W]etlands can perform critical functions related to the integrity of other waters—functions such as pollutant trapping, flood control, and runoff storage." *Rapanos*, 547 U.S. at 779 (Kennedy, J., concurring in the judgment). The role of wetlands in reducing flood peaks is particularly valuable;

according to EPA, "[o]ne review of wetland studies reported that riparian wetlands reduced or delayed floods in 23 of 28 studies." EPA, Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence at ES-9 (2015), *available at* http://cfpub.epa.gov/ncea/cfm/recordisplay. cfm?deid=296414. Wetlands also "store large amounts of sediment and organic matter from upstream and from upland areas. For example, riparian areas have been shown to remove 80−90% of sediments leaving agricultural fields in North Carolina." *Id.* The Agencies estimate that the Final Rule's restoration of protection to wetlands may result in public benefits of $306 to $501 million annually. EPA & Corps, Economic Analysis of the EPA-Army Clean Water Rule 50 (2015) (hereinafter 2015 Economic Analysis), *available at* http://www2.epa.gov/sites/ production/files/2015-06/documents/508-final_clean_water_rule_economic_ analysis_5-20-15.pdf.

The Final Rule serves other public interests as well, such as the fishing industry. According to EPA, about 33 million Americans go fishing each year for a total of 554 million days. *See* EPA, Factsheet: The Clean Water Rule for Recreation (2015), *available at* http://www2.epa.gov/sites/production/files/2015- 05/documents/fact_sheet_recreation_final_0.pdf. Altogether, fishing is a $48 billion-per-year industry that supports almost a million family-wage jobs. *Id.* Protecting seasonal and rain-dependent streams from degradation and

9

contamination is important to preserving fish habitat and supporting the fishing industry. *Id.* EPA estimates that in California, for instance, 64 percent of stream miles in salmon/steelhead range are seasonal or rain dependent, and thus may be left vulnerable without the Final Rule. *Id.* And in Colorado, approximately half of the stream miles within native trout range are seasonal or rain dependent. *Id.*

The petitioner states have not shown that their state-law programs would adequately protect these and other vital public interests in the absence of the Final Rule. They assert that "all States have full power to protect waters not under federal authority," Stay Br. at 20, but in fact many states have laws restricting whether and how they can protect waters beyond the minimum federal requirements. *See, e.g.*, Miss. Code Ann. § 49-17-34(2) (rules relating to water quality or discharge standards "shall not exceed the requirements of federal statutes and federal regulations"); N.C. Gen. Stat. § 150B-19.3(a) (environmental agency may not adopt a rule that imposes "a more restrictive standard, limitation, or requirement than those imposed by federal law or rule" if there is a federal law or rule on the same subject matter, other than in certain defined circumstances); *see also* 2015 Economic Analysis, *supra*, at 4 (noting a 2013 report estimating that "approximately two-thirds of all states place some legal constraint on the authority of state and local government officials to adopt aquatic resource protections beyond the CWA definition of 'waters of the U.S.'"). In fact, most of the petitioner

10

states have previously advised the Supreme Court, as amici in *Rapanos*, that there are numerous benefits associated with a broad application of the Clean Water Act. Brief for Amici Curiae in Support of Respondents at 2-4, 14-18, *Rapanos*, 547 U.S. 715 (Nos. 04-1034, 04-1384), 2006 WL 139208. Their position here thus represents a stark reversal of their earlier view that "only a comprehensive approach to water-pollution regulation at the federal level can achieve the Nation's hopes for clean water." *Id.* at 18.[3]

Put simply, the public-interest factor weighs heavily against granting a stay. *See Rapanos*, 547 U.S. at 777 (Kennedy, J., concurring in the judgment) ("Important public interests are served by the Clean Water Act in general and by the protection of wetlands in particular."). The petitioner states give no substantive reason why staying the Final Rule would be in the public interest, other than arguments that assume the Rule will eventually be struck down. *See* Stay Br. at 19-20. Implementing the Final Rule would have many public benefits; staying it would have none. The states' motion should be denied.

---

[3] This amicus brief was submitted by, among others, Michigan, Florida, Kentucky, Louisiana, Mississippi, North Carolina, Ohio, Oklahoma, South Carolina, Tennessee, and Wisconsin. The Conservation Groups respectfully request that the Court take judicial notice of this brief. *Lyons v. Stovall*, 188 F.3d 327, 332 n.3 (6th Cir. 1999) (court may take judicial notice of briefs submitted to another court).

## CONCLUSION

For all of the foregoing reasons, the Conservation Groups respectfully request that the Court deny petitioners' motion for a stay.

Respectfully submitted this 23rd day of September, 2015.

**NATURAL RESOURCES DEFENSE COUNCIL**

/s/ Jennifer A. Sorenson
Jennifer A. Sorenson
Natural Resources Defense Council
111 Sutter Street, 20th Floor
San Francisco, CA 94104
Phone: (415) 875-6164
E-mail: jsorenson@nrdc.org

*Counsel for Respondent-Intervenors
Natural Resources Defense Council
and National Wildlife Federation*

**SOUTHERN ENVIRONMENTAL LAW CENTER**

/s/ Catherine Wannamaker
Catherine Wannamaker
Christopher K. DeScherer
Southern Environmental Law Center
463 King Street, Suite B
Charleston, SC 29403
Phone: (843) 720-5270
E-mail: cwannamaker@selcsc.org
E-mail: cdescherer@selcsc.org

Megan L. Hinkle
Southern Environmental Law Center
127 Peachtree Street, Suite 605
Atlanta, GA 30303-1840
Phone: (404) 521-9900
E-mail: mhinkle@selcga.org

*Counsel for Respondent-Intervenors
One Hundred Miles and South Carolina
Coastal Conservation League*

12

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2015, I electronically filed the foregoing Opposition of Respondent-Intervenors Natural Resources Defense Council, National Wildlife Federation, One Hundred Miles, and South Carolina Coastal Conservation League to Motion for Stay Pending Review with the Clerk of Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

/s/ Jennifer A. Sorenson

# Tab C

## Respondents' Opposition to State Petitioners' Motion for Stay of Clean Water Rule Pending Review

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| STATE OF OHIO, *et al.,* <br> Petitioners, <br><br> v. <br><br> UNITED STATES ARMY CORPS OF ENGINEERS, *et al.* <br> Respondents. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Petition for Review No. 15-3799 |
| STATE OF OKLAHOMA, *et al.,* <br> Petitioners, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.* <br> Respondents. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Petition for Review No. 15-3822 |
| STATE OF TEXAS, *et al.,* <br> Petitioners, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.* <br> Respondents. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Petition for Review No. 15-3853 |
| STATE OF GEORGIA, *et al.,* <br> Petitioners, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.* <br> Respondents. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Petition for Review No. 15-3887 |

# RESPONDENTS' OPPOSITION TO STATE PETITIONERS' MOTION FOR STAY OF CLEAN WATER RULE PENDING REVIEW

# **TABLE OF CONTENTS**

BACKGROUND ............................................................................................................. 1

STANDARD OF REVIEW .......................................................................................... 4

ARGUMENT  ................................................................................................................ 4

I.     State Petitioners Have Not Made a Strong Showing
that They Are Likely to Succeed on the Merits ..................................................... 4

       A.     The Rule Complies with the APA's Procedural Requirements ................. 4

       B.     The Rule Complies with the APA's Substantive Requirements ............... 7

       C.     The Rule is Within the Agencies' Authority under the CWA ................... 8

       D.     The Rule is Within the Agencies' Constitutional Authority ................... 11

II.    The States Will Not Be Irreparably Harmed Absent a Stay ............................... 11

       A.     The States' Sovereignty Is Not Irreparably Harmed ................................. 12

       B.     The States' Allegations of Increased CWA
Implementation Costs Do Not Establish Irreparable Harm ............... 13

III.   The Balance of Harms Weighs Decidedly Against a Stay ................................. 19

CONCLUSION ............................................................................................................ 20

CERTIFICATE OF SERVICE ................................................................................. 21

# TABLE OF AUTHORITIES

Cases

*Agape Church v. FCC,*
738 F.3d 397 (D.C. Cir. 2013) ............................................................................ 5

*Am. Trucking Associations, Inc. v. FMCSA,*
724 F.3d 243 (D.C. Cir. 2013) ............................................................................ 6

*Am. Hosp. Ass'n v. Harris,*
625 F.2d 1328 (7th Cir. 1980) .......................................................................... 13

*Citizens Coal Council v. EPA,*
447 F.3d 879 (6th Cir. 2006) ............................................................................. 8

*E. Tenn. Natural Gas Co. v. FERC,*
677 F.2d 531 (6th Cir. 1982) ............................................................................. 6

*Georgia v. McCarthy,*
No. 2:15-cv-79, 2015 WL 5092568 (S.D. Ga. Aug. 27, 2015) ......................... 3

*Hodel v. Va. Surface Min. and Reclamation Ass'n, Inc.,*
452 U.S. 264 (1981) ......................................................................................... 13

*In re: Clean Water Rule: Definition of "Waters of the United States,"*
MDL No. 2663 (J.P.M.L.) .................................................................................. 3

*In re Settlement Facility Dow Corning Trust,*
No. 14-1090, 2014 WL 4824822 (6th Cir. Mar. 31, 2014) ............................. 12

*In re Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency,*
156 F.3d 1279 (D.C. Cir. 1998) .......................................................................... 7

*Macon Cnty. Samaritan Memorial Hosp. v. Shalala,*
7 F.3d 762 (8th Cir. 1993) .................................................................................. 7

*Murray Energy Corp. v. EPA,*
No. 1:15-cv-110, 2015 WL 5062506 (N.D. W. Va. Aug. 26, 2015) ............. 3, 4

*Nken v. Holder,*
   556 U.S. 418 (2009) .................................................................. 4, 18, 20

*North Dakota v. EPA,*
   No. 3:15-cv-59 (D. N.D. Aug. 27 & Sept. 4, 2015) ................................ 4

*NRDC v. Thomas,*
   838 F.2d 1224 (D.C. Cir. 1988) ................................................................ 5

*Ohio State Conference of N.A.A.C.P. v. Husted,*
   769 F.3d 385 (6th Cir. 2014) ........................................... 1, 4, 12, 13

*Precon Dev. Corp., Inc. v. U.S. Army Corps of Eng'rs,*
   633 F.3d 278 (4th Cir. 2011) ................................................................ 10

*Rapanos v. United States,*
   547 U.S. 715 (2006) ............................................... 2, 9, 10, 11

*Sackett v. EPA,*
   132 S. Ct. 1367 (2012) ........................................................................ 2

*San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n,*
   789 F.2d 26 (D.C. Cir. 1986) ................................................................ 7

*S.F. Baykeeper v. Whitman,*
   297 F.3d 877 (9th Cir. 2002) ................................................................ 15

*Shinseki v. Sanders,*
   556 U.S. 396 (2009) ............................................................................ 6

*Small Refiner Lead Phase-Down Task Force v. EPA,*
   705 F.2d 506 (D.C. Cir. 1983) .......................................................... 6, 7

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers,*
   531 U.S. 159 (2001) .......................................................................... 11

*Steel Co. v. Citizens for a Better Envt.,*
   523 U.S. 83 (1998) .............................................................................. 1

*United States v. Cundiff,*
   555 F.3d 200 (6th Cir. 2009) ................................................................ 2

*United States v. Riverside Bayview Homes, Inc.,*
    474 U.S. 121 (1985) ................................................................................ 11, 13

