# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | |
|---|---|
| State of Texas, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 3:15-CV-00162, |
| v. ) | consolidated with Nos. |
| ) | 3:15-cv-165; 15-cv-266; |
| United States Environmental ) | and 3:18-cv-176 |
| Protection Agency, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## BRIEF OF SOUTHEASTERN LEGAL FOUNDATION AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

Kimberly S. Hermann
 *pro hac vice* pending
Southeastern Legal Foundation
560 W. Crossville Rd., Ste. 104
Roswell, GA 30075
Tel.:  (770) 977-2131
Fax:  (770) 977-2134
khermann@southeasternlegal.org

Jennifer A. Simon
 *pro hac vice* pending
Kazmarek Mowrey Cloud Laseter LLP
1230 Peachtree St., NE, Ste. 3600
Atlanta, GA 30309
Tel.:  (404) 812-0126
Fax:  (404) 812-0845
jsimon@kmcllaw.com

# TABLE OF CONTENTS

Table of Authorities ................................................................................. ii

Interest of *Amicus Curiae* ....................................................................... 1

Nature and Stage of the Proceedings ...................................................... 2

Issue and Standard for Decision ............................................................. 3

Introduction and Summary of the Argument .......................................... 4

Argument ................................................................................................. 5

    I.    The 2015 WOTUS Rule is unlawful because it exceeds the federal government's Commerce Clause authority. ............................................... 6

    II.    The 2015 WOTUS Rule is unlawful because it is unconstitutionally vague. ..................................................................... 12

Conclusion ............................................................................................ 22

# TABLE OF AUTHORITIES

## Cases

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) ........... 11

*Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) .......................................... 3

*Connally v. General Constr. Co.*, 269 U.S. 385 (1926) ..................................... 12

*Davis v. United States*, 185 F.2d 938 (9th Cir. 1950) .................................... 7, 8

*Emp'r Sols. Staffing Grp. II, LLC v. Office of Chief Admin. Hearing Officer*, 833 F.3d 480 (5th Cir. 2016) ................................................................................ 4

*FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307 (2012) .................... 12, 19

*FCC v. Fox Television Stations, Inc.*, 566 U.S. 502 (2009) ................................. 3

*Gonzales v. Raich*, 545 U.S. 137 (2005) ............................................................. 6

*In re: Envt'l Protection Agency and Dep't of Def. Final Rule; "Clean Water Rule: Definition of Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015)*, No. 15-3751 (6th Cir.) ....................................................................... 1

*Johnson v. United States*, 135 S. Ct. 2551 (2015) ........................................... 14

*Murray Energy Corp. v. United States Dep't of Def.*, 817 F.3d 261 (6th Cir. 2016), *cert. granted*, 2017 U.S. LEXIS 690 (U.S. Jan. 13, 2017) .................. 2

*Nat'l Assoc. of Mfrs. v. Dep't of Def.*,  138 S. Ct. 617 (2018) ............................. 2

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ........................ 9, 23

*Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702 (D.C. Cir. 2008) .................... 4

*North Am. Dredging Co. of Nev. v. Mintzer*, 245 F. 297 (9th Cir. 1917) ........... 9

*Rapanos v. United States*, 547 U.S. 715 (2006) ........................................passim

*Sackett v. EPA*, 566 U.S. 120 (2012) ............................................................... 15

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943)............................................................... 3

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018)....................................................... 14

*The Daniel Ball*, 77 U.S. 557 (1870) ..................................................................... 7

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807 (2016) ....... 4, 13, 22

*United States v. Lopez*, 514 U.S. 549 (1995)................................................. 6, 10

*United States v. Williams*, 553 U.S. 285 (2008) ............................................. 13

*Utah v. United States*, 304 F.2d 23 (10th Cir. 1962) ........................................ 7

*Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427 (2014).................................... 2

*Wickard v. Filburn*, 317 U.S. 111 (1942) ......................................................... 9

*Wis. Pub. Serv. Corp. v. Fed. Power Comm'n*, 147 F.2d 743 (7th Cir. 1945).... 7

## Statutes

5 U.S.C. § 706(2)(A) ............................................................................................. 3

5 U.S.C. § 706(2)(D) ............................................................................................. 3

33 U.S.C. § 1319(c)(1) ......................................................................................... 13

33 U.S.C. § 1319(c)(2) ......................................................................................... 13

## Other Authorities

Sunding & Zilberman, The Economics of Environmental Regulation by
Licensing: An Assessment of Recent Changes to the Wetland Permitting
Process, 42 Natural Resources J. 59 (2002) .................................................. 21

