UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 3:15-cv-162 |
| U.S. ENVIRONMENTAL | ) | consolidated with Civil Action |
| PROTECTION AGENCY et al., | ) | Nos. 3:15-cv-165, 3:15-cv-266, |
| | ) | and 3:18-cv-176 |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NATURAL RESOURCES DEFENSE | ) | |
| COUNCIL et al., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| | ) | |

**DEFENDANT-INTERVENORS' CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 3

I.    The Clean Water Act's protections were eroded in the years leading up to the Rule by overly-restrictive Agency practices ................................................. 3

II.   The Rule largely restores the Act's proper scope of coverage ........................ 4

NATURE AND STAGE OF THE PROCEEDING ...................................................... 7

STATEMENT OF THE ISSUES AND STANDARD OF REVIEW ............................ 8

SUMMARY OF THE ARGUMENT ............................................................... 8

ARGUMENT ........................................................................................................... 9

I.   Plaintiffs' substantive attacks on the Clean Water Rule lack merit .............. 9

    A.     The Rule lawfully uses the "significant nexus" standard ................... 9

    B.     The Rule covers waters that have significant effects downstream ... 12

         1.    "Tributaries," as defined, have a significant nexus ................. 14

         2.    "Adjacent" waters, as defined, have a significant nexus ........ 20

         3.    The Rule is consistent with Justice Kennedy's statements about the "ordinary high water mark" and adjacency ............ 24

    C.     The Rule gives meaning to the word "navigable" .............................. 26

    D.     "Adjacent" does not have to mean "abutting" ................................... 29

    E.     The Rule properly covers adjacent "waters," not just wetlands ....... 29

    F.     The Clean Water Rule does not resurrect the Migratory Bird Rule .. 30

    G.     Plaintiffs cannot complain about Texas coastal prairie wetlands ..... 32

    H.     Waters can be both point sources and receiving waters ................... 33

II.  Plaintiffs' procedural attacks on the Clean Water Rule lack merit .............. 35

    A.     Plaintiffs' notice-and-comment arguments fail ................................. 35

         1.  Plaintiffs' logical outgrowth arguments fail ................................... 35

2.  The draft Science Report satisfied the Agencies' obligation to notice their sources for comment .......................................... 39

3.  The Agencies responded to Plaintiffs' comments.......................... 42

B.  The Rule does not implicate the Regulatory Flexibility Act, and if it did, any error was harmless..................................................... 44

C.  Plaintiffs cannot sue under appropriations act claims, and the Rule was not the product of an "unfair" process ......................................... 45

III.  The Clean Water Rule is constitutional ........................................... 46

A.  The Rule is not unconstitutionally vague ............................................. 47

B.  The Rule does not exceed the federal government's authority under the Commerce Clause ................................................................ 51

C.  The Rule does not violate the Tenth Amendment or "state sovereignty" ....................................................................... 53

REMEDY ................................................................................................ 55

CONCLUSION........................................................................................ 55

CERTIFICATE OF SERVICE .................................................................. 57

# TABLE OF AUTHORITIES

## CASES

*Action on Children's Television v. FCC*,
    564 F.2d 458 (D.C. Cir. 1977) ............................................................... 36

*Alenco Commc'ns, Inc. v. FCC*,
    201 F.3d 608 (5th Cir. 2000) ................................................................ 44

*Am. Coke & Coal Chems. Inst. v. EPA*,
    452 F.3d 930 (D.C. Cir. 2006) ............................................................... 38

*Am. Iron & Steel Inst. v. EPA*,
    886 F.2d 390 (D.C. Cir. 1989) ............................................................... 39

*Am. Radio Relay League, Inc. v. FCC*,
    524 F.3d 227 (D.C. Cir. 2008) ............................................................... 41

*Am. Transfer & Storage Co. v. ICC*,
    719 F.2d 1283 (5th Cir. 1983) .............................................................. 35

*Am. Trucking Ass'ns v. EPA*,
    175 F.3d 1027 (D.C. Cir. 1999) ............................................................. 44

*Am. Trucking Ass'ns, Inc. v. FMCSA*,
    724 F.3d 243 (D.C. Cir. 2013) ............................................................... 37

*Automotive Parts & Accessories Ass'n v. Boyd*,
    407 F.2d 330 (D.C. Cir. 1968) ............................................................... 42

*Avoyelles Sportsmen's League, Inc. v. Marsh*,
    715 F.2d 897 (5th Cir. 1983) .......................................................... 48, 49

*Baltimore Gas & Elec. Co. v. NRDC*,
    462 U.S. 87 (1983) .................................................................................. 13

*BCCA Appeal Grp. v. EPA*,
    355 F.3d 817 (5th Cir. 2004) ............................................................ 8, 13

*Beazer E., Inc. v. EPA Region III,*
    963 F.2d 603 (3d Cir. 1992) .................................................................. 23

*Brazos Elec. Power Co-op., Inc. v. FERC,*
    205 F.3d 235 (5th Cir. 2000) ............................................................... 23

*Cent. & S. W. Servs., Inc. v. EPA,*
    220 F.3d 683 (5th Cir. 2000) ............................................................... 55

*OfficeMax, Inc. v. United States,*
    428 F.3d 583 (6th Cir. 2005) ............................................................... 31

*Chevron U.S.A. Inc. v. NRDC,*
    467 U.S. 837 (1984) ............................................................................. 10

*Christopher M. by Laveta McA. v. Corpus Christi Indep. Sch. Dist.,*
    933 F.2d 1285 (5th Cir. 1991) ............................................................. 53

*City of El Cenizo v. Texas,*
    890 F.3d 164 (5th Cir. 2018) ......................................................... 47, 48

*City of Milwaukee v. Illinois,*
    451 U.S. 304 (1981) ............................................................................. 28

*Conservation Law Found. v. Pritzker,*
    37 F. Supp. 3d 254 (D.D.C. 2014) ...................................................... 55

*Envtl. Def. Ctr., Inc. v. EPA,*
    344 F.3d 832 (9th Cir. 2003) ............................................................... 44

*FCC v. Nat'l Citizens Comm. For Broad.,*
    436 U.S. 775 (1978) ............................................................................. 21

*Ford Motor Co. v. Texas Dep't of Transp.,*
    264 F.3d 493 (5th Cir. 2001) ............................................................... 50

*Garcia-Melendez v. Ashcroft,*
    351 F.3d 657 (5th Cir. 2003) ............................................................... 53

iv

*Grassley v. Legal Servs. Corp.*,
535 F. Supp. 818 (S.D. Iowa 1982) ..................................................... 45

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ............................................................... 47, 50

*Hercules, Inc. v. EPA*,
598 F.2d 91 (D.C. Cir. 1978) ............................................... 46

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
452 U.S. 264 (1981) ..................................................... 51-52, 54

*Hill v. Colorado*,
530 U.S. 703 (2000) ........................................................... 49

*Home Box Office, Inc. v. FCC*,
567 F.2d 9 (D.C. Cir. 1977) ............................................. 43

*Illinois v. City of Milwaukee*,
406 U.S. 91 (1972) ........................................................... 52

*Johnson v. United States*,
135 S. Ct. 2551 (2015) ..................................................... 47

*Kaiser Aetna v. United States*,
444 U.S. 164 (1979) ......................................................... 52

*Koretoff v. Vilsack*,
707 F.3d 394 (D.C. Cir. 2013) ........................................ 32

*Long Island Care at Home, Ltd. v. Coke*,
551 U.S. 158 (2007) ......................................................... 36

*Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*,
158 F.3d 135 (D.C. Cir. 1998) ........................................ 28

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ......................................................... 51

*Nat'l Treasury Emps.' Union v. Campbell*,
    654 F.2d 784 (D.C. Cir. 1981) ............................................................. 45

*New York v. EPA*,
    413 F.3d 3 (D.C. Cir. 2005) ................................................................. 39

*New York v. United States*,
    505 U.S. 144 (1992) ............................................................................ 53

*N. Cal. River Watch v. City of Healdsburg*,
    496 F.3d 993 (9th Cir. 2007) .............................................................. 11

*NRDC v. Thomas*,
    838 F.2d 1224 (D.C. Cir. 1988) ......................................................... 38

*Ohio Pub. Interest Research Grp., Inc. v. Whitman*,
    386 F.3d 792 (6th Cir. 2004) .............................................................. 28

*Pub. Citizen, Inc. v. FAA*,
    988 F.2d 186 (D.C. Cir. 1993) ............................................................ 42

*Rapanos v. United States*,
    547 U.S. 715 (2006) ............................................. 4, 9-13, 16, 24, 26, 30-31, 34, 52

*Roark & Hardee LP v. City of Austin*,
    522 F.3d 533 (5th Cir. 2008) ............................................................. 47

*S.F. Baykeeper v. Cargill Salt Div.*,
    481 F.3d 700 (9th Cir. 2007) ..........................................................29-30

*Solid Waste Agency of Northern Cook County (SWANCC) v.
United States Army Corps of Engineers*,
    531 U.S. 159 (2001) ........................................................4, 10, 27-29, 31

*South Terminal Corp. v. EPA*,
    504 F.2d 646 (1st Cir. 1974) .............................................................. 35

*Sys. Fuels, Inc. v. United States*,
    642 F.2d 112 (5th Cir. 1981) ............................................................. 21

*Texas Office of Pub. Util. Counsel v. FCC,*
    265 F.3d 313 (5th Cir. 2001) .............................................................. 41

*Texas v. EPA,*
    690 F.3d 670 (5th Cir. 2012) .............................................................. 21

*Texas v. EPA,*
    726 F.3d 180 (D.C. Cir. 2013) ............................................................ 54

*Texas v. Lyng,*
    868 F.2d 795 (5th Cir. 1989) .............................................................. 41

*United States v. Ashland Oil & Transp. Co.,*
    504 F.2d 1317 (6th Cir. 1974) ........................................................ 3, 52

*United States v. Bailey,*
    571 F.3d 791 (8th Cir. 2009) .............................................................. 11

*United States v. Davis,*
    825 F.3d 1014 (9th Cir. 2016) ............................................................ 11

*United States v. Donovan,*
    661 F.3d 174 (3d Cir. 2011) ............................................................... 11

*United States v. Gerke Excavating, Inc.,*
    464 F.3d 723 (7th Cir. 2006) .............................................................. 11

*United States v. Johnson,*
    467 F.3d 56 (1st Cir. 2006) ................................................................ 11

*United States v. Lipar,*
    665 F. App'x 322 (5th Cir. 2016) ........................................................ 11

*United States v. Lucas,*
    516 F.3d 316 (5th Cir. 2008) ................................................... 11, 48, 49

*United States v. Riverside Bayview Homes, Inc.,*
    474 U.S. 121 (1985) ...................................................... 3, 10, 12-13, 29

vii

*United States v. Robison*,
505 F.3d 1209 (11th Cir. 2007) ............................................................. 11

*United States v. Williams*,
553 U.S. 285 (2008) ................................................................47, 49-50

*United Steelworkers of Am., AFL-CIO-CLC v. Schuylkill Metals Corp.*,
828 F.2d 314 (5th Cir. 1987) ............................................................ 35, 37

*U.S. Telecom Ass'n v. FCC*,
825 F.3d 674 (D.C. Cir. 2016) .........................................................48-49

*Utility Air Regulatory Group v. EPA*,
134 S. Ct. 2427 (2014) ...................................................................... 7

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008) ........................................................................ 47

*WJG Tel. Co. v. FCC*,
675 F.2d 386 (D.C. Cir. 1982) ........................................................... 21

*WorldCom, Inc. v. FCC*,
238 F.3d 449 (D.C. Cir. 2001) ...................................................... 22, 23

