UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, et al., | § | |
| | § | |
| *Plaintiffs,* | § | CIVIL ACTION NO. 3:15-cv-162 |
| | § | consolidated with Nos. 3:15-cv-165, |
| v. | § | 3:15-cv-266, and 3:18-cv-176 |
| | § | |
| U.S. ENVIRONMENTAL PROTECTION | § | |
| AGENCY, et al., | § | |
| | § | |
| *Defendants.* | § | |

**FEDERAL DEFENDANTS' RESPONSE TO
STATES' AND TO PRIVATE PARTY PLAINTIFFS'
MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Introduction ................................................................................................................ 1

Background ................................................................................................................. 3

    I.      The Clean Water Act and implementing regulations ................................... 3

    II.     The 2015 Rule and ensuing litigation .......................................................... 4

         A.     The 2015 "Waters of the United States" Rule ................................... 5

         B.     Litigation over the 2015 Rule ......................................................... 7

    III.    The President's Executive Order and administrative reconsideration ......... 9

    IV.    Recent developments ................................................................................... 11

Standard of Review .................................................................................................. 13

Argument ................................................................................................................. 14

    I.      The claims are not prudentially ripe........................................................... 14

         A.     This case is not fit for judicial decision. ......................................... 15

         B.     No hardship will befall the challengers if the Court delays a
              decision on the merits ...................................................................... 18

    II.     The claims against interstate waters' inclusion in the definition of
         "waters of the United States" is untimely. ................................................. 19

    III.    The challengers fail to meet their burden to show significant
         procedural deficiencies............................................................................... 21

         A.     The 2015 Rule is a logical outgrowth of the proposal. ................... 22

              1.     The distance limitations in the definition of
                   "neighboring" logically grew out of the proposal................ 24

              2.     The distance limitations for case-specific waters
                   logically grew out of the proposal......................................... 30

3.      Any notice defect that adjacent waters do not include
        waters used for certain agricultural activities is
        harmless error. ....................................................................... 31

B.      The public had adequate opportunity to comment on the
        Science Report. ..................................................................................... 33

C.      The anti-lobbying and "propaganda" claims lack merit. ................. 36

IV.   The Agencies take no position on the remaining claims at this time. ......... 39

Conclusion .................................................................................................................... 40

## INTRODUCTION

In 2015, the United States Environmental Protection Agency ("EPA") and Department of the Army, United States Army Corps of Engineers ("Army" or "Corps") (together, "the Agencies" or "Federal Defendants") promulgated a rule that revised the definition of "waters of the United States" under the Clean Water Act ("CWA").[1] The Rule, which has been enjoined by courts around the country, has never had nationwide effect. At this time, the rule is preliminarily enjoined in 28 states, including in the 3 states covered by this Court's recent injunction. Doc. 140 (Order of Sept. 11, 2018).

The Agencies have clear legal authority to reconsider the rules of prior administrations. Pursuant to the President's Executive Order,[2] the Agencies are actively engaged in two such related rulemakings. In the first, the Agencies have proposed to repeal the 2015 Rule. In the second, they are preparing to propose a new definition of "waters of the United States." In light of these proposed rulemakings and this Court's injunction, the claims brought by the States and by the Private Party Plaintiffs (together, "the challengers") are not ripe for review. Instead, the rulemaking process—not litigation—is the best way forward. The Agencies have proposed to take action that, if finalized, would eliminate the complex challenges this case raises. As such, this Court need not entangle itself in those challenges; it should decline further involvement "until

---

[1] *See* Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015) ("2015 Rule" or "Rule").

[2] *See* Exec. Order No. 13,778, 82 Fed. Reg. 12,497 (Feb. 28, 2017).

an administrative decision has been formalized." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807 (2003).

If the Court nevertheless proceeds to the merits, the Agencies here respond only to a portion of the challengers' claims. The Agencies have proposed the repeal of the 2015 Rule and are actively reconsidering many of the substantive questions raised by the challengers here. Having received public comments, including those from parties to this case, the Agencies will decide whether the 2015 Rule should be repealed, modified, or retained. Until the Agencies take final action on that proposal, the Agencies are keeping an open mind. That means that though their prior briefs and statements (made when the rulemaking posture was different) are a matter of public record, the Agencies now take no position on the substantive issues currently being reconsidered.

As for the procedural challenges to the 2015 Rule that are not intertwined with substantive issues under reconsideration, however, the Court should deny the motions for summary judgment and grant summary judgment to the Agencies. *First*, the challenge to the 2015 Rule's inclusion of interstate waters is untimely. The Agencies did not reconsider, and made no changes to, the jurisdictional status of interstate waters. Thus, the Agencies did not restart the time period for judicial review as to that specific issue. *Second*, the challengers fail to meet their burden to show any notice-and-comment defects in the 2015 Rule. *Third*, the Agencies provided adequate notice of the scientific basis for the Rule. *Finally*, the anti-lobbying and "propaganda" claims lack merit.

# BACKGROUND

## I.     The Clean Water Act and implementing regulations

The CWA generally prohibits "the discharge of any pollutant by any person," 33

U.S.C. § 1311(a), unless the discharger "obtain[s] a permit and compl[ies] with its

terms." *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 11

(1981) (citation omitted).[3] A "discharge of a pollutant" occurs when a person adds "any

pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A).

"[N]avigable waters," in turn, are "the waters of the United States." *Id.* § 1362(7).

The Agencies, charged with implementing the CWA, "must necessarily choose

some point at which water ends and land begins," but "[w]here on this continuum to find

the limit of 'waters' is far from obvious." *United States v. Riverside Bayview Homes*,

474 U.S. 121, 132 (1985). The Corps first promulgated regulations defining "waters of

the United States" in 1977. *See* 42 Fed. Reg. 37,122, 37,144 (July 19, 1977). In the late

1980s, the Agencies adopted regulatory definitions of that statutory phrase substantially

similar to the 1977 definition.[4] *See* 51 Fed. Reg. 41,206, 41,216-17 (Nov. 13, 1986); 53

---

[3] The CWA establishes two permitting programs for authorization to discharge pollutants
to "waters of the United States." *See* 33 U.S.C. §§ 1342 & 1344; *Coeur Alaska, Inc. v.
Se. Alaska Conservation Council*, 557 U.S. 261 (2009). EPA administers the CWA
section 402 National Pollutant Discharge Elimination System ("NPDES") program, under
which persons may discharge pollutants downstream under certain conditions. The Corps
administers the CWA section 404 program, issuing permits for the discharge of dredged
or fill material. *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 626 (2018).

[4] The Agencies then defined "waters of the United States" as:

*Cont.*

Fed. Reg. 20,764, 20,765 (June 6, 1988).  Thus, as of 2015, the Agencies had interpreted

and implemented essentially the same definition of "waters of the United States" for

nearly 40 years.

Over those four decades, the Agencies refined their longstanding regulatory

definition of "waters of the United States" through guidance documents and agency

practice, as informed by Supreme Court decisions.  *See, e.g.*, *Solid Waste Agency of N.*

*Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001); *Rapanos v. United States*,

547 U.S. 715 (2006); *United States v. Robison*, 505 F.3d 1208 (11th Cir. 2007).  Though

"imperfect," this decades-old program provides a measure of certainty and predictability.

*See In re EPA & Dep't of Def. Final Rule*, 803 F.3d 804, 808 (6th Cir. 2015) (describing

the "familiar" pre-2015 Rule regime).

## II.    The 2015 Rule and ensuing litigation

 Since the Agencies promulgated the "WOTUS" Rule in 2015, there have been

many administrative and judicial developments.  Significantly, the 2015 Rule is not—nor

has it ever been—implemented nationwide.  It is currently judicially enjoined in 28

---

> All waters which are currently used, were used in the past, or may be susceptible
> to use in interstate or foreign commerce . . . All interstate waters including
> interstate wetlands. . . . All other waters, such as intrastate lakes, rivers, streams
> (including intermittent streams),  . . . Tributaries of waters identified in . . . this
> section; The territorial sea; and Wetlands adjacent to waters (other than waters that
> are themselves wetlands) identified
> . . . in this section . . . .

40 C.F.R. § 232.2 (2014); *see also* 33 C.F.R. § 328.3 (2014) (containing nearly identical
text).

states.  The Agencies, moreover, have proposed a rule that, if finalized, would repeal the 2015 Rule.

### A.    The 2015 "Waters of the United States" Rule

In June 2015, the Agencies promulgated the 2015 Rule, revising the regulatory definition of "waters of the United States."  *See* 80 Fed. Reg. 37,054 (June 29, 2015).  A stated purpose of the 2015 Rule was to "increase CWA program predictability and consistency by clarifying the scope of 'waters of the United States' protected under the Act."  *Id.*  The 2015 Rule placed waters into three categories: (A) waters that are categorically "jurisdictional by rule" in all instances (*i.e.*, without the need for any additional analysis); (B) waters that are subject to case-specific analysis to determine whether they are jurisdictional, and (C) waters that are categorically excluded from jurisdiction.

*"Jurisdictional by Rule" Waters.*  Waters that are "jurisdictional by rule" include (1) waters that are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters that are subject to the ebb and flow of the tide; (2) interstate waters, including interstate wetlands; (3) the territorial seas; (4) impoundments of waters otherwise identified as jurisdictional; (5) tributaries of the first three categories of "jurisdictional by rule" waters; and (6) waters adjacent to a water identified in the first five categories of "jurisdictional by rule" waters, including wetlands, ponds, lakes, oxbows, impoundments, and similar waters.  *See id.* at 37,104.

The 2015 Rule added definitions of key terms including, as relevant here, "tributaries" and "neighboring" adjacent waters that are "jurisdictional by rule."  *See id.*

at 37,105.  A tributary under the 2015 Rule is a water that contributes flow, either directly or through another water, to a water identified in the first three categories of "jurisdictional by rule" waters and that is characterized by the presence of the "physical indicators" of a bed and banks and an ordinary high water mark.  And "neighboring" adjacent waters are those located:

- within 100 feet of the ordinary high water mark of a category (1) through (5) "jurisdictional by rule" water;

- within the 100-year floodplain of a category (1) through (5) "jurisdictional by rule" water and not more than 1,500 feet from the ordinary high water mark of such water;

- within 1,500 feet of the high tide line of a category (1) through (3) "jurisdictional by rule" water; and all waters within 1,500 feet of the ordinary high water mark of the Great Lakes.

*Id*. at 37,105.

*Case-Specific Waters.*  In addition to the six categories of "jurisdictional by rule" waters, the 2015 Rule identifies certain waters that are subject to a case-specific analysis to determine if they have a "significant nexus" to a category (1) through (3) "jurisdictional by rule" water.  *Id*. at 37,104-05.  The first category consists of five specific types of waters: prairie potholes, Carolina and Delmarva bays, pocosins, western vernal pools in California, and Texas coastal prairie wetlands.  *Id*. at 37,105.  The second category consists of all waters located within the 100-year floodplain of any category (1) through (3) "jurisdictional by rule" water and all waters located within 4,000 feet of the

6

high tide line or ordinary high water mark of any category (1) through (5) "jurisdictional by rule" water.  *Id.*

The 2015 Rule defines "significant nexus" to mean a water, including wetlands, that either alone or in combination with other similarly situated waters in the region, significantly affects the chemical, physical, or biological integrity of a category (1) through (3) "jurisdictional by rule" water.  80 Fed. Reg. at 37,106.  "For an effect to be significant, it must be more than speculative or insubstantial."  *Id.*  The term "in the region" means "the watershed that drains to the nearest" primary water.[5]  Under the 2015 Rule, to determine whether a water, alone or in combination with similarly situated waters across a watershed, has a significant nexus, one must consider nine functions such as sediment trapping, runoff storage, provision of life cycle dependent aquatic habitat, and other functions.  *Id.*

*Exclusions.*  The Agencies also retained exclusions from the definition of "waters of the United States" for prior converted cropland and waste treatment systems.  *Id.* at 37,105.  In addition, the Agencies codified several exclusions that reflected longstanding agency practice, and added others such as "puddles" and "swimming pools" in response to public comments on the proposed 2015 Rule.  *Id*. at 37,096-98, 37,105.

### B.    Litigation over the 2015 Rule

Once published, the 2015 Rule was immediately challenged by 31 states and many other parties in district and appellate courts across the country, including this Court.  83

---

[5] A "primary" water is a category (1) through (3) "jurisdictional by rule" water.

Fed. Reg. 5,200, 5201 (Feb. 6, 2018).  On August 27, 2015—the day before the 2015

Rule was to take effect—the District Court in North Dakota enjoined the Rule in 13

states, holding that the movants there "are likely to succeed on the merits of their claim."

*See North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1055 (D.N.D. 2015).

Meanwhile, petitions for review of the 2015 Rule were consolidated in the Sixth

Circuit Court of Appeals.  On October 9, 2015, that court issued a nationwide stay of the

2015 Rule pending further proceedings.  *See In re EPA*, 803 F.3d 804.  It "conclude[d]

that petitioners have demonstrated a substantial possibility of success on the merits of

their claims."  *Id.* at 807.  Noting "the sheer breadth of the ripple effects caused by the

Rule's definitional [changes]," the Sixth Circuit stayed the 2015 Rule to "restore

uniformity of regulation under the familiar, if imperfect, pre-Rule regime, pending

judicial review."  *Id.* at 808.  Consistent with the Sixth Circuit's stay order, the Agencies

thereafter returned to their longstanding practice of applying, nationwide, the definition

of "waters of the United States" set forth in their 1980s regulations, as informed by

guidance, agency practice, and relevant case law.  83 Fed. Reg. at 5,201.

In the Sixth Circuit litigation, many of the parties argued that the court did not

have jurisdiction over the challenges under 33 U.S.C. § 1369(b)(1).  The Sixth Circuit

held that it had jurisdiction, and the Supreme Court granted certiorari.  *See In re U.S.

Dep't of Def.*, 817 F.3d 261 (6th Cir. 2016), *cert. granted*, *Nat'l Ass'n of Mfrs. v. DOD*,

137 S. Ct. 811 (2017), *rev'd*, 138 S. Ct. 617 (2018).

### III.    The President's Executive Order and administrative reconsideration

On February 28, 2017, the President of the United States signed an Executive Order directing the Agencies to reconsider the 2015 Rule.  Exec. Order No. 13,778, 82 Fed. Reg. 12,497.  The order declared it to be "in the national interest to ensure that the Nation's navigable waters are kept free from pollution, while at the same time promoting economic growth, minimizing regulatory uncertainty, and showing due regard for the roles of the Congress and the States under the Constitution."  *Id.* § 1.

Consistent with the President's directive, in July 2017 the Agencies proposed to repeal the 2015 Rule.  If finalized, this proposal would recodify the prior regulatory definition of "waters of the United States," promulgated by the Agencies in the late 1980s.  "Definition of 'Waters of the United States'−Recodification of Pre-Existing Rules."  82 Fed. Reg. 34,899 (July 27, 2017).  In response to the proposal, the Agencies received more than 685,000 comments.  *See* https://www.regulations.gov/document?D= EPA-HQ-OW-2017-0203-0001 (rulemaking docket).

Upon consideration of the comments received, in July 2018 the Agencies published a Supplemental Notice of Proposed Rulemaking, to clarify that they are proposing to permanently repeal the 2015 Rule in its entirety.  83 Fed. Reg. 32,227 (July 12, 2018).  The Supplemental Notice also reiterates that the Agencies are proposing to recodify the pre-2015 regulations, and to implement the longstanding regulatory framework that is currently being administered by the Agencies in those states where the 2015 Rule is enjoined, while they continue to consider a new definition of "waters of the United States."  *Id.*

9

The Agencies are proposing to repeal the 2015 Rule for several reasons, including: (1) there is substantial uncertainty associated with the 2015 Rule for regulators, the regulated community, and the public resulting from legal challenges and preliminary rulings by several courts; and (2) the Agencies are concerned that certain findings and assumptions supporting adoption of the 2015 Rule were not correct, and that these conclusions, if erroneous, may separately justify repeal of the 2015 Rule. *Id.* at 32,228; 32,237-39. The Agencies are also considering the preliminary, adverse legal findings of various courts (including this one), and whether to accept and adopt one or more of those preliminary conclusions of law, including whether to conclude that the 2015 Rule exceeds EPA's authority under the Clean Water Act. *Id.* at 32,228; 32,238; 32,240.

Thus, the Agencies have proposed to conclude that regulatory certainty would be best achieved by permanently repealing the 2015 Rule and recodifying the scope of CWA jurisdiction currently in effect in some states. *Id.* at 32,228; 32,237-38. The Agencies also propose to conclude that rather than achieving its stated objectives of increasing predictability and consistency under the CWA, *see* 80 Fed. Reg. at 37,055, the 2015 Rule is creating significant confusion and uncertainty for states, tribes, local governments, agency staff, regulated entities, and the public, particularly in view of court decisions that have cast doubt on the legal viability of the rule. 83 Fed. Reg. at 32,228; 32,237-38.

## IV.  Recent developments

In January 2018, the Supreme Court overturned the Sixth Circuit's jurisdictional ruling,[6] holding that, under CWA section 509(b)(1), 33 U.S.C. § 1369(b)(1), "any challenges to the Rule . . . must be filed in federal district courts."  *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. at 624.  The Sixth Circuit then vacated its stay of the 2015 Rule and dismissed all challenges brought in the Courts of Appeals for lack of jurisdiction.  *In re U.S. Dep't of Def.*, 713 Fed. App'x 489 (6th Cir. 2018).

In February, after a notice-and-comment rulemaking, the Agencies amended the 2015 Rule to add an applicability date of February 6, 2020 (the Applicability Rule).  83 Fed. Reg. 5,200.  In the Applicability Rule the Agencies found that the applicability date would serve the public interest by maintaining the pre-2015 regulatory framework for a time so that only one regulatory definition of "waters of the United States" will be applicable nationwide.  *See* 83 Fed. Reg. at 5,202.  The alternative, the Agencies concluded, would be a patchwork of regulations, one that depended on the geographic reach of various judicial injunctions of the 2015 Rule, and which would be undesirable for most stakeholders.  *Id.*

The Applicability Rule has been challenged in federal district courts in South Carolina, New York, Washington, and California.  *See S.C. Coastal Conservation League v. EPA*, No. 18-cv-330; *New York v. EPA*, No. 1:18-cv-01030-JPO (S.D.N.Y.) (summary judgment briefing completed); *Natural Res. Def. Council, Inc. v. EPA*, No. 1:18-cv-1048-

---

[6] *See In re U.S. Dep't of Def.*, 817 F.3d 261 (6th Cir. 2016), *cert. granted*, 137 S. Ct. 811 (2017).

JPO (S.D.N.Y.) (same); *Puget Soundkeeper Alliance v. Wheeler*, No. 2:15-cv-01342-JCC (W.D. Wash.) (cross-motion for summary judgment and response to plaintiffs' motion for summary judgment filed Sept. 14, 2018); *Waterkeeper Alliance v. Wheeler*, 3:18-cv-3521 (N.D. Cal.) (answer filed Aug. 17, 2018).  In August 2018, the South Carolina District Court enjoined the Applicability Rule nationwide, but the United States has asked that court to stay judgment and will appeal that decision.  *S.C. Coastal Conservation League*, No. 18-cv-330 (D.S.C.), Docs. 66 (order), 67 (judgment), 73 (notice of appeal), & 74 (motion to stay judgment).

In addition to this Court's September 2018 preliminary injunction, in June 2018 the Southern District of Georgia preliminarily enjoined the 2015 Rule in 11 states.  *See Georgia v. Pruitt*, 326 F. Supp. 3d 1356 (S.D. Ga. 2018).  Intervenor Plaintiffs in that case have also moved to amend or modify that preliminary injunction, and seek a nationwide injunction of the 2015 Rule.  *Georgia v. Wheeler,* No. 2:15-cv-0079 (S.D. Ga.), Doc. 208.  Three other states are currently seeking a preliminary injunction in a case filed in Ohio.  *See Ohio v. EPA*, No. 2:15-cv-02467 (S.D. Ohio).  The North Dakota District Court also clarified the scope of the preliminary injunction issued by that court to include the State of Iowa, which intervened as a plaintiff after the preliminary injunction was granted.  *North Dakota v. EPA*, No. 3:15-cv-59-DLH-ARS, Doc. 250 (D.N.D. Sept. 18, 2018).  And additional challengers of the 2015 Rule have sought to lift the stay of their cases and for a ruling on their motions for preliminary injunction.  *Oklahoma v. EPA*, No. 4:15-cv-00381-CVE-FHM (N.D. Okla.), Doc. 58; *Chamber of Commerce v. EPA*, No. 4:15-cv-0386-CVE-PJC (N.D. Okla.), Doc. 68.

## STANDARD OF REVIEW

Because the Clean Water Act does not provide a separate standard for review of agency decision-making, judicial review of final agency action by the Agencies is governed by the standard set out in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  Under the APA, a court may set aside agency actions "found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A).  Under arbitrary-and-capricious review, a court may set aside an agency's decision only if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1254 (11th Cir. 2007) (internal quotation marks and citation omitted).  "[W]hen a party seeks review of agency action under the APA [before a district court], the district judge sits as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001); *see also Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1225 (D.C. Cir. 1993). Challenges to agency action under the APA are properly adjudicated on cross-motions for summary judgment.  *See, e.g.*, *Fla. Fruit & Veg. Ass'n. v. Brock*, 771 F.2d 1455, 1459 (11th Cir. 1985) (finding that "the summary judgment procedure is particularly appropriate in cases in which the court is asked to review . . . a decision of a federal administrative agency").  Judicial review, however, is limited to the administrative record

compiled and relied on by the agency.  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419-20 (1971).

## ARGUMENT

This case is not ripe for adjudication.  The 2015 Rule has been enjoined by this Court and that rule, along with the substantive issues raised by the challengers here, is under active reconsideration by the Agencies.  The Court should thus decline a "premature adjudication" of these issues "until an administrative decision has been formalized." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 807 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)).  And because they are currently reconsidering the 2015 Rule, the Agencies do not state a position on the substantive issues subject to that administrative process.  But if the Court reaches the procedural challenges discussed below, it should deny them.

## I.      The claims are not prudentially ripe.

In addition to constitutional limitations on the jurisdiction of federal courts, prudential concerns may counsel judicial restraint.  *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993) (stating that the "ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.").  A court will decline to exercise jurisdiction over a matter as prudentially unripe when it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.  *Id.*  This doctrine is designed to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial

14

interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 807-08 (internal quotation marks and citations omitted); *accord Texas Indep. Producers & Royalty Owners Ass'n v. U.S. E.P.A.*, 413 F.3d 479, 482, 483 (5th Cir. 2005) (declining to review CWA rule in part based on ongoing related administrative process).  To decide whether a matter is ripe, courts examine the "fitness of the issues for judicial decision" and the "hardship" to the parties of withholding consideration.  *Abbott Labs.*, 387 U.S. at 149.  State Plaintiffs and Private Party Plaintiffs must satisfy both prongs.  *Nat'l Advertising Co.*, 402 F.3d at 1339.  They fail to do so here.

In considering and applying the "fitness" and "hardship" prongs of the ripeness analysis, the courts also consider: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented."  *Texas Indep. Producers*, 413 F.3d at 482-83 (citing *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).

**A.      This case is not fit for judicial decision.**

The "fitness for judicial decision" prong goes to a court's ability to visit an issue and whether it would benefit from further factual development.  *Nat'l Park Hosp. Ass'n*, 538 U.S. at 804.  A case is more likely to be ripe if it is not contingent on future possibilities.  *Texas v. United States,* 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' ") (citation omitted).  "In the context of agency decision

making, letting the administrative process run its course before binding parties to a judicial decision prevents courts from 'entangling themselves in abstract disagreements over administrative policies, and . . . protect[s] the agencies from judicial interference' in an ongoing decision-making process." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386–87 (D.C. Cir. 2012) (citing *Abbott Labs.,* 387 U.S. at 148). In addition to conserving judicial resources, postponing review where there are ongoing administrative proceedings "comports with [a court's] theoretical role as the governmental branch of last resort." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996).

Here, the ongoing reconsideration process and this Court's injunction make this matter unfit for judicial resolution. Indeed, the Agencies have proposed to repeal the 2015 Rule, an administrative action that would rescind the very action that is the subject of this litigation and recodify the regulations that predate the 2015 Rule. 82 Fed. Reg. 34,899; 83 Fed. Reg. 32,227.[7]

Notably, some of the reasons the Agencies have cited in the proposed repeal are the same ones raised by the challengers on summary judgment. For example, the Supplemental Notice of Proposed Rulemaking states, "court rulings against the 2015

---

[7] The Agencies' proposal is based at least in part on the same issues as those raised by the challengers here. *See, e.g.*, 83 Fed. Reg. at 32,240 (discussing concerns about clarity, the scope of the 2015 Rule, and the scope of the Agencies' CWA rulemaking authority); State Pls. Br. at 6-25 (arguing that the 2015 Rule is inconsistent with Supreme Court precedent and the CWA); Private Party Pls. Br. at 29-44 (same). In fact, several of the State Plaintiffs and Private Party Plaintiffs, among other challengers of the 2015 Rule, submitted comments supporting the proposal to repeal. *See* Exhibit 1 (comments submitted by States Plaintiffs and Private Party Plaintiffs). All exhibits cited herein will be included in the parties' Joint Appendix. In addition, they are being filed along with this brief.

Rule suggest that the interpretation of the 'significant nexus' standard as applied in the 2015 Rule may not comport with and accurately implement the legal limits on CWA jurisdiction intended by Congress and reflected in decisions of the Supreme Court." 83 Fed. Reg. at 32,228; *see also id.* at 32,238 (noting this Court's findings regarding the significant nexus standard). The Agencies are also evaluating whether "many features that are categorically jurisdictional under the 2015 Rule, such as wetlands that fall within the distance thresholds of the definition of 'neighboring,' test the limits of the scope of the Commerce Clause because they may not have the requisite effect on the channels of interstate commerce." *Id.* at 32,249. And the Agencies have expressed concern that the 2015 Rule "may have altered the balance of authorities between the federal and State governments, contrary to the agencies' statements in promulgating the 2015 Rule and in contravention of CWA section 101(b), 33 U.S.C. 1251(b)." *Id.* at 32,228. Rather than use its limited resources to resolve issues raised in both litigation and the rulemaking, the Court should respect the prerogative of the Executive Branch to complete its reconsideration and possible replacement of the 2015 Rule.

Further, consistent with the President's directive, the Agencies have drafted a new proposed definition of "waters of the United States." *See* 83 Fed. Reg. at 32,238. If the Agencies finalize either the repeal rule or a new definition (or both), this case would become moot. *Cf. Am. Petroleum Inst. v. EPA*, 683 F.3d at 387 (staying litigation when "[t]he proposed rule would wholly eliminate" the issues in this litigation). Allowing the administrative process to run its course will allow the Agencies to "crystalliz[e] [their] policy before that policy is subjected to judicial review," *Wyo. Outdoor Council v. U.S.*

17

*Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999), and avoid "inefficient" and unnecessary "piecemeal review." *Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin.*, 740 F.2d 21, 30 (D.C. Cir. 1984) (citation and internal quotation marks omitted).

In sum, this Court need not review a rule that it has already enjoined and that may never be applicable in the states that are plaintiffs here.

> ### B.  No hardship will befall the challengers if the Court delays a decision on the merits.

As for the "hardship" prong of the ripeness analysis, "[a]bstract injury is not enough.  It must be alleged that the plaintiff has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged statute or official conduct." *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) (internal quotation marks and citations omitted).  "[R]ipeness is peculiarly a question of timing" and is governed by the situation at the time of review, rather than the situation at the time of the events under review. *Anderson v. Green*, 513 U.S. 557, 559 (1995) (internal quotation marks and citation omitted) (finding no live dispute where agency action would not take effect absent further action by the agency). "The plaintiffs need not wait until the threatened injury occurs, but the injury must be 'certainly impending.'" *Paraquad, Inc. v. St. Louis Hous. Auth.*, 259 F.3d 956, 958–59 (8th Cir. 2001) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

The challengers are not currently harmed by the 2015 Rule, which has been enjoined by this Court.  Nor do they face any impending harm because there is no

suggestion that the Court will lift the injunction any time soon.  So there is no hardship to the challengers if the Court declines to decide their claims *now*.

For these reasons, the Court should conclude that the challenges to the 2015 Rule are not ripe at this time and hold this matter in abeyance.  In the event the Court proceeds to decide the issues raised by the challengers, however, the following sections explain why certain procedural challenges should be denied.

## II.    The claims against interstate waters' inclusion in the definition of "waters of the United States" is untimely.

The challengers dispute the inclusion of "interstate waters" in the definition of waters of the United States.  Private Party Pls. Br. at 32; State Pls. Br. at 11.  But APA challenges to final agency actions must generally be brought within six years.  28 U.S.C. § 2401(a); *Nat'l Ass'n of Mfrs.*, 138 S. Ct. at 626-27.  The 2015 Rule did not change the long-standing regulatory language that includes interstate waters as a separate category of waters of the United States.  Because the time to challenge that portion of the regulation is long past, the claims as to interstate waters must be dismissed as untimely.

Interstate waters have long been a distinct category of waters of the United States under the Agencies' regulations, along with traditional navigable waters and the territorial seas.  *See* 33 C.F.R. § 323.2(a)(4) (1978) (identifying jurisdictional "[i]nterstate waters and their tributaries, including adjacent wetlands"); *id.* at § 323.2(a)(5) (1978) (distinguishing between waters that are "part of a tributary system to interstate waters" and waters that are part of the tributary system "to navigable waters of the United States").  The specific regulatory text on interstate waters has not changed since 1982

(though in 1986 the Corps consolidated and renumbered its regulations).  *Compare* 33

C.F.R. § 323.2(a)(2) (1983) (waters of the United States include "[a]ll interstate waters

including interstate wetlands") *with* 33 C.F.R. § 328.3(a)(2) (1987) (same) *and* 33 C.F.R.

§ 328.3(a)(2) (2015) (same).

In undertaking a rulemaking on "waters of the United States" and modifying

certain related regulations, the Agencies did not reopen the pre-2015 regulations for

judicial review and thus did not restart the six-year statute of limitations.  The relevant

inquiry is whether the agency has given any "indication that [it] was reconsidering" the

regulation.  *Ohio Pub. Interest Research Grp., Inc. v. Whitman*, 386 F.3d 792, 800 (6th

Cir. 2004).  For example, in *Ohio PIRG*, EPA sought comment on whether state permit

programs implemented under the Clean Air Act complied with the agency's

interpretation of that statute.  *Id.*  The agency did not, however, "signal its reconsideration

of its previous rule interpreting" that statute.  *Id.*  Thus, the court held that a challenge to

the interpretation was time-barred.

Here, the Agencies stated in the proposal that the Rule "does not change" the

Agencies' jurisdiction over interstate waters.  79 Fed. Reg. 22,188, 22,200 (Apr. 21,

2014).  Although some comments addressed interstate waters, the Agencies' response

reiterated the Proposed Rule in again noting that there was no such change in the status of

interstate waters.  80 Fed. Reg. at 37,058, 37074-75.  The Proposed Rule, the response to

comments, and the Rule all demonstrate that the Agencies neither proposed to—nor

did—reconsider the inclusion of interstate waters.  So they did not "reopen the question"

20

of interstate waters for purposes of judicial review, and the challenge to interstate waters

is untimely.  *Ohio PIRG*, 386 F.3d at 800.

### III.   The challengers fail to meet their burden to show significant procedural deficiencies.

The challengers say that they lacked adequate opportunity to comment on the 2015

Rule and a supporting Science Report.  As previously discussed, this Court should avoid

premature judicial entanglement "in abstract disagreements over administrative policies."

*Nat'l Park Hosp. Ass'n*, 538 U.S. at 807–08.  Since 2015, the challengers and other

interested parties have had further opportunity to—and did—present their objections

through the Agencies' reconsideration proceedings.  For example, this past July, the

Agencies invited further comment through a supplemental notice of proposed

rulemaking, specifically soliciting comment on issues raised here on summary judgment.

These include whether "distance-based limitations that were not specified in the proposal

. . . mitigated or affected the agencies' change in interpretation of similarly situated

waters in the 2015 Rule," and "on any other issues that may be relevant to the agencies'

consideration of whether to repeal the 2015 Rule, such as whether any potential

procedural deficiencies limited effective public participation in the development of the

2015 Rule."  83 Fed. Reg. at 32,249.  *See also* Exhibit 1 (comments submitted by

Plaintiff States and Private Party Plaintiffs in support of proposal to rescind the 2015

Rule).

If the Agencies rescind the 2015 Rule, as they have proposed to do, this case will

be moot.  Even if the Agencies simply modify or maintain the 2015 Rule, the challengers

now have the opportunity, in that rulemaking, to comment on the final regulatory text and all the support for the 2015 Rule.  *See Hedge v. Lynn*, 689 F. Supp. 898, 910 (D. Minn. 1988) (procedural claims moot after agency provided subsequent process).  For this reason, this Court should "let[] the administrative process run its course before binding parties to a judicial decision."  *Am. Petroleum Inst.*, 683 F.3d at 386.  If the Court declines to do so, it should reject the procedural challenges on the merits because Plaintiffs fail to meet their burden of showing that the 2015 Rule suffer from notice-and-comment defects or is otherwise procedurally deficient.

### A.    The 2015 Rule is a logical outgrowth of the proposal.

Under the APA, a "[g]eneral notice" of proposed rulemaking must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved" and provide the public an opportunity to comment.  5 U.S.C. § 553(b)(3), (c). The purpose of these procedures is "to get public input so as to get the wisest rules," to "ensure fair treatment for persons to be affected by regulations," and "to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage."  *Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666, 678 (6th Cir. 2005) (internal quotation marks and citation omitted).

The notice requirement does not mean that an agency is confined to adopting the position it proposed, as such a restriction would undermine the "purpose of notice and comment—to allow an agency to reconsider, and sometimes change, its proposal based on the comments of affected persons."  *Ass'n of Battery Recyclers v. EPA*, 208 F.3d 1047, 1058 (D.C. Cir. 2000).  Rather, an agency satisfies the notice requirement, and

need not seek further comment, if the final rule is a "logical outgrowth" of the proposed

rule. *ConocoPhillips Co. v. U.S. E.P.A.*, 612 F.3d 822, 834 (5th Cir. 2010) (citation

omitted). A final rule is a logical outgrowth "if affected parties should have anticipated

that the relevant modification was possible." *Allina Health Servs. v. Sebelius*, 746 F.3d

1102, 1107 (D.C. Cir. 2014). Thus, changes to a proposal—even substantial ones—may

be made, provided the final rule is a "logical outgrowth" of the proposed rule. *Long*

*Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007); *see also Alto Dairy v.*

*Veneman*, 336 F.3d 560, 569-70 (7th Cir. 2003) ("The purpose of a rulemaking

proceeding is not merely to vote up or down the specific proposals advanced . . . but to

refine, modify, and supplement the proposals in the light of evidence and arguments

presented in the course of the proceeding.").

A proposed rule satisfies the logical outgrowth test if it "expressly ask[s] for

comments on a particular issue or otherwise ma[kes] clear that the agency [is]

contemplating a particular change." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d

1076, 1081 (D.C. Cir. 2009). The requirements of APA section 553 are thus satisfied "if

affected parties should have anticipated that the relevant modification was possible,"

*Allina Health Servs.*, 746 F.3d at 1107, or if additional notice and comment "would not

provide commenters with their first occasion to offer new and different criticisms."

*Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1311 (D.C. Cir. 1991) (internal quotation marks

and citation omitted).

Here, the Agencies adequately described the subjects and issues involved in the

rulemaking and invited comment from the public. Though certain aspects of the final

Rule differed from the proposal, the modifications to the Proposed Rule were foreseeable and, at least in part, the result of comments.

>    **1.     The distance limitations in the definition of "neighboring" logically grew out of the proposal.**

The 2015 Rule retained the 1986 regulation's definition of "adjacent" as "bordering, contiguous [to], or neighboring." 33 C.F.R. § 328.3(c)(1); *see id.* § 328.3(a)(6).[8] "Neighboring" adjacent waters are those (1) within 100 feet of the ordinary high water mark of a primary water, impoundment, or tributary; (2) within the 100-year floodplain (but not more than 1,500 feet from the ordinary high water mark) of primary water, impoundment, or tributary; or (3) within 1,500 feet of the high tide line of a primary water or within 1,500 feet of the ordinary high water mark of the Great Lakes. *Id.* § 328.3(c)(2).  The challengers contend that in defining "adjacent," the Agencies failed to provide adequate notice of these distance limitations.  *See* State Pls. Br. at 32-36; Private Party Pls. Br. at 19.  They are wrong.

In the proposal, the Agencies sought comment on a number of ways to address and clarify jurisdiction over "adjacent waters," including establishing a floodplain interval (e.g., a 50-year or 100-year floodplain) and providing clarity on reasonable proximity as an important aspect of adjacency.  *See, e.g.*, 79 Fed. Reg. at 22,209 ("This new definition is designed to provide greater clarity by identifying specific areas and characteristics for jurisdictional adjacent waters, but the agencies request comment for additional

---

[8] The terms "bordering" and "contiguous" are unchanged from the 1986 regulation.  See 80 Fed. Reg. at 37,080.  The challengers do not dispute these definitions.

clarification.").  Though the distances in the final Rule identified a smaller subset of waters as "neighboring" than proposed, the final distance limitations logically grew from and were within the range of the proposed distances.  *See, e.g., Waukesha v. EPA*, 320 F.3d 228 (D.C. Cir. 2003) (rejecting logical outgrowth challenge where final metric was not expressly proposed, but was within the range of possible outcomes presented to the public); *Texas Office of Pub. Util. Counsel v. F.C.C.*, 265 F.3d 313, 326 (5th Cir. 2001) (rejecting logical outgrowth challenge where the "modified proposal retained the essential framework of the original proposal, but . . . added a few provisions to allay affordability concerns").

For "adjacent" waters, the Agencies stated their intent to bring "greater clarity to the meaning of 'neighboring'" by "*defin[ing] the lateral reach*" of that term.  79 Fed. Reg. at 22,207 (emphasis added); *see id.* at 22,208-09.  The Agencies noted that the term "neighboring," which was historically part of the definition of "adjacent," "has generally been interpreted broadly in practice," and that the clarification of "neighboring" was intended to capture those waters that in practice the Agencies "have identified as having a significant effect" on the chemical, physical, or biological integrity of primary waters. *Id.* at 22,207.

The proposed definition of "neighboring" encompassed waters located within the distance limitations established by the riparian area or floodplain of a primary water, impoundment, or tributary, and waters with a shallow subsurface hydrologic connection or confined surface hydrologic connection to a primary water, impoundment, or tributary. *Id.*; *see also id.* at 22,263.  The proposal further explained that, to the extent

"neighboring" might be defined based on a shallow subsurface hydrologic connection or confined surface hydrologic connection, the Agencies would "assess the distance" between the water body and the jurisdictional water, as the Agencies have "always included an element of reasonable proximity" in the application of the definition of "adjacent." *Id.* at 22,207-08 (citing *Riverside Bayview*, 474 U.S. at 133-34); *see also* 42 Fed. Reg. at 37,128.  Recognizing that sometimes "the *distance* between water bodies may be sufficiently far that even the presence of a hydrologic connection may not support an adjacency determination," the Agencies requested comment on a number of other options, including "*establishing specific geographic limits* for using shallow subsurface or confined surface hydrological connections as a basis for determining adjacency" and a specific floodplain interval.  79 Fed. Reg. at 22,208 (emphases added).  The Agencies thus informed the public that the definition of "neighboring" was intended to set a clear spatial limit as to the geographic scope of adjacent waters, based on riparian area, floodplain, and/or some distance limits, and invited comment on how best to accomplish that objective.

Importantly, the slew of comments on distance limitations show that the public had adequate notice of the issue.  *See Am. Trucking Ass'ns, Inc. v. FMCSA*, 724 F.3d 243, 253 (D.C. Cir. 2013) (finding logical outgrowth where comments "expressly recognized" the possibility that the agency would promulgate a provision requiring an off-duty break for short- and long-haul truckers alike).  Many commenters flatly rejected the idea of any distance limitations (whether based on a riparian area or floodplain or a set distance).  For example, some commenters asserted that the *Rapanos* plurality opinion, not Justice

Kennedy's opinion, should be followed, and that a hydrologic connection rather than distance should be considered.  *See, e.g.*, Exhibit 2 (Comments on proposed 2015 Rule), Part 1 at 1-23 (Comments of N.M. Cattle Growers Ass'n at 12; Tex. Comm'n on Envtl. Quality at 6).  Others commented that there should be no distance limitation in the definition of "neighboring," asserting that chemical and biological connectivity can extend well beyond a riparian area or floodplain.  Exhibit 2 (Comments on proposed 2015 Rule), Part 1 at 24-174 (Comments of Clean Water Action at 6; S. Envtl. Law Ctr. at 16-17; Earthjustice at 7; NRDC at 62); *see also* Exhibit 2 (Comments on proposed 2015 Rule), Part 1 at 175-298 (Comment of Minn. Dep't of Nat'l Res. at 2 (suggesting hydrologic criteria to determine adjacency rather than "geographic proximity"); Comment of Ducks Unlimited at 76 ("the general goal of categorically incorporating riparian and floodplain waters as jurisdictional 'adjacent waters' within the definition of 'neighboring' is appropriate")).

In fact, many commenters responded to the Agencies' request for suggested distance limits by proposing specific floodplain intervals set by the Federal Emergency Management Agency, riparian areas, and numerical distances. *See, e.g.*, Exhibit 2 (Comments on proposed 2015 Rule), Part 2 at 1-77 (Comments of Ky. Oil & Gas Ass'n at 8 (recommending 100-year floodplain for larger order streams, and the riparian zone within 50 feet of the ordinary high water mark for smaller order streams); Ctr. for Rural Affairs at 5 (recommending floodplains and riparian areas as "clear, water body-specific, physical boundaries"); Nat'l Lime Ass'n at 15 (supporting 5-year floodplain); NAIOP at 5 (recommending 100 feet from a subsection (a)(1)-(5) water or the floodplain of such a

27

water); Fla. Crystals Corp. at 10 (suggesting a 200 foot limit); AASHTO at 8 (supporting floodplain, riparian zone, or specific geographic limits such as distance limitations based on the bank-to-bank width of the jurisdictional water); Hancock Cty. Drainage Bd. at 1 (suggesting a distance in feet from the jurisdictional water); N.M. Mining Ass'n at 2-3 (suggesting one-half mile); *see also* Exhibit 2 (Comments on proposed 2015 Rule), Part 2 at 78-108 (NAM Comments at 22 (citing a case in which a water 125 feet from a tributary was found to have no significant nexus)).

These comments show that the floodplain and numerical distance limitations in the final definition of "neighboring" were sufficiently presented to the public in the "general notice" of proposed rulemaking required by the APA.  *See* 5 U.S.C. § 553; *cf. E. Tenn. Natural Gas Co. v. FERC*, 677 F.2d 531, 536 (6th Cir. 1982) (rejecting notice claim where parts of a final rule were shaped by the comments on the proposal).  The Agencies then responded to the comments on the proposed definition of "neighboring" by setting a specific floodplain interval and numerical distance limits.  80 Fed. Reg. at 37,082-84.

Contrary to what the challengers suggest, the APA does not require the Agencies to propose the precise numerical distance limits that were adopted.  *See* State Pls. Br. at 33; Private Party Pls. Br. at 19; *Chrysler Corp. v. Dep't of Transp.*, 515 F.2d 1053, 1061 (6th Cir. 1975) (proposed rule provided adequate notice of headlamp specifications, even though the agency did not mention any time limitation attached to the specifications in proposal); *Ala. Power Co. v. OSHA*, 89 F.3d 740, 744 (11th Cir. 1996) (final standard on specific weight of fabrics for clothing worn by employees exposed to flames or electrical arcs was a logical outgrowth of proposal that did not propose any weights but did state

objective to prevent burn injuries); *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 548 (D.C. Cir. 1983) (although proposal "did not list specific 'loopholes' that EPA might try to close," the final rule's past production requirements for "small" refiners was a logical outgrowth of the proposal); *City of Waukesha*, 320 F.3d at 232 (affirming the final rule of 30 µg/L, though the proposals were 20, 40, or 80 µg/L); *cf. Kennecott v. EPA*, 780 F.2d 445, 452 (4th Cir. 1985) ("the agency is not required to specify every precise proposal that it may eventually adopt").  Instead, the Agencies provided a range of possibilities by proposing to define "neighboring" in terms of riparian areas, floodplains, and distances beyond floodplains.  79 Fed. Reg. at 22,207-08.  Commenters recognized that a distance limitation based on a floodplain could result in the inclusion of waters "miles away" from a jurisdictional water, depending on the flood interval selected.  *See*, *e.g.*, Exhibit 2 (Comments on proposed 2015 Rule), Part 2 at 109-229 (Comments of N.D. at 9; Water Advocacy Coal. at 50).  Several commenters understood that the term "floodplain" could mean a 500-year floodplain.  Exhibit 2 (Comments on proposed 2015 Rule), Part 2 at 124-267 (Comments of Water Advocacy Coal. at 50; AFBF at 12; V. Watson).  As such, the distances adopted in the Rule constituted a "natural subset" of what these informed commenters believed to be within the potential scope of the proposal's treatment of "neighboring."  *La. Fed. Land Bank Ass'n v. Farm Credit Admin.*, 336 F.3d 1075, 1081 (D.C. Cir. 2003) (upholding a "natural subset" of the proposal against a logical outgrowth challenge).

### 2.     The distance limitations for case-specific waters logically grew out of the proposal.

The challengers also fail to show defective notice of the distance limitations for the case-specific category of waters.  State Pls. Br. at 36-39; Private Party Pls. Br. at 20. In the 2015 Rule, waters within the 100-year floodplain of a primary water, or within 4,000 feet of the high tide line or ordinary high water mark of a primary water, impoundment, or tributary, are subject to case-specific significant nexus determinations. 33 C.F.R. § 328.3(a)(8).  But notably, these waters were already subject to a case-specific determination of significant nexus following *Rapanos*.  And the waters subject to case-by-case determinations in the final rule are a subset of those waters proposed for case-specific determinations in the proposal.

The Agencies made clear they proposed to provide clarity and predictability by limiting the case-specific category of waters to those waters "sufficiently close" to a jurisdictional water.  79 Fed. Reg. at 22,200, 22,211, 22,213, 22,217, 22,247, 22,263. They proposed that case-specific significant nexus determinations be based on a record that included all available information, the first item of which would be the "location" of the water body, and sought comments on this approach.  *Id.* at 22,214.  Thus, though the proposal did not specify the distances in the final rule, at least the "germ" of a distance limitation was contained in the proposal and gave the public notice.  *NRDC v. Thomas*, 838 F.2d 1224, 1242 (D.C. Cir. 1988).

As with the proposal to define "neighboring" by reference to a specific lateral limit, the Agencies received many comments on case-specific determinations of

significant nexus. For example, some commenters recognized the proposal's distance component and asked the Agencies to specify what distance would be considered "sufficiently close." *See, e.g.*, Exhibit 2 (Comments on proposed 2015 Rule), Part 1 at 20-48; 124-229; 260-67 (Comments of Nat'l Lime Ass'n at 11; NAIOP at 2; Water Advocacy Coal. at 58; Wis. Wetlands Ass'n at 3). Others rejected the use of distance limitations altogether, or suggested that distance should not be the sole factor in considering whether a water should be subject to a case-specific analysis. Exhibit 2 (Comments on proposed 2015 Rule), Part 1 at 106-174 (Comment of NRDC at 54-55); Part 2 at 268-83 (Comments of Mo. Coal. for the Env't at 6); & Part 3 at 1-107 (NWF at 59-60); *see also* Exhibit 3 (Science Advisory Board Proposed Rule Review at 3) (suggesting that distance not be the sole indicator for evaluation of case-specific waters). These comments confirm that the Agencies gave adequate notice of the distance components for determining case-specific waters.

### 3.   Any notice defect that adjacent waters do not include waters used for certain agricultural activities is harmless error.

Plaintiffs argue that the Proposed Rule did not provide adequate notice that the Agencies might conclude that waters used for normal farming, silviculture, and ranching activities should not be considered "adjacent." State Pls. Br. at 39-40; *see* 33 C.F.R. § 328.3(c)(1). Under the Rule, jurisdiction over such waters will be determined only after a case-specific significant nexus analysis is conducted, which was generally the status quo prior to the Rule. It is well-recognized that one logical outgrowth of rulemaking is that an agency will retain the status quo. *New York v. EPA*, 413 F.3d 3, 43-

44 (D.C. Cir. 2005); *Am. Iron & Steel Inst*, 886 F.2d at 400.  That is precisely what happened here with respect to adjacent waters used for normal agricultural activities.

But even if there was a deficiency in notice, the APA directs reviewing courts to take "due account" of "the rule of prejudicial error."  5 U.S.C. § 706.  When a court finds that a procedural deficiency does not defeat the purpose of the bypassed requirements, it may conclude that the error was harmless.  *United States v. Utesch*, 596 F.3d 302, 312 (6th Cir. 2010) (citing examples of application of "harmless-error rule" in APA review context).  Even when a final rule is an abrupt departure from a proposed rule, "if parties directed comments to such a denouement, it might well be properly regarded as a harmless error—depending on how pointed were the comments and by who[m] made." *Allina Health Servs.*, 746 F.3d at 1109-10.  If plaintiff itself made such a comment, "it would presumably be hoist on its own petard."  *Id.* at 1110.  And if a comment was made by others, if it were the same comment the petitioner would have made, "it would still presumably be non-prejudicial because all that is necessary in such a situation is that the agency had an opportunity to consider the relevant views."  *Id.*  Here, there is no harm as a result of any notice defect.

Notably, the record already contains many examples of comments that tributaries should not be determined to be jurisdictional as a category rather than on a case-specific basis.  *See, e.g.*, Exhibit 2 (Comments on proposed 2015 Rule), Part 2 at 124-229 (Comment of Water Advocacy Coal. at 45-47) & Part 3 at 108-22 (Comment of Mich. Farm Bureau at 7).  And many commenters requested specialized treatment for agricultural activities in virtually all aspects of the 2015 Rule.  *See, e.g.*, Exhibit 2

(Comments on proposed 2015 Rule), Part 3 at 123-202 (Comments of Tex. at 4; Western States Water Coalition at 2, 5; Nev. DNR at 6; W. Va. DEP at 9; Kan. Agric. Alliance at 4); *see also* Exhibit 4 (Agencies' Response to Comments on 2015 Rule; Topic 8 at 30-31).  It was reasonably foreseeable that the Agencies might adopt special treatment for agricultural use waters in some contexts but not others.  *See Long Island Care at Home*, 551 U.S. at 175.  In any event, the Agencies already had the full benefit of these comments.  *Cf. Ass'n of Battery Recyclers, Inc. v. EPA*, 208 F.3d at 1059 (no prejudicial error where petitioners commented on alternative standards in all contexts but agency only adopted alternative standards in one context).

In sum, any deficiency in notice of the scope of adjacent waters as to waters used for normal agriculture is harmless.  The Agencies had the full benefit of related comments from the challengers and others.  Thus, the purpose of notice was not frustrated.

### B.    The public had adequate opportunity to comment on the Science Report.

When they published the Proposed Rule, the Agencies made available a Draft Science Report.  Exhibit 5 (2015 Rule Draft Science Report at 1-1); 79 Fed. Reg. at 22,189.  The Agencies also extended the comment period to allow for comment on the Science Advisory Board's peer review of the draft Report.  79 Fed. Reg. 61,591 (Oct. 14, 2014).  Yet the Private Party Plaintiffs assert that they had no meaningful opportunity to comment, ostensibly because the final Science Report was not published until after the

close of the comment period.  Private Party Pls. Br. at 20-22.  This argument does not withstand scrutiny.

Under the APA's notice and comment requirements, technical studies and data upon which an agency relies must be made available for public evaluation.  *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008).  But meaningful participation does not require an opportunity to comment on "every bit of information influencing an agency's decision."  *Texas Office of Pub. Util. Counsel v. FCC*, 265 F.3d 313, 326 (5th Cir. 2001) (citation and internal quotation marks omitted); *see also Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006) (same).  And an agency may add supporting documentation for a final rule in response to comments, as well as supplementary data that expands on or confirms the information contained in the proposed rule, so long as no prejudice is shown.  *Id.* at 1076.

Here, EPA's Science Advisory Board recommended revisions to "improve the clarity of the Report, better reflect the scientific evidence, expand the discussion of approaches to quantifying connectivity, and make the document more useful to decision-makers."  Exhibit 6 (Science Advisory Board Report Review at cover letter).  It did not recommend a "new" approach.  Nor did the Science Report adopt one.  The final Science Report simply clarified and expanded upon concepts and topics in the Draft Science Report.  Its later publication thus did not prejudice Private Party Plaintiffs.  Indeed, there were many comments on the Science Advisory Board's review of the Draft Science Report and on the concept of connectivity on a gradient.  *See, e.g.*, Exhibit 2 (Comments on proposed 2015 Rule), Part 1 at 106-174 (NRDC at 33-34, 36); Part 2 at 124-229

34

(Comment of Water Advocacy Coal. at 24-28).  These comments show that the public

knew about the Agencies' supporting documentation and that it had the chance to give

input.

For their part, Private Party Plaintiffs, who offer vague references to "comments"

that they could have submitted on the final report, fall far short of their burden to

establish with "reasonable specificity" how they may have responded if given the

opportunity.  Private Party Pls. Br. at 21; *Texas v. Lyng*, 868 F.2d 795, 799 (5th Cir.

1989).  To be sure, they mention in passing that they were denied the opportunity to

comment on scientific sources added to the Science Report and other changes to the draft.

Private Party Pls. Br. at 21 n.4.  But nowhere do they identify how they would have

commented.  In fact, a majority of the 353 supplementary scientific sources were posted

to or identified in the rulemaking docket *before* the comment period closed.  They

include 102 scientific citations on the Agencies' list of additional supporting materials

(*see* Exhibit 7); 59 citations in the Science Advisory Board review of the Draft Science

Report (*see* Exhibit 6 at B-1 through B-5); 22 citations in references that were added to

the docket and are part of the record, including the references cited in the Arid West

Report (*see* Exhibit 8 at 77-102); and one cite listed in the Proposed Rule.  Other citations

were included in comments to the Proposed Rule or in attachments to such comments.

*See*, *e.g.,* Exhibit 2 (Comments on proposed 2015 Rule), Part 3 at 203-17 (Utility Water

Act Group Comment at App. A-1, citing James P. Hurley et al., *Influences of Watershed

Characteristics on Mercury Levels in Wisconsin Rivers*. 29 ENVTL. SCI. & TECH. 1867

(1995)).  Of the remaining citations, 120 provided additional support for statements and

conclusions already in the Draft Science Report; 23 provided new information, mostly on effects of human-altered systems to address comments in the Science Advisory Board's peer review of the Draft Science Report; and six discuss various methods and metrics to quantify connectivity in response to the SAB's peer review, an issue that has not been raised by any party.

The Agencies, in short, gave sufficient notice of the scientific underpinnings of the 2015 Rule, and Private Party Plaintiffs do not show otherwise.

### C.     The anti-lobbying and "propaganda" claims lack merit.

Private Party Plaintiffs' assertions of unlawful advocacy, Private Party Pls. Br. at 24-26, do not set forth a justiciable claim and are irrelevant to their APA allegation that the Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or was promulgated "without observance of procedure required by law," *id*. § 706(2)(D).

Private Party Plaintiffs base their challenge on two appropriations act provisions that do not set forth "procedures that are required by law."  Private Party Pls. Br. at 25-26 (citing Pub. L. No. 113-76, div. E, § 718, 128 Stat. 5, 36 (2015); Pub. L. No. 113-235, div. E, § 715, 128 Stat. 2130, 2382-83 (2015)).  One provision prohibits the expenditure of funds for indirect lobbying of Congress in support of, or in opposition to, pending legislation; the other prohibits the expenditure of funds for publicity that is self-aggrandizing, purely partisan, or conceals an agency's role in sponsoring the material. *Id.*  In contrast, the type of statutes that provide a basis for a procedural claim under 5 U.S.C. § 706(2)(D) set forth specific procedures that an agency must affirmatively

36

undertake, such as the APA's requirements for notice and comment.  5 U.S.C. § 603. Here, the United States Government Accountability Office ("GAO") concluded that the Agencies completed all applicable procedural requirements in promulgating the Rule. July 15, 2016 GAO letter at 2, available at http://gao.gov/products/GAO-15-750R ("Our review of the procedural steps taken indicates that the agencies complied with the applicable requirements.").

It is well-established that there is no private right of action for a claim that an agency has misused appropriated funds under either an appropriations act or under 18 U.S.C. § 1913, which generally prohibits the use of appropriated funds to pay for a communication (*e.g.*, letter or advertisement) that is intended or designed to influence a member of Congress to favor, adopt, or oppose legislation.  *Nat'l Treasury Emp. Union v. Campbell*, 654 F.2d 784, 790-93 (D.C. Cir. 1981); *Grassley v. Legal Servs. Corp*., 535 F. Supp. 818, 825-26 (S.D. Iowa 1982).  The GAO's role is to "investigate all matters related to the receipt, disbursement, and use of public money" and to "make an investigation and report ordered by either House of Congress or a committee of Congress having jurisdiction over revenue, appropriations, or expenditures."  31 U.S.C. § 712(1), (4).  Congress may take appropriate legislative action after an investigation or report by the GAO, but there is no remedy for a private party to enforce what Private Party Plaintiffs generally refer to as "anti-lobbying provisions," Private Party Pls. Br. at 26.

*See Nat'l Treasury Emp. Union*, 654 F.2d at 794.[9]  The GAO opinion relied on by Private Party Plaintiffs, Op. B-326944, 2015 WL 8618591 (Comp. Gen. Dec. 14, 2015), is not to the contrary.

Even if the GAO opinion were correct, it is irrelevant to whether the Rule was promulgated "without observance of procedure required by law."  5 U.S.C. § 706(2)(D). The GAO opinion in no way found that EPA acted in bad faith.  Upon its own finding that no violations occurred, EPA took no disciplinary action, and no further steps are required on the part of EPA. In any event, the GAO opinion regarding the expenditure of funds has no relevance to the procedural requirements that the Agencies were required to follow, or to whether the Rule is arbitrary, capricious, or otherwise contrary to law. *Cf. Miss. Comm'n on Envtl. Quality*, 790 F.3d 138, 184-85 (D.C. Cir. 2015) (finding that claim of violation of the Information Quality Act did not give rise to a right of action or bear on the petitions for review of EPA decision that specific areas were not in attainment of air quality standards).

---

[9] Similarly, Private Party Plaintiffs do not satisfy the minimal constitutional requirements for standing set in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), as to this claim. Those requirements are: (1) an injury in fact; (2) a causal connection between the injury and the challenged conduct; and (3) the likelihood that a favorable decision will remedy the injury.  *Id.* Private Party Plaintiffs have not stated how the asserted anti-lobbying and publicity spending restrictions, or any resulting anti-deficiency violation, affect them.  Nor do they state how a judicial finding of such violations would translate into a meaningful remedy as to the Rule.

Private Party Plaintiffs' anti-lobbying and propaganda claims, even, if they were cognizable, are wholly unavailing.  The Agencies acted with an open mind and complied with all applicable procedural requirements in promulgating the Rule.

**IV.     The Agencies take no position on the remaining claims at this time.**

The Agencies take no position on the challengers' remaining objections to the 2015 Rule.  That is because those objections substantially overlap with issues subject to reconsideration in the Agencies' ongoing rulemaking proposing to repeal the 2015 Rule. *See Iowa League of Cities v. EPA*, 711 F.3d 844, 871 (8th Cir. 2013).  The issues on which the Agencies take no position include, *inter alia*, the 2015 Rule's substantive interpretation of "similarly situated," 83 Fed. Reg. at 32,240; constitutional questions, *id.* at 32,241; the 2015 Rule's consistency with the policy goals of the CWA, *id.* at 32,246; and whether the 2015 Rule would exceed the CWA's statutory limits, *id.* at 32,249.  *See also* Br. of Southeastern Legal Foundation as Amicus Curiae (Doc. 160-1) (asserting constitutional questions).

Instead, the Agencies respectfully request that the Court apply the prudential ripeness doctrine and hold the adjudication of any such issues in abeyance because "the disputed matter that forms the basis for [the Court's] jurisdiction has thus become a moving target," and the Agencies "would face more uncertainty" if the Court "were to rule in the midst of the [Agencies'] ongoing rulemaking process."  *Wyoming v. Zinke*, 871 F.3d 1133, 1142-43 (10th Cir. 2017) (holding appeal prudentially unripe where regulation under review was subject to ongoing reconsideration and had been enjoined).

## CONCLUSION

This Court should conclude that the claims are not ripe and delay adjudicating them at this time.

Dated:  November 8, 2018                    Respectfully submitted,

                                            JONATHAN D. BRIGHTBILL
                                            Deputy Assistant Attorney General

                                            /s/ *Andrew J. Doyle*
                                            ANDREW J. DOYLE, Attorney in Charge
                                            DANIEL R. DERTKE, Attorney
                                            United States Department of Justice
                                            Environment and Natural Resources Division
                                            Environmental Defense Section
                                            P.O. Box 7611
                                            Washington, DC 20044
                                            Tel:  (202) 514-4427 (Doyle)
                                            Fax: (202) 514-8865
                                            andrew.doyle@usdoj.gov

                                            *Counsel for Federal Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will cause a copy to be served upon counsel of record.

                                            */s/ Andrew J. Doyle*