IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, ET AL, | § | |
| | § | |
| Plaintiffs, | § | NO. 3:15-CV-162, |
| v. | § | CONSOLIDATED WITH NOS. |
| | § | 3:15-CV-165, 3:15-CV-266, AND |
| UNITED STATES ENVIRONMENTAL | § | 3:18-CV-176 |
| PROTECTION AGENCY, ET AL, | § | |
| | § | JUDGE GEORGE C. HANKS, JR. |
| Defendants. | § | |

Amicus Brief of Bayou City Waterkeeper

<u>Table of Contents</u>

I.    Nature & Stage of Proceeding ..................................................................... 1

II.   Statement of Issues ..................................................................................... 2

III.  Summary of Argument ................................................................................ 3

IV.   Background .................................................................................................. 5

    A. The Texas Coastal Prairie Wetlands Represent a Complex Network of Waters that Directly Affect the Integrity of Navigable Waters Within the Lower Galveston Bay Watershed.................................................................. 5
    B. In the Corps' Galveston District, the Supreme Court's Decision in *SWANCC* Led to Underenforcement of the Clean Water Act and Widespread Wetlands Loss  7
    C. In Crafting the Clean Water Rule, the EPA and Corps Carefully Considered the Scientific Research and Technical Data Supporting the Connectivity of Texas Coastal Prairie Wetlands to Navigable Waters................................................. 10

V.    Analysis..................................................................................................... 13

    A. Scientific Research and Technical Data Support Jurisdiction over Texas Coastal Prairie Wetlands Based on Their "Significant Nexus" to Traditional Navigable Waters ..................................................................................................... 15
    B. Scientific Research and Technical Data Support the Agencies' Decision to Analyze Texas Coastal Prairie Wetlands in Combination with "Similarly Situated" Waters ......................................................................................... 16
    C. The Clean Water Rule and Supporting Documents Define Texas Coastal Prairie Wetlands in Great Detail.................................................................. 17

VI.   Conclusion ............................................................................................... 18

Table of Authorities

Cases

*BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 824 (5th Cir. 2004)............................ 14, 16, 17

*Rapanos v. United States*, 547 U.S. 715 (2006) ..........................................................passim

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 US
    159 (2001) .................................................................................................. 3, 7, 9

Statutes and Regulations

33 C.F.R. § 328.3 ............................................................................................... 11

5 U.S.C. § 706 ..................................................................................................... 14

The Clean Water Rule, 80 Fed. Reg. 37,054 .................................................. 10, 11, 17, 18

Bayou City Waterkeeper submits this amicus brief to inform this Court's review of the 2015 Clean Water Rule's provisions clarifying when Texas coastal prairie wetlands fall within the jurisdiction of the Clean Water Act. Bayou City Waterkeeper urges the Court to uphold the Clean Water Rule as a valid exercise of administrative discretion.

## I.   Nature & Stage of Proceeding

These consolidated cases, filed in 2015 and 2018 by the States of Texas, Louisiana, and Mississippi and various groups representing members of construction, transportation, agricultural, and commercial development industries, challenge the 2015 Clean Water Rule. On September 12, 2018, this Court temporarily enjoined the Rule's enforceability in Texas, Louisiana, and Mississippi and ordered the parties to brief all remaining issues in the case. (Docs. 140 at 2; 154.)

On October 18, 2018, the plaintiffs moved for summary judgment and asked the Court to vacate the 2015 Clean Water Rule. (Docs. 156, 157.) On summary judgment, only the industry plaintiffs challenge a provision of the Clean Water Rule that outlines protections for Texas coastal prairie wetlands. (*See* Doc. 156 at 41-43, 47-48.) On November 8, 2018, the defendants, a mixture of federal governmental entities and representatives, urged the Court to reject plaintiffs' claims as not ripe. (Doc. 170.) That same day, the defendant-intervenors Natural Resources Defense Council and National Wildlife Federation filed a cross-motion for summary judgment and asked the Court to uphold the Clean Water Rule, including its Texas coastal prairie wetlands provision. (Docs. 168, 169.)

1

Bayou City Waterkeeper files this amicus brief in opposition to the plaintiffs' motions for summary judgment and in support of the defendant-intervenors' cross-motion for summary judgment. Bayou City Waterkeeper focuses its brief on the Clean Water Rule's protections for Texas coastal prairie wetlands and asks the Court to uphold the 2015 Clean Water Rule.

## II.   Statement of Issues

In their motions for summary judgment, the industry plaintiffs insist that the Clean Water Rule's classification of Texas coastal prairie wetlands is arbitrary and capricious under the Administrative Procedure Act. (Doc. 156 at 41.) In their cross-motion for summary judgment, the defendant-intervenors Natural Resources Defense Council and National Wildlife Federation state the relevant standard of review; Bayou City Waterkeeper incorporates it in full. (*See* Doc. 168 at 8.)

Bayou City Waterkeeper files this amicus brief to assist this Court's evaluation of the 2015 Clean Water Rule in Texas, particularly as it relates to the Texas coastal prairie wetlands by addressing the following factual and related legal issues:

- The regional importance of Texas coastal prairie wetlands to the quality of navigable waters and to neighboring communities;

- The historic underenforcement of the Clean Water Act in the greater Houston area as a result of confusion over its application to Texas coastal prairie wetlands;

- The scientific research and technical data considered by the U.S. Environmental Protection Agency ("EPA") and U.S. Army Corps of Engineers ("Corps") in crafting the Clean Water Rule's provisions governing jurisdictional determinations relating to Texas coastal prairie wetlands; and

2

- The legal validity of the Clean Water Rule's Texas coastal prairie wetlands provisions under the Administrative Procedure Act.

### III.   Summary of Argument

For nearly two decades, the Corps' Galveston District has improperly excluded from jurisdiction a class of wetlands known as the Texas coastal prairie wetlands. As the headwaters to navigable waters like the Lower Galveston Bay, these wetlands directly affect aquatic integrity regionally. Texas coastal prairie wetlands also serve a range of other functions, including stormwater detention, storm surge protection, and other flood prevention benefits, which have been valued at billions of dollars. Yet, as a result of the Galveston District's decision to treat these important wetlands as isolated waters in most circumstances, significant acreage of wetlands has been lost to commercial and residential development at an escalating pace for nearly 20 years.

The Galveston District based its policy on an overly narrow interpretation of the Supreme Court's decision in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 US 159 (2001) ("*SWANCC*"). If implemented, the Clean Water Rule would correct this narrow reading, and would resolve a longstanding regulatory failure within this region, by providing the Galveston District with clear instructions as to when Texas coastal prairie wetlands fall within the Clean Water Act's scope.

In this litigation, the industry plaintiffs challenge the Clean Water Rule's provisions relating to the Texas coastal prairie wetlands. (*See* Doc. 156 at 41-43, 47-48.). They assert that these provisions are arbitrary and capricious because, they say, Texas coastal prairie

wetlands are not "meaningfully defined" and otherwise are improperly defined by "scientifically irrelevant" political boundaries. (*Id.*)

The defendant-intervenors correctly assert that the industry plaintiffs cannot raise this argument now because at no point did they or anyone else raise these arguments during the comment period. (Doc. 168 at 31-32.) Regardless, the defendant-intervenors correctly contend, the final Clean Water Rule and supporting documents thoroughly and sufficiently define the Texas coastal prairie wetlands provision with reference to scientific research and technical data; further, the defendant-intervenors note, the industry plaintiffs' complaint about the Texas coastal prairie wetlands being defined too narrowly should not be taken seriously because the thrust of their overall argument is that the Clean Water Rule is too broad. (Doc. 168 at 32.)

To assist the Court with its review of these arguments, in this amicus brief, Bayou City Waterkeeper provides more information about the Texas coastal prairie wetlands, their regional importance, and the Corps' failure to protect them. Bayou City Waterkeeper ultimately asserts that this portion of the Clean Water Rule is not arbitrary and capricious under the Administrative Procedure Act because:

- Scientific research and technical data confirm a "significant nexus" between Texas coastal prairie wetlands and traditional navigable waters based on hydrological connectivity and other factors authorized by the Supreme Court in *Rapanos*.

- Extensive scientific research and technical data also support the Agencies' decision to analyze Texas coastal prairie wetlands in combination as "similarly situated" waters.

- Contrary to the industry plaintiffs' suggestion, the final Clean Water Rule and supporting documents define Texas coastal prairie wetlands in great detail and with reference to scientific research and technical data.

The Court should reject the plaintiffs' motions for summary judgment, grant the defendant-intervenors' cross-motion for summary judgment, and uphold the 2015 Clean Water Rule.

## IV.   Background

A. The Texas Coastal Prairie Wetlands Represent a Complex Network of Waters that Directly Affect the Integrity of Navigable Waters Within the Lower Galveston Bay Watershed

For years, researchers at reputed institutions like Texas A&M University and the Houston Advanced Research Center have studied what the Clean Water Rule calls Texas coastal prairie wetlands—which also are referred to regionally as pimple mounds, coastal prairie pothole wetlands, marsh wetlands, and palustrine wetlands—and repeatedly confirmed their connectivity and importance to indisputably navigable waters, including Lower Galveston Bay. The Texas coastal prairie wetlands, which "were formed thousands of years ago by ancient rivers and bayous and once occupied almost a third of the landscape around Galveston Bay," are found "[a]long the Gulf of Mexico from western Louisiana to south Texas" and "occur as a mosaic of depressions, ridges, swales, intermound flats, and mima mounds."[1]

---

[1] EPA & Corps, Technical Support Document for the Clean Water Rule: Definition of Waters of the United States, at 348 (May 27, 2015), **Docket no. EPA-HQ-OW-2011-20869**.
A Joint Appendix, containing record excerpts cited by the parties, is scheduled to be filed after the completion of briefing. (*See* Doc. 154 at 2.) For ease of reference and compilation,

Today, Texas coastal prairie wetlands serve as "the headwaters for virtually all of the water bodies feeding into Galveston Bay"[2] and therefore "are a critical part of the aquatic integrity of our regional bayous and bays" that constitute navigable waters.[3] Research repeatedly has confirmed that these wetlands, regarded by the Corps' Galveston District as geographically isolated, "are not isolated" due to their hydrological connectivity.[4]

Regionally, Texas coastal prairie wetlands serve a range of important, valuable functions.[5] Researchers estimate the value of wetlands' stormwater detention services alone, which reduce the effects of flooding for neighboring communities, at a minimum of $600 million.[6] When other functions that these wetlands serve are added to this figure—

───────────────────────

this brief refers to record documents using their EPA docket numbers. To the extent this brief cites to any documents from the regulatory docket not already compiled by the parties, Bayou City Waterkeeper will coordinate with the parties to include those documents with the Joint Appendix. Documents can be found by searching the full docket number, including the last four or five digits, on the government's website, www.regulations.gov. Excerpts from documents outside of the Administrative Record are provided for additional factual context and attached as exhibits to this brief; all legal argument in this brief, however, rests on documents within the Administrative Record.

[2] **Exhibit 1**, Excerpts from John S. Jacob, et al, Houston-Area Freshwater Wetland Loss, 1992–2010, at Summary (Texas A&M University System, May 2014). The full article is available at https://tcwp.tamu.edu/files/2015/06/WetlandLossPub.pdf (last visited Nov. 15, 2018).

[3] **Exhibit 2**, John S. Jacob, et al, Upper Texas Gulf Coast Pothole Wetlands: New Research shows Significant and Profound Hydrologic Connections to Galveston Bay and other Area Waters, at 3 (Texas Coastal Watershed Program, Texas A&M Agrilife Extension, July 2011).

[4] **Exhibit 2**, at 3.

[5] **Exhibit 1**, at 1 (Wetlands functions "include[e] detaining stormwater, controlling erosion, storing and cleansing water, and providing places for recreation for people and habitat for wildlife.").

[6] **Exhibit 1**, at 12-13.

such as their role in protecting coastal areas and shorelines by weakening the force of storms, decreasing flooding in other ways, cleansing water before it reaches navigable waters, replenishing groundwater supplies, reducing erosion, providing habitats for wildlife such as migratory birds, providing places for recreation, and offering an intangible sense of beauty and place in our culture—the figure leaps to the billions.[7]

### B. In the Corps' Galveston District, the Supreme Court's Decision in *SWANCC* Led to Underenforcement of the Clean Water Act and Widespread Wetlands Loss

Despite the indisputable benefits Texas coastal prairie wetlands offer to navigable waters and neighboring communities in the region, due to confusion over the Clean Water Act's scope, they historically have not received adequate protection within the Corps' Galveston District. As a result, Texas coastal prairie wetlands have been permanently lost to rapid commercial and residential development.

The Supreme Court's 2001 ruling in *SWANCC* represented a jurisdictional turning point within the Galveston District. In *SWANCC*, the Supreme Court held that the Clean Water Act did not grant jurisdiction over isolated, abandoned sand and gravel pits with seasonal ponds, which provide migratory bird habitats. 531 US 159. The Galveston District read this opinion to exempt from regulatory jurisdiction almost all regional wetlands outside of FEMA's 100-year floodplain—an approach which differed from that taken by other Corps district offices both in and out of Texas.[8] The Galveston District's unique

---

[7] *Id.*

[8] Texas Parks & Wildlife, Comment to Advance Notice of Rulemaking re Docket no. OW-2002-0050, at 3, 7-9 (2003) ("TPWD 2003 Comment") (resubmitted in 2014 by Natural Resources Defense Council in support of Clean Water Rule) (discussing Seattle Adjacency

approach produced "confusion on the part of the regulated community and the resource agencies responsible for fish and wildlife habitat and water quality" and led to "substantial degradation of what are clearly interstate waters," including those already listed as impaired within the State of Texas under the Clean Water Act.[9]

In 2006, Justice Kennedy's concurrence in *Rapanos v. United States*, 547 U.S. 715 (2006), clarified that the Clean Water Act's jurisdiction could extend to hydrologically connected waters like the Texas coastal prairie wetlands. Justice Kennedy recognized:

> Wetlands can perform critical functions related to the integrity of other waters—functions such as pollutant trapping, flood control, and runoff storage. 33 CFR §320.4(b)(2). Accordingly, ***wetlands possess the requisite nexus***, and thus come within the statutory phrase "navigable waters," ***if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as "navigable."***

*Id.* at 779-80 (emphasis added).

Although this opinion led to additional scientific research showing the connectivity of Texas coastal prairie wetlands complexes to navigable waters in this region, the Galveston District did not change its policy and continued to categorically exclude most Texas coastal prairie wetlands as outside the scope of the Clean Water Act's protections.

As a result, within the Galveston District post-*SWANCC*, "[h]undreds of thousands of acres of coastal pothole wetlands… fell out of jurisdiction."[10] Not coincidentally, it has

---

Guidance and approach taken by other Corps offices in Texas), **Docket no. EPA-HQ-OW-2011-0880-17477**.

[9] *Id.*

[10] **Exhibit 2**, at 1.

been estimated that more than 80% of wetlands lost regionally to development in the past 25 years were outside the 100-year floodplain.[11] These figures underestimate the full extent of wetlands loss regionally; the actual number of acres lost may be much higher.[12] Researchers identified a full 50-75% more wetlands lost than those identified by the U.S. Fish & Wildlife's National Wetland Inventory.[13]

Texas coastal prairie wetlands "continue to be lost at a rate that is higher than any other wetland class in the Houston-Galveston region."[14] Without any change in the Galveston District's policy, the region will lose at least 100,000 more acres of wetlands to development in the next four decades.[15] Continuing losses "will very likely have grave

---

[11] **Exhibit 1**, at 11 ("Since 2001, the U.S. Army Corps of Engineers (USACE) has deemed the vast majority of wetlands documented as lost in this study as outside of its jurisdiction. The Galveston District of the USACE currently considers almost all palustrine wetlands subject to development in this area to be 'isolated' from the 'waters of the U.S.'").

[12] **Exhibit 1**, at 8.

[13] *Id.*; *see also* Economic Analysis of the EPA-Army Clean Water Rule, at 47 (May 2015), **Docket no. EPA-HQ-OW-2011-0880-20866** (noting that as of 2015 only approximately 75 percent or more of the wetlands in these states [including Texas] were not digitally mapped in the NWI").

[14] **Exhibit 3**, Excerpts from Galveston Bay Wetland Mitigation Assessment & Local Government Capacity Building, at 12 (Houston Advanced Research Center, et al 2014) (prepared for the Texas General Land Office). The full report is available at https://www.harcresearch.org/sites/default/files/Project_Documents/13-079-000-7102%20Report_2014_Final.pdf  (last visited Nov. 15, 2018). The greatest loss of Texas coastal wetlands has occurred in Harris County—"more than double that of the [seven neighboring] counties combined." **Exhibit 1**, at Summary.

[15] **Exhibit 4**, Matthew Tresaugue, Review: Developers failing to follow wetlands mandate, Houston         Chronicle    (Aug.        2,        2015),        available        at https://www.houstonchronicle.com/news/houston-texas/houston/article/Review-Developers-failing-to-follow-wetlands-6417918.php (last visited Nov. 2, 2018).

implications for the long-term health of the Galveston Bay System," which will lose its "principal means of cleaning the polluted runoff that enters the bay."[16]

      C.   <u>In Crafting the Clean Water Rule, the EPA and Corps Carefully Considered the Scientific Research and Technical Data Supporting the Connectivity of Texas Coastal Prairie Wetlands to Navigable Waters</u>

After receiving more than 1.1 million public comments over 200 days and hosting 400 public meetings, the EPA and Corps finalized the Clean Water Rule. *See* Clean Water Rule, 80 Fed. Reg. at 37,057; Extension of Comment Period for the Definition of "Waters of the U.S." under the Clean Water Act Proposed Rule and Notice of Availability, 79 Fed. Reg. 61,590, 61,590-91 (Oct. 14, 2014) (extending the comment period on the agencies' proposal until November 14, 2014). The comments received included detailed comments in support of the Clean Water Rule's Texas coastal prairie wetlands provision.[17] Notably, the Agencies did not receive any substantive comments in opposition to this provision.[18]

The final Clean Water Rule instructs that Texas coastal prairie wetlands "must be analyzed 'in combination' as 'similarly situated' waters when making a case-specific significant nexus analysis." 80 Fed. Reg. at 37071. Importantly, the Rule does not create blanket jurisdiction over Texas coastal prairie wetlands, but articulates that their special

---

[16] **Exhibit 1**, at Summary.

[17] *See generally* Response to Comments, Topic 4, at 4.3.4.4, **Docket no. EPA-HQ-OW-2011-0880-20872** (responding to some comments to the Texas coastal prairie wetlands provision).

[18] *Id.* at 4.3.4.4.2 ("The Agencies did not identify substantive comments that addressed this topic.").

nature requires a slightly different analysis that must be anchored in the Supreme Court's

significant nexus test. *See* 33 C.F.R. § 328.3(a)(7)(v).

The final version of the Clean Water Rule describes the Texas coastal prairie

wetlands in great detail:

> Along the Gulf of Mexico from western Louisiana to south Texas,
> freshwater wetlands occur as a mosaic of depressions, ridges, intermound
> flats, and mima mounds. These coastal prairie wetlands were formed
> thousands of years ago by ancient rivers and bayous and once occupied
> almost a third of the landscape around Galveston Bay, Texas. The term Texas
> coastal prairie wetlands is not used uniformly in the scientific literature but
> encompasses Texas prairie pothole (freshwater depressional wetlands) and
> marsh wetlands that are described in some studies that occur on the Lissie
> and Beaumont Geological Formations, and the Ingleside Sand.
>
> Texas coastal prairie wetlands are locally abundant and in close
> proximity to other coastal prairie wetlands and function together
> cumulatively. Collectively as a complex, Texas coastal prairie wetlands can
> be geographically and hydrologically connected to each other via swales and
> connected to downstream waters, contributing flow to those downstream
> waters. Cumulatively, these wetlands can control nutrient release levels and
> rates to downstream waters, as they capture, store, transform, and pulse
> releases of nutrients to those waters.
>
> The agencies conclude that Texas coastal prairie wetlands are
> similarly situated based on their close proximity to each other and the
> tributary network, their hydrologic connections to each other and the
> tributary network, their interaction and formation as a complex of wetlands,
> their density on the landscape, and their similar functions.

80 Fed. Reg. at 37072-37073.

The EPA and Corps' Technical Support Document for the Clean Water Rule:

Definition of Waters of the United States ("Technical Support Document") echoes this

definition and includes citations to several scientific reports.[19] Detailed findings in both the Technical Support Document and the EPA and Corps' Connectivity of Streams & Wetlands to Downstream Waters: A Review & Synthesis of the Scientific Evidence ("Connectivity Report") further support the categorization of Texas coastal prairie wetlands within the final Clean Water Rule.[20]

Seemingly in direct response to the Galveston District's restrictive exercise of jurisdiction over Texas coastal prairie wetlands, the Connectivity Report recognizes: "Caution should be used in interpreting connectivity for wetlands that have been designated as 'geographically isolated' because… wetland complexes could have connections to downstream waters through stream channels even if individual wetlands within the complex are geographically isolated."[21]

In urging this caution, the Connectivity Report refers specifically to Texas coastal prairie wetlands and cites to research that concludes these wetlands should not be regarded as geographically isolated:

> The wetlands in this complex have been considered to be a type of geographically isolated wetland. Collectively, however, they are connected both geographically and hydrologically to downstream waters in the area: During an almost 4-year study period, nearly 20% of the precipitation that fell on the wetland complex flowed out through an intermittent stream into downstream waters [at Armand Bayou, a navigable water located in southeast Harris County that eventually feeds into the Lower Galveston Bay]. ***Thus, wetland complexes could have connections to downstream waters***

---

[19] Technical Support Document, at 348-49, **Docket no. EPA-HQ-OW-2011-20869**.
[20] Connectivity Report, **Docket no. EPA-HQ-OW-2011-20859**; Technical Support Document, **Docket no. EPA-HQ-OW-2011-20869**.
[21] Connectivity Report, at 6.1.3.1, **Docket no. EPA-HQ-OW-2011-20859.**

*through stream channels even when the individual wetland components are geographically isolated*.[22]

The Technical Report identifies additional studies identifying the benefits of Texas coastal prairie wetlands to navigable waters:

> One study found that in a study area near Galveston Bay, over one-third of the precipitation that fell within the study area was captured within Texas coastal prairie wetland drainage basins and thus have the potential for the wetlands to provide floodwater storage and water quality benefits to downstream waters. Enwright et al. 2011.

> …Another study found that Texas coastal prairie wetlands intercept runoff before it enters large water bodies and thus have the opportunity to filter pollutants before they reach downstream (a)(1) through (a)(3) waters, such as Galveston Bay. Sipocz 2002; Sipocz 2005. Cumulatively, these wetlands can control nutrient release levels and rates to downstream waters, as they capture, store, transform and pulse releases of nutrients to those waters. Enwright et al. 2011; Forbes et al. 2012.[23]

## V.   Analysis

In addition to the arguments already raised by the defendant-intervenors, this Court should reject the industry plaintiffs' request for summary judgment on the Texas coastal prairie wetlands provision because the EPA and Corps engaged in reasoned decisionmaking that was supported by the Administrative Record, scientific research, and technical data.

---

[22] *Id.*

[23] Technical Support Document, at 348-49, **Docket no. EPA-HQ-OW-2011-20869**. The Connectivity Report also identifies other biological connections between Texas Coastal Prairie Wetlands and navigable waters by noting their use by migrating redhead ducks and lesser scaup, which allowed the birds to feed, drink, preen, and rest. *See* Connectivity Report, at 4.4.4, **Docket no. EPA-HQ-OW-2011-20859.**

The Administrative Procedure Act forbids "arbitrary and capricious" agency action. 5 U.S.C. § 706(2)(A). In *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 824 (5th Cir. 2004), the U.S. Court of Appeals for the Fifth Circuit characterized this standard as "narrow":

> A rule is "arbitrary and capricious" only where the agency has considered impermissible factors, failed to consider important aspects of the problem, offered an explanation for its decision that is contrary to the record evidence, or is so irrational that it could not be attributed to a difference in opinion or the result of agency expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Thus, agency decisions will be upheld so long as the agency "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a `rational connection between the facts found and the choice made.'" *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

The Fifth Circuit emphasized that the Administrative Procedure Act is "'most deferential'" where, as here, "its decision is based upon its evaluation of complex scientific data within its technical expertise." *Id.* (quoting *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983)).

As explained below, the Agencies did not act in an arbitrary or capricious manner in providing protections for Texas coastal prairie wetlands because:

- Scientific research and technical data show a "significant nexus" between Texas coastal prairie wetlands and traditional navigable waters based on hydrological connectivity and other factors identified by the Supreme Court in *Rapanos*.

- Scientific research and technical data also support the Agencies' decision to analyze Texas coastal prairie wetlands in combination as "similarly situated" waters.

- Contrary to the industry plaintiffs' suggestion, the final Clean Water Rule and supporting documents define Texas coastal prairie wetlands in great detail.

14

The Court should reject the industry plaintiffs' arguments against the Texas coastal prairie wetlands provision and uphold the Clean Water Rule.

A. <u>Scientific Research and Technical Data Support Jurisdiction over Texas Coastal Prairie Wetlands Based on Their "Significant Nexus" to Traditional Navigable Waters</u>

In *Rapanos*, Justice Kennedy expressly recognized that wetlands may affect the "chemical, physical, and biological integrity" of navigable waters by performing "critical functions… such as pollutant trapping, flood control, and runoff storage"; these functions, in turn, could create a sufficient nexus to sustain jurisdiction under the Clean Water Act. 547 U.S. at 779-80.

The Connectivity Report and the Technical Support Document identify research supporting the conclusion that Texas coastal prairie wetlands influence the "biological, physical, and chemical integrity" of navigable waters because they perform functions that are remarkably similar to those identified by Justice Kennedy in *Rapanos*. They:

- Control nutrient release levels and rates to downstream waters, as they capture, store, transform and pulse releases of nutrients to those waters;[24]

- Intercept runoff before it enters large water bodies and thus have the opportunity to filter pollutants before they reach downstream;[25]

- Influence water quality to navigable waters downstream through hydrological and geographical connections;[26] and

- Provide floodwater storage capacity by capturing substantial amounts of rainfall.[27]

---

[24] *Id.*
[25] *Id.*
[26] Connectivity Report, at 6.1.3.1, **Docket no. EPA-HQ-OW-2011-20859.**
[27] Technical Support Document, at 348-49, **Docket no. EPA-HQ-OW-2011-20869**.

Based on these functions, the Rule properly authorizes jurisdiction over Texas coastal prairie wetlands with a significant nexus to navigable waters. There is no evidence the EPA and Agency "considered impermissible factors, failed to consider important aspects of the problem, offered an explanation for its decision that is contrary to the record evidence, or is so irrational that it could not be attributed to a difference in opinion or the result of agency expertise." *BCCA Appeal Grp.*, 355 F.3d at 824. Rather, the Texas coastal prairies provision is well-grounded in scientific research and technical data and supported by "a satisfactory explanation for its action." *Id.*

    B.  <u>Scientific Research and Technical Data Support the Agencies' Decision to Analyze Texas Coastal Prairie Wetlands in Combination with "Similarly Situated" Waters</u>

In *Rapanos*, Justice Kennedy also recognized that wetlands may play "critical functions related to the [chemical, physical, and biological] integrity" of navigable waters "in combination with similarly situated lands in the region." 547 U.S. at 779-80.

Here, the text of the Clean Water Rule, the Connectivity Report, and the Technical Support Data all identify research showing that Texas coastal prairie wetlands function in combination to affect the "chemical, physical, and biological integrity" of navigable waters like Lower Galveston Bay. For example, the Technical Support Document specifically identifies research which shows how Texas coastal prairie wetlands "are locally abundant[,] in close proximity to other coastal prairie wetlands[,] and function together cumulatively" and "[c]ollectively as a complex" through geographic and hydrological

connections" to serve a range of important functions, including those addressed above.[28]

(*See* § V-A.)

Given these findings and their grounding in scientific research and technical data, the Agencies' decision to combine the Texas coastal prairies wetlands as "similarly situated… for purposes of a significant nexus analysis, in the watershed that drains to the nearest water" was not arbitrary and capricious. 80 Fed. Reg. at 37104-37105.

C.  The Clean Water Rule and Supporting Documents Define Texas Coastal Prairie Wetlands in Great Detail

Contrary to the industry plaintiffs' suggestion, the final version of the Clean Water Rule describes the Texas coastal prairie wetlands in sufficient detail. The Rule identifies their broader location and describes their composition to aid in their proper identification: They are located "[a]long the Gulf of Mexico from western Louisiana to south Texas" and "occur as a mosaic of depressions, ridges, intermound flats, and mima mounds." 80 Fed. Reg. at 37072-37073. The Rule also explains their arrangement and grouping relative to other Texas coastal prairie wetlands and how they function as a complex: These wetlands are "locally abundant and in close proximity to other coastal prairie wetlands and function together cumulatively [and] [c]ollectively as a complex." *Id.* And the Rule further explains that Texas coastal prairie wetlands may be "geographically and hydrologically connected to each other via swales and connected to downstream waters" and "contribut[e] flow to those downstream waters." *Id.*

---

[28] Technical Support Document, at 348-49, **Docket no. EPA-HQ-OW-2011-20869**.

The Technical Support Document bolsters this definition with references to relevant scientific research, which further explains the Clean Water Rule's intended coverage.[29] This suffices under the Administrative Procedure Act and the Constitution's vagueness standards.

<div align="center">VI.   <u>Conclusion</u></div>

Bayou City Waterkeeper respectfully requests that the Court deny the plaintiffs motions for summary judgment, grant the defendant-intervenors' cross-motion for summary judgment, and uphold the 2015 Clean Water Rule.

Date: November 15, 2018

<div style="margin-left: 40%;">

By: <u>*/s/ Kristen Schlemmer*</u>
Kristen Schlemmer
Texas Bar No. 24075029
S.D. Tex. Bar No. 2078411
Bayou City Waterkeeper
2010 N. Loop West, Suite 275
Houston, TX 77018
Tel: (281) 901-0182
kristen@bayoucitywaterkeeper.org
*Attorney for Bayou City Waterkeeper*

</div>

---

[29] Technical Support Document, at 348-49, **Docket no. EPA-HQ-OW-2011-20869.**

<u>Certificate of Service</u>

I certify that on November 15, 2018, I electronically filed Bayou City Waterkeeper's Proposed Amicus Brief and all attachments using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

<u>*/s/ Kristen Schlemmer*</u>
Kristen Schlemmer

*Attorney for Bayou City Waterkeeper*

19