*Winter v. NRDC,*
    555 U.S. 7 (2008) ................................................................................... 12, 18

*Wyo. v. Hoffman,*
    423 F. Supp. 450 (D. Wyo. 1976) ............................................................ 12

Statutes

5 U.S.C. § 553(b)(3) ........................................................................................ 5

5 U.S.C. § 553(c) ............................................................................................. 5

5 U.S.C. § 706 .............................................................................................. 6, 7

33 U.S.C. § 1311 ............................................................................................. 2

33 U.S.C. § 1311(a) ........................................................................................ 1

33 U.S.C. § 1313 ............................................................................................. 2

33 U.S.C. § 1313(d) .................................................................................. 15, 16

33 U.S.C. § 1313(d)(2) .................................................................................. 15

33 U.S.C. § 1315(b) ....................................................................................... 16

33 U.S.C. § 1341 ..................................................................................... 13, 16, 17

33 U.S.C. § 1342 ............................................................................................. 2

33 U.S.C. § 1344 ............................................................................................. 2

33 U.S.C. § 1362(7) ........................................................................................ 1

33 U.S.C. § 1362(12) ...................................................................................... 1

33 U.S.C. § 1369(b)(1) ................................................................................. 1, 3

33 U.S.C. § 1370 ..................................................................................... 12

Code of Federal Regulations

33 C.F.R. § 328.3(a)(6) ........................................................................... 5

33 C.F.R. § 328.3(a)(8) ........................................................................... 5

33 C.F.R. § 328.3(c)(2) ........................................................................... 5

33 C.F.R. § 328.3(c)(3) ........................................................................... 9

33 C.F.R. § 328.3(c)(5) ........................................................................... 11

40 C.F.R. § 122.2(1)(vi) .......................................................................... 5

40 C.F.R. § 122.2(1)(viii) ........................................................................ 5

40 C.F.R. § 122.2(3)(ii) ........................................................................... 5

40 C.F.R. § 122.2(3)(iii) .......................................................................... 9

40 C.F.R. § 130.7(d)(1) ........................................................................... 15

40 C.F.R. § 232.2(3)(v) ........................................................................... 11

Federal Register

51 Fed. Reg. 41,206 (Nov. 13, 1986) ..................................................... 2

79 Fed. Reg. 22,188 (Apr. 21, 2014) .................................................. 5, 6

80 Fed. Reg. 37,054 (June 29, 2015) ....................... 1, 3, 8, 9, 10, 11, 19

Legislative Materials

S. Rep. No. 92-414, at 77 (1971), reprinted in 1972 U.S.C.C.A.N. 3668, 3742-43 ........ 1

Guidance

EPA's Action Development Process, Administrative Record Guidance, Sept. 2011, at
  9-10, available at http://www.epa.gov/ogc/adminrecordsguidance09.00.11.pdf...... 7

Respondents (the "Agencies") oppose the motion by 18 states ("States" or "Petitioners") to stay the Clean Water Rule, 80 Fed. Reg. 37,054 (June 29, 2015). The Court should not consider the States' request before it decides whether it has jurisdiction. *Steel Co. v. Citizens for a Better Envt.*, 523 U.S. 83, 93-101 (1998). Although the Agencies interpret the Clean Water Act ("CWA"), 33 U.S.C. § 1369(b)(1), to provide jurisdiction, the States *themselves* argue in their separate motion to dismiss that the Court lacks jurisdiction, so it is especially appropriate for the Court to resolve its jurisdiction before considering the equitable relief sought by the States.

In any event, the States have not met their "heavy burden of demonstrating that a stay is warranted." *Ohio State Conference of N.A.A.C.P. v. Husted*, 769 F.3d 385, 389 (6th Cir. 2014) ("*N.A.A.C.P.*"). The Rule is valid, it does not irreparably harm the States, and enjoining it would be contrary to the public interest.

## **BACKGROUND**

The CWA prohibits the discharge of any "pollutant" into "navigable waters" except as specifically allowed. *Id.* §§ 1311(a), 1362(7), (12). The Act defines "navigable waters" as "the waters of the United States, including the territorial seas." *Id.* § 1362(7). Congress used this broad definition because restricting jurisdiction under the CWA to the relatively few waterways that support navigation would make it impossible to achieve the objectives of the Act. S. Rep. No. 92-414, at 77 (1971), reprinted in 1972 U.S.C.C.A.N. 3668, 3742-43. The scope of "waters of the United

States" is a critical component of the Act. It defines, for example, where regulated parties must obtain permits to discharge pollutants. 33 U.S.C. §§ 1311, 1342, 1344.

The Supreme Court most recently addressed the 1986 definition, 51 Fed. Reg. 41,206 (Nov. 13, 1986), in fractured opinion in *Rapanos v. United States*, 547 U.S. 715 (2006). Four Justices concluded that Congress intended to protect only "relatively permanent" waters that connect to traditional navigable waters, and wetlands that have a "continuous surface connection" to such relatively permanent waters. *Id.* at 742. Justice Kennedy's concurring opinion concluded that CWA jurisdiction extends to waters that, either alone or in combination with "similarly situated lands in the region," have a "significant nexus" to traditional navigable waters. *Id.* at 779-80. Four dissenting Justices concluded that the term "waters of the United States" encompasses waters that satisfy "either the plurality's [standard] or Justice Kennedy's." *Id.* at 810 & n.14 (Stevens, J., dissenting).

This Court has characterized *Rapanos* as a "bafflement." *United States v. Cundiff*, 555 F.3d 200, 208 (6th Cir. 2009). Several Justices have suggested that the Agencies should more clearly define "waters of the United States." *Rapanos*, 547 U.S. at 758 (Roberts, C.J., concurring); *id.* at 811-12 (Breyer, J. dissenting); *Sackett v. EPA*, 132 S. Ct. 1367, 1375-76 (2012) (Alito, J., concurring).

The Clean Water Rule accomplishes that needed goal. The Agencies developed the Rule based on the best-available peer-reviewed science, and exhaustive public participation, including more than one million submitted comments, and more than

400 meetings with states, small businesses, farmers, academics, miners, energy companies, counties, municipalities, environmental organizations, federal agencies, and others. 80 Fed. Reg. at 37,057; *see* Certified Index to the Administrative Record, No. 15-3799, Dkt. No. 16. Many stakeholders urged the Agencies to provide bright-line boundaries that would minimize delays and costs. 80 C.F.R. at 37,057; Record Excerpts ("RE") 008-120 (attached as Add. Vol. I). The Agencies' overriding objective was to provide clear, consistent, and easily-implementable standards. *Id.*

In addition to the petitions for review consolidated in this Court, there are 14 challenges to the Rule in multiple district courts. *See* Schedule of District Court Actions (attached at Add. Vol. II). The United States has moved the Judicial Panel on Multidistrict Litigation to transfer those and subsequently-filed district court actions to a single district court. *See In re: Clean Water Rule: Definition of "Waters of the United States,"* MDL No. 2663 (J.P.M.L.). Pending resolution of that motion, the United States sought and obtained litigation stays in almost all of the district court actions.

Three district courts, however, entered orders on motions for a preliminary injunction of the Rule. Two denied relief, holding that this Court has exclusive jurisdiction under 33 U.S.C. § 1369(b)(1). *Georgia v. McCarthy*, No. 2:15-cv-79, 2015 WL 5092568 (S.D. Ga. Aug. 27, 2015) (appeal pending);[1] *Murray Energy Corp. v. EPA*,

---

[1] Eleven of the State Petitioners here are plaintiffs in *Georgia*.

No. 1:15-cv-110, 2015 WL 5062506 (N.D. W. Va. Aug. 26, 2015). One found that it

had jurisdiction and issued a preliminary injunction of the Rule effective in 13 states.

*North Dakota v. EPA*, No. 3:15-cv-59 (D. N.D. Aug. 27 & Sept. 4, 2015).

## STANDARD OF REVIEW

"[A] stay is not a matter of right, but is rather an exercise of judicial discretion

that requires examining the circumstances of the particular case." *N.A.A.C.P.,* 769

F.3d at 387 (quoting *Nken v. Holder*, 556 U.S. 418, 433 (2009)) (internal quotation

marks omitted). The moving parties "bear[] the burden of showing that the

circumstances justify an exercise of that discretion." *Nken*, 556 U.S. at 433-34. Four

factors inform the Court's decision: "(1) whether the stay applicant has made a strong

showing that he is likely to succeed on the merits; (2) whether the applicant will be

irreparably injured absent a stay; (3) whether issuance of the stay will substantially

injure the other parties interested in the proceeding; and (4) where the public interest

lies." *Id.* at 434 (citation omitted).

## ARGUMENT

I.   **State Petitioners Have Not Made a Strong Showing that They Are Likely to Succeed on the Merits.**

A.   **The Rule Complies with the APA's Procedural Requirements.**

The States incorrectly argue that they did not have adequate notice that the

Agencies were considering distance-based criteria to define covered waters. Mot. 7-8.

Under the Rule, "waters of the United States" include "adjacent waters," defined to

- 4 -

include waters located either within 100 feet of or within the 100-year floodplain and up to a maximum of 1,500 feet of other jurisdictional waters. 33 C.F.R. § 328.3(a)(6), (c)(2); 40 C.F.R. § 122.2(1)(vi), (3)(ii). "Waters of the United States" may, depending on a case-specific showing of significant nexus, also include waters within the 100-year floodplain of traditional navigable (or other primary) waters or within 4,000 feet of jurisdictional waters. 33 C.F.R. § 328.3(a)(8); 40 C.F.R. § 122.2(1)(viii).

The Administrative Procedure Act ("APA") requires public notice that is sufficiently descriptive of the "subjects and issues involved," and an opportunity to comment. 5 U.S.C. § 553(b)(3); (c). A final rule is a logical outgrowth of the proposal "if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *Agape Church v. FCC*, 738 F.3d 397, 411 (D.C. Cir. 2013); *NRDC v. Thomas*, 838 F.2d 1224, 1242 (D.C. Cir. 1988) (rule is a "logical outgrowth" if at least "the germ" of the final rule is found in the proposal).

The Rule's treatment of "adjacent waters" is a logical outgrowth of the proposal. The proposed rule defined "adjacent waters" to include those "located within the riparian area or floodplain" of a tributary or other jurisdictional waters, 79 Fed. Reg. 22,188, 22,263 (Apr. 21, 2014), but requested "other reasonable options for providing clarity for jurisdiction over waters with these types of connections," including "establishing specific geographic limits" for adjacency such as "distance limitations." *Id.* at 22,208; *see also id.* at 22,209 (seeking comments on the "limits on

adjacency, such as a *specific distance* or a specific floodplain interval") (emphasis added). Adopting distance limitations is hardly "chang[ing] course entirely." Mot. 8. Numerous commenters, including agencies of several State Petitioners, supported the establishment of specific geographic limits for determining adjacency, such as a specific flood frequency interval. RE001-117. Comments are evidence of the adequacy of the notice. *See Am. Trucking Associations, Inc. v. FMCSA*, 724 F.3d 243 (D.C. Cir. 2013); *E. Tenn. Natural Gas Co. v. FERC*, 677 F.2d 531, 536 (6th Cir. 1982).

The Rule's treatment of "case-by-case waters" is also a logical outgrowth of the proposal. For example, the Agencies explained that the "distance of hydrologic connection" is one of the factors that could be considered when evaluating a connection with a downstream water. 79 Fed. Reg. at 22,214. Far from an unexpected focus, Mot. 9, this was sufficiently descriptive to provide a fair opportunity to comment on whether a distance limitation should apply to case-by-case waters. RE118-120. Moreover, the States fail to show that they are actually harmed by a limit in the Rule that *excludes* waters from federal regulation. 5 U.S.C. § 706; *Shinseki v. Sanders*, 556 US 396, 409 (2009).

The States err in relying on *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506 (D.C. Cir. 1983). That court found a change in the regulatory definition of "small" to be a logical outgrowth; although "the proposal did not list specific 'loopholes' that EPA might try to close," regulated entities were "aware generally" what EPA was trying to do. *Id.* at 548. The only provision the court found was not

adequately noticed was the new ownership requirement that arose from a single comment. *Id.* at 548-49. Here, the States and others were at least "aware generally" that the Rule could include distance limitations.

The States also err in relying on two internal Corps memoranda. Mot. 10 & n.3. These documents are pre-decisional, deliberative documents and are not part of the certified administrative record; thus, they are beyond the scope of judicial review. 5 U.S.C. § 706; *In re Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency*, 156 F.3d 1279, 1279 (D.C. Cir. 1998); *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 789 F.2d 26, 44 (D.C. Cir. 1986); *see also* EPA's Action Development Process, Administrative Record Guidance, Sept. 2011, at 9-10, available at http://www.epa.gov/ogc/adminrecordsguidance09-00-11.pdf, last visited Sept. 23, 2015. The memoranda simply reflect a robust internal airing of views during the rulemaking. Ultimately, however, the Agencies' decision must stand or fall on the certified record. On that score, as explained below, Petitioners cannot show that the Agencies acted unreasonably.

## B. The Rule Complies with the APA's Substantive Requirements.

The States argue that the distance parameters in the Rule's definition of "adjacent" and with respect to case-by-case waters are arbitrary. Mot. 10-11. However, "bright-line tests are a fact of regulatory life." *Macon Cnty. Samaritan Memorial Hosp. v. Shalala*, 7 F.3d 762, 768 (8th Cir. 1993). Indeed, many commenters urged the Agencies

to establish bright lines. 80 Fed. Reg. at 37,057; RE008-120. The issue is whether the administrative record supports the bright-lines that the Agencies crafted. It does.

The preamble to the Rule explains, for example, that "adjacent waters provide similar functions and work together to maintain the … integrity of" downstream waters, and that "this functional connectivity is particularly evident where covered adjacent waters are located within the floodplain." 80 Fed. Reg. at 37,069. Similarly, the Science Advisory Board observed that "connections occur on a continuum or gradient from highly connected to highly isolated." 80 Fed. Reg. at 37,057. The Technical Support Document ("TSD") explains that "the Agencies are using their technical expertise to promulgate a practical rule that draws reasonable boundaries in order to protect the waters that most clearly have a significant nexus while minimizing uncertainty about the scope of 'waters of the United States.'" RE217.

Furthermore, it is entirely unremarkable that the Agencies relied on their own technical and policy expertise along with scientific evidence. *Id.* at 37,060 ("Significant nexus is not a purely scientific determination."). This is all part and parcel of the APA's deferential standard of review. *Citizens Coal Council v. EPA*, 447 F.3d 879, 890 (6th Cir. 2006) (en banc) (applying the "highest level of deference" to agency's technical and scientific determinations).

## C. The Rule Is Within the Agencies' Authority under the CWA.

The Rule is based on the CWA and its goals, objectives, and policies, the Supreme Court case law, the relevant and available science, and the agencies' technical

expertise and experience. 80 Fed. Reg. at 37,060. Contrary to Petitioners' argument, Mot. 12, the Rule is well within the Agencies' authority.

First, the Rule defines "tributary" as a water that contributes flow to traditional navigable waters and possesses "the physical indicators of a bed and banks and an ordinary high water mark." 33 C.F.R. § 328.3(c)(3); 40 C.F.R. § 122.2(3)(iii). It does not regulate tributaries based on "the smallest trickle." Mot. 12. The science showed that "sufficient volume, duration, and frequency of flow are required to create a bed and banks and ordinary high water mark." 80 Fed. Reg. at 37,066. *See also* RE149-190. Thus, the Agencies reasonably determined that the physical indicators required by the Rule assure that there is sufficient volume, frequency, and duration of flow to meaningfully affect downstream waters. The States also mischaracterize Justice Kennedy's opinion. He did not say that the CWA "cannot cover . . . waters sending only the 'merest trickle' into navigable waters," Mot. 13; rather, he criticized the plurality for allowing regulation of mere trickles, if continuous, while excluding regulation of torrents that are only seasonal. 547 U.S. at 769.

The Rule's treatment of "adjacent waters" also aligns with Justice Kennedy's conclusion that "[t]hrough regulations … the Corps may choose to identify categories of tributaries that, due to their volume of flow …, their *proximity to navigable waters*, or other relevant considerations, are significant enough that wetlands adjacent to them *are likely, in the majority of cases*, to perform important functions for an aquatic system incorporating navigable waters." *Rapanos*, 547 U.S. at 780-81 (emphasis added). That is

- 9 -

exactly what the Agencies did in finding that "adjacent waters," as defined, significantly affect the physical integrity, RE221-226; the chemical integrity, RE226-230; and the biological integrity of traditional navigable and other primary waters, RE230-236. The Agencies' findings demonstrate that the required "significant nexus" is *likely* to exist in the *majority* of waters covered by the Rule—consistent with Justice Kennedy's concurring opinion. 547 U.S. at 780-81.

Likewise, contrary to Petitioners' assertion, Mot. 14, the Rule's approach to case-by-case waters aligns with Justice Kennedy's opinion. As Justice Kennedy stated, waters "possess the requisite nexus …" if, either "alone or in combination with similarly situated lands in the region, [they] significantly affect the chemical, physical, and biological integrity of" traditional navigable waters. 547 U.S. at 717. Justice Kennedy never suggested that all possible functions or integrity criteria must always be shown to demonstrate a significant nexus. The Agencies reasonably concluded that a water "has a significant nexus when any single function or combination of functions performed by the water … contributes significantly to the chemical, physical, or biological integrity of the nearest traditional navigable water." 80 Fed. Reg. at 37,093. This interpretation is supported with ample scientific analysis in the record, *see*, *e.g.,* RE126-148, and the Agencies are entitled to deference on that interpretation. *See Rapanos*, 547 U.S. at 778 (Kennedy, J., concurring); *Precon Dev. Corp., Inc. v. U.S. Army Corps of Eng'rs*, 633 F.3d 278, 290 n.10 (4th Cir. 2011).

This approach is also consistent with *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers,* 531 U.S. 159 (2001), where "the Court rejected the Corps' assertion of jurisdiction over isolated ponds and mudflats *bearing no evident connection to navigable-in-fact waters.*" *Rapanos*, 547 U.S. at 779 (Kennedy, J., concurring) (emphasis added). The Rule's treatment of case-by-case waters, by contrast, requires a connection of significance between the waters in question and traditional navigable waters. *See* 33 C.F.R. § 328.3(c)(5); 40 C.F.R. § 232.2(3)(v); RE242-274. A mere showing that the water hosts migratory birds and has a significant impact on their ecosystem would *not* establish a significant nexus under the Rule. 80 Fed. Reg. at 37,094 ("[n]on-aquatic species or … non-resident migratory birds … are not evidence of biological connectivity for purposes of this rule").

### D.    The Rule Is Within the Agencies' Constitutional Authority.

The States bootstrap their constitutional claims from their CWA claims and the constitutional claims are just as meritless. The Rule's protection of waters with a significant nexus to traditional navigable waters is well within Congress' power. *Rapanos*, 547 U.S. at 782 ("in most cases regulation of wetlands that are adjacent to tributaries and possess a significant nexus with navigable waters will raise no serious constitutional or federalism difficulty"); *see also United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132-33 (1985). Further, the Rule retains states' "full authority to implement their own programs to more broadly and more fully protect the waters in their jurisdiction," 80 Fed. Reg. at 37,060.

## II.    The States Will Not Be Irreparably Harmed Absent a Stay.

The States have the burden "to demonstrate that they will suffer more than a mere 'possibility' of irreparable harm." *Winter v. NRDC*, 555 U.S. 7, 20-24 (2008); *Ohio State Conference of N.A.A.C.P. v. Husted*, 769 F.3d 385, 389 (6th Cir. 2014) (quotation omitted). The alleged harm "must be both certain and immediate, rather than speculative or theoretical." *In re Settlement Facility Dow Corning Trust*, No. 14-1090, 2014 WL 4824822, at *1 (6th Cir. Mar. 31, 2014). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Id.* Petitioners show no irreparable harm pending judicial review.

### A.    The States' Sovereignty Is Not Irreparably Harmed.

The States claim that the Rule deprives them of their constitutional right to control their own waters and lands, Mot. 16, but the CWA explicitly retains state authority to regulate intrastate waters more stringently than any federal requirements imposed under the CWA. 33 U.S.C. § 1370. The Rule simply protects certain waters under federal law, whether or not those waters are additionally protected under state law. This was also the case under the prior regulatory framework, which provided federal protection for "waters of the United States" whether or not they were also regulated by state law, while retaining States' full authority to regulate discharges into waters within their borders.[2]

---

[2] The States' citation to *Wyo. v. Hoffman*, 423 F. Supp 450 (D. Wyo. 1976), is undercut by more recent precedent that federal regulation of water or land for the purpose of

**B.     The States' Allegations of Increased CWA Implementation Costs Do Not Establish Irreparable Harm.**

The States also claim that they will have to expend unspecified sums under three CWA programs: Water Quality Standards ("WQS"); Section 401 Water Quality Certifications; and National Pollutant Discharge Elimination System ("NPDES") permits. Ordinarily, compliance costs do not qualify as irreparable harm. *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980); *cf. N.A.A.C.P.*, 769 F.3d at 389 (state's general allegations that court order would "require additional time and money" insufficient to establish irreparable harm). That is for good reason. If the normal costs of a new regulation constituted irreparable harm, no matter how small or uncertain the amount, then the irreparable harm prong would effectively be eliminated and virtually every new federal regulation would be subject to a stay.

In any event, Petitioners fail to show that they will incur any unavoidable, certain, and imminent costs due to the Rule while this case is pending. The States already participate in the three CWA programs they cite and the only harms they assert are the alleged *additional* costs they claim they will expend on "newly jurisdictional" waters under the Rule. The States filed this motion more than a week after the Rule took effect, yet their supporting declarations pre-date the effective date

---

pollution control does is not a cognizable harm to "state sovereignty." *See, e.g.*, *Hodel v. Va. Surface Min. and Reclamation Ass'n, Inc.*, 452 U.S. 264, 284-93 (1981); *see also Riverside Bayview*, 474 U.S. at 132-33.

by weeks, or even months. These stale allegations fail to identify any costs that actually have been incurred due to the Rule, and instead offer only baseless speculation as to unspecified costs that may occur in the remote future.

First, the alleged costs relating to the WQS program (Mot. 17-18) are speculative and not likely to occur during the pendency of this litigation. The States' claim that they must "immediately" identify waters that are newly jurisdictional under the Rule, determine whether these waters meet WQS, and what designated uses to apply to these waters, in time to meet an April 1, 2016 deadline for their biennial reports, is false. Mot. 17; Stiles Supp. Decl ¶ 5. Nothing in the Rule or EPA's regulations regarding submission of biennial reports requires states to take any immediate action to identify newly jurisdictional waters. EPA guidance recognizes the flexibilities states have in developing their biennial reports and prioritizing their resources. Decl. of T. Wall, EPA, ¶¶ 11-14 ("Wall Decl.") (attached at Add. Vol. II). Because of the timing of state development of their biennial reports due on April 1, 2016, "expects that relevant considerations of the Clean Water Rule in a state's [Section] 303(d) listing program will not begin to have any practical effects until the states develop their lists to be submitted April 1, *2018*." Wall Decl. ¶ 13 (emphasis added). Thus, the Rule imposes no immediate burdens with respect to biennial reports.

Moreover, because WQS are typically expressed as general categories that apply broadly, the Rule does not require states to identify "newly jurisdictional" waters.

Decl. of S. Hisel-McCoy, EPA ("Hisel-McCoy Decl.") ¶ 10 (attached at Add. Vol. II). The applicability of a WQS to a particular water may change, but that does not require any immediate action. *Id.* Nor does the Rule require the states to expend any resources on updating WQS. WQS are updated triennially and states can prioritize which WQS to update to balance resources and priorities. *Id.* ¶ 9. The Rule does not require any immediate expenditure or resources on updating WQS. *Id.*

The States' suggestion that this "process" could cost in excess of $300,000 is based on something called a Use Attainability Analysis ("UAA") that Kansas prepared in the early 2000s. Mot. 17 (citing Stiles Decl. ¶¶ 8, 10). A UAA is only required when a State wishes to designate a water for a use other than one of the minimum protective uses set forth in the CWA. Hisel-McCoy Decl. ¶ 6. Nothing in the Clean Water Rule requires a state to undertake a UAA, much less to do so immediately. *Id.* Kansas prepared the UAAs because it chose to designate waters for uses less protective than those specified in the CWA. *Id.* ¶ 7. Noting in the Rule "requires it to make that choice again, or to take any action immediately with regard to identifying newly jurisdictional waters, even if the state does make that choice again." *Id.*

The States also fail to show that any imminent Total Maximum Daily Load ("TMDL") requirements flow from the Rule. Wall Decl. ¶ 16. While a state's CWA Section 303(d) list of waters must rank waters for TMDL development, there is no statutory or regulatory deadline for state action. *S.F. Baykeeper v. Whitman*, 297 F.3d 877, 885 (9th Cir. 2002); 40 C.F.R. § 130.7(d)(1). Under 33 U.S.C. § 1313(d)(2), states

- 15 -

must submit TMDLs for EPA review and approval "from time to time," which is hardly imminent. Similarly, the States fail to show that the Rule requires them to immediately inventory and monitor water quality in newly jurisdictional waters. Mot. 18. There "are no specific monitoring requirements in EPA's regulations with respect to a state's development of its section 305(b) and 303(d) reports" and "States retain broad discretion in deciding the timing and scope of their monitoring programs." Wall Decl. ¶ 13.

The second category of harms that the States allege—relating to Section 401 Certifications (Mot. 18)—is also remote and speculative. Mot. 18. The States assert that because the new definition expands the number of waters of the United States, more Section 401 Certifications will be requested. Mot. 18-19. The States rely exclusively on the Economic Analysis' estimated increase of 2.84 to 4.65% in jurisdictional waters and its estimated cost of $798,000 and $1.3 million for processing Section 401 Certifications for "newly jurisdictional" waters in all 50 states. *Id.*[3] The Economic Analysis does not support the States' allegations of harm.

First, the figures in the Economic Analysis were intended to be illustrative and, in fact, overestimate the extent of waters that will be newly covered under the Rule.

_____

[3] The States assert that the they "expect more" certification requests, Stiles Decl. ¶ 14, or that requests are "likely to increase," Pigott Decl. ¶ 9; Preston Decl. ¶ 8, but say nothing about the scope of any increase or the resulting costs, and by themselves fail to assert *any* concrete harm.

Decl. of J. Goodin, EPA ("Goodin Decl.") ¶¶ 12-20 (attached at Add. Vol. II). Even assuming the percentage increase in jurisdictional waters reflected in the Economic Analysis will occur, it is likely to lead to "no more than a handful" of additional Section 401 Certifications requests to a State per year. Decl. of J. Moyer, U.S. Army Corps of Engineers ("Moyer Decl.") ¶ 7 (attached at Add. Vol. II). Second, the Section 401 Certification costs estimated in the Economic Analysis are a nationwide annual aggregate; not one of the States even attempts to estimate how much it will actually be required to spend.

Moreover, the States ignore that they have the ability to avoid or minimize any increased costs associated with Section 401 Certifications. Many states charge fees for Section 401 Certifications and have control over the amount of fees to be collected. Goodin Decl. ¶ 10. Further, any State that feels burdened by additional costs due to an increase in Section 401 Certifications may choose not to act on them, as the statute provides that a state may waive its Section 401 Certification authority with regard to any permit. Goodin Decl. ¶¶ 8-9.

The States' third category of alleged costs—relating to the possibility of more NPDES permits (Mot. 19)—is also speculative. There is no evidence regarding the number of new NDPES permits any State is likely to receive, the cost any State is likely to incur, or the timing of such costs.[4] EPA, which has NPDES permitting

---

[4] Ms. McClary only asserts that Oklahoma "could see an increase." McClary Decl. ¶ 6. Mr. Stiles asserts that Kansas will issue "additional" permits, Stiles Decl. ¶ 13.

authority for certain states and territories "would not expect to see a large number of previously unpermitted industrial facilities applying for individual permits as a result of the Clean Water Rule." Declaration of D. Nagle, EPA ("Nagle Decl.") ¶ 12 (attached at Add. Vol. II). Indeed, since the Rule's effective date, EPA has received no applications by entities that discharge pollutants to water but did not seek NPDES permits prior to the Rule. *Id.* ¶ 13.

Even if the Rule increased NPDES permit requests in the petitioning states, states may offset NPDES administration costs with permit fees. Nagle Decl. ¶ 10. Oklahoma charges $500 per individual NPDES permit. *Id.* Several states *require* the adjustment of fee programs to offset the administrative costs associated with CWA implementation. *Id.* Thus, any costs the States incur due to additional NPDES permits for newly jurisdictional waters are recoverable and do not constitute irreparable harm.

## III.   The Balance of Harms Weighs Decidedly Against a Stay.

Courts must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief [and] [i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences." *Winter*, 555 U.S. at 24 (citations omitted). Those two inquiries merge with respect to the federal government. *Nken*, 556 U.S. at 435.

A nationwide stay pending review of the Clean Water Rule disserves the public interest. By clarifying what waters are included *and* what waters are excluded from jurisdiction, the Rule ensures "timely, consistent, and predictable jurisdictional

determinations." 80 Fed. Reg. at 37,056. Staying the Rule would undo the predictability and consistency achieved by the Rule. The Rule not only protects the nation's waters, but also benefits farmers, homeowners, small businesses, and other entities that must comply with the Clean Water Act. Among the Rule's clarifying features are several exclusions, some of which are codified for the first time. 80 Fed. Reg. at 37,059; *see* Moyer Decl. ¶ 5. These exclusions are already being applied in 37 states where the Rule is in effect, leading to determinations of no CWA jurisdiction without time consuming and resource-intensive case-specific significant nexus analyses. *See* Moyer Decl. ¶ 9.

A stay pending review also would harm the Rule's supporters. Of the over one million comments received by the Agencies during the rulemaking, most were supportive. 80 Fed. Reg. at 37,054. Seven states and the District of Columbia have intervened in this action in support of the Rule because the Rule "protects their water quality, assists them in administering water pollution programs by dispelling confusion about the Act's reach, and prevents harm to their economies by ensuring adequate regulation of waters in upstream states." Motion by New York et al. to Intervene, No. 15-3799, Dkt. No. 19-1, at 2-3, 15-17. Staying the Rule would harm these interests.

Finally, the States' delay in seeking a stay in this Court cuts sharply against a stay. The Rule was published in the Federal Register on June 29, 2015, but the States waited more than two months, until September 9, to seek a stay here. "A stay is an 'intrusion into the ordinary processes of administration and judicial review,'" and "is

not a matter of right." *Nken*, 556 U.S. at 427 (citations omitted). The Agencies have already dedicated extensive effort to implementing the new Rule. *See* Moyer Decl. ¶ 11. Additionally, although the Rule has only been in effect for a little more than three weeks, hundreds of pending requests for jurisdictional determinations, individual permit applications, and general permit applications are being considered under the new Rule. Moyer Decl. ¶ 8. Changing the status quo would be enormously disruptive, confusing, and inequitable, and is simply unwarranted.

## **CONCLUSION**

The States' Motion for Stay Pending Review should be denied.

Dated: September 23, 2015             Respectfully submitted,

JOHN C. CRUDEN
Assistant Attorney General
Environment & Natural Resources Division

*/s/ Jessica O'Donnell*
MARTHA C. MANN
DANIEL R. DERTKE
AMY J. DONA
ANDREW J. DOYLE
JESSICA O'DONNELL
United States Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
T: (202) 305-0851
martha.mann@usdoj.gov
daniel.dertke@usdoj.gov
amy.dona@usdoj.gov
andrew.doyle@usdoj.gov
jessica.o'donnell@usdoj.gov
*Counsel for Respondents*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I caused a true and correct copy of the foregoing

to be electronically filed on September 23, 2015. All registered counsel are to receive

notice of the filing via the Court's electronic case filing system.

/s/ Jessica O'Donnell
United States Department of Justice
Counsel for Respondents

# Tab D

**State Petitioners' Reply in Support of Motion for a Stay Pending Review**

Nos. 15-3799, 15-3822, 15-3853, 15-3887

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| STATE OF OHIO, *ET AL.*,<br>    Petitioners,<br>        v.<br>U.S. ARMY CORPS OF ENGINEERS, *ET AL.*,<br>    Respondents. | : : : : : : : | No. 15-3799 |
| STATE OF OKLAHOMA,<br>    Petitioner,<br>        v.<br>U.S. E.P.A., *ET AL.*,<br>    Respondents. | : : : : : : : | No. 15-3822 |
| STATE OF TEXAS, *ET AL.*,<br>    Petitioners,<br>        v.<br>U.S. E.P.A., *ET AL.*,<br>    Respondents. | : : : : : : : | No. 15-3853 |
| STATE OF GEORGIA, *ET AL.*,<br>    Petitioners,<br>        v.<br>U.S. E.P.A., *ET AL.*,<br>    Respondents. | : : : : : : : | No. 15-3887 |

## STATE PETITIONERS' REPLY IN SUPPORT OF
## MOTION FOR A STAY PENDING REVIEW

This Court clearly has the authority to stay the WOTUS Rule while it considers the motion to dismiss for lack of jurisdiction, and it should do so because the Rule is unlawful and imposes irreparable harm on the States every day.

## ARGUMENT

## I.   This Court Has The Authority To Stay The Rule Now

The Agencies' request that this Court delay granting a stay until after a final decision on the jurisdictional issue (Opp. 1) is contrary to what the Agencies argued to other courts and is wrong as a matter of law.  In persuading the Southern District of Georgia to decline on jurisdictional grounds to rule on the merits of the preliminary injunction sought by eleven Petitioner States, the Agencies represented that if those States sought a stay from this Court, "Federal Defendants [would] not dispute the Sixth Circuit's authority to stay the Rule."  Doc. 65 at 12, No. 2:15-cv-00079 (S.D. Ga.).  The Agencies, which also fought to limit to only thirteen States the preliminary injunction issued by the District of North Dakota, should not be permitted to continue delaying the States' right to preliminary relief through such contradictory representations.

This Court has the authority to determine its own jurisdiction, and, "[u]ntil its judgment declining jurisdiction should be announced, it [has] authority, from the necessity of the case, to make orders to preserve the existing conditions." *United States v. Shipp*, 203 U.S. 563, 573 (1906); *see United States v. United Mine*

*Workers*, 330 U.S. 258, 291 (1947); *Am. Fed. of Musicians v. Stein*, 213 F.2d 679, 689 (6th Cir. 1954). This Court should exercise that authority by entering a stay of the WOTUS Rule before full briefing and decision on jurisdiction concludes.[1]

## II.   The States Are Likely To Succeed On The Merits

### A.   The WOTUS Rule Violates The Notice-And-Comment Mandate

The WOTUS Rule defines "adjacent" and case-by-case waters based on five distance-based approaches, none of which was arguably presaged in the proposed rule. Stay Mot. 7-10. The Agencies thus failed to inform the public of "the range of alternatives being considered with reasonable specificity," in clear violation of the APA's notice-and-comment mandate. *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983).

The Agencies' contrary arguments are unavailing. They note that they informed the public that they would consider adopting unspecified "geographical limits" for adjacent waters. Opp. 5-6. On that basis, they contend that they are permitted to adopt *absolutely any distance-based approaches to all the waters in the United States*. Unsurprisingly, the Agencies are unable to cite any case, from any jurisdiction, upholding a comparable approach to notice-and-comment

---

[1] The Agencies cite to *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998) (Opp. 1), but that case did not involve a stay pending determination of jurisdiction. Rather, it simply held that courts cannot render a *final* merits decision absent a finding that the plaintiff has standing.

rulemaking.  *See Small Refiner*, 705 F.2d at 513; *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1082 (D.C. Cir. 2009).[2]

The Agencies also observe that there were over "one million submitted comments" on the Rule (Opp. 2), but have not identified a single comment addressing the specific distance-based approaches that the Agencies adopted.  *See, e.g.*, Opp. Addendum RE003-05, RE014, RE0017, RE0027 (only discussing the merits of distance-based limitations in general).[3]

## B. The Rule Is Arbitrary And Capricious

In response to the Stay Motion's argument that the record does not justify the distance-based limits that the Agencies crafted, Stay Mot. 10-11, the Agencies admit that the Rule would be arbitrary and capricious if "the administrative record [failed to] support[] the bright-lines that the Agencies crafted."  Opp. 8.   Yet, the Agencies fail to point to even a single sentence in the record supporting the

---

[2] For case-by-case waters, the most the Agencies can muster is a reference to the "distance of hydrologic connection."  Opp. 6.  That does not begin to suggest the bright-line, distance-based limitations ultimately adopted in the final rule.  79 Fed. Reg. 22,211-15 (Apr. 21, 2014).  The Agencies also assert that the States are not harmed by the geographical approach to case-by-case waters because the approach was narrower than in the proposal's limitless approach.  Opp. 6.  This misses the point.  The limitations introduced in the final Rule were clearly an (unsuccessful) attempt by the Agencies to remedy the unlawfulness of the proposal's approach, and the States had a right under the APA to provide comment upon the legality and wisdom of the Agencies' attempted remedy before it became final.

[3] Even if some commenter had guessed one of the five specific approaches that the Agencies adopted, this would be of "little significance" because "the agency must itself provide notice of [its] proposal."  *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 462 (D.C. Cir. 2012); *see Small Refiner*, 705 F.2d at 549.

specific "bright-line" approaches they chose. Opp. 7-8 (noting only that the record discusses adjacency in general). "While a 'bright line' test is not in itself arbitrary, the Rule['s specific choices] must be supported by some evidence." Doc. 70 (ND PI) at 13, No. 3:15-cv-00059 (D. N.D.). This complete lack of support is unsurprising given that the Corps itself argued to EPA that some of these five approaches "ha[ve] no basis in science or law, and thus [are] 'arbitrary.'"[4] Critically, while the Agencies note that the Rule "must stand or fall on the certified record" (Opp. 7), they have absolutely no answer for the States' argument that the lack of public notice as to these five approaches made it impossible for the States to build a record to contest the specific approaches chosen (Stay Mot. 9).

## C.  The WOTUS Rule Is Incompatible With *Rapanos* And *SWANCC*

Tributaries. As the Stay Motion noted (Stay Mot. 12), Justice Kennedy's *Rapanos* concurrence disparaged the plurality's test because that test permitted jurisdiction over waters sending only the "merest trickle[s]" into navigable waters. 547 U.S. at 769. The unmistakable implication is that Justice Kennedy's test does not cover such "mere[] trickle" waters. In response, the Agencies disagree that the Rule's tributary definition covers waters that send only the "merest trickle" into primary waters. Opp. 9. But the Rule provides that *any* water or sometimes wet

---

[4] Doc. 62-3 at 2, No. 2:15-cv-00079 (S.D. Ga.). These internal documents reflect, in the Agencies' words, a "robust" debate as to the five distance-based approaches in the final Rule. Opp. 7. The problem, under the APA, is that the "robust" debate took place entirely behind closed doors, without public input. Stay Mot. 9-10.

land that has a "physical indicator" of a bed, bank and OHWM is jurisdictional if it sends *any* amount of flow—*even a trickle*—into a traditional water.  33 C.F.R. § 328.3(c)(3); *accord* 80 Fed. Reg. at 37,076.  The Rule thus exemplifies "the concern Justice Kennedy" expressed.  ND PI, at 11.

"Adjacent" Waters.  The Rule similarly violates Justice Kennedy's reasoning in defining "adjacent" waters.  Justice Kennedy rejected a Corps *regulation* asserting jurisdiction over wetlands adjacent to "drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water volumes toward it."  547 U.S. at 781.  The Agencies argue that Justice Kennedy permitted them to define categories of adjacent waters "through regulations."  Opp. 9.  But Justice Kennedy held that any regulations must be *narrower* than the Corps' regulation that he *rejected* as "preclude[d]" by the CWA.  547 U.S. at 781.  The WOTUS Rule doubles down on the defect Justice Kennedy found fatal in the *Rapanos* regulation.  Indeed, the Rule is more expansive than the regulation Justice Kennedy rejected, as it covers all "adjacent" waters, and not just wetlands, then broadly redefines "adjacency" to include, for example, non-adjacent waters within a 100-year floodplain and 1,500 feet of a "tributary."  33 C.F.R. § 328.3(c)(2).

Remarkably, the Agencies read *Rapanos* as permitting them to adopt a broader adjacency rule than the one Justice Kennedy rejected.  The Agencies do not dispute that their own estimates show a 17.1% increase in per se CWA

jurisdiction over their "isolated waters category" of "intrastate, non-navigable waters," based largely upon the new adjacency category.  *See* Stay Mot. 15.

Case-by-Case Waters.  In *Rapanos*, Justice Kennedy explained that any regulation that swept in the "isolated ponds and mudflats" encompassed by the Migratory Bird Rule invalidated in *SWANCC* violated the CWA.  547 U.S. at 779. In their Stay Motion, the States argued that the Rule's rejection of Justice Kennedy's holistic inquiry into a water's impact means that the Rule covers not only the specific waters at issue in *SWANCC*, but numerous similarly isolated waters.  For example, the States pointed out that the Rule's "dispersal" concept would almost certainly cover the waters encompassed by the Migratory Bird Rule. Stay Mot. 14.  The Agencies offer no response.  Instead, they merely note that the Rule did not specifically re-adopt the Migratory Bird Rule (Opp. 11), without disputing that the WOTUS Rule's approach to case-by-case waters swallows not only the *SWANCC* waters, but many other isolated waters.

**D.    The WOTUS Rule Violates The State's Constitutional Rights**

*SWANCC* rejected the Migratory Bird Rule because, *inter alia*, that rule's coverage intruded on the States' "traditional and primary power over land and water use."  *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 173-74.  Given that the Agencies cannot meaningfully dispute that

the WOTUS Rule covers more than the isolated waters at issue in *SWANCC*, it necessarily violates the States' constitutional rights.  *See Id.*

## III.  The Rule Is Imposing Irreparable Harms Upon The States Every Day

Sovereignty Harms. In their Stay Motion, the States argued that the Rule deprives them of their sovereign rights over their own local waters, the same harm that was sufficient for preliminary relief in both *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001), and for this Rule in the District of North Dakota. Stay Mot. 16.  The Agencies' opposition offers no meaningful answer and fails to address either *Kansas* or the North Dakota decision.  Instead, the Agencies' only response is that "the CWA explicitly retains state authority to regulate intrastate waters *more stringently* than any federal requirements imposed under the CWA." Opp. 12 (emphasis added).  But the touchstone of the sovereign right at issue is the authority to protect intrastate waters *as the States so choose*, which includes the option of imposing regulations that are more *or* less stringent than the CWA requires.  *See SWANCC*, 531 U.S. at 174 (unlawful assertion of CWA authority invades States' "traditional and primary power over land and water use").

Unrecoverable Financial Harms. The Agencies also have no serious response to the States' showing that the Rule imposes unrecoverable financial harms on them.  The Agencies estimated that the Rule will impose costs of *more than a million dollars per year* upon the States under the Section 404 and NDPES

programs alone (Stay Mot. 18-19), which is more than sufficient for a stay.[5]  As the Agencies admit, implementation of the Rule in 37 States is proceeding apace, with the Agencies already receiving "hundreds" of permitting requests under the Rule (Opp. 20), necessitating "[c]alls, webinars, and meetings with States" (Moyer Decl. ¶11).  So while the Agencies attempt to back away from their own yearly cost estimates under the Section 404 and NDPES programs by speculating that the States will only receive "a handful" of application or certification requests per State (Opp. 17), this argument is belied by the Agencies' own account of the rapid new permitting activity taking place under the Rule.  *See* Opp. 20; Moyer Decl. ¶11.  This shows that the Agencies' prior estimates as to the volume of additional applications under the Rule were, if anything, a serious undercounting.

The Agencies' remaining arguments are similarly meritless.  The Agencies suggest that the States can pass Section 404 and NPDES permitting and certification costs onto their citizens (Opp. 17-18), but this is the "equivalent of having the Court order that the States (and their citizens) pay their own damages." *Texas v. United States*, No. B-14-254, 2015 WL 1540022, at *8 (S.D. Tex. Apr. 7, 2015); *accord Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015).  The

---

[5] The Agencies suggest that financial harms imposed by federal regulations are sometimes insufficient for a stay (Opp. 13), but ignore the States' caselaw holding that the federal government's sovereign immunity leads to irreparable financial harms (Stay Mot. 16-17).  That is especially true here, where the Agencies estimate that the Rule will impose entirely unrecoverable costs of over a million dollars per year upon the sovereign States, which will necessarily harm the States' citizens.

Agencies also assert that the States' Section 401 certifications under the Section 404 program, but not their duties under the NPDES program, can be "waive[d]." Opp. 17-18. "State certifications under [Section] 401 are essential in the scheme to preserve state authority to address the broad range of pollution," meaning that the Agencies urge the States to avoid financial harm by abandoning their sovereign rights. *S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S. 370, 386 (2006).[6]

## IV.    The Equities And The Public Interest Strongly Favor A Stay

The Agencies' public interest arguments only reinforce the need for an immediate stay. The Agencies argue that the Rule will bring "predictability and consistency" (Opp. 19), but the opposite is currently true where, by the Agencies' own affirmative choice, the Rule is being enforced in 37 States. The farmers and homeowners in those States are being forced to make permitting decisions without knowing whether the Rule will survive judicial review. Stay Mot. 19-20. And the

---

[6] The Agencies also quibble with the States' declarations, as to the specific costs that the States will suffer under the WQS program. Opp. 14-15. Given the Agencies' own million dollar plus cost estimate as to the separate Section 404 and NPDES programs, as well as the States' largely undisputed sovereign harms, this Court need not decide the disputed WQS factual questions. In any event, several of EPA's factual assertions regarding the WQS program misstate the Rule's burden upon the States. To take just one example, EPA points out that a Use Attainability Analysis is "only required when a State wishes to designate a water for a use other than one of the minimum protective uses set forth in the CWA." Opp. 15. But since the Rule adds many new waters to federal jurisdiction, this leaves a State with two options: accept EPA's designations as to the water's permissible use and impairment status; or, expend State resources to make its own inquiry, under the costly Use Attainability Analysis process. *See* 40 CFR 131.10; 40 C.F.R. 130.7. The former path would surrender the State's sovereign rights under the CWA.

Agencies themselves are wasting significant public resources implementing in 37 States a rule that is unlikely to survive judicial review, including processing "hundreds of pending requests for jurisdictional determinations, individual permit applications, and general permit applications . . . under the new Rule." Opp. 20.

Finally, there is no merit to the Agencies' suggestion that the States delayed in seeking relief. Opp. 19. Most of the Petitioner States sought immediate preliminary relief in the forum that they believe has jurisdiction: the district courts (where the Agencies sought to slow proceedings). Thirteen States obtained such relief in the District of North Dakota before the Rule's effective date. The remaining States filed promptly in this Court, three business days after the North Dakota court clarified that its injunction did not apply nationwide, contrary to the States' reasonable expectations. *See Texas*, 787 F.3d at 768-69 (nationwide preliminary injunction of agency immigration rule, in lawsuit by 26 States).[7]

## CONCLUSION

The States respectfully request that the Court grant the motion for a stay.

---

[7] States supporting the Rule speculate that the Rule will protect them and the environment (Doc. 45, No. 15-3887 (6th Cir.)) but fail to explain which newly jurisdictional waters are not already adequately protected by State regulation and offer no evidence that their sister States' current regulations of intrastate waters are harming other States. In any event, these States offer no argument that imposing the Rule now would serve *any* useful purpose, if the Rule is likely to be vacated as illegal. The Natural Resources Defense Council, *et al.*, assert that the Rule protects drinking water from "public drinking-water systems" (Doc. 46 at 5, No. 15-3887 (6th Cir.)), ignoring that these systems are already protected by the federal Safe Drinking Water Act, 42 U.S.C. § 300f *et seq*.

Respectfully Submitted,

**Case No. 15-3799**

*/s/ Daniel P. Bock*
BILL SCHUETTE
Michigan Attorney General

S. PETER MANNING
Division Chief
DANIEL P. BOCK
Assistant Attorney General
Environment, Natural Resources, and
Agriculture Division
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
517-373-7540; 517-373-1610 fax
manningp@michigan.gov

*Counsel for State of Michigan*

*/s/ Eric E. Murphy*
MICHAEL DEWINE
Attorney General of Ohio

ERIC E. MURPHY
State Solicitor
LEE ANN RABE
Assistant Attorney General
PETER T. REED
Deputy Solicitor
30 East Broad Street, 17th Floor
Columbus, OH 43215
614-466-8980; 614-466-5087 fax
eric.murphy@
 ohioattorneygeneral.gov

*Counsel for State of Ohio*

*/s/ Elizabeth P. McCarter*
HERBERT H. SLATERY III
Tennessee Attorney General and Reporter

BARRY TURNER
Deputy Attorney General
ELIZABETH P. McCARTER
Senior Counsel
Office of the Attorney General and Reporter
Environmental Division
P.O. Box 20207
Nashville, Tennessee 37202
615-532-2582; 615-741-8724 fax
lisa.mccarter@ag.tn.gov

*Counsel for State of Tennessee*

**Case No. 15-3822**

*/s/ P. Clayton Eubanks*
P. CLAYTON EUBANKS
Deputy Solicitor General
SARAH A. GREENWALT,
Assistant Solicitor General
Office of the Oklahoma Attorney General
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 522-8992; (405) 522-0608 fax
Clayton.Eubanks@oag.ok.gov
Sarah.Greenwalt@oag.ok.gov

*Counsel for State of Oklahoma*

**Case No. 15-3853**

/s/ Megan K. Terrell
JAMES D. "BUDDY" CALDWELL
Attorney General of Louisiana
TREY PHILIPS
First Assistant Attorney General
MEGAN K. TERRELL
Deputy Director – Civil Division
Chief – Environmental Section
Assistant Attorney General
Office of the Louisiana Attorney
General
1885 N. Third Street
Baton Rouge, Louisiana 70802
Tel:  (225) 326-6020
Fax: (225) 326-6099

*Counsel for State of Louisiana*

/s/ Mary Jo Woods
JIM HOOD
Attorney General of the State of
Mississippi
MARY JO WOODS
Special Assistant Attorney General
Mississippi Attorney General's
Office
Post Office Box 220
Jackson, Mississippi  39205
mwood@ago.state.ms.us
Tel:  (601) 359-3020
Fax: (601) 359-2003

*Counsel for State of Mississippi*

/s/ Matthew B. Miller
KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General
BERNARD L. McNAMEE
Chief of Staff
SCOTT A. KELLER
Solicitor General
JAMES E. DAVIS
Deputy Attorney General for Civil
Litigation
JON NIERMANN
Chief, Environmental Protection Division
MATTHEW B. MILLER
Assistant Attorney General
Texas Bar No. 24074722
matt.miller@texasattorneygeneral.gov
Southern District Bar No. 2638649
LINDA B. SECORD
Assistant Attorney General
Texas Bar No. 17973400
linda.secord@texasattorneygeneral.gov
Southern District Bar No. 1850549
Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Tel.  (512) 463-2012
Fax. (512) 320-0911

*Counsel for State of Texas*

13

<u>**Case No. 15-3887**</u>

/s/ Britt C. Grant
Samuel S. Olens
  *Attorney General*
Britt C. Grant
  *Solicitor General*
Timothy A. Butler
  *Deputy Solicitor General*
James D. Coots
  *Sr. Asst. Attorney General*
OFFICE OF THE ATTORNEY GENERAL
40 Capitol Square, S.W.
Atlanta, Georgia 30334
bgrant@law.ga.gov
(404) 651-9453
  *Counsel for State of Georgia*

/s/ Elbert Lin
Patrick Morrisey
  *Attorney General*
Elbert Lin
  *Solicitor General*
Misha Tseytlin
  *General Counsel*
Erica N. Peterson
  *Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
State Capitol
Building 1, Rm 26-E
Charleston, West Virginia 25305
Elbert.Lin@wvago.gov
(304) 558-2021
  *Counsel for State of West Virginia*

/s/ Andrew Brasher
Luther Strange
  *Attorney General*
Andrew Brasher
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, Alabama 36130
abrasher@ago.state.al.us
(334) 353-2609
  *Counsel for State of Alabama*

/s/ Allen Winsor
Pamela Jo Bondi
  *Attorney General*
Allen Winsor
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, Florida 32399-1050
Allen.winsor@myfloridalegal.com
(850) 414-3300
  *Counsel for State of Florida*

/s/ Thomas M. Fisher
Gregory F. Zoeller
  *Attorney General*
Thomas M. Fisher
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
302 West Washington Street

/s/ Sam M. Hayes
Sam M. Hayes
  *General Counsel*
Craig A. Bromby
  *Deputy General Counsel*
Andrew J. Norton
  *Deputy General Counsel*

14

Indiana Government Center - South,
Fifth Floor
Indianapolis, Indiana 46204
(317) 232-6255
Tom.Fisher@atg.in.gov
   *Counsel for State of Indiana*

NORTH CAROLINA DEPARTMENT OF
   ENVIRONMENT AND NATURAL RESOURCES
215 W. Jones Street
Raleigh, North Carolina 27603
sam.hayes@ncdenr.gov
craig.bromby@ncdenr.gov
andrew.norton@ncdenr.gov
(919) 707-8600
   *Counsel for Petitioner North Carolina*
   *Department Of Environment and Natural*
   *Resources*

*/s/ Jeffrey A. Chanay*
Derek Schmidt
   *Attorney General*
Jeffrey A. Chanay
   *Chief Deputy Attorney General*
Burke W. Griggs
   *Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
120 SW 10th Ave., 3d Floor
Topeka, Kansas 66612
jeff.chanay@ag.ks.gov
burke.griggs@ag.ks.gov
(785) 368-8435
   *Counsel for State of Kansas*

*/s/ James Emory Smith*
Alan Wilson
   *Attorney General*
Robert D. Cook
   *Solicitor General*
James Emory Smith, Jr.
   *Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
1000 Assembly Street, Room 519
Columbia, South Carolina 29201
bcook@scag.gov
(803) 734-3680
   *Counsel for State of South Carolina*

*/s/ Sean J. Riley*
Jack Conway
   *Attorney General*
Sean J. Riley
   *Chief Deputy Attorney General*
OFFICE OF THE ATTORNEY GENERAL
700 Capitol Avenue, Suite 118
Frankfort, Kentucky 40601
sean.riley@ag.ky.gov
(502) 696-5650
   *Counsel for State of Kentucky*

*/s/ Parker Douglas*
Sean D. Reyes
   *Attorney General*
Parker Douglas
   *Chief of Staff & Federal Solicitor*
OFFICE OF THE UTAH ATTORNEY GENERAL
Utah State Capitol Complex
350 North State Street, Suite 230
Salt Lake City, Utah 84114-2320
pdouglas@utah.gov
(801) 538-9600
   *Counsel for State of Utah*

/s/ Karla Z. Keckhaver
 Brad D. Schimel
  *Attorney General*
Karla Z. Keckhaver
  *Assistant Attorney General*
WISCONSIN DEPARTMENT OF JUSTICE
17 West Main Street
Madison, Wisconsin 53707
keckhaverkz@doj.state.wi.us
(608) 264-6365
  *Counsel for State of Wisconsin*

16

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2015, I caused the foregoing Reply In Support of Motion For A Stay Pending Review to be served via the Court's CM/ECF system on all registered counsel.

**No. 15-3822**

*/s/ P. Clayton Eubanks*
P. CLAYTON EUBANKS
Counsel for State of Oklahoma

**No. 15-3853**

*/s/ Matthew B. Miller*
MATTHEW B. MILLER
Counsel for State of Texas

**No. 15-3799**

*/s/ Eric E. Murphy*
ERIC E. MURPHY
Counsel for State of Ohio

**No. 15-3887**

*/s/ Elbert Lin*
ELBERT LIN
Counsel for State of West Virginia

# Tab E

## Order of Stay

# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: October 09, 2015

Ms. Loren L. AliKhan
Office of the Attorney General
of the District of Columbia
441 Fourth Street, N.W.
Washington, DC 20001

Mr. Andrew B. Ayers
Mr. Philip Bein
Office of the Attorney General of New York
The Capital
Albany, NY 12054

Ms. Lorelei M Bensel
Oregon Department of Justice
1162 Court Street, N.E.
Salem, OR 97301

Mr. Timothy S. Bishop
Mayer Brown
71 S. Wacker Drive
Chicago, IL 60606

Mr. Daniel Paul Bock
Office of the Attorney General
Environmental Protection Division
525 W. Ottawa Street
Suite 640 G. Mennen Williams Building
Lansing, MI 48909-0000

Mr. Edward Grant Bohlen
Office of the Attorney General of Hawaii
465 S. King Street
Honolulu, HI 96813

Ms. Kay R. Bonza
New Mexico Environment Department
121 Tijeras Avenue, N.E., Suite 1000
Albuquerque, NM 87102

Mr. Andrew Lynn Brasher
Office of the Attorney General of Alabama
501 Washington Avenue
Montgomery, AL 36111

Ms. Janette K. Brimmer
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA 98104-0000

Mr. Craig A. Bromby
North Carolina Department of Environment and Natural Resources
215 W. Jones Street
Raleigh, NC 27603

Ms. Karma B. Brown
Hunton & Williams
2200 Pennsylvania Avenue, N.W.
Washington, DC 20037

Ms. Kristy A. N. Bulleit
Hunton & Williams
2200 Pennsylvania Avenue, N.W.
Washington, DC 20037

Mr. Jeffrey A. Chanay
Office of the Attorney General of Kansas
120 S.W. 10th Street, Second Floor, #301
Topeka, KS 66612-1597

Ms. Jennifer C. Chavez
Earthjustice
1625 Massachusetts Avenue, N.W., Suite 702
Washington, DC 20036

Mr. Douglas M. Conde
Office of the Attorney General of Idaho
P.O. Box 83720
Boise, ID 83720-0010

Mr. John Michael Connolly
Mr. William Spencer Consovoy
Consovoy McCarthy
3033 Wilson Boulevard, Suite 700
Arlington, VA 22201

Mr. Christopher Kaltman DeScherer
Southern Environmental Law Center
43 Broad Street, Suite 300
Charleston, SC 29401

Ms. Amy J. Dona
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, DC 20044

Mr. Parker Douglas
Office of the Attorney General of Utah
P.O. Box 140857
Salt Lake City, UT 84114-0857

Mr. Andrew J. Doyle
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, DC 20044

Mr. P. Clayton Eubanks
Ms. Sarah A. Greenwalt
Office of the Attorney General of Oklahoma
313 N.E. 21st Street
Oklahoma City, OK 73105

Ms. Jamie Leigh Ewing
Office of the Attorney General of Arkansas
323 Center Street, Suite 200
Little Rock, AR 72201-2610

Mr. Thomas Molnar Fisher
Office of the Attorney General of Indiana
302 W. Washington Street, Fifth Floor
Indianapolis, IN 46204-0000

Mr. Paul Garrahan
Oregon Department of Justice
Natural Resources Section
1515 S.W. Fifth Avenue, Suite 410
Portland, OR 97201

Mr. Jonathan A Glogau
Office of the Attorney General
Complex Litigation
107 W. Gaines Street
Tallahassee, FL 32399-1050

Ms. Britt C. Grant
Office of the Attorney General of Georgia
40 Capitol Square, S.W., Suite 132
Atlanta, GA 30334

Mr. Burke W. Griggs
Office of the Attorney General of Kansas
120 S.W. 10th Street, Second Floor
Topeka, KS 66612-1597

Mr. Sam M Hayes
North Carolina Department of Environment & Natural Resources
217 W. Jones Street
Raleigh, NC 27603

Ms. Ruth Hamilton Heese
State of Alaska Department of Law
123 Fourth Street, Sixth Floor
Juneau, AK 99801

Ms. Kimberly S. Hermann
Southeastern Legal Foundation
2255 Sewell Mill Road
Marietta, GA 30062

Ms. Megan Hinkle
127 Peachtree Street, N.E.
Atlanta, GA 30303

Mr. Andrew J. Hirth
Office of the Attorney General of Missouri
P.O. Box 899
Jefferson City, MO 65102

Mr. Richard A. Horder
Kazmarek Mowrey Cloud Laseter
1230 Peachtree Street, N.E., Suite 3600
Atlanta, GA 30309

Mr. Alan L. Joscelyn
Office of the Attorney General of Montana
P.O. Box 201401
Helena, MT 59620-1401

Mr. James Kaste
Office of the Attorney General
Water & Natural Resources Division
123 Capitol Building
Cheyenne, WY 82002

Ms. Karla Z. Keckhaver
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707-7857

Mr. Jeffrey M. Kendall
State of New Mexico
1190 St. Francis Drive, Suite N-4050
Sante Fe, NM 87505

Mr. Michael B. Kimberly
Mayer Brown
1999 K Street, N.W.
Washington, DC 20006

Mr. Scot L. Kline
Office of the Attorney General of Vermont
109 State Street
Montpelier, VT 05609-1001

Mr. Justin D. Lavene
Office of the Attorney General of Nebraska
P.O. Box 98920
Lincoln, NE 68509

Mr. Ronald Lavigne
Office of the Attorney General Ecology Division
P.O. Box 40117
Olympia, WA 98506

Mr. Elbert Lin
Office of the Attorney General of West Virginia
1900 Kanawha Boulevard, E., E-26
Charleston, WV 25305-0000

Mr. Jon Michael Lipshultz
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, DC 20044

Mr. John R. Lopez IV
Office of the Attorney General of Arizona
1275 W. Washington Street
Phoenix, AZ 85007

Mr. S. Peter Manning
Office of the Attorney General of Michigan
P.O. Box 30217
Lansing, MI 48909-7717

Ms. Elizabeth P. McCarter
Office of the Attorney General of Tennessee
P.O. Box 20207
Nashville, TN 37202

Ms. Kerry L. McGrath
Hunton & Williams
2200 Pennsylvania Avenue, N.W.
Washington, DC 20037

Mr. Charles David McGuigan
Office of the Attorney General of South Dakota
1302 E. Highway 14, Suite 1
Pierre, SD 57501-4106

Mr. John K. McManus
Office of the Attorney General of Missouri
P.O. Box 899
Jefferson City, MO 65102

Mr. Matthew Bryan Miller
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711

Mr. Eric E. Murphy
Mr. Peter T. Reed
Office of the Attorney General of Ohio
30 E. Broad Street, 17th Floor
Columbus, OH 43215

Ms. Jessica O'Donnell
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, DC 20044

Ms. Margaret I. Olson
Office of the Attorney General of North Dakota
500 N. Ninth Street
Bismarck, ND 58501

Ms. Lee Ann Rabe
Office of the Attorney General 30 E. Broad Street, 16th Floor
Columbus, OH 43215

Mr. Craig W. Richards
State of Alaska
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501

Mr. Gregory C. Ridgley
Office of the State Engineer
P.O. Box 25102
Santa Fe, NM 87504

Mr. John Quentin Melcher Riegel
National Association of Manufacturers
733 10th Street, N.W., Suite 700
Washington, DC 20001

Ms. Kirsten S. P. Rigney
Office of the Attorney General of Connecticut
55 Elm Street, Second Floor
Hartford, CT 06106

Mr. Sean J. Riley
Office of the Attorney General of Kentucky
700 Capitol Avenue, Suite 118
Frankfort, KY 40601

Mr. David Ross
Office of the Attorney General of Wyoming
123 Capitol Avenue
Cheyenne, WY 82002

Mr. James N. Saul
Lewis & Clark Law School
10015 S.W. Terwilliger Boulevard
Portland, OR 97219

Mr. Matthias L. Sayer
New Mexico Department of Game and Fish
1 Wildlife Way
Santa Fe, NM 87507

Mr. Seth Schofield
Office of the Attorney General Massachusetts
One Ashburton Place, 18th Foor
Boston, MA 02108

Mr. Paul Martin Seby
Holland & Hart
555 17th Street, Suite 32
Denver, CO 80202

Ms. Jennifer Anne Simon
Kazmarek Mowrey Cloud Laseter
1230 Peachtree Street, N.E., Suite 3600
Atlanta, GA 30309

Ms. Deborah Ann Sivas
Mills Legal Clinic
Environmental Law Clinic
559 Nathan Abbott Way
Stanford, CA 94305

Mr. Brooks Meredith Smith
Troutman Sanders
P.O. Box 1122
Richmond, VA 23218

Mr. James Emory Smith Jr.
Office of the Attorney General of South Carolina
P. O. Box 11549
Columbia, SC 29211

Ms. Jennifer Ann Sorenson
Natural Resources Defense Council
111 Sutter Street, 20th Floor
San Francisco, CA 94104-0000

Mr. Wayne K. Stenehjem
Office of the Attorney General of North Dakota
500 N. Ninth Street
Bismarck, ND 58501

Ms. Megan K. Terrell
Office of the Attorney General of Louisiana
P.O. Box 94005
Baton Rouge, LA 70804-9005

Ms. Alicia E. Thesing
Mills Legal Clinic
Environmental Law Clinic
559 Nathan Abbott Way, N150
Stanford, CA 94305

Mr. Andrew Turner
Hunton & Williams
2200 Pennsylvania Avenue, N.W.
Washington, DC 20037

Mr. Lawrence VanDyke
Office of the Attorney General of Nevada
100 N. Carson Street
Carson City, NV 89701

Ms. Jennifer L. Verleger
Office of the Attorney General of North Dakota
500 N. Ninth Street
Bismarck, ND 58501

Ms. Catherine Wannamaker
Southern Environmental Law Center
463 King Street, Suite B
Charleston, SC 29403

Ms. Mary Jo Woods
Office of the Attorney General of Mississippi
P.O. Box 220
Jackson, MS 39205

Mr. Frederick Richard Yarger
Office of the Attorney General of Colorado
1300 Broadway, Tenth Floor
Denver, CO 80203

Ms. Tamara Zakim
Earthjustice
50 California Street
San Francisco, CA 94111

     Re:    Case Nos. 15-3751/15-3799/15-3817/15-3820/15-3822/15-3823/15-3831/15-3837/15-3839/15-3850/15-3853/15-3858/15-3885/15-3887/15-3948,
*In re: EPA;* Originating Case No. : EPA-HQ-OW-2011-0880

Dear Counsel,

    The Court issued the enclosed order today in this case.

                       Sincerely yours,

                       s/Cathryn Lovely for Amy Gigliotti
                       Opinions Deputy
                       Direct Dial No. 513-564-7012

Enclosure

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0246p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

| | |
|---|---|
| In re: Environmental Protection Agency and Department of Defense Final Rule; "Clean Water Rule: Definition of Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015). <br><br> _____ <br><br> State of Ohio, State of Michigan, and State of Tennessee (15-3799); State of Oklahoma (15-3822); State of Texas, State of Louisiana, and State of Mississippi (15-3853); State of Georgia, State of West Virginia, State of Alabama, State of Florida, State of Indiana, State of Kansas, Commonwealth of Kentucky, North Carolina Department of Environment and Natural Resources, State of South Carolina, State of Utah, and State of Wisconsin (15-3887), <br><br>         *Petitioners*, <br><br>   *v.* <br><br> United States Army Corps of Engineers, et al., <br>        *Respondents*. | Nos. 15-3799/3822/3853/3887 |

On Petition for Review of a Final Rule from the United States Army
Corps of Engineers and the Environmental Protection Administration.
No. EPA-HQ-OW-2011; Judicial Panel on Multi-District Litigation, No. 135.

Decided and Filed: October 9, 2015

Before: KEITH, McKEAGUE and GRIFFIN, Circuit Judges.

_____

McKEAGUE, J., delivered the order of the court in which GRIFFIN, J., joined. KEITH, J. (pg. 7), delivered a separate dissent.

1

———————————

**ORDER OF STAY**

———————————

McKEAGUE, Circuit Judge.   Petitioners in these four actions, transferred to and consolidated in this court by the Judicial Panel on Multi-District Litigation for handling as a multi-circuit case, represent eighteen states[1] who challenge the validity of a Final Rule adopted by respondents U.S. Army Corps of Engineers and the U.S. Environmental Protection Agency, "the Clean Water Rule."  80 Fed. Reg. 37,054 (June 29, 2015).  The Clean Water Rule clarifies the definition of "waters of the United States," as used in the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, "through increased use of bright-line boundaries" to make "the process of identifying waters protected under the Clean Water Act easier to understand, more predictable and consistent with the law and peer reviewed science, while protecting the streams and wetlands that form the foundation of our nation's water resources."  80 Fed. Reg. at 37,055.  Petitioner states contend that the definitional changes effect an expansion of respondent agencies' regulatory jurisdiction and dramatically alter the existing balance of federal-state collaboration in restoring and maintaining the integrity of the nation's waters.  Petitioners also contend the new bright-line boundaries used to determine which tributaries and waters adjacent to navigable waters have a "significant nexus" to waters protected under the Act are not consistent with the law as defined by the Supreme Court, and were adopted by a process that failed to conform to the rulemaking requirements of the Administrative Procedures Act ("APA").

Although petitioners have moved the court to dismiss their own petitions for lack of subject matter jurisdiction under 33 U.S.C. § 1369(b)(1)—a matter on which briefing is pending—they also move for a stay of the Clean Water Rule pending completion of the court's review.  Respondents and numerous intervenors oppose the stay.[2]  Respondents contend that we

———————————

[1]The eighteen petitioner states are Ohio, Michigan, Tennessee, Oklahoma, Texas, Louisiana, Mississippi, Georgia, West Virginia, Alabama, Florida, Indiana, Kansas, Kentucky, North Carolina, South Carolina, Utah and Wisconsin.

[2]Among the respondent-intervenors are several environmental conservation groups and several respondent-intervenor states who support the new Rule:  New York, Connecticut, Hawaii, Massachusetts, Oregon, Vermont, Washington and the District of Columbia.

have jurisdiction, but insist that petitioners have not made the requisite showing to justify a stay of the Rule that became effective August 28, 2015.  For reasons that follow, we now grant the stay pending determination of our jurisdiction.

The parties agree that our decision is guided by consideration of four factors:  "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Mich. Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991).  *See also Nken v. Holder*, 556 U.S. 418, 433 (2009).   These are not prerequisites that must be met, but interrelated considerations that must be balanced.  *Griepentrog*, 945 F.3d at 153.  The motion for stay is addressed to our discretion, early in the case based on incomplete factual development and legal research, for the purpose of preserving the status quo pending further proceedings.  *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004). The party seeking a stay bears the burden of showing that the circumstances of the particular case justify exercise of our discretion, guided by sound legal principles, to maintain the status quo pending conclusive determination of the legality of the action.  *Nken*, 556 U.S. at 433–34.

The present circumstances pose a threshold question:  What is the status quo?  Petitioners ask us to stay enforcement of the Clean Water Rule that went into effect on August 28, 2015.  They ask us to restore the status quo as it existed before the Rule went into effect.  Respondents' position is that the status quo is best preserved by leaving the Rule alone.  Considering the pervasive nationwide impact of the new Rule on state and federal regulation of the nation's waters, and the still open question whether, under the Clean Water Act, this litigation is properly pursued in this court or in the district courts, we conclude that petitioners have acted without undue delay and that the status quo at issue is the pre-Rule regime of federal-state collaboration that has been in place for several years, following the Supreme Court's decision in *Rapanos v. United States*, 547 U.S. 715 (2006).

Regarding this "open question," we are mindful of the dissent's concern that we should not consider exercising our discretionary power to issue a stay before confirming our jurisdiction

under the Clean Water Act, 33 U.S.C. § 1369(b)(1), to do so. We have no doubt of our authority, however, "to make orders to preserve the existing conditions and the subject of the petition[s]" pending our receipt and careful consideration of briefing on the jurisdictional question. *See United States v. United Mine Workers of Am.*, 330 U.S. 258, 291 (1947). While petitioners have grounds to question our jurisdiction, *see* § 1369(b)(1), respondents' contrary position has color as well. *See Nat'l Cotton Council of Am. v. U.S. E.P.A.*, 553 F.3d 927, 933 (6th Cir. 2009). Briefing on the jurisdictional question will be completed and the question ripe for decision in a matter of weeks.

Meanwhile, we conclude that petitioners have demonstrated a substantial possibility of success on the merits of their claims. Petitioners first claim that the Rule's treatment of tributaries, "adjacent waters," and waters having a "significant nexus" to navigable waters is at odds with the Supreme Court's ruling in *Rapanos*, where the Court vacated the Sixth Circuit's upholding of wetlands regulation by the Army Corps of Engineers. Even assuming, for present purposes, as the parties do, that Justice Kennedy's opinion in *Rapanos* represents the best instruction on the permissible parameters of "waters of the United States" as used in the Clean Water Act,[3] it is far from clear that the new Rule's distance limitations are harmonious with the instruction.

Moreover, the rulemaking process by which the distance limitations were adopted is facially suspect. Petitioners contend the proposed rule that was published, on which interested persons were invited to comment, did not include any proposed distance limitations in its use of terms like "adjacent waters" and significant nexus." Consequently, petitioners contend, the Final Rule cannot be considered a "logical outgrowth" of the rule proposed, as required to satisfy the notice-and-comment requirements of the APA, 5 U.S.C. § 553. *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007). As a further consequence of this defect, petitioners contend, the record compiled by respondents is devoid of specific scientific support for the distance limitations that were included in the Final Rule. They contend the Rule is therefore not

---

[3]There are real questions regarding the collective meaning of the Court's fragmented opinions in *Rapanos*. *See United States v. Cundiff*, 555 F.3d 200, 208–10 (6th Cir. 2009).

the product of reasoned decision-making and is vulnerable to attack as impermissibly "arbitrary or capricious" under the APA, 5 U.S.C. § 706(2).

In the extant briefing, respondents have not persuasively rebutted either of petitioners' showings. Although the record compiled by respondent agencies is extensive, respondents have failed to identify anything in the record that would substantiate a finding that the public had reasonably specific notice that the distance-based limitations adopted in the Rule were among the range of alternatives being considered. Respondents maintain that the notice requirements were met by their having invited recommendations of "geographical limits" and "distance limitations." Perhaps. But whether such general notice satisfies the "logical outgrowth" standard requires closer scrutiny. Nor have respondents identified specific scientific support substantiating the reasonableness of the bright-line standards they ultimately chose. Their argument that "bright-line tests are a fact of regulatory life" and that they used "their technical expertise to promulgate a practical rule" is undoubtedly true, but not sufficient. At this stage, at least, we are satisfied that petitioners have met their burden of showing a substantial possibility of success on the merits.

There is no compelling showing that any of the petitioners will suffer immediate irreparable harm—in the form of interference with state sovereignty, or in unrecoverable expenditure of resources as they endeavor to comply with the new regime—if a stay is not issued pending determination of this court's jurisdiction. But neither is there any indication that the integrity of the nation's waters will suffer imminent injury if the new scheme is not immediately implemented and enforced.

What is of greater concern to us, in balancing the harms, is the burden—potentially visited nationwide on governmental bodies, state and federal, as well as private parties—and the impact on the public in general, implicated by the Rule's effective redrawing of jurisdictional lines over certain of the nation's waters. Given that the definitions of "navigable waters" and "waters of the United States" have been clouded by uncertainty, in spite of (or exacerbated by) a series of Supreme Court decisions over the last thirty years, we appreciate the need for the new Rule. *See Rapanos*, 547 U.S. 715; *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of*

*Engineers*, 531 U.S. 159 (2001); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985). In one sense, the clarification that the new Rule strives to achieve is long overdue. We also accept that respondent agencies have conscientiously endeavored, within their technical expertise and experience, and based on reliable peer-reviewed science, to promulgate new standards to protect water quality that conform to the Supreme Court's guidance. Yet, the sheer breadth of the ripple effects caused by the Rule's definitional changes counsels strongly in favor of maintaining the status quo for the time being.

A stay allows for a more deliberate determination whether this exercise of Executive power, enabled by Congress and explicated by the Supreme Court, is proper under the dictates of federal law. A stay temporarily silences the whirlwind of confusion that springs from uncertainty about the requirements of the new Rule and whether they will survive legal testing. A stay honors the policy of cooperative federalism that informs the Clean Water Act and must attend the shared responsibility for safeguarding the nation's waters. *See* 33 U.S.C. § 1251(b) ("It is the policy of Congress to recognize, preserve, and protect the primary responsibilities and rights of the States to prevent, reduce, and eliminate pollution."). In light of the disparate rulings on this very question issued by district courts around the country—enforcement of the Rule having been preliminarily enjoined in thirteen states[4]—a stay will, consistent with Congress's stated purpose of establishing a national policy, 33 U.S.C. § 1251(a), restore uniformity of regulation under the familiar, if imperfect, pre-Rule regime, pending judicial review.

Accordingly, on due review of the relevant considerations in light of the briefs filed by petitioners, respondents and intervenors, and in the exercise of our discretion, we GRANT petitioners' motion for stay. The Clean Water Rule is hereby STAYED, nationwide, pending further order of the court.

---

[4]*See North Dakota v. U.S. E.P.A.*, No. 3:15-cv-59, 2015 WL 5060744 (D.N.D. Aug. 27, 2015) (staying operation of the Rule in North Dakota, Alaska, Arizona, Arkansas, Colorado, Idaho, Missouri, Montana, Nebraska, Nevada, South Dakota, Wyoming, and New Mexico).

Nos. 15-3799/ 3822/ 3853/ 3887     *State of Ohio, et al. v. U.S. Army Corps of Eng'rs, et al.*     Page 7

_____

**DISSENT**

_____

KEITH, Circuit Judge, dissenting.  Because I believe that it is not prudent for a court to act before it determines that it has subject-matter jurisdiction, I respectfully dissent.

If we lack jurisdiction to review the Rule, then we lack jurisdiction to grant a stay. *See Telecomm. Research & Action Ctr. v. FCC*, 750 F.2d 70, 77–78 (D.C. Cir. 1984) (holding that a district court did not have jurisdiction to review a rule or issue a writ of mandamus because of a special review statute that assigned judicial review to the courts of appeals); *see also Greater Detroit Recovery Auth. v. EPA*, 916 F.2d 317, 321–24 (6th Cir. 1990) (holding that a district court was without subject-matter jurisdiction and, therefore, did not have the authority to award attorneys' fees because a special review statute gave the courts of appeals exclusive jurisdiction).

One of the issues in this case is whether this court has exclusive jurisdiction to review the Rule in the first instance.  We can enjoin implementation of the Rule if we determine that we have jurisdiction.  But until that question is answered, our subject-matter jurisdiction is in doubt, and I do not believe we should stay implementation of the Clean Water Rule.

Because subject-matter jurisdiction is a threshold determination, I do not reach the merits of the petitioners' motion.

ENTERED BY ORDER OF THE COURT

_____

Deborah S. Hunt, Clerk