U.S. Gen. Accounting Office, Report to the Chairman, Subcomm. on Energy
Policy, Natural Res. and Regulating Affairs, Comm. on Gov't Reform,
House of Representatives, Waters and Wetlands: Corps of Eng'rs Needs to

Evaluate Its District Office Practices in Determining Jurisdiction, GAO-04-297 (Feb. 2004) ............................................................. 17

USACE, "Recognizing Wetlands" (Nov. 2017) ................................ 20

## Regulations

33 CFR § 320.4(a) (2004) ................................................................ 21

40 CFR 19.4 ..................................................................................... 13

Clean Water Rule: Definition of 'Waters of the United States,' 80 Fed. Reg. 37053 (Jun. 29, 2015) ...........................................................passim

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 3............................................................... 6

## INTEREST OF *AMICUS CURIAE*

SLF has been challenging the 2015 WOTUS Rule since before the Rule's inception. SLF filed comments on the proposed rule on November 14, 2014 (see EPA-HQ-OW-2011-0880-19466) and filed several of the first legal challenges to the final 2015 WOTUS Rule. *See SLF v. EPA*, No. 15-cv-02488 (N.D. Ga.); *SLF. v. EPA*, No. 15-13102 (11th Cir.), transferred, No. 15-3885 (6th Cir.), and consolidated, *In re: Envt'l Protection Agency and Dep't of Def. Final Rule; "Clean Water Rule: Definition of Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015)*, No. 15-3751 (6th Cir.).

SLF successfully contested the U.S. Environmental Protection Agency's and the Army Corps of Engineers' (the Agencies) motion to transfer the matter to the Judicial Panel on Multidistrict Litigation, MDL No. 2663. *See* Response of Southeastern Legal Foundation, Inc.; Georgia Agribusiness Council, Inc.; and Greater Atlanta Homebuilders Association, Inc., in Opposition to the United States' Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407 for Consolidation of Pretrial Proceedings, *In re: Clean Water Rule: Definition of "Waters of the United States,"* MDL No. 2663 (Aug. 19, 2015), ECF No. 68.

SLF participated in the Sixth Circuit briefing regarding the proper jurisdiction for the legal challenges. *See* Jurisdictional Motion and Jurisdictional Reply, *Southeastern Legal Foundation v. EPA*, No. 15-3885 (6th Cir. Oct. 2, 2015), ECF No. 37; (Nov. 4, 2015), ECF No. 62. Following the Sixth

1

Circuit's jurisdictional rulings, SLF submitted briefing in support of the National Association of Manufacturer's successful petition for certiorari to the Supreme Court. *See* Resp'ts' Br. in Supp. of Pet. for Cert., *Nat'l Assoc. of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617 (2018) (No. 16-299) (Oct. 5, 2016); *Murray Energy Corp. v. Dep't of Def.*, 817 F.3d 261 (6th Cir. 2016), *cert. granted*, 2017 U.S. LEXIS 690 (U.S. Jan. 13, 2017) (No. 16-299). SLF was also active in the successful Supreme Court litigation. *See* Resp'ts' Br. in Supp. of Cert., *Nat'l Assoc. of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617 (2018) (No. 16-299) (Apr. 26, 2017).

Prior to the WOTUS litigation, SLF successfully challenged EPA's similar attempt to "assert[ ] newfound authority to regulate millions of small sources" and "rewrite clear statutory terms to suit its own sense of how the statute should operate" in its Tailoring Rule under the Clean Air Act. *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2446 (2014). The Court concluded it was "not willing to stand on the dock and wave goodbye as EPA embarks on this multiyear voyage of discovery" in search of ever-expanding regulatory authority. *Id.* Because of its parallel overreach, the 2015 WOTUS Rule should receive a comparable fate.

## NATURE AND STAGE OF PROCEEDINGS

These consolidated cases challenge the legality of the 2015 WOTUS Rule. On September 11, 2018, this Court temporarily enjoined the Rule as to the

2

States of Texas, Louisiana, and Mississippi. The Private Party Plaintiffs and the State Plaintiffs now move for summary judgment and ask this Court to vacate the 2015 WOTUS Rule. *Amicus* files this brief in support of both the Private Party Plaintiffs' motion for summary judgment and the State Plaintiffs' motion for summary judgment.

## ISSUE AND STANDARD OF DECISION

As the plaintiffs set forth in their motions for summary judgement, this case presents a number of issues all of which ultimately ask whether the 2015 WOTUS Rule is unlawful and should be vacated. *Amicus* writes separately specifically to address whether the Rule violates the U.S. Constitution.

A regulation is unlawful under the Administrative Procedure Act (APA) if it is adopted "without observation of [the] procedure required by law," 5 U.S.C. § 706(2)(D), or is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). The legal question of the constitutionality of an agency action is part of judicial review under the APA. *See FCC v. Fox Television Stations, Inc.*, 566 U.S. 502, 516 (2009). An agency order may not stand if the agency has misconceived the law. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

To determine the lawful reach of the Agencies' authority under the CWA, a court must "give effect to [the] unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 846 (1984). Agency

3

interpretations of Supreme Court precedent are reviewed *de novo*, without deference. *Emp'r Sols. Staffing Grp. II, LLC v. Office of Chief Admin. Hearing Officer*, 833 F.3d 480, 484 (5th Cir. 2016). Similarly, courts do not defer to an agency's interpretation that presents "serious constitutional difficulties." *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008).

## INTRODUCTION AND SUMMARY OF ARGUMENT

As Justice Kennedy has previously observed, "the Act's reach is 'notoriously unclear' and the consequences to landowners even for inadvertent violations can be crushing." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1816 (2016) (Kennedy, J., concurring). In the 2015 WOTUS Rule, the Agencies have done nothing to bring clarity to the law or to return federal jurisdiction to its constitutional confines. Instead, the Agencies have continued their "immense expansion of federal regulation of land use that has occurred under the Clean Water Act—without any change in the governing statute— during the past five Presidential administrations." *Rapanos v. United States*, 547 U.S. 715, 722 (2006) (Scalia, J., plurality). The 2015 WOTUS Rule extends federal jurisdiction well beyond its constitutional limits under the Commerce Clause, and, in part because of that expansion to include waters no longer recognizable to any reasonable person as significant, is now so vague that it violates the Constitution's Fifth Amendment due process protections.

The Supreme Court has already once declared that it was not willing to allow the Agencies to "assert[ ] jurisdiction over ... [a]ny plot of land" forming part of this country's "endless network of visible channels ... containing water ephemerally wherever the rain falls," including "storm drains, roadside ditches, ripples of sand in the desert that may contain water once a year, and lands that are covered by floodwaters once every 100 years," so as to "engulf entire cities and immense arid wastelands." *Id.* The unconstitutional reach of the 2015 WOTUS Rule destines it to a comparable fate. Therefore, SLF requests this Court grant plaintiffs' motions for summary judgment and vacate the 2015 WOTUS Rule in its entirety.

## ARGUMENT

The 2015 WOTUS Rule exceeds the Agencies' constitutional authority, both because it extends beyond the scope of the Commerce Clause and because it is unconstitutionally vague. It encroaches upon the states' regulatory spheres and, perhaps because the federal government is ill-equipped to control such local concerns, is incomprehensible to the ordinary public. Most water does not meaningfully affect interstate commerce and, therefore, is entirely outside the purview of federal regulation. Waters with a true impact on interstate commerce should be easy to identify and should not require the average landowner to pay tens of thousands of dollars or more and engage in

5

years of analysis for expert opinions and agency consultations. Because of this dual overreach, the 2015 WOTUS Rule must be vacated.

## I. The 2015 WOTUS Rule is unlawful because it exceeds the federal government's Commerce Clause authority.

The Constitution grants to Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. That power extends only to three areas:

- "channels of interstate commerce;"
- the "instrumentalities of interstate commerce;" and
- "activities that substantially affect interstate commerce."

*United States v. Lopez*, 514 U.S. 549, 558-59 (1995).[1]

The "channels of interstate commerce" are those traditionally navigable waters regulated by the federal government since at least 1870 and defined as follows:

> Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel

---

[1] *Amicus* notes that nothing in the CWA relates to instrumentalities of interstate commerce and Congress has not sought to create a comprehensive regulatory scheme for water and land-use management sufficient to invoke the substantial-effects category. *See Gonzales v. Raich*, 545 U.S. 1, 37 (2005) (Scalia, J., concurring in the judgment). *Amicus* includes analysis here showing why, regardless, the 2015 WOTUS Rule violates the third prong of this test. Waters covered under the 2015 WOTUS Rule do not have a substantial effect on interstate commerce, whether the Agencies had the authority to rely on that basis for regulation or not.

are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water.

*The Daniel Ball*, 77 U.S. 557, 563 (1870). This definition remained remarkably consistent over the next century until the passage of the CWA, and courts applied its language throughout that time to determine federal authority over various waterbodies. *See, e.g., Utah v. United States*, 304 F.2d 23 (10th Cir. 1962); *Davis v. United States*, 185 F.2d 938 (9th Cir. 1950); *Wis. Pub. Serv. Corp. v. Fed. Power Comm'n*, 147 F.2d 743 (7th Cir. 1945).

"Traditional navigable waters" are the first covered group of waters under the 2015 WOTUS Rule. *See* Clean Water Rule: Definition of 'Waters of the United States,' 80 Fed. Reg. 37053, 37058 (Jun. 29, 2015). However, the Agencies did not define "traditional navigable waters" as the courts have traditionally defined the term and, in extending the definition, the Agencies did not remain within the bounds of the Commerce Clause. Instead, the Agencies expanded its scope well beyond any recognizable origins to include the following:

- Waters that are currently being used, have historically been used, or are susceptible to being used for "commercial waterborne recreation (for example, boat rentals, guided fishing trips, or water ski tournaments)";

7

- Waters that have historically been used for commercial navigation;
- Waters that are "susceptible to being used in the future for commercial navigation, including commercial waterborne recreation"; and
- Waters that "may be susceptible to use in interstate or foreign commerce."

*See id.* at 37074; 37104.

This definition strays in several ways from not only the first but the third prong of the Commerce Clause. First, navigability is not the only criterion for federal jurisdiction. Wholly intrastate navigable waters may not be – and indeed would not typically be – a channel of interstate commerce. Only if the water "forms, by itself or by uniting with other waters, a continued highway over which commerce is or may be carried on with other states or foreign countries in the customary modes in which such commerce is conducted by water, [does it] fall[ ] within the scope of federal jurisdiction." *Davis*, 185 F.2d at 942–43. And certainly *every* water capable of being navigated does not *significantly* affect interstate commerce.

Second, waters that "have historically been used" for commercial navigation are not available for federal regulation if hydrogeological changes render such use no longer possible now or in the future. 80 Fed. Reg. at 37074. Running even farther afield, *any* waters with "commercial waterborne recreation," and certainly not waters that are merely "susceptible to being used in … commercial waterborne recreation," do not meet the threshold of having

a "substantial effect" on interstate commerce. *Id.* For example, in *North American Dredging Co. of Nev. v. Mintzer*, 245 F. 297 (9th Cir. 1917), the Ninth Circuit explained:

> Mere depth of water, without profitable utility, will not render a water course navigable in the legal sense . . ., nor will the fact that it is sufficient for pleasure boating or to enable hunters or fishermen to float their skiffs or canoes. To be navigable, a water course must have a useful capacity as a public highway of transportation.

*Id.* at 300

Certain wholly intrastate waters may have such a substantial effect on interstate commerce that they arguably fall within Congress' authority if Congress wished to promulgate legislation regulating their use. But the Agencies' loose language expands federal jurisdiction to cover the most local of commercial activities. Waters that "may be susceptible to use" for "boat rentals" would seem to include any neighborhood pond with a boy scout boat dock and a canoe. 80 Fed. Reg. at 37074. This is not what our Founding Fathers contemplated in crafting the Commerce Clause.

Rather, under the Commerce Clause, Congress may only regulate activities with a "substantial economic effect on interstate commerce." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 551 (2012) (quoting *Wickard v. Filburn*, 317 U.S. 111, 125 (1942)) (emphasis added). These waters must be so important in size and utility that they form an important part of a substantial

9

interstate commercial market – not a pond where canoes can be rented for a quarter.

Thus, waters that "may be" merely "susceptible" to being used in interstate or foreign commerce do not rise to the level of actually having a substantial and economic effect on interstate commerce. And allowing such language to govern the reach of federal jurisdiction expands federal control to the vague proclivities of each local regulator across the country and what she believes "may" be possible. 80 Fed. Reg. at 37074.

As if the expansion of "traditional navigable waters" was not far enough, the 2015 WOTUS Rule then asserts jurisdiction over all "interstate waters, including interstate wetlands[,] . . . even if they are not navigable . . . and do not connect to such waters." *Id.* Returning to the three prongs of the Commerce Clause ("channels of interstate commerce," "instrumentalities of interstate commerce," and "activities that substantially affect interstate commerce," *Lopez,* 514 U.S. at 558-59), no one could reasonably argue *every* interstate water meets this test. Nonnavigable, isolated trickles and wet areas are neither channels nor instrumentalities of interstate commerce and indeed have no effect whatsoever on interstate commerce, regardless of whether they cross state lines. "Isolated ponds" simply cannot be "'waters of the United States' in their own right." *Rapanos,* 547 U.S. at 742.

The 2015 WOTUS Rule then further compounds this unjustifiable overreach by asserting federal jurisdiction over all tributaries of these core waters, however distant, regardless of size, and regardless of their actual effect on water quality. 80 Fed. Reg. at 37104. *See also id.* at 37058(the definition of tributary is "a bed and banks and an indicator of ordinary high water mark," with no requirement that the one key element be present: water). As Justice Scalia noted, the Supreme Court's precedent simply does not support "the Corps' inclusion of dry beds as 'tributaries.'" *Rapanos*, 547 U.S. at 746. A dry bed bears no reasonable relation to, much less a "substantial economic effect" on, interstate commerce.

The Rule expands jurisdiction still further by covering certain waters that are "adjacent" or have a "significant nexus" with certain core waters and/or their tributaries even if these nearby waters are completely physically separate and have no commercially-relevant interconnection. 80 Fed. Reg. at 37104-05.

"There is a view of causation that would obliterate the distinction between what is national and what is local in the activities of commerce." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 554 (1935) (Cardozo, J., concurring). That is what the 2015 WOTUS Rule has done. By extending federal jurisdiction over an unending sequence of ever-more-attenuated connections to navigable waters, the agencies have "asserted

11

jurisdiction over virtually any parcel of land containing a channel or conduit—whether man-made or natural, broad or narrow, permanent or ephemeral—through which rainwater or drainage may occasionally or intermittently flow." *Rapanos*, 547 U.S. at 722. Such regulation "of immense stretches of intrastate land … [is] an unprecedented intrusion into traditional state authority." *Id.* at 738. Because the 2015 WOTUS Rule no longer bears any reasonable relationship to interstate commerce, it violates the Commerce Clause of the Constitution and must be vacated.

## II. The 2015 WOTUS Rule is unlawful because it is unconstitutionally vague.

The 2015 WOTUS Rule is also unconstitutional because it is too vague to inform the regulated community what conduct it prohibits or to enable regulators to enforce the regulation consistently. "'A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" *Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012) (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)). Thus, a regulation must be vacated if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously

discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). The 2015 WOTUS Rule fails on both counts.

Critically, the 2015 WOTUS Rule interprets a criminal statute, and violations of its directives include exorbitant fines and possible incarceration. For violations deemed to arise out of negligence, the landowner is subject to fines of up to $37,500 *per day* of noncompliance and imprisonment for up to a year. *See* 33 U.S.C. § 1319(c)(1), adjusted per 40 CFR 19.4. Where the government deems the violation to be more knowing, the penalties can go as high as $140,000 *per day* and six years of imprisonment. *See id.* at (c)(2), adjusted per 40 CFR 19.4.[2] *See also Rapanos*, 547 U.S. at 721 (internal quotation marks and citations omitted):

> [T]he Clean Water Act imposes criminal liability, as well as steep civil fines, on a broad range of ordinary industrial and commercial activities. In this litigation, for example, for backfilling his own wet fields, Mr. Rapanos faced 63 months in prison and hundreds of thousands of dollars in criminal and civil fines.

*See also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. at 1807 (Kennedy, J., concurring) ("[T]he consequences to landowners even for inadvertent violations can be crushing.").

Where criminal statutes are implicated, protecting due process becomes even more critical. *See Johnson v. United States*, 135 S. Ct. 2551, 2556–57

---

[2] https://www.epa.gov/enforcement/criminal-provisions-clean-water-act

(2015) (internal citations and quotations omitted) ("Our cases establish that the Government violates [the Constitution's Fifth Amendment due process guarantee] by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement. The prohibition of vagueness in criminal statutes is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law..."); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (internal quotation omitted) ("[T]he Court has expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."). Because of the "crushing" consequences of CWA violations, it is imperative that the "statute provide standards to govern the actions of police officers, prosecutors, juries, and judges" in order to "guard[ ] against arbitrary or discriminatory law enforcement." *Dimaya*, 138 S. Ct. at 1212. However, the descriptions provided in the 2015 WOTUS Rule could hardly be less clear in delineating which waters are covered by the CWA's requirements and which are not. No average landowner could presume to even guess whether his waters are covered, and even well-informed scientists would reasonably disagree. Regulators across the country will necessarily reach different conclusions about similar waterbodies, thus setting up the exact

14

potential for arbitrary and discriminatory enforcement the Fifth Amendment is designed to protect against. As Justice Alito described:

> The reach of the Clean Water Act is notoriously unclear. Any piece of land that is wet at least part of the year is in danger of being classified by EPA employees as wetlands covered by the Act, and according to the Federal Government, if property owners begin to construct a home on a lot that the agency thinks possesses the requisite wetness, the property owners are at the Agency's mercy. The EPA may issue a compliance order demanding that the owners cease construction, engage in expensive remedial measures, and abandon any use of the property. If the owners do not do the EPA's bidding, they may be fined up to $75,000 per day ($37,500 for violating the Act and another $37,500 for violating the compliance order). And if the owners want their day in court to show that their lot does not include covered wetlands, well, as a practical matter, that is just too bad. Until the EPA sues them, they are blocked from access to the courts, and the EPA may wait as long as it wants before deciding to sue. By that time, the potential fines may easily have reached the millions. In a Nation that values due process, not to mention private property, such treatment is unthinkable.

*Sackett v. EPA*, 566 U.S. 120, 132 (2012) (Alito, J., concurring).

Nearly every classification in the 2015 WOTUS Rule is impenetrably vague, and, worse, the definitions build on each other, creating an impossible cascade of nuance and subjectivity. For example, as discussed above, even identifying which waters are "traditional[ly] navigable" requires reading the mind of the field agent as to which waters are "susceptible to being used in the future for . . . waterborne recreation." 80 Fed. Reg. at 37074.

Then, the Agencies assert jurisdiction over all tributaries of traditionally navigable waters, interstate waters, or the territorial seas. *See id.* at 37058.

However, the definition of tributary ("a bed and banks and an indicator of ordinary high water mark") defines the concept into nonexistence. The first issue is the definition of "ordinary high water mark," which begins innocently enough with the description of a "clear, natural line impressed on the banks," but then devolves to include the following: "changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, *or other appropriate means* that consider the characteristics of the surrounding areas." *Id.* at 37076 (emphasis added). This ultimately leaves the determination to the vagaries of the local enforcement agent. No landowner could fathom a guess as to what the agent might believe are "appropriate means" to determine whether a part of his property might be a tributary. Further compounding the Rule's opacity, that local enforcement agent need not even visit the property to make this determination. He can rely solely on "remote sensing," "hydrologic estimation," "regional regression analysis," "hydrologic modeling," or "historic records of water flow." *Id.* at 37077. None of these tools are even available to the regulated community and may directly contradict what is readily observable in the field. To add insult to injury, the Rule then further authorizes federal jurisdiction over a tributary even where "the banks . . . may be very low or may even disappear at times" and the bed, banks and ordinary high water mark may be entirely "absent in the field." *Id.* at 37077-78. Thus, according to the 2015 WOTUS Rule, a "tributary" can be present even where there are no

16

banks, no observable high water mark, and the only evidence of historical water flow is a secret government source. With this non-definition, no property owner could possibly know whether his property and activities implicate the CWA, and no field agent could ever hope to apply the regulation consistently. It is no surprise, then, as Justice Scalia observed, "The Corps' enforcement practices vary somewhat from district to district because 'the definitions used to make jurisdictional determinations' are deliberately left 'vague.'" *Rapanos*, 547 U.S. at 727 (quoting GAO Report[3] at 26).

Presuming one could theoretically identify federal "tributaries," the Rule then asserts federal jurisdiction over all waters with a "significant nexus" to those tributaries and certain other covered waters. To make this determination, a landowner must evaluate *every* water within 4,000 feet (nearly a square mile) of the covered water and evaluate whether the water in question is "similarly situated," "function alike," and has a "significant effect" on the downstream water. 80 Fed. Reg. at 37059. The "significant effect" analysis is based on a myriad of disparate factors, including "sediment trapping; nutrient recycling; pollutant trapping, transformation, filtering, and

---

[3] U.S. Gen. Accounting Office, Report to the Chairman, Subcomm. on Energy Policy, Natural Res. and Regulating Affairs, Comm. on Gov't Reform, House of Representatives, Waters and Wetlands: Corps of Eng'rs Needs to Evaluate Its District Office Practices in Determining Jurisdiction, GAO-04-297 at 26 (Feb. 2004)).

transport; retention and attenuation of floodwaters; runoff storage; contribution of flow; export of organic matter; export of food resources; and provision of life-cycle dependent aquatic habitat." *Id.* at 37067. The word "significant" is itself unclear, but the ways in which the effect can be "significant" further multiplies the ambiguity, with each part of the definition being entirely subjective. If reasonable marine scientists and botanists could disagree as to a water's "significance," no land owner or field agent could possibly consistently determine whether a water is subject to federal jurisdiction.

The Agencies then assert jurisdiction over all waters "adjacent" to traditionally navigable waters, interstate waters, or the territorial seas. 80 Fed. Reg. at 37058. One metric for determining "adjacency" is whether the water is within the covered water's 100-year flood plain as defined by the Federal Emergency Management Agency (FEMA). *Id.* at 37081. Although the 100-year flood plain contour might at first blush appear to be a bright-line rule, the agencies admit that "much of the United States has not been mapped by FEMA and, in some cases, a particular map may be out of date and may not accurately represent existing circumstances on the ground." 80 Fed. Reg. at 37081. If accurate flood maps don't exist or the agency has discretion to disregard them in favor of its interpretation of the "circumstances on the ground," the location of the 100-year flood plain fails to provide landowners

18

with any certainty, *id.*, so they can "know what is required of them [and] ... act accordingly." *Fox Television*, 132 S. Ct. at 2317. And, more critically, the 100-year flood plain does nothing to ensure those "enforcing the law do not act in an arbitrary or discriminatory way." *Id.*

Among those "adjacent" and "significant nexus" waters over which the Agencies assert jurisdiction in the 2015 WOTUS Rule are wetlands. *See* 80 Fed. Reg. at 37075; 37080. However, the 2015 WOTUS Rule fails to provide the regulated community and field agents with any consistent basis for identifying those wetlands now subject to federal jurisdiction. For example, if wetlands "have intermingled wetland and non-wetland components that are ... physically and functionally integrated[,] they can be considered a single water for purposes of the rule." *Id.* at 37081. However, if instead, there are "groups of wetlands that are ... part of a complex of wetlands[, they] would not be considered a single water for purposes of the rule." *Id.* The Rule provides no further discussion of the distinction between the two categories, leaving a landowner to guess as to whether the wet areas on his property can be considered part of a "group" of wetlands such that his wetland could be excluded if it falls outside the distance threshold, or whether his property is part of an "intermingled wetland" that must be considered as one with other surrounding wet areas. Moreover, the Rule purports to cover even isolated wetlands that would appear to be entirely disconnected from any other water

19

body. *See id.* at 37093 ("Some effects of non-floodplain wetlands on downstream waters are due to their isolation, rather than their connectivity. Wetland 'sink' functions that trap materials and prevent their export to downstream waters (e.g., sediment and entrained pollutant removal, water storage) result because of the wetland's ability to isolate material fluxes."). Finally, if the wet areas on a property are small and ephemeral, the landowner must determine whether they are a "puddle," excluded under the Rule (which the Agencies concede "is an inexact term," *id.* at 37099), or whether they could be a "prairie pothole[, which] demonstrate a wide range of hydrologic permanence" or a "western vernal pool," which are "shallow" and "seasonal" and "dry up during warmer, drier months." *Id.* at 37071; 37072. Moreover, as the Agencies concede, "In most cases, wetlands are dry for a portion of the year making it difficult for an untrained person to identify them." *See* USACE, "Recognizing Wetlands" (Nov. 2017).[4]

Ultimately, parsing all of this ambiguity will require an average landowner to engage the services of a costly environmental professional to obtain a scientific opinion on whether his land is jurisdictional. And, even then, the U.S. Army Corps of Engineers may disagree when it assesses the property due to the highly subjective nature of the relevant definitions. From there, "[i]n

---

[4] https://usace.contentdm.oclc.org/digital/collection/p16021coll11/id/2309/

20

deciding whether to grant or deny a permit, the U.S. Army Corps of Engineers (Corps) exercises the discretion of an enlightened despot, relying on such factors as 'economics,' 'aesthetics,' 'recreation,' and 'in general, the needs and welfare of the people,'." *Rapanos*, 547 U.S. at 721 (quoting 33 CFR § 320.4(a) (2004)). "The average applicant for an individual permit spends 788 days and $271,596 in completing the process, and the average applicant for a nationwide permit spends 313 days and $28,915—not counting costs of mitigation or design changes. Sunding & Zilberman, The Economics of Environmental Regulation by Licensing: An Assessment of Recent Changes to the Wetland Permitting Process, 42 Natural Resources J. 59, 74-76 (2002). '[O]ver $1.7 billion is spent each year by the private and public sectors obtaining wetlands permits.' *Id.*, at 81." *Id.*

Complying with the law should not be this hard. Curtailing the Agencies' authority back within its lawful Constitutional bounds should eliminate the costly ambiguity, because waters that have an actual significant economic impact on interstate commerce should be obvious. Nearly all the unnecessary complexity comes in identifying those pools and trickles that are isolated or barely exist. Waters of significance should be generally recognizable to the average landowner such that properties can be bought, sold and developed without undergoing years of expert analysis. This is a foundational element of the system of private property rights we value in this country. And certainly

21

due process requires that landowners be able to determine what restrictions exist on their properties before risking fines and imprisonment. By the Agencies' reasoning, not only can the law place that determination in the sole discretion of individual agents, but the Agencies are not even obligated to provide that determination in advance. *See* U.S. Reply Br., *U.S. Army Corps of Eng'rs v. Hawkes Co.*, No. 15-290, at 2 (Mar. 23, 2016) ("the CWA neither mandates nor explicitly references [the jurisdictional determination] practice"); U.S. Br., *id.* (Jan 22, 2016), at 4 ("Corps' regulations authorize (but do not require) the Corps to provide an inquiring party with a" jurisdictional determination). Such brazenness is more characteristic of a despotic system of government than one that allegedly values due process and individual rights. The 2015 WOTUS Rule must be vacated in its entirety as unlawful and unconstitutional.

## CONCLUSION

"In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder. . . . The Constitution's express conferral of some powers makes clear that it does not grant others. . . . State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power. . . . By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary

power." *Sebelius*, 567 U.S. at 533-36 (internal citations and quotation marks omitted).

In the 2015 WOTUS Rule, the Agencies have well exceeded their constitutional authority. They have asserted federal jurisdiction over trickles, moist areas, dry beds, and other small-to-nonexistent water bodies bearing no significant connection to interstate economic activities, and they have crafted definitions so vague that local agents can extend federal jurisdiction even further, well beyond the contemplation of any ordinary landowner. The federalism concerns here are not merely academic. Rather, the 2015 WOTUS Rule jeopardizes the liberty of every citizen by granting Corps field agents the arbitrary power to assert unchecked federal jurisdiction over nearly every local, isolated damp and sometimes-damp area.

"[T]here can be no question that it is the responsibility of this Court to enforce the limits on federal power by striking down acts of Congress that transgress [their constitutional] limits." *Id.* at 538. SLF supports Plaintiffs' Motions for Summary Judgment and requests this Court vacate the 2015 WOTUS Rule as unconstitutional.

Dated: October 24, 2018

Respectfully submitted,

*Kimberly S Hermann*

Kimberly S. Hermann

23

*pro hac vice* pending
Georgia Bar No. 646473
Southeastern Legal Foundation
560 W. Crossville Rd., Ste. 104
Roswell, GA 30075
Tel.:  (770) 977-2131
Fax:  (770) 977-2134
khermann@southeasternlegal.org


Jennifer A. Simon
*pro hac vice* pending
Georgia Bar No. 636946
Kazmarek Mowrey Cloud Laseter LLP
1230 Peachtree St., NE, Ste. 900
Atlanta, GA 30309
Tel.:  (404) 812-0126
Fax:  (404) 812-0845
jsimon@kmcllaw.com


***Counsel for Amicus Curie***

24

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2018, I served true and correct copies of the forgoing Motions and Orders for *Pro Hac Vice*, Southeastern Legal Foundation's Unopposed Motion for Leave to File a Brief as *Amicus Curiae* in Support of Plaintiffs' Motions for Summary Judgment, Proposed *Amicus Curiae* Brief, and Proposed Order by U.S. Postal Service first-class delivery on the following:

Craig James Pritzlaff
Attorney General of Texas
P.O. Box 12548
Austin, TX  78711

Jessica Amber Ahmed
Linda B. Second
Office of the Attorney General of Texas
300 W. 15th St.
Austin, TX  78711-2548

Brantley Starr
Lisa Anne Bennet
Office of the Attorney General of Texas
209 W. 14th St.
7th Floor (MC-059)
Austin, TX  78701

Megan Kathleen Terrell
Assistant Attorney General
Environmental Section
1885 North Third St.
Baton Rouge, LA  70802

Mary Jo Woods
Mississippi Attorney General's Office
P. O. Box 220
Jackson, MS  39205

E. Brantley Webb
Mayer Brown LLP
1999 K Street NW
Washington, DC  20006

Timothy S. Bishop
Mayer Brown LLP
71 S. Wacker Dr.
Chicago, IL  60606

Hannah DeMarco Sibiski
Arnold & Porter LLP
700 Louisiana St., Ste. 4000
Bank of America Tower
Houston, TX  77002

Joel M. Gross
Jonathan S. Martel
Arnold & Porter LLP
601 Massachusetts Ave., NW
Washington, DC  20001

Lowell Mark Rothschild
Bracewell and Giuliani, LLP
111 Congress Ave., Ste. 2300
Austin, TX  78602

Andrew J. Doyle
U.S. Department of Justice
Environmental & Natural Resources
Division
P.O. Box 7611
Washington, DC  20044

Jennifer A. Sorenson
Natural Resources Defense Council
111 Sutter St., 21st FL
San Francisco, CA  94101

Samuel Zachary Fayne
Arnold & Porter LLP
Three Embarcadero Center
10th Floor
San Francisco, CA  94111

Amy J. Dona
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC  20044

Daniel R. Dertke
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, DC  20044

I hereby certify that on October 24, 2018, I sent by Federal Express

Overnight delivery the above-referenced documents to the following:

Catherine Marlantes Rahm
Natural Resources Defense Council
40 West 20th St.
New York, NY  10011

*Kimberly S Hermann*

Kimberly S. Hermann