## STATUTES

5 U.S.C. § 553(b) ...................................................................... 35

5 U.S.C. § 553(c)....................................................................... 35

5 U.S.C. § 605(b) ...................................................................... 44

5 U.S.C. § 706(2) ...............................................................8, 45, 55

5 U.S.C. § 801(a) ...................................................................... 46

28 U.S.C. § 2401(a) .................................................................... 28

33 U.S.C. § 466a(d) (1952) ............................................................. 28

33 U.S.C. § 466i(e) (1952) .................................................................................... 28

33 U.S.C. § 1251(a) ............................................................................ 3, 10, 12, 30-31

33 U.S.C. § 1311(a) .................................................................................................. 33

33 U.S.C. § 1313(a) .................................................................................................. 28

33 U.S.C. § 1313(c) .................................................................................................. 54

33 U.S.C. § 1341(a) .................................................................................................. 54

33 U.S.C. § 1342 ....................................................................................................... 33

33 U.S.C. § 1342(a) .................................................................................................. 54

33 U.S.C. § 1344(a) .................................................................................................. 54

33 U.S.C. § 1344(f) .............................................................................................. 34, 39

33 U.S.C. § 1362(7) ............................................................................................... 3, 34

33 U.S.C. § 1362(12) ................................................................................................ 34

33 U.S.C. § 1362(14) ................................................................................................ 34

33 U.S.C. § 1370 ....................................................................................................... 55

## REGULATIONS

33 C.F.R. § 328.3(a) ......................................................... 5, 6, 11, 30, 32, 50

33 C.F.R. § 328.3(a) (2014) .................................................................................... 30

33 C.F.R. § 328.3(a) (1999) ...................................................................................... 6

33 C.F.R. § 328.3(a) (1987) .................................................................................... 39

33 C.F.R. § 328.3(b) ........................................................................................ 5, 15, 18

33 C.F.R. § 328.3(c) .......................................................... 5, 14, 15, 18-20, 31, 39, 48-50

40 C.F.R. § 122.2 (2006) ............................................................................................ 30

79 Fed. Reg. 22,188 (Apr. 21, 2014) ................................................................ 28, 36-40

79 Fed. Reg. 61,591 (Oct. 14, 2014) ........................................................................ 40

80 Fed. Reg. 37,054 (June 29, 2015) ................................................................... *passim*

## OTHER AUTHORITIES

U.S. Const., Art. I, sec. 8, cl. 3 ................................................................................. 51

Pub. L. No. 113-76 div. E, tit. VII, § 718, 128 Stat. 5 (2014) ...................................... 45

S. Rep. No. 92-414 (1972), 1972 U.S.C.C.A.N. 3668 ..................................................... 3

S. Conf. Rep. No. 92-1236 (1972), 1972 U.S.C.C.A.N. 3776 ...................................... 28

## INTRODUCTION

Clean water is essential for drinking, swimming, fishing, irrigating crops, and providing habitat for wildlife. The goal of the Clean Water Act—one of the country's most important environmental laws—is to restore and protect "the waters of the United States" from pollution and destruction. "Waters of the United States" is not defined in the Act, but under Supreme Court precedent it includes not only waters that are navigable in fact, but also waters that have a "significant nexus" with such downstream waters.

The Clean Water Rule clarifies the meaning of "waters of the United States." *See* Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015) (the Rule). In promulgating the Rule, the Environmental Protection Agency and the Army Corps of Engineers (the Agencies) undertook an extensive scientific inquiry to determine which water bodies have significant impacts downstream, and therefore satisfy the significant nexus standard for coverage under the Act.

The rulemaking effort took four years and was extraordinarily thorough. The Agencies reviewed the scientific literature on the connections between streams, wetlands, and downstream waters, including more than 1,200 peer-reviewed publications. *Id.* at 37,057. EPA synthesized that information into a 400-

1

page report (the Science Report). JA[20859].[1] The report underwent peer review, including by EPA's Science Advisory Board (SAB), which convened a panel of 27 experts from an array of relevant fields. 80 Fed. Reg. at 37,062. The Agencies held over 400 meetings with stakeholders around the country, made the draft Rule available for more than 200 days of public comment, and responded to over one million public comments. *Id.* at 37,057.

The Clean Water Rule's definition of "waters of the United States" reflects extensive, compelling evidence that tributaries and adjacent waters, as defined in the Rule, are critical to the integrity of downstream waters. The Rule better protects these water bodies, which supply drinking-water systems serving millions of Americans, guard against flooding, filter pollution, and provide habitat for aquatic wildlife.

Plaintiffs' attacks on the Rule are meritless, both legally and factually, and are riddled with mischaracterizations and exaggerations. The Court should reject Plaintiffs' claims, and uphold the Rule.

---

[1] The Joint Appendix is scheduled to be filed after the completion of briefing. *See* Order at 2, ECF No. 154. This brief refers to record documents, the first time they are cited, using the last four or five digits of their EPA docket numbers, all of which begin with "EPA-HQ-OW-2011-0880-[xxxx]." Documents can be found by searching the full docket number, including the last four or five digits, on the government's website, www.regulations.gov.

## BACKGROUND

**I.     The Clean Water Act's protections were eroded in the years leading up to the Rule by overly-restrictive Agency practices**

In the Clean Water Act, Congress laid a weighty charge on the Agencies: "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act aims to achieve that objective by applying a suite of protective measures to "navigable waters," defined as "the waters of the United States," *id.* § 1362(7). "Congress chose to define the waters covered by the Act broadly," *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 133 (1985), and with good reason. If the Act's protections did not apply to small, upstream waters that feed into larger, downstream waters, then tributaries that join to form a navigable-in-fact river could be used "as open sewers," rendering the navigable waterway a "conduit for upstream waste." *United States v. Ashland Oil & Transp. Co.*, 504 F.2d 1317, 1326 (6th Cir. 1974).

The Supreme Court has recognized the Clean Water Act's broad scope. Upholding the Act's application to certain wetlands, the Court observed that the statute incorporates a "broad, systemic view of the goal of maintaining and improving water quality." *Riverside Bayview*, 474 U.S. at 132. The protection of aquatic ecosystems demands "broad federal authority to control pollution," and "'it is essential that discharge of pollutants be controlled at the source.'" *Id.* at 132–33 (quoting S. Rep. No. 92-414, at 77 (1972), 1972 U.S.C.C.A.N. 3668, 3742).

3

For nearly three decades the Agencies implemented the Act in accordance with Congress's vision. Starting in the 2000s, however, two Supreme Court cases—*Solid Waste Agency of Northern Cook County (SWANCC) v. United States Army Corps of Engineers*, 531 U.S. 159 (2001), and *Rapanos v. United States*, 547 U.S. 715 (2006)—created confusion over the scope of the Act's coverage. The holding of *SWANCC* was narrow, and *Rapanos* produced splintered opinions with no majority. Nevertheless, in the wake of these cases the Agencies began treating many waters as only covered by the Act if a significant nexus to downstream waters could be demonstrated on a case-by-case basis. These determinations could be time-consuming and costly, even if a significant nexus was ultimately found. As a result, enforcement of the Act suffered, and vital waters were left vulnerable to pollution and destruction. The widespread reliance on case-by-case determinations also led to inconsistencies and unpredictability in the application of the Act. Eventually, there was an outcry from legislators, regulated parties, and others "to make the process of identifying waters protected under the [Clean Water Act] clearer, simpler, and faster." 80 Fed. Reg. at 37,056.

## II.   The Rule largely restores the Act's proper scope of coverage

The Clean Water Rule largely restores the scope of coverage Congress intended under the Clean Water Act. It covers waters scientifically shown to have a significant impact on downstream navigable or interstate waters. The

4

Rule is "easier to understand" and "environmentally more protective" than the prior regulatory regime. 80 Fed. Reg. at 37,057. It employs more bright-line rules and relies less on case-by-case analyses. *Id.* at 37,055.

The Rule establishes a three-tiered framework. First, traditional navigable waters, interstate waters, the territorial seas, tributaries, and adjacent waters are categorically covered by the Act. 33 C.F.R. § 328.3(a)(1)-(6).[2] The Science Report provides unequivocal evidence that *all* tributaries "exert a strong influence on the integrity of downstream waters," Science Report ES-2, meaning all tributaries have a significant nexus to downstream waters. The Rule thus categorically protects tributaries. 33 C.F.R. § 328.3(a)(5). Likewise, the Science Report provides clear evidence that wetlands and open waters in a river or tributary's floodplain are "highly connected" to those tributaries and rivers, Science Report 4-39, meaning they, too, have a significant nexus downstream. The Rule, therefore, categorically protects "adjacent" waters. 33 C.F.R. § 328.3(a)(6), (c)(1)-(2).

Second, the Rule categorically excludes many waters from the Act's coverage. *Id.* § 328.3(b). For instance, waste treatment systems, prior converted cropland, groundwater, stormwater control features created in dry land, many types of ditches, and some other waters are excluded. *Id.*

---

[2] The Rule can be found in several sections of the C.F.R., but for ease of reference this brief cites the codification found in Title 33, part 328.

Third, the Rule recognizes that some waters, while not categorically protected, may be found jurisdictional after a case-by-case, individual determination of that water's "significant nexus" to waters downstream. These features include, for instance, waters that are not close enough to be "adjacent" but are within 4,000 feet of certain other water bodies. *Id.* § 328.3(a)(8). Because the Science Report found that waters located outside of a river's floodplain can still provide numerous functions to downstream waters, such as floodwater storage, *see* Science Report ES-3, the Agencies reasonably concluded that such waters could qualify as "waters of the United States" if shown individually to have a significant impact downstream. 80 Fed. Reg. at 37,059.

Contrary to Plaintiffs' claims, the Clean Water Rule does not radically expand the Clean Water Act's reach. As compared to the regulatory text that preceded it, and the Agencies' historic practices, the Rule *shrinks* Clean Water Act coverage. *Id.* at 37,054, 37,101.[3] As compared to the Agencies' more recent practice, the Agencies found that the Rule may expand coverage slightly—by less than 5%, according to very conservative estimates. *Id.* at 37,101; *see also* Economic

---

[3] State Plaintiffs describe the prior regulations as "much narrower" than the Rule, States Br. 42, but that is unquestionably incorrect. *Compare, e.g.*, 33 C.F.R. § 328.3(a)(5) (1999) (protecting all tributaries), *with* 33 C.F.R. § 328.3(a)(5), (c)(3) (2018) (protecting only a defined set of tributaries); *compare also, e.g.*, 33 C.F.R. § 328.3(a)(3) (1999) (protecting all waters that could affect interstate commerce), *with* 33 C.F.R. § 328.3 (2018) (omitting that category entirely).

Analysis at vi-vii, JA[20866].[4] Nonetheless, the Rule's practical impact is significant. The lack of clarity in the pre-Rule regime led to underenforcement of the Act's protections. The Rule better protects certain waters by clarifying they are protected—even if, legally, they were covered by the Act before the Rule too.

## NATURE AND STAGE OF THE PROCEEDING

The States of Texas, Louisiana, and Mississippi (State Plaintiffs) and a number of industry groups (Industry Plaintiffs) filed complaints challenging the Clean Water Rule in 2015. ECF No. 1, Case No. 15-cv-162; ECF No. 1, Case No. 15-cv-165. Natural Resources Defense Council and National Wildlife Federation (Defendant-Intervenors) were granted leave to intervene in February 2016. ECF No. 46, Case No. 15-cv-162. After a stay of proceedings was lifted, in September 2018, the Court granted Plaintiffs' request for a preliminary injunction, limited to Texas, Louisiana, and Mississippi. ECF No. 140, Case No. 15-cv-162. Plaintiffs have now moved for summary judgment, and Defendant-Intervenors hereby oppose those motions and cross-move for summary judgment.

---

[4] Plaintiffs' claims that the Rule is "transformative" and fundamentally changes "the allocation of federal and state authority," States' Br. 20-21, 24-26, are thus overblown. And any reliance on *Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427 (2014), is misplaced. The interpretation struck down in that case was "inconsistent with—in fact, would overthrow—the [Clean Air] Act's structure and design." 134 S. Ct. at 2442. The Clean Water Rule, by contrast, is consistent with the Clean Water Act, which delegates to EPA the task of interpreting "waters of the United States," and protecting those waters.

## STATEMENT OF THE ISSUES AND STANDARD OF REVIEW

Plaintiffs argue that the Clean Water Rule violates the Clean Water Act, the U.S. Constitution, and the Administrative Procedure Act (APA). These claims are governed by the APA's standard of review. Claims under the Clean Water Act and the Constitution are judged by whether the Rule is "contrary to constitutional right" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(B)-(C). Plaintiffs' procedural claims are judged by whether the Agencies acted "without observance of procedure required by law." *Id.* § 706(2)(D). Plaintiffs' remaining APA claims are judged under the highly deferential arbitrary and capricious standard. *Id.* § 706(2)(A); *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 824 (5th Cir. 2004) (describing that standard of review as "narrow" and noting that a court must be most deferential where the agency's decision depends on its technical expertise). Questions of law are reviewed *de novo*, but with deference to the Agencies' reasonable interpretation of ambiguous terms in the Clean Water Act. *See BCCA Appeal Grp.*, 355 F.3d at 824-25.

## SUMMARY OF THE ARGUMENT

Plaintiffs' arguments that the Rule violates the Clean Water Act are meritless. The Rule lawfully interprets the Act using the "significant nexus" standard, and correctly applies that standard to the scientific evidence. The Rule covers waters with significant impacts downstream, and Plaintiffs have no

support for their contrary claims. Plaintiffs' procedural arguments are likewise meritless. The final Rule's distance limitations and tributary definition were a logical outgrowth of the proposal. Plaintiffs were not entitled to a new comment period on the final Science Report, because its core findings were unchanged from the previously-released draft and Plaintiffs in any event do not specify what they would have said differently. The Agencies responded to all significant comments. Plaintiffs' Regulatory Flexibility Act claims fail, and any purported error was harmless. Plaintiffs' "propaganda" complaints are both non-justiciable and substantively exaggerated.

Plaintiffs' constitutional attacks fare no better. The Rule is not vague, much less unconstitutionally so. Plaintiffs' Commerce Clause and Tenth Amendment claims are premised on the untrue notion that the Rule regulates waters without a connection to navigable waters, and likewise fail.

The Court should reject Plaintiffs' challenges and uphold the Rule.

## ARGUMENT

## I.   Plaintiffs' substantive attacks on the Clean Water Rule lack merit

### A.   The Rule lawfully uses the "significant nexus" standard

Congress delegated Clean Water Act rulemaking authority to the Agencies, and they are entitled to "generous leeway" in interpreting ambiguous provisions in that statute. *Rapanos*, 547 U.S. at 758 (Roberts, C.J., concurring)

9

(citing *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842-45 (1984)). The Agencies reasonably interpreted "waters of the United States" to mean waters that are or significantly impact navigable and interstate waters. This is consonant with Supreme Court precedent, and the text and purpose of the Clean Water Act.

The significant nexus test is drawn from Supreme Court opinions. In *Riverside Bayview*, for instance, the Court upheld the Agencies' finding that certain wetlands were "waters of the United States" where they played "a key role in protecting and enhancing water quality." 474 U.S. at 133-34. In *SWANCC*, the Court observed that this "significant nexus" between wetlands and navigable waters had informed the Court's reading of the Act. 531 U.S. at 167. And in *Rapanos*, Justice Kennedy drew on these cases to conclude that the Act protects wetlands with a "significant nexus" to traditionally navigable waters. 547 U.S. at 759, 787 (Kennedy, J., concurring). Such a nexus exists where wetlands, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780. This reflects the objective of the Clean Water Act—to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

The Clean Water Rule lawfully interprets the Act with reference to this "significant nexus" standard. 80 Fed. Reg. at 37,060. Waters are "waters of the

United States" if they "significantly affect the chemical, physical, or biological integrity of traditional navigable waters, interstate waters, or the territorial seas." *Id.* Under the Rule, some waters must meet this test on a case-specific basis, 33 C.F.R. § 328.3(a)(7)-(8), and others are protected based on a finding that they categorically meet this test, *id.* § 328.3(a)(5)-(6).

Courts have held time and again that waters meeting the significant nexus test qualify as "waters of the United States" under the Act. Every Court of Appeals to have decided the question has found that if the significant nexus test is satisfied, jurisdiction is proper.[5] This makes sense, because five Justices—four dissenters plus Justice Kennedy—would find that *at least* those waters meeting the significant nexus standard are covered by the Act. *See Rapanos*, 547 U.S. at 809-11 & n.14 (Stevens, J., dissenting) (assuming Justice Kennedy's approach will be controlling in most cases); *see also United States v. Davis*, 825 F.3d 1014, 1024–25

---

[5] *See United States v. Robison*, 505 F.3d 1209, 1222 (11th Cir. 2007) (Justice Kennedy's "significant nexus" standard governs); *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 999–1000 (9th Cir. 2007) (same); *United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724 (7th Cir. 2006) (same); *see also United States v. Donovan*, 661 F.3d 174, 182-84 (3d Cir. 2011) (if either Justice Kennedy's or the plurality's test is met, there is a "water of the United States"); *United States v. Bailey*, 571 F.3d 791, 799 (8th Cir. 2009) (same); *United States v. Johnson*, 467 F.3d 56, 66 (1st Cir. 2006) (same). The Fifth Circuit has not yet decided this question. *See United States v. Lucas*, 516 F.3d 316, 327 (5th Cir. 2008) (finding same result under all three *Rapanos* standards); *see also United States v. Lipar*, 665 F. App'x 322, 325 (5th Cir. 2016) (noting district court failed to address varying *Rapanos* tests).

(9th Cir. 2016) (noting that the Supreme Court and circuit courts consider dissenting opinions when interpreting fragmented Supreme Court decisions).

By contrast, not a single Court of Appeals has held that only the *Rapanos* plurality opinion is controlling, which is the novel interpretation offered by Plaintiffs here. *See* Mot. for Summ. J. of Pl. States ("States Br.") 8, ECF No. 157. Justice Kennedy's opinion is "far more faithful to our precedents and to principles of statutory interpretation" than the plurality, *Rapanos*, 547 U.S. at 788 (Stevens, J., dissenting), and as explained above, was drawn from the Supreme Court's opinions in *Riverside Bayview* and *SWANCC*. It better reflects the Act's broad terms and environmentally protective aim. *See* 33 U.S.C. § 1251(a); *Rapanos*, 547 U.S. at 767-76 (Kennedy, J., concurring); *Riverside Bayview*, 474 U.S. at 133. And because five Justices rejected the plurality reading as unduly narrow, *see* 547 U.S. at 768 (Kennedy, J., concurring); *id.* at 788 (Stevens., J., dissenting), implementing only that standard would have been improper.[6]

B. **The Rule covers waters that have significant effects downstream**

The scientific record overwhelmingly supports the Agencies' finding that tributaries and adjacent waters, as defined, satisfy the significant nexus standard. "A reviewing court must be 'most deferential' to the agency where, as here, its

---

[6] State Plaintiffs' arguments that the Rule fails the plurality test, States Br. 9-11, are therefore irrelevant. The Rule—properly—did not try to "pass" that test.

decision is based upon its evaluation of complex scientific data within its technical expertise." *BCCA Appeal Grp.*, 355 F.3d at 824 (quoting *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983)).

According to peer-reviewed science and agency experience, headwaters and wetlands play "a crucial role in controlling sediment, filtering pollutants, reducing flooding, providing habitat for fish and other aquatic wildlife, and many other vital chemical, physical, and biological processes." 80 Fed. Reg. at 37,055. The "great majority" of tributaries under the Rule are headwater streams that transport water, sediments, organic matter, nutrients, and organisms downstream. *Id.* at 37,058. And a bed, banks, and ordinary high water mark—required by the Rule's definition of tributary—demonstrate "sufficient volume, frequency, and flow" to establish that the connection to downstream waters is significant. *Id.*; *see also id.* at 37,076 (a bed, banks, and ordinary high water mark "are only created by sufficient and regular intervals of flow"). Likewise, the science demonstrates that adjacent waters, as defined by the Rule, are connected to downstream waters and "function as a system to protect the chemical, physical, or biological integrity of those waters." *Id.* at 37,058.[7]

---

[7] If the *majority* of waters in a certain category have significant effects, then categorical treatment is justified. *Riverside Bayview*, 474 U.S. at 135 n.9; *Rapanos*, 547 U.S. at 780-81 (Kennedy, J., concurring).

### 1.    "Tributaries," as defined, have a significant nexus

The Science Report concluded unequivocally that all tributaries, including ephemeral and intermittent ones, significantly impact the physical, chemical, and biological condition of downstream rivers. Science Report 6-1 (tributaries "exert a strong influence on the integrity of downstream waters"). That is because most rivers get most of their water from tributaries, as opposed to groundwater or rain, *id.* at 3-5, 6-2, so rivers are in essence composed of tributaries. A watershed operates like a funnel: tributaries collect water and other materials over a broad expanse, and convey them to a concentrated point downstream, like a large river.

The Science Report's definition of "tributary" is broader than the Clean Water Rule's. In the Science Report, a tributary is a stream with a bed and banks that flows into a larger stream or river. *See* Science Report 2-2, 2-4, A-13. The Rule, by contrast, requires that a tributary *also* have an ordinary high water mark. 33 C.F.R. § 328.3(c)(3). "Tributaries" under the Rule are thus a *subset* of tributaries in the Science Report. The States have it exactly backward when they claim the opposite. States Br. 27-28. The Rule was conservative, because the Science Report would have justified an even broader definition of "tributaries."

Plaintiffs describe the tributaries covered by the Rule misleadingly. Industry Plaintiffs, for instance, claim the Rule covers "stormwater systems" and "ephemeral drainages." Mot. for Summ. J. of Pls. in Nos. 3:15-cv-165, 3:15-cv-266,

14

and 3:18-cv-176 ("Industry Br.") 32, ECF No. 156. But the Rule exempts many such features. *See* 33 C.F.R. § 328.3(b)(3)(i) (exempting ephemeral ditches not built in streams); *id.* § 328.3(b)(6) (exempting stormwater control features built in dry land). The States, for their part, argue that each *individual* criterion for a tributary is insufficient to ensure a significant nexus, States Br. 13-16, but that attacks a straw man: the Rule requires a finding of all three criteria *together*, *see* 33 C.F.R. § 328.3(c)(3). And Industry Plaintiffs repeatedly imply that a tributary's only requirements are a bed, bank, and ordinary high water mark, Industry Br. 32-33, 34, often leaving out that a tributary must also contribute flow to a downstream navigable or interstate water, 33 C.F.R. § 328.3(c)(3).

Industry Plaintiffs argue that the Rule's definition of "tributary" is "inconsistent with the scientific evidence," claiming that some tributaries in the arid Southwest lack a significant nexus despite having an ordinary high water mark. Industry Br. 34-35. Even if true, that claim is legally irrelevant as long as the majority of defined tributaries have such a nexus, *supra* note 7. In any event, the science clearly disproves Industry Plaintiffs' claim. Flows from ephemeral tributaries are a major driver of flow in southwestern rivers. *See* Science Report B-37, B-59 to B-60; Technical Support Document (TSD) at 265-66, JA[20869]. Ephemeral channels in arid landscapes influence downstream waters by impacting sub-surface flows, Science Report 1-10 (ephemeral flows in arid

15

landscapes are "key sources" of baseflow for downstream waters); *id.* at B-41 to B-42 (ephemeral tributaries in the Southwest are the "dominant source of recharge in valley floors"), and by supplying surface water during flood events. During one high-intensity storm in New Mexico, flows from an ephemeral tributary accounted for 76% of the Rio Grande's flood flow. *Id.* at 3-7 to 3-8.

Plaintiffs' implication that tributaries flowing in heavy, infrequent bursts are less significant than tributaries flowing in small, continuous volumes is unsupported and incorrect. *See id.* at 1-8 (low-frequency, short-duration flooding can result in a large-magnitude downstream transfer of floodwaters, sediment, large woody debris, and organisms, with important downstream effects). Justice Kennedy's *Rapanos* opinion recognized this. He explained that the plurality's insistence on regular flow "makes little practical sense," because "[t]he merest trickle, if continuous, would count as a 'water,'" while "torrents thundering at irregular intervals through otherwise dry channels would not." *Rapanos*, 547 U.S. at 769 (Kennedy, J., concurring).

Plaintiffs also claim that a bed, banks, and ordinary high water mark are not "reliable" indicators of regular flow in the arid West, Industry Br. 34; States' Br. 14-15, but again, the science is against them. Plaintiffs cite a 2006 Army Corps document which found that in arid Western channels the ordinary high water mark was not indicative of "inundation areas associated with specific recurrence

16

interval flood events." States Br. 14-15 & n.2 (citing Lichvar et al., *Distribution of Ordinary High Water Mark (OHWM) Indicators and Their Reliability in Identifying the Limits of "Waters of the United States" in Arid Southwestern Channels* 14 (2006), available at https://bit.ly/2ySr7VY). (State Plaintiffs misleadingly end the quote after the words "inundation areas." States Br. 15.) But these indicators *were* reliable evidence of flow, including "moderate to extreme flood events," Lichvar et al. at 14, belying the claim that ordinary high water marks have "no connection to water flow" in arid regions. *Contra* States Br. 14. Similarly, the cited 2013 Corps document noted that ordinary high water mark indicators in arid regions are "randomly" located across a channel, States Br. 15 & n.3 (citing Lefebvre et al., *Survey of OHWM Indicator Distribution Patterns across Arid West Landscapes* 17 (2013), available at https://bit.ly/2RHSk4X)—but the ordinary high water mark was still a reliable indicator of *flow*. The document explains that ordinary high water marks "may best be described as flow indicators," and "are useful for identifying portions of the channel that have been inundated from the most recent flow event." Lefebvre et al. at 17. Ordinary high water marks are thus a reliable indicator of flow, and significant nexus, in the arid Southwest.

The fact that the scientific record includes a case study on the San Pedro River does not undermine the Rule. *Contra* Industry Br. 34-35. The Science Report includes a twenty-two page study of "Southwestern Intermittent and Ephemeral

Streams." Science Report B-37 to B-60. It has six pages on the San Pedro River, but discusses many other Southwestern streams and rivers as well. *E.g.*, *id.* at B-48 to B-58. It also explains why the San Pedro is representative. *Id.* at B-45, B-48.

Plaintiffs assert, without support, that the Rule should not extend to tributaries if a "break" exists between them and the downstream water. *See* Industry Br. 35; States Br. 12-13, 15. Breaks could include bridges, dams, or places where a stream goes underground. *See* 33 C.F.R. § 328.3(c)(3). Allowing for such breaks makes sense: a break does not necessarily remove a tributary's connection to downstream waters. *See* Response to Comments (RTC) Topic 8 at 479, JA[20872]. While the SAB's review of the *draft* Science Report recommended more studies from human-modified stream ecosystems, *see* Industry Br. 35, the *final* Science Report does extensively discuss human modifications. *E.g.*, Science Report 1-11 to 1-14, 2-44 to 2-47, and 5-4 to 5-9. Industry Plaintiffs do not claim that the final report failed to respond to the SAB's recommendation, and have no basis to suggest that the final Rule was "inconsistent" with the SAB's "conclusion." Industry Br. 35.

Industry Plaintiffs also make a confusing attack on the Rule's exclusion of certain ditches from coverage. The Rule does not, as they claim, "categorical[ly] assert[] . . . jurisdiction" over some ditches. Industry Br. 40. Instead, the Rule expressly addresses ditches by *excluding* some. *See* 33 C.F.R. § 328.3(b)(3). Ditches

18

are otherwise covered by the Rule only if they would qualify anyway as "tributaries." *Id.* § 328.3(c)(3).

Plaintiffs' argument—that this distinction between excluded and included ditches is arbitrary—mischaracterizes agency documents and elides Plaintiffs' position in this case. Plaintiffs claim that the Agencies conceded a lack of evidence for covering some ditches, Industry Br. 41, but to the contrary, the Agencies explained that because many ditches function as tributaries with a significant nexus to downstream waters, they should be covered. RTC Topic 6 at 89, 23. To the extent the record reflects any question about ditches, it was whether any ditches could justifiably be *excluded* from coverage. *See id.* at 23. But Industry Plaintiffs are presumably not challenging those exclusions—if struck down, *more* ditches would be covered by the Rule. That would be directly contrary to Plaintiffs' stated aim of limiting the Clean Water Act's reach. Thus it is unclear how striking down the Rule's exclusion of some ditches would redress any injury they assert in this litigation. Put another way, even if the Agencies erred by excluding too many ditches, that would be harmless as to Plaintiffs. And to the extent Plaintiffs imply that *more* ditches should have been excluded, they offer nothing at all to support that.

19

## 2.    "Adjacent" waters, as defined, have a significant nexus

The Clean Water Rule defines adjacent waters as those that are either very

close to another covered water, like a traditionally navigable water or a tributary,

or those that are within its 100-year floodplain and also within 1,500 feet. 33

C.F.R. § 328.3(c)(2). That definition is supported by the science, because waters

within these boundaries have been shown to have significant impacts

downstream. Plaintiffs' arguments to the contrary are meritless.

In promulgating the Rule, the Agencies relied on clear evidence that

wetlands located in floodplains are "highly connected" to rivers and tributaries.

Science Report 4-39; *see also id.* at ES-2 to ES-3. Floods, even if infrequent, have

significant and lasting impacts on aquatic systems because they allow rivers and

wetlands to exchange water and other materials, in both directions. *Id.* at 4-1, 4-

39. Floodplain wetlands reduce floods by capturing water that overflows a river.

*Id.* at 4-1, 4-7, 6-4. While the word "floodplain" may suggest that connections

only occur during flooding, connections persist at other times as well. Rivers are

porous, and water from a river channel may flow into the shallow subsurface,

mix with other water—such as from a neighboring wetland—and return to the

river. *Id.* at 2-12, 2-21, 4-7. The Agencies thus reasonably concluded that the

"geographic position" of an adjacent water is "indicative of the relationship"

between it and the water to which it is adjacent, reflecting "the movement of

20

materials and energy between the two." TSD at 305; *see also* Science Report ES-11 (recognizing spatial proximity as "one important determinant" of the connection between wetlands and streams). Plaintiffs thus misrepresent the record when they assert that waters in a 100-year floodplain are not significantly connected to the river creating that floodplain. *See* Industry Br. 37.

The cases cited by Industry Plaintiffs do not support their argument that the "adjacency" definition is arbitrary. In one case, the D.C. Circuit upheld an agency's figure whose "exact genesis" was unclear, finding that the agency could make a "legislative-type judgment" reflecting its informed discretion. *See WJG Tel. Co. v. FCC*, 675 F.2d 386, 388–89 (D.C. Cir. 1982) (quoting *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 814 (1978)). Here, too, the boundaries of adjacency are based on the science and the Agencies' informed discretion about where to draw a regulatory line. In addition, the distances chosen were not "automatic" or "unreasoned," *see Sys. Fuels, Inc. v. United States*, 642 F.2d 112, 114 (5th Cir. 1981), and the decision did not "lack . . . findings," Industry Br. 40 (quoting *Texas v. EPA*, 690 F.3d 670, 678 (5th Cir. 2012)). The Agencies decided where to draw a line based on the evidence, their expertise, and their legal and policy judgments.

Contrary to Plaintiffs' assertions, Industry Br. 38-40, the science supports the Agencies' choice of a 100-foot boundary, a 1,500 foot limit within a floodplain, and a 100-year floodplain interval. For waters within 100 feet, the

21

Agencies observed that "[m]any studies indicate that the primary water quality and habitat benefits will generally occur within a several hundred foot zone of a water." 80 Fed. Reg. at 37,085. For waters within the 100-year floodplain, the 1,500 foot boundary is based on the Agencies' "review of the scientific literature," their "technical expertise and experience, and the implementation value of drawing clear lines," and balances the twin goals of "protect[ing] vitally important waters within a watershed" that "most clearly have a significant nexus," and "providing a practical and implementable rule." *Id.*; *see also id.* at 37,086 (finding that "water features within 1,500 feet of [a tidally-influenced traditional navigable water, the territorial seas, or the Great Lakes] are physically connected to such waters" and significantly affect them). The question is whether the Agencies' choices are "within a zone of reasonableness, not whether [their] numbers are precisely right." *WorldCom, Inc. v. FCC*, 238 F.3d 449, 462 (D.C. Cir. 2001) (internal quotation omitted).[8]

---

[8] Separate from "adjacency," Plaintiffs also criticize the Rule's 4,000 foot limit on waters subject to a significant nexus analysis. Industry Br. 40; States Br. 28-29. But Plaintiffs have not asserted any injury to them from that limit, which narrows the Rule's scope and thus serves Plaintiffs' purported aim to limit the reach of the Clean Water Act. Defendant-Intervenors have argued elsewhere that this exclusion violates the Agencies' statutory duty to protect "waters of the United States." Conservation Groups Br. 40-45, *In re Clean Water Rule*, No. 15-3751 (6th Cir. Nov. 1, 2016), ECF No. 130. But Industry and State Plaintiffs are presumably not arguing that this boundary improperly *shrinks* Clean Water Act protections. If Plaintiffs mean to imply that the Agencies should have used some

The Agencies chose to use a 100-year interval floodplain, as opposed to a different interval, in part for reasons of clarity. 80 Fed. Reg. at 37,089. Contrary to the Industry Plaintiffs' claims, Industry Br. 39, that does not make the decision arbitrary. Within the bounds of what is supported by the scientific evidence, administrability and enforceability can be a consideration in setting a regulatory standard. *See WorldCom*, 238 F.3d at 459. Here, the floodplain interval chosen by the Agencies was reasonable and supported by the science, because it protects waters with a significant influence on the integrity of downstream waters in a clear and implementable way. *See Beazer E., Inc. v. EPA Region III*, 963 F.2d 603, 609 (3d Cir. 1992) (courts defer to an agency's line-drawing if the interpretation is "reasonable and consonant with Congress' intent"). Industry Plaintiffs assert that a shorter flood interval would have been clearer, Industry Br. 39, but the Agencies did not agree, and they explained why, *see* 80 Fed. Reg. at 37,083; TSD at 300-01. The court should not second-guess that judgment. *See Brazos Elec. Power Co-op., Inc. v. FERC*, 205 F.3d 235, 240 (5th Cir. 2000) (reviewing court may not "substitute its judgment for that of the agency").

The grab-bag of additional attacks Plaintiffs make on the adjacency definition are also meritless. First, although the SAB advised that adjacency

---

shorter distance limit than 4,000 feet, that also fails, because they offer nothing at all to support any such argument.

23

should be based on functional relationships and not only distance, States Br. 18-

19, 39, the Rule follows that advice. Adjacency is premised on a water's

significant nexus, and the geographic triggers are a reasonable proxy for that

functional relationship. Second, Industry Plaintiffs complain that the definition

of adjacency does not comport with the *Rapanos* plurality's continuous surface

connection requirement, Industry Br. 37, but that is irrelevant. As explained

above, the *Rapanos* plurality is not controlling, and the Rule does not purport to,

and does not need to, abide by its limitations. Finally, the States argue that the

Rule is "necessarily" illegal because it covers waters adjacent to tributaries and

not "interstate, navigable waters." States Br. 17. But tributaries under the Rule

are connected to interstate or navigable waters, and so are waters adjacent to

those tributaries.

### 3.   The Rule is consistent with Justice Kennedy's statements about the "ordinary high water mark" and adjacency

Plaintiffs repeatedly and incorrectly claim that the Rule is inconsistent

with Justice Kennedy's *Rapanos* opinion. Industry Br. 33-34, 36; States Br. 12-13,

17. In *Rapanos*, Justice Kennedy analyzed the pre-Clean Water Rule regulations,

including their treatment of waters adjacent to tributaries. The pre-Rule

regulations differ from the Clean Water Rule in significant respects, including

that the Rule's definition of tributary covers fewer waters, and the Rule is backed

up by a voluminous scientific record.

24

Justice Kennedy observed that the pre-Clean Water Rule definition of tributary "may well provide a reasonable measure" of whether tributaries bear a sufficient nexus with other regulated waters. 547 U.S. at 781 (Kennedy, J., concurring). He explained that the Agencies could also identify, through regulation, categories of tributaries significant enough that wetlands adjacent to them are "likely, in the majority of cases," to have a significant nexus to navigable waters. *Id.* at 780-81. The Clean Water Rule follows this advice, identifying categories of tributaries and their adjacent waters that are demonstrated to have a significant nexus downstream.

At the time, Justice Kennedy criticized the Corps' standard for tributaries as providing insufficient "assurance" that adjacent wetlands had a significant nexus. *Id.* at 781; States Br. 17-18. But the Clean Water Rule's extensive scientific record provides that "assurance," and embodies the "more specific regulation[]" Justice Kennedy acknowledged could obviate the need to demonstrate significant nexus on a case-by-case basis. 547 U.S. at 782 (Kennedy, J., concurring).

Similarly, Justice Kennedy stated—without the benefit of the Rule's scientific record—that using the ordinary high water mark to identify tributaries could not be the "determinative measure" of whether adjacent wetlands were covered by the Act. *Id.* at 781. But the Clean Water Rule does not do this. The Rule requires an ordinary high water mark *and* a bed and banks—as well as the

25

contribution of flow downstream—and together these features ensure a significant nexus. *See* 80 Fed. Reg. at 37,076.

### C.   The Rule gives meaning to the word "navigable"

Contrary to Plaintiffs' claims, Industry Br. 29-32; States Br. 6, the Clean Water Rule does not ignore the word "navigable" in the Clean Water Act. The Rule defines "waters of the United States" as those with a significant impact on *navigable* and interstate waters. That gives meaning to the word "navigable." *See Rapanos*, 547 U.S. at 779 (Kennedy, J., concurring) (consistent with the need to give "navigable" some meaning, the Corps' jurisdiction depends upon the existence of a "significant nexus" to navigable waters).

Plaintiffs' assertion that the Rule regulates waters without a significant nexus to navigable waters, Industry Br. 29-31, simply ignores the science. Instead of grappling with the record, Industry Plaintiffs insert two photographs into their brief, *id.* at 30, which are evidence of nothing. Plaintiffs do not explain, for instance, how they can tell that the feature in "Figure 1" has an ordinary high water mark, a bed and banks, and a contribution of flow to a downstream navigable or interstate water, each of which is required to meet the definition of a tributary under the Rule. *Id.* Nor do they assert that flow from this feature does *not* significantly impact such downstream waters. Apparently relying on their own impression of how the picture looks, they simply claim it "makes no sense"

26

for the Rule to cover it. *Id.* at 31. That is patently insufficient. "Figure 2" is likewise irrelevant. Industry Plaintiffs label that feature as having been deemed a "water of the United States" *before* the Clean Water Rule (the photo was submitted with comments in 2014). *Id.* at 30. Industry Plaintiffs may be unhappy about the pre-Rule regulations, but that is not what this case is about.

Industry Plaintiffs next claim, without basis, that the Clean Water Rule would cover the ponds at issue in *SWANCC*. Industry Br. 31. Without citation or evidence, they say there is "little doubt" that the Corps would find a significant nexus between the ponds and a nearby creek. *Id.* That unfounded assertion cannot be credited. In any event, *SWANCC* did not hold (as Industry Plaintiffs imply) that the ponds at issue could not be covered by the Clean Water Act *even if* they had a significant nexus to navigable waters. The Court held, narrowly, that the Migratory Bird Rule as applied to the ponds exceeded the Agencies' statutory authority. *See* 531 U.S. at 174. The Court distinguished cases, like *Riverside Bayview*, involving waters with a "significant nexus." *See id.* at 167.

Industry Plaintiffs' challenge to the Rule's coverage of "interstate waters," Industry Br. 32, is untimely. The protection of interstate waters has been on the books for 35 years, since 1983. *See* 33 C.F.R. § 323.2(a)(2) (1983) ("waters of the United States" include "[a]ll interstate waters"). The Agencies did not reconsider this longstanding provision when issuing the Clean Water Rule, *see* Definition of

27

"Waters of the United States" Under the Clean Water Act; Proposed Rule, 79 Fed. Reg. 22,188, 22,200 (Apr. 21, 2014), so the Rule did not open a new period for judicial review. *See* 28 U.S.C. § 2401(a); *Ohio Pub. Interest Research Grp., Inc. v. Whitman*, 386 F.3d 792, 800 (6th Cir. 2004); *Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*, 158 F.3d 135, 145 (D.C. Cir. 1998). Industry Plaintiffs' challenge is clearly time-barred.

It is also wrong on the merits. The predecessors to the Clean Water Act explicitly protected interstate waters, regardless of navigability. *See, e.g.*, 33 U.S.C. §§ 466a(d)(1), 466i(e) (1952). The Act retained these protections. *See* 33 U.S.C. § 1313(a) (pre-existing water quality standards for "interstate" waters remain in effect). The purpose of the Clean Water Act was to expand, not shrink, federal protections, and the term "navigable waters" was to be given "the broadest possible constitutional interpretation." S. Conf. Rep. No. 92-1236, at 144 (1972), 1972 U.S.C.C.A.N. 3776, 3822. The Supreme Court has never suggested that the Act does not extend to navigable *and* interstate waters. *See SWANCC*, 531 U.S. at 165-66, 169, 171, 172 (describing certain waters not covered by the Act as *neither* navigable *nor* interstate); *City of Milwaukee v. Illinois*, 451 U.S. 304, 309-10, 317 (1981) (finding that a nuisance claim over interstate waters was not governed by federal common law because Congress had occupied the field with the Clean Water Act).

### D.      "Adjacent" does not have to mean "abutting"

Industry Plaintiffs mischaracterize *Riverside Bayview* in suggesting that

adjacent waters must "actually abut" a traditional navigable water. *See* Industry

Br. 36. The Court in *Riverside Bayview* found that "wetlands adjacent to lakes,

rivers, streams, and other bodies of water may function as integral parts of the

aquatic environment," and may be protected on that basis. *See* 474 U.S. at 135.

The Court noted that the respondent's property abutted a navigable waterway,

*id.*, but did not hold that the Act's scope was limited to abutting waters.

Industry Plaintiffs complain that adjacent waters must be "inseparably

bound up" with navigable waters to receive the Act's protections, suggesting

that the Rule's definition of adjacency contravenes this principle. *See* Industry Br.

36. But the Rule applies that principle: waters with a significant nexus are

inseparably bound up with downstream waters. *See SWANCC*, 531 U.S. at 167.

### E.      The Rule properly covers adjacent "waters," not just wetlands

Industry Plaintiffs also claim that the Rule should not cover adjacent

"waters" but only adjacent wetlands. Industry Br. 36-37. In support, they cite the

*Rapanos* plurality—which is not controlling—and a distinguishable Ninth Circuit

opinion. The Ninth Circuit found that an adjacent pond was not covered by the

Act because then-existing regulations—preceding the Clean Water Rule—

expressly covered only adjacent "wetlands." *See S.F. Baykeeper v. Cargill Salt Div.*,

481 F.3d 700, 705, 707 (9th Cir. 2007). The Ninth Circuit did not address whether the Agencies could have amended the adjacency provision to cover waters other than wetlands, as they did in the Rule.[9]

The Clean Water Rule's application to adjacent waters other than wetlands is reasonable. "[A]djacent open waters . . . perform many of the same important functions as wetlands that impact downstream waters." TSD at 326; *see also id.* at 325 (relevant question is whether non-wetland waters have a significant nexus). In his concurring opinion, Justice Kennedy discussed waters *or* wetlands. *Rapanos*, 547 U.S. at 767 (Kennedy, J., concurring) ("the connection between a nonnavigable *water or* wetland and a navigable water may be so close . . . that the Corps may deem the *water or* wetland a 'navigable water'" (emphases added)).

### F.    The Clean Water Rule does not resurrect the Migratory Bird Rule

Industry Plaintiffs suggest that the Clean Water Act covers only waters with a chemical, physical, *and* biological influence on downstream waters, all at the same time. Industry Br. 37-38. That is incorrect. The Act aims to restore the "chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C.

---

[9] Though the Clean Water Rule extended the provision for adjacency from wetlands to "waters," it also deleted the prior regulation's capacious coverage of "[a]ll other waters" that could affect interstate commerce, 33 C.F.R. § 328.3(a)(3) (2014); *see also supra* note 3. Plaintiffs in *Cargill* had waived any argument under that "other waters" provision. *See* 481 F.3d at 709-10 (discussing EPA's parallel "other waters" provision in 40 C.F.R. § 122.2 (2006)).

§ 1251(a), meaning all three types of integrity are important. Pollution that harms any one type should therefore be controlled. It would severely distort the Act to find that *only* pollution which degrades waters *in all three respects simultaneously* may be regulated. *Cf. OfficeMax, Inc. v. United States*, 428 F.3d 583, 589-90 (6th Cir. 2005) (explaining that the word "and" can be construed disjunctively to avoid an incoherent reading). Justice Kennedy implicitly recognized this, and identified functions with a "significant nexus" that do not necessarily affect all three types of integrity—such as pollution filtering, or flood control. *See Rapanos*, 547 U.S. at 775, 779, 786 (Kennedy, J., concurring).

This common-sense reading of the Clean Water Act does not "reinstate[] the Migratory Bird Rule." *Contra* Industry Br. 38; States Br. 20. Before *SWANCC*, the Agencies protected waters used by migratory birds regardless of those waters' relationship to other waters. *SWANCC*, 531 U.S. at 163-64. By contrast, the Clean Water Rule only protects waters that significantly influence the integrity of traditionally navigable or interstate waters. For instance, if upstream wetlands serve as nurseries for species that live in traditionally navigable waters, such wetlands may have a significant (biological) nexus to that water. *See* 33 C.F.R. § 328.3(c)(5)(ix). The Migratory Bird Rule did not turn on such impacts to a water's biological integrity. As the Agencies explained, non-aquatic species such

as non-resident migratory birds "are not evidence of biological connectivity for purposes of [the Clean Water Rule]." 80 Fed. Reg. at 37,094.

### G. Plaintiffs cannot complain about Texas coastal prairie wetlands

Industry Plaintiffs attack the Agencies' determination that Texas coastal prairie wetlands are "similarly situated" for purposes of a significant nexus analysis, meaning they function together in affecting downstream waters. Industry Br. 41-43; *see also* 33 C.F.R. § 328.3(a)(7)(v), (c)(5). These criticisms are waived, lack merit, and mischaracterize the Agencies' findings.

First, Industry Plaintiffs' argument is waived because it was not raised during the comment period. *See* RTC Topic 4 at 450 (Agencies saw no comments opposing Texas coastal prairie wetland approach); *Koretoff v. Vilsack*, 707 F.3d 394, 398 (D.C. Cir. 2013) (specific argument must be raised). This is not a technicality. Plaintiffs cannot withhold an argument during the comment period, then attack the Agencies for failing to respond to that (unstated) criticism.

Second, Industry Plaintiffs mischaracterize the record. The Agencies did not "admit" that the term Texas coastal prairie wetlands is "made up." Industry Br. 41. What the Agencies said is that the term is not used uniformly in scientific literature. 80 Fed. Reg. at 37,073. That is not remotely the same thing. Industry Plaintiffs also severely mischaracterize the record when they say the Agencies were "without scientific support" in describing the wetlands as "locally

32

abundant and in close proximity to other coastal prairie wetlands." Industry Br. 42. In describing the wetlands as "locally abundant and in close proximity to other coastal prairie wetlands," TSD at 348, the Agencies specifically cited a scientific study in support. *Id.* at 348, 390 (citing Nicholas Enwright *et al.*, *Using Geographic Information Systems (GIS) to Inventory Coastal Prairie Wetlands Along the Upper Gulf Coast, Texas*, Wetlands 31:687-697 (2011)). That is the opposite of "without scientific support."

Finally, Industry Plaintiffs complain that waters described as Texas coastal prairie wetlands may also be found in Louisiana, and the Agencies should not have drawn a regulatory line based on state boundaries. Industry Br. 42-43. But Industry Plaintiffs' aim is to restrict the Rule's coverage, so they cannot be heard to complain about the Agencies excluding features in Louisiana, even if that exclusion was improper. Overturning that exclusion would not redress any injury Industry Plaintiffs assert. To the extent Plaintiffs suggest that coastal prairie wetlands should not be included in *either* Texas *or* Louisiana, they lack any support for that claim. *See* TSD at 348-349 (explaining the science that supports a finding that Texas coastal prairie wetlands are similarly situated).

## H.    Waters can be both point sources and receiving waters

The Clean Water Act requires a permit in order to discharge pollutants to "waters of the United States" from a "point source." 33 U.S.C. §§ 1311(a), 1342,

1362(7), (12). Industry Plaintiffs claim that the Clean Water Rule is flawed because under the Rule, a waterway like a ditch can be both a "point source" and a "water of the United States." Industry Br. 43-44. This position is inconsistent with the Clean Water Act, which contemplates "waters of the United States" that are also "point sources." For instance, Congress exempted from permitting requirements discharges into certain ditches, which makes sense only if the ditches would otherwise have been "waters of the United States." 33 U.S.C. § 1344(f)(1)(C). Similarly, Congress included not only ditches but also "channels" in the definition of point source. *Id.* § 1362(14). If Industry Plaintiffs were correct, large, navigable-in-fact shipping channels could not be considered "navigable waters"—an absurd conclusion. Finally, Industry Plaintiffs' reading is contrary to the Agencies' longstanding position. *See* TSD at 74.

In support of their position, Industry Plaintiffs cite a passage from the *Rapanos* plurality opinion. Industry Br. 44. Apart from not being controlling, the plurality did not take as categorical a stance as Plaintiffs suggest. The plurality concluded that the Act's definition of "discharge" would "make little sense" if point sources and navigable waters were *significantly overlapping*, 547 U.S. at 735, and that "by and large" ditches are not "waters of the United States," *id.* at 736. That does not mean point sources are *never* waters of the United States. Elsewhere, the plurality effectively conceded that a ditch could sometimes be a

34

"water of the United States." *Id.* at 729, 757 (remanding for a determination

whether the "drains and ditches" at issue were waters of the United States).

At bottom, Industry Plaintiffs offer an unsupported policy argument that

there is no "need" to designate point sources as "waters of the United States,"

because point sources are "closely regulate[d]." Industry Br. 44. Such policy

decisions are squarely the province of expert Agencies; not regulated entities.

## II.   Plaintiffs' procedural attacks on the Clean Water Rule lack merit

### A.   Plaintiffs' notice-and-comment arguments fail

#### 1.   Plaintiffs' logical outgrowth arguments fail

Under the APA, notice of a proposed rulemaking must include "either the

terms or substance of the proposed rule or a description of the subjects and

issues involved" and must provide the public an opportunity to comment.

5 U.S.C. § 553(b)(3), (c). After public comment, the agency may modify its rule;

"the rule is not required to 'remain frozen in its original vestigial form.'" *United*

*Steelworkers of Am., AFL-CIO-CLC v. Schuylkill Metals Corp.*, 828 F.2d 314, 317-18

(5th Cir. 1987) (quoting *South Terminal Corp. v. EPA*, 504 F.2d 646, 659 (1st Cir.

1974)). An agency may "adopt a new rule . . . containing substantial differences

from the one proposed and still have acted lawfully," *Am. Transfer & Storage Co.*

*v. ICC*, 719 F.2d 1283, 1303 (5th Cir. 1983), so long as the rule is a "logical

outgrowth" of the proposal, *United Steelworkers*, 828 F.2d at 317-18. The

touchstone of the "logical outgrowth" inquiry is whether the change from proposed to final was "reasonably foreseeable." *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007).

Plaintiffs claim that the Rule's definition of "adjacent" waters fails the logical-outgrowth test because it contains distance-based metrics. Industry Br. 19; States Br. 32-36. That argument ignores the record. In the notice of proposed rulemaking, the Agencies explained that "adjacent" has "always included an element of reasonable proximity," 79 Fed. Reg. at 22,207, and requested comment on different ways to define "adjacent waters," including "establishing specific geographic limits" for using hydrological connections to determine adjacency, such as "distance limitations," *id.* at 22,208. The Agencies did not need to specify the precise distances ultimately chosen, as long as it was reasonably foreseeable that the Agencies would use distance-based criteria. *See Am. Transfer & Storage Co.*, 719 F.2d at 1303 (explaining a notice of proposed rulemaking "need not specifically identify 'every precise proposal which [the agency] may ultimately adopt as a rule'" (quoting *Action on Children's Television v. FCC*, 564 F.2d 458, 470 (D.C. Cir. 1977))). Contrary to Plaintiffs' assertions, States Br. 34, the distance-based criteria in the final Rule are not "unrelated" to the riparian and floodplain concepts in the proposal. Waters within 100 feet (a bit more than the distance between first and second base) are not "unrelated" to what the proposed Rule

36

described as riparian waters—those "bordering" a primary water and influenced by it. And waters within a 100-year floodplain reflect the Agencies' proposal to include floodplain waters. 79 Fed. Reg. at 22, 199.

Many commenters—including some Plaintiffs—complained that the proposed definition of "adjacent" was too "vague" and "expansive" and urged the Agencies to provide more certain criteria. *E.g.*, RTC Topic 3 at 18; *see also id.* at 392. Indeed, commenters' "dominant request was to identify specific limits." *Id.* at 18. Numerous commenters opined on using distance-based criteria to define adjacent waters.[10] Some proposed specific distance-based limits.[11] These comments demonstrate that it was "readily apparent" that distance-based criteria were under consideration. *See United Steelworkers*, 828 F.2d at 318; *Am. Trucking Ass'ns, Inc. v. FMCSA*, 724 F.3d 243, 253 (D.C. Cir. 2013).[12]

---

[10] *See* RTC Topic 3 at 123 (Texas Commission of Environmental Quality criticized proposed "hydrologic connection" standard because it "has no geographic limit"); *id.* at 154 (Georgia Department of Transportation suggested "establishing specific geographic limits"); *see also id.* at 108, 109-10, 389 (comments opposing distance-based limits on adjacency).

[11] *See, e.g.*, RTC Topic 3 at 132 (Hancock County Drainage Board commented that definition of "neighboring" should have "a distance in feet from watercourse"); *id.* at 240-41 (Kentucky Oil & Gas Association proposed 100-year floodplain for larger streams, and riparian zone within 50 feet for smaller streams); *id.* at 262 (National Lime Association proposed 5-year floodplain).

[12] State Plaintiffs' reliance on an internal Corps memorandum, States Br. 33, is misplaced. While some individuals in the Corps were temporarily unaware

Plaintiffs also complain that the Rule's 4,000-foot cut-off for waters subject to a significant nexus analysis was not a logical outgrowth of the proposed rule, which had no cut-off. Industry Br. 20; States Br. 36-39. But Plaintiffs can show no prejudice from that change to the proposed rule. The change made the final Rule *narrower* than the proposal, categorically excluding from coverage some waters that would have otherwise been subject to potential inclusion. *See Am. Coke & Coal Chems. Inst. v. EPA*, 452 F.3d 930, 941 (D.C. Cir. 2006) (rejecting claim when petitioner could show "no prejudice" from "less stringent" final rule); *see also* Industry Br. 20; States Br. 36-37 (acknowledging that under the proposed rule "any" water could be deemed jurisdictional, whereas under the final Rule that was true only for waters within certain defined limits).[13]

In any event, the Rule's addition of a distance-based limit on waters subject to a significant nexus analysis was a logical outgrowth of the proposal. The Agencies sought comment on an approach that would take the "location" of the water into account, 79 Fed. Reg. at 22,214; *see NRDC v. Thomas*, 838 F.2d 1224, 1242 (D.C. Cir. 1988) (finding logical outgrowth where "the germ" of the decision

---

that the Agencies would impose a distance-based limit on waters subject to a significant nexus analysis, as explained above, that limit does not harm Plaintiffs.

[13] State Plaintiffs also attack the Rule's specification of "significant nexus," "ordinary high water mark," and "high tide line," but their assertions make no sense; these are not "geographical distances." *Contra* States Br. 37.

was there), and commenters' discussions of distance-based cut-offs for the

significant-nexus analysis further confirms that such criteria were foreseeable, *see*

RTC Topic 5 at 17, 64, 111, 140, 152, 153, 165, 212.

The Agencies' decision *not* to exempt waters used for agriculture from the

"tributary" definition was also foreseeable. *Contra* States Br. 39-40. No such

exemption existed under the prior rule, *see* 33 C.F.R. § 328.3(a)(5) (1987), nor was

one proposed, *see* 79 Fed. Reg. at 22,201-04; *id.* at 22,263. Preserving that status

quo for tributaries, as the Agencies did, meets the logical outgrowth standard.

*See New York v. EPA*, 413 F.3d 3, 44 (D.C. Cir. 2005); *Am. Iron & Steel Inst. v. EPA*,

886 F.2d 390, 400 (D.C. Cir. 1989). That the final Rule exempted waters used for

farming from its "adjacency" definition, *see* 33 C.F.R. § 328.3(c)(1), which if

anything advances Plaintiffs' stated goals, does not entitle them to an *additional*

exemption in a wholly different context. Finally, although Plaintiffs criticize the

Agencies for saying that the Rule would not impact the Act's farming-activity

exemption for certain permitting requirements, States Br. 40; 33 U.S.C.

§ 1344(f)(1), the Rule does not, in fact, affect that distinct exemption.

### 2. The draft Science Report satisfied the Agencies' obligation to notice their sources for comment

When the Agencies issued the proposed Clean Water Rule, they released a

draft of the Science Report, synthesizing over 1,000 peer-reviewed studies on the

connections between streams and wetlands and downstream waters. 79 Fed. Reg.

at 22,190.[14] After the SAB reviewed the draft, the Agencies extended the

comment period for input on the SAB's findings. 79 Fed. Reg. 61,591 (Oct. 14,

2014). The changes to the final Science Report in response to the SAB's review

were a normal part of the administrative process, and Industry Plaintiffs had an

opportunity—by commenting on the SAB's review—to weigh in on those

changes. There is no basis for Industry Plaintiffs' assertion that they were entitled

to an additional comment period on the final Science Report. Industry Br. 20-22.

The so-called "notable changes" to the final version of the Science Report

alleged by Industry Plaintiffs, Industry Br. 20, are anything but. The final

Report's "continuum-based approach," for instance, was not "new"—the draft

used a continuum-based approach too. *See* 79 Fed. Reg. at 22,193 (noting that the

draft report documented "a gradient" in the relation of waters to each other);

Draft Science Report 3-4, 4-21 to 4-23, 6-3 (discussing the "River Continuum

Concept"); *id.* at 3-33 (discussing the factors that "determine where components

of a [river] system fall on the connectivity-isolation gradient"); *id.* at 5-57

(discussing the "continuum of connectivity" in wetlands), JA[0004]. While the

final Science Report followed the SAB's recommendation to put "greater

emphasis" on the gradient nature of connectivity, RTC Topic 9 at 15, this

---

[14] Because the Science Report only existed as a draft during the comment period, the final report was not "withheld" then. *Contra* Industry Br. 1, 18, 22.

approach was not "new" and Industry Plaintiffs had ample opportunity to comment on it.

The Science Report's inclusion of hundreds of new citations also did not require additional comment. As the Agencies explained, the majority of the new sources had already been posted to the public docket during the comment period. U.S. Resp. to Mots. Summ. J. 30, *Georgia v. Wheeler*, No. 15-cv-00079 (S.D. Ga. Oct. 10, 2018) (ECF No. 215). Others were cited by or attached to comments, and others provided additional support for conclusions already in the draft, or responded to the SAB. *Id.* at 30-31. In any event, Industry Plaintiffs fail to identify with "reasonable specificity" a single source to which they object, and "how they might have responded if given the opportunity." *Texas v. Lyng*, 868 F.2d 795, 799 (5th Cir. 1989). Conclusory assertions that they would have "expanded and refined" their critiques, Industry Br. 21 n.4, are not enough. "[T]he public 'need not have an opportunity to comment on every bit of information influencing an agency's decision.'" *Texas Office of Pub. Util. Counsel v. FCC*, 265 F.3d 313, 326 (5th Cir. 2001) (quoting *Lyng*, 868 F.2d at 799); *see also id.* at 326 n.6 (noting petitioners failed to explain how the lack of opportunity to comment prejudiced them). *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227 (D.C. Cir. 2008), cited by Industry Plaintiffs, Br. 22, is inapposite. In that case, the FCC "cherry-pick[ed]"

which parts of studies it would release. 524 F.3d at 237. Here, there is no

allegation that the draft report or studies were "cherry-picked."

### 3. The Agencies responded to Plaintiffs' comments

The Agencies satisfied their obligation to respond to significant comments.

*Contra* Industry Br. 23-24. A response to comments need only enable the Court to

see "what major issues of policy were ventilated" and why the Agencies reacted

as they did. *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (quoting

*Automotive Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 335 (D.C. Cir. 1968)).

The Agencies' responses run to 17 volumes. The volume on "Tributaries" alone is

631 pages. RTC Topic 8, available at https://bit.ly/2PItzrL. The Agencies were

thorough by any standard, and engaged with all significant comments.

First, the Agencies did not ignore comments about tributaries in the arid

West. *Contra* Industry Br. 23. As described above, the Agencies extensively

documented the applicability of the definition of "tributary" in the Southwest.

*Supra* Part I(B)(1); *see also* Science Report 1-10, 5-7 to 5-8, B-37 to B-60. The

preamble to the Rule expressly and repeatedly discusses the arid West. 80 Fed.

Reg. at 37,064, 37,077, 37,079, 37,092. Industry Plaintiffs' claim that "neither the

preamble to the final Rule nor any other agency pronouncement addresses [the]

applicability of the Rule in the arid West," Industry Br. 23, is demonstrably false.

42

The Agencies also addressed Industry Plaintiffs' claim that the Rule would override permitting exemptions. *Contra* Industry Br. 23-24. The Rule maintains all statutory exemptions, expands regulatory exemptions, and does not add any additional permitting requirements for agriculture. RTC Topic 1 at 13-14. The Agencies did not ignore Plaintiffs' comments; they accurately responded by explaining that the comments were unsupported. 80 Fed. Reg. at 37,055, 37,080, 37,097-98; RTC Topic 6 at 30-31. This satisfies any conceivable obligation to respond. An agency need not respond extensively to unfounded speculation. *See Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977).[15]

Finally, no comments were "demeaned." Industry Br. 24. The concerns about the Rule that Administrator McCarthy referred to as myths in the cited news article—for instance, that the Rule would regulate puddles—*were* myths. Far from demeaning stakeholders, the Agencies' outreach efforts were nearly unprecedented: they conducted 400 meetings across the country over four years, 80 Fed. Reg. at 37,057, and wrote 17 volumes of responses to comments that totaled over 7,500 pages.

---

[15] Plaintiffs' comments seem premised on the notion that ditches are regulated more extensively under the Rule, but that is wrong. *See* 80 Fed. Reg. at 37,058; RTC Topic 6 at 27 ("[B]y clarifying and expanding the specific exclusions for ditches, the agencies anticipate that more ditches will be clearly excluded in comparison to previous regulations and guidance related to waters of the U.S.").

### B. The Rule does not implicate the Regulatory Flexibility Act, and if it did, any error was harmless

Industry Plaintiffs' claims under the Regulatory Flexibility Act (RFA) are baseless. The RFA's mandates are "procedural rather than substantive" and the only question is whether the agency made a reasonable, good-faith effort to carry out the RFA's mandate. *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 625 (5th Cir. 2000). The Agencies did so here. As required by the RFA, the Agencies certified that the Rule would not "have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b); 80 Fed. Reg. at 37,102. The Agencies found that because the Rule is definitional, it does not impose direct regulatory burdens on small entities. 80 Fed. Reg. at 37,102; RTC Topic 11 at 113-14; *see Am. Trucking Ass'ns v. EPA*, 175 F.3d 1027, 1045 (D.C. Cir. 1999) (upholding RFA certification because rule did not directly regulate small entities).

In any event, the Agencies' substantial outreach to small businesses would render any deficiency in the RFA analysis harmless. *See Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 879 (9th Cir. 2003) (applying harmless error standard to RFA). In addition to over 400 public stakeholder meetings, *see* 80 Fed. Reg. at 37,057, the Agencies held outreach meetings, in conjunction with the Office of Management and Budget and Small Business Administration, with small business representatives from sectors across the economy. *See* Final Report of the Discretionary Small Entity Outreach for the Clean Water Rule (Small Entity

44

Report) 3, 7-15, JA[20865]. The Agencies responded to comments from these and

other small businesses, *e.g.*, RTC Topic 11 at 178-82, and adjusted several parts of

the Rule in response to their input, *see* Small Entity Report 21-22.

### C. Plaintiffs cannot sue under appropriations act claims, and the Rule was not the product of an "unfair" process

Industry Plaintiffs' claim that EPA engaged in unlawful advocacy is not

justiciable. Long-standing authority provides that the "anti-propaganda and anti-

lobbying provisions" cited by Industry Plaintiffs, Industry Br. 24-26, are not

privately enforceable. *See Nat'l Treasury Emps.' Union v. Campbell*, 654 F.2d 784,

790-93 (D.C. Cir. 1981); *Grassley v. Legal Servs. Corp.*, 535 F. Supp. 818, 825-26 (S.D.

Iowa 1982). Nor are those provisions enforceable as "procedure[s] required by

law" under the APA, 5 U.S.C. § 706(2)(D). They apply generally to any use of

appropriated funds. *See* Pub. L. No. 113-76 div. E, tit. VII, § 718, 128 Stat. 5, 234

(2014). The GAO—the same agency on which Plaintiffs rely for their

appropriations act claims[16]—concluded that the Agencies *had* complied with

procedural requirements in promulgating the Rule. *See* U.S. Gov't Accountability

Office, GAO-15-750R, *Clean Water Rule: Definition of "Waters of the United States"*

at 2 (July 16, 2015), available at http://gao.gov/products/GAO-15-750R; 5 U.S.C.

---

[16] EPA strongly disagreed with the GAO's conclusion that there were appropriations act violations. *See* EPA, Letter from McCarthy to GAO (Sept. 15, 2016), available at https://bit.ly/2DoxMuX.

§ 801(a)(1)(B)(i)-(iv), (a)(2)(A) (requiring GAO to assess compliance with various procedures).

Industry Plaintiffs' contention that the Rule should be vacated because the Agencies' supposed "covert propaganda" demonstrates a lack of "fairness and transparency," Industry Br. 26, is both untrue and divorced from any legal standard. The single EPA blog post and use of "Thunderclap" does not plausibly demonstrate that the Agencies' four-year outreach effort lacked fairness or transparency. And Industry Plaintiffs do not say what legal principle could conceivably authorize "vacating the Rule" solely on the basis of a Thunderclap posting. *See* Industry Br. 25. A presumption of regularity applies to official administrative actions, overcome "only upon a strong showing of bad faith or improper behavior." *Hercules, Inc. v. EPA*, 598 F.2d 91, 123 (D.C. Cir. 1978). The two cited examples of social media use do not remotely meet this standard.

## III.   The Clean Water Rule is constitutional

As explained below, Plaintiffs' contentions that the Clean Water Rule is unconstitutional or fundamentally alters the federal-state balance have no merit, and are not close questions. As a result, the canons of interpretation Plaintiffs invoke, *see* Industry Br. 50-53; States Br. 21-23, have no relevance.

A.     **The Rule is not unconstitutionally vague**

The Clean Water Rule provides more clarity than the previous regulatory regime by instituting "clearer definitions" and more "bright-line boundaries" to establish waters that are covered by the Clean Water Act, or excluded. 80 Fed Reg. at 37,055. The Rule is not vague, and certainly not unconstitutionally so.

The Constitution does not require that regulations provide "perfect clarity" or "precise guidance." *United States v. Williams*, 553 U.S. 285, 304 (2008). A law is facially vague only when "plagued with such 'hopeless indeterminacy' that it precludes 'fair notice of the conduct'" it prohibits, or "'so standardless that it invites arbitrary enforcement.'" *City of El Cenizo v. Texas*, 890 F.3d 164, 190 (5th Cir. 2018) (quoting *Johnson v. United States*, 135 S. Ct. 2551, 2556, 2558 (2015)). Pre-enforcement constitutional challenges like Plaintiffs' are "disfavored" because they "often rest on speculation." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008); *see also Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 547 (5th Cir. 2008) (pre-enforcement vagueness claims are "often difficult, perhaps impossible").

Plaintiffs have not met their burden. The Rule is neither difficult to understand nor so standardless as to encourage arbitrary enforcement. Courts have upheld provisions far less specific than those challenged here. *See, e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104, 108, 112 (1972) (upholding ordinance that

47

prohibited noise that "tends to disturb the peace or good order of [a] school session"); *City of El Cenizo*, 890 F.3d at 190 (upholding prohibition on any policy or practice that "materially limits" the enforcement of immigration laws). The Fifth Circuit has twice upheld Clean Water Act jurisdictional determinations against vagueness challenges, even prior to the Rule's clarifications. *See Lucas*, 516 F.3d at 328 (prevalence of "wet property" on site, and fact that property's wetlands connected to some creeks leading to the Gulf, provided notice that property may contain "waters of the United States"); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 917 (5th Cir. 1983) (knowledge that part of property was a wetland provided notice).

The Rule's definition of "ordinary high water mark" does not allow the Agencies to "reach any outcome they please," *contra* Industry Br. 45. Ordinary high water mark is defined by reference to specified, physical characteristics or "other appropriate means that consider the characteristics of the surrounding areas." 33 C.F.R. § 328.3(c)(6); *see also* U.S. Army Corps of Engineers, Regulatory Guidance Letter No. 05-05 at 3 (Dec. 2005) (providing guidance on other appropriate means), available at https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll9/id/1253. This provides some flexibility, but that does not equate to impermissible vagueness. *See U.S. Telecom Ass'n v. FCC*, 825 F.3d 674,

48

737 (D.C. Cir. 2016).[17] Plaintiffs' suggestion that the definition is vague just because landowners may not know with certainty, simply by looking at their property, whether the Rule will apply, Industry Br. 46, misunderstands the test. The question is whether landowners are *on notice* that the Rule *may* apply. *See Avoyelles Sportsmen's League*, 715 F.2d at 917; *Williams*, 553 U.S. at 305 (hypothetical "close cases" are not enough). The Clean Water Rule, including the test for ordinary high water marks, easily meets that standard.

The Rule's standard for a "significant nexus" analysis similarly provides notice to potentially regulated parties. The Rule adds substance and clarity to the standard articulated by Justice Kennedy in *Rapanos*, listing specific types of effects on downstream waters that are relevant, such as "[p]ollutant trapping" and "[r]unoff storage." 33 C.F.R. § 328.3(c)(5)(i)-(ix). Industry Plaintiffs imply that once landowners suspect there are jurisdictional waters on their property, it may be difficult to determine whether the significant nexus test is satisfied. Industry Br. 46. Again, that is not unconstitutional. *See Williams*, 553 U.S. at 306

---

[17] Nor is it unconstitutional for the Rule to allow the use of remote sensing tools and historical evidence, *contra* Industry Br. 46. The Agencies have used such evidence for years. 80 Fed. Reg. at 37,076-77; *accord Lucas*, 516 F.3d at 326-27 (affirming determination based in part on maps and aerial photography). Moreover, such evidence is necessary if a tributary's physical markings have been intentionally destroyed. *See* 80 Fed. Reg. at 37,077. Speculation that computer models *could* lead to arbitrary enforcement, Industry Br. 45-46, is insufficient. *See Hill v. Colorado*, 530 U.S. 703, 733 (2000).

(possible difficulty in determining whether relevant facts have been proven does not render a statute unconstitutionally vague); *Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493, 509 (5th Cir. 2001) (statute not unconstitutionally vague merely because "an individual can raise uncertainty about its application to the facts of their case"). The Rule is constitutional because it provides fair notice: landowners can tell if their property might contain jurisdictional waters.

Plaintiffs' complaints about the Rule's categorical exemptions, Industry Br. 46-47, also misapply the vagueness standard. Close cases or residual uncertainty are permissible, *see Williams*, 553 U.S. at 305, and unavoidable, *cf. Grayned,* 408 U.S. at 110 ("we can never expect mathematical certainty from our language"). And Industry Plaintiffs' contention that they cannot understand the exemption for "puddles" lacks credibility. The Rule explains in unambiguous detail the difference between puddles and wetlands. A puddle is "a very small, shallow, and highly transitory pool of water that forms on pavement or uplands" during or after a storm. 80 Fed. Reg. at 37,099. A wetland is an area inundated or saturated by water to such an extent that it normally supports "vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(c)(4).

Industry Plaintiffs' contention that "Texas coastal prairie wetlands" is vague, Industry Br. 47-48, is especially weak. The Rule explains where these waters are, as well as their distinctive features. 33 C.F.R. 328.3(a)(7)(v). The

preamble gives additional detail. 80 Fed. Reg. at 37,073. Contrary to Industry

Plaintiffs' claims, Industry Br. 48, the Constitution does not require the Rule to

state *exactly* how near the coast or how tightly packed the wetlands must be.

### B.    The Rule does not exceed the federal government's authority under the Commerce Clause

The Constitution grants Congress authority to regulate interstate

commerce. U.S. Const., Art. I, sec. 8, cl. 3. The Clean Water Act's regulation of

navigable waters and interstate waters, and their tributaries and adjacent waters

as described in the Rule, falls comfortably within this authority.

Plaintiffs' argument that the Rule exceeds the Commerce Clause authority

depends on a false premise that the Rule extends to waters with a "tangential"

connection to navigable waters. States Br. 42; *see also* Industry Br. 49. As

explained above, the evidence refutes such claims: waters covered by the Rule

are, or significantly impact, navigable and interstate waters. The Rule properly

extends to the channels of interstate commerce and activities that substantially

affect interstate commerce: navigable and interstate waters and waters that

significantly influence them. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519,

536 (2012) (Congress may regulate "the channels of interstate commerce" and

"activities that substantially affect interstate commerce").[18]

---

[18] To the extent the Rule applies to interstate waters that are not also navigable, the Commerce Clause reaches those. *See Hodel v. Va. Surface Mining &*

"It has long been settled that Congress has extensive authority over this Nation's waters under the Commerce Clause." *Kaiser Aetna v. United States*, 444 U.S. 164, 173 (1979). And it would "make a mockery" of Congress's Commerce Clause powers if its authority to control pollution was limited to the navigable water itself, because then tributaries which join to form that river could be used "as open sewers as far as federal regulation was concerned." *Ashland Oil*, 504 F.2d at 1326. Because the Commerce Clause authority extends to navigable and interstate waters, it also extends to waters that could significantly pollute and degrade those navigable and interstate waters. *See Rapanos*, 547 U.S. at 776 (Kennedy, J., concurring) (applying the Act to waters with a "significant nexus" to navigable waters does not raise constitutional difficulties or federalism concerns); *id.* at 782-83 (citing Supreme Court case law explaining, *inter alia*, that regulation of tributaries may be required to manage a navigable water).

Finally, Industry Plaintiffs argue that the Rule runs afoul of the Commerce Clause because the Agencies supposedly said waters covered by the Rule

---

*Reclamation Ass'n*, 452 U.S. 264, 282 (1981) (Commerce Clause permits regulation of "activities causing air or water pollution . . . that may have effects in more than one State"). Water pollution that flows from one state to another can have economic consequences, and Congress could rationally conclude that regulating interstate water pollution is needed to address substantial effects on interstate commerce. *See also Illinois v. City of Milwaukee*, 406 U.S. 91, 105 (1972) (rights in "interstate streams" raise federal questions); *id.* at 105 n.6 (application of federal law important where water at issue was "bounded . . . by four States").

"could" affect interstate commerce, but not necessarily. *See* Industry Br. 49 (citing 80 Fed. Reg. at 37,084). This blatantly mischaracterizes the quoted statement, which was not referring to the Rule but to the *pre*-Rule regulations—specifically, a provision that the Rule *deleted. See* 80 Fed. Reg. at 37,084.[19]

### C.   The Rule does not violate the Tenth Amendment or "state sovereignty"

State Plaintiffs' argument that the Rule violates the Tenth Amendment is also premised on the incorrect contention that the Rule encompasses isolated, local waters without a significant nexus to navigable waters. *See* States Br. 44. As explained above, the record supports the opposite conclusion: as the Agencies found, waters covered by the Rule have a significant nexus to traditional navigable waters and interstate waters. Because these are properly regulated under the Commerce Clause, there is also no Tenth Amendment violation. *See New York v. United States*, 505 U.S. 144, 156 (1992). The States thus have no basis

---

[19] The Southeastern Legal Foundation (SLF) amicus brief, ECF No. 160-1, largely repeats—albeit in more heated rhetoric—the flawed constitutional claims raised by the parties, which fail for the reasons explained in this section. To the extent SLF offers arguments not raised by Plaintiffs—for instance, that the Rule's definition of "traditional navigable waters" is overbroad, *see id.* at 7-10—the Court should not consider them. It is well-settled that an amicus curiae generally "cannot expand the scope of [a case] to implicate issues that have not been presented by the parties." *Garcia-Melendez v. Ashcroft*, 351 F.3d 657, 662 n.2 (5th Cir. 2003) (internal quotation marks omitted); *accord Christopher M. by Laveta McA. v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d 1285, 1292 (5th Cir. 1991) (amici cannot raise issues not raised by the parties absent "exceptional circumstances").

to argue that the Rule "invades" their "sovereign authority," States Br. 44. *See*

*Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981).

State Plaintiffs' contention that the Rule regulates "states as states," States

Br. 45, is also off the mark. The Clean Water Act creates a cooperative federalism

framework that allows—but does not require—states to implement certain of its

provisions. State Plaintiffs cite provisions of the Act and claim that these require

the States to take action. States Br. 45. But a state that does not wish to implement

such provisions may decline to do so, and the "full regulatory burden will be

borne by the Federal Government." *Hodel*, 452 U.S. at 288; *see, e.g.*, 33 U.S.C.

§§ 1313(c)(4), (d)(2), 1342(a), (b), 1344(a), (g). Similarly, while the States claim the

Rule will impose a "steep financial cost" on them, States Br. 46, citing costs of

certification and permitting, they could waive such certifications or give up such

permitting duties, *see* 33 U.S.C. §§ 1341(a)(1), 1342(a), (b). The Supreme Court has

"repeatedly affirm[ed] the constitutionality of federal statutes" like the Clean

Water Act "that allow States to administer federal programs but provide for

direct federal administration if a State chooses not to." *Texas v. EPA*, 726 F.3d 180,

196 (D.C. Cir. 2013).

State Plaintiffs also repeatedly suggest that where the Clean Water Act

applies, it "displace[s]" state and local regulation. States Br. 44, 47; *see also id.* at

25. That is misleading. Where the Clean Water Act applies, it limits the discharge

of pollutants. Otherwise, the Act has no effect on local land-use or other regulations. And as to water pollution, even where the Act applies it still allows states to regulate *more* stringently, if they prefer. *See* 33 U.S.C. § 1370.

## REMEDY

Vacatur is the usual remedy under the APA. 5 U.S.C. § 706(2). However, under certain circumstances the Court has discretion to remand without vacatur, *see Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000), or to sever and vacate only an offending provision while leaving the rest of the rule intact, *see Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 254, 271 (D.D.C. 2014). Given the multiple, varied attacks on the Rule mounted by Plaintiffs, and the claim-specific nature of the vacatur inquiry, if the Court credits any of Plaintiffs' claims it should provide an opportunity for further briefing on remedy.

## CONCLUSION

For the foregoing reasons, the Court should deny each of Plaintiffs' claims and uphold the Clean Water Rule.

Dated: November 8, 2018          Respectfully submitted,

/s/ Catherine Marlantes Rahm
Catherine Marlantes Rahm
Attorney in charge, admitted *pro hac vice*
Natural Resources Defense Council
40 West 20th Street
New York, NY 10011
Phone: (212) 727-4628/ Fax: (415) 795-4799
E-mail: crahm@nrdc.org

Jared E. Knicley, *pro hac vice* pending
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Phone: (202) 513-6242 / Fax: (415) 795-4799
E-mail: jknicley@nrdc.org

*Counsel for Defendant-Intervenors Natural Resources
Defense Council and National Wildlife Federation*

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2018, I electronically filed the foregoing **DEFENDANT-INTERVENORS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will cause a copy to be served upon counsel of record.

/s/ Catherine Marlantes Rahm