UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 3:15-cv-162 |
| U.S. ENVIRONMENTAL | ) | consolidated with Civil Action |
| PROTECTION AGENCY et al., | ) | Nos. 3:15-cv-165, 3:15-cv-266, |
| | ) | and 3:18-cv-176 |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NATURAL RESOURCES DEFENSE | ) | |
| COUNCIL et al., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| | ) | |

**DEFENDANT-INTERVENORS' REPLY
IN SUPPORT OF CROSS-MOTION
FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

ARGUMENT ..................................................................................................... 2

I.  Plaintiffs' substantive attacks on the Clean Water Rule lack merit ................. 2

    A.  The *Rapanos* plurality opinion is neither controlling nor "better" than Justice Kennedy's concurrence. ...................................................... 2

    B.  Plaintiffs misrepresent and try to evade the scientific evidence supporting the Rule's "significant nexus" findings ............................. 5

        1.  The Rule's definition of tributary is not overbroad .................. 5

        2.  The Rule's definition of adjacency is not overbroad ............... 10

        3.  The Rule comports with Justice Kennedy's test ....................... 13

    C.  Plaintiffs' "interstate waters" challenge is meritless ........................... 14

    D.  The Clean Water Rule does not revive the "Migratory Bird Rule" .. 15

    E.  Plaintiffs cannot complain about Texas coastal prairie wetlands ..... 16

    F.  Waters can be both point sources and receiving waters ................... 17

II.  Plaintiffs' procedural attacks on the Clean Water Rule lack merit ............... 18

    A.  Plaintiffs' notice-and-comment arguments fail .................................... 18

        1.  Plaintiffs' logical outgrowth arguments fail ............................. 18

        2.  Plaintiffs had a meaningful opportunity to comment on the Science Report ................................................................................ 21

        3.  Plaintiffs' complaints about the response to comments fail ... 25

    B.  The Agencies complied with the Regulatory Flexibility Act, and any procedural deficiency was harmless ................................................... 26

    C.  The Agencies did not have a "closed mind" about the Rule ........... 28

III.  The Clean Water Rule is constitutional ............................................................ 29

    A.  The Rule is not unconstitutionally vague ............................................ 29

    B.  The Rule does not exceed the federal government's authority under the Commerce Clause ................................................................. 31

C.      The Rule does not violate the Tenth Amendment.............................. 34

CONCLUSION........................................................................................................ 34

CERTIFICATE OF SERVICE ............................................................................ 36

# TABLE OF AUTHORITIES

## CASES

*Air Transp. Ass'n of Am. v. C.A.B.,*
    732 F.2d 219 (D.C. Cir. 1984) ................................................................ 23

*Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.,*
    663 F.3d 476 (D.C. Cir. 2011) ................................................................ 28

*Alenco Commc'ns, Inc. v. FCC,*
    201 F.3d 608 (5th Cir. 2000) ................................................................. 26

*American Transfer & Storage Co. v. ICC,*
    719 F.2d 1283 (5th Cir. 1983) ............................................................... 20

*Am. Trucking Ass'ns v. EPA,*
    175 F.3d 1027 (D.C. Cir. 1999) .............................................................. 27

*Avoyelles Sportsmen's League, Inc. v. Marsh,*
    715 F.2d 897 (5th Cir. 1983) ................................................................. 30

*BCCA Appeal Grp. v. EPA,*
    355 F.3d 817 (5th Cir. 2004) ............................................................... 4, 8

*Beazer E., Inc. v. EPA Region III,*
    963 F.2d 603 (3d Cir. 1992) ............................................................... 10, 12

*City of El Cenizo v. Texas,*
    890 F.3d 164 (5th Cir. 2018) ................................................................. 30

*City of Milwaukee v. Illinois,*
    451 U.S. 304 (1981) ............................................................................. 33

*Cmty. Nutrition Inst. v. Block,*
    749 F.2d 50 (D.C. Cir. 1984) ................................................................. 23

*C & W Fish Co. v. Fox, Jr.,*
    931 F.2d 1556 (D.C. Cir. 1991) .............................................................. 28

*FBME Bank Ltd. v. Mnuchin*,
 249 F. Supp. 3d 215 (D.D.C. 2017) ...................................................... 26

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
 452 U.S. 264 (1981) .............................................................. 32, 34

*Idaho Farm Bureau Federation v. Babbitt*,
 58 F.3d 1392 (9th Cir. 1995) ..................................................... 24, 25

*Iowa League of Cities v. EPA*,
 711 F.3d 844 (8th Cir. 2013) ........................................................ 28

*Jones v. Cain*,
 600 F.3d 527 (5th Cir. 2010) ........................................................ 28

*Koretoff v. Vilsack*,
 707 F.3d 394 (D.C. Cir. 2013) ...................................................... 16

*Long Island Care at Home, Ltd. v. Coke*,
 551 U.S. 158 (2007) .................................................................. 18

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
 567 U.S. 519 (2012) .............................................................. 31, 33

*Nicholas Acoustics & Specialty Co. v. H & M Constr. Co.*,
 695 F.2d 839 (5th Cir. 1983) ......................................................... 8

*Pub. Citizen, Inc. v. FAA*,
 988 F.2d 186 (D.C. Cir. 1993) ...................................................... 25

*Rapanos v. United States*,
 547 U.S. 715 (2006) ...................................................... 4-6, 13, 14, 32

*Roark & Hardee LP v. City of Austin*,
 522 F.3d 533 (5th Cir. 2008) ...................................................... 29, 30

*Sackett v. EPA*,
 566 U.S. 120 (2012) .................................................................. 31

*Small Refiner Lead Phase-Down Task Force v. EPA*,
    705 F.2d 506 (D.C. Cir. 1983) ............................................................... 28

*Solid Waste Agency of Northern Cook County (SWANCC) v.*
*United States Army Corps of Engineers*,
    531 U.S. 159 (2001) ...................................................... 7, 15, 33

*Solite Corp. v. EPA*,
    952 F.2d 473 (D.C. Cir. 1991) ............................................................... 23

*Texas Office of Pub. Util. Counsel v. FCC*,
    265 F.3d 313 (5th Cir. 2001) ...................................................... 23, 24

*Texas v. Lyng*,
    868 F.2d 795 (5th Cir. 1989) ...................................................... 23, 24

*Thompson v. Clark*,
    741 F.2d 401 (D.C. Cir. 1984) ............................................................... 27

*United States v. Lopez*,
    514 U.S. 549 (1995) ............................................................................... 33

*United States v. Lucas*,
    516 F.3d 316 (5th Cir. 2008) ................................................................ 30

*United States v. Nova Scotia Food Products Corp.*,
    568 F.2d 240 (2d Cir. 1977) ................................................................ 24

*United States v. Riverside Bayview Homes, Inc.*,
    474 U.S. 121 (1985) ....................................................................... 6, 13

*U.S. Telecom Ass'n v. FCC*,
    825 F.3d 674 (D.C. Cir. 2016) ............................................................... 30

*United Steelworkers of Am., AFL-CIO-CLC v. Schuylkill Metals Corp.*,
    828 F.2d 314 (5th Cir. 1987) ...................................................... 19, 20

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ............................................................................... 27

*WorldCom, Inc. v. FCC,*
    238 F.3d 449 (D.C. Cir. 2001) ........................................................................ 10, 12

*Zabel v. Tabb,*
    430 F.2d 199 (5th Cir. 1970) ............................................................................. 32

## STATUTES

5 U.S.C. § 553(b) ............................................................................................. 19

5 U.S.C. § 605(b) ............................................................................................. 27

5 U.S.C. § 706(2) ............................................................................................. 29

33 U.S.C. § 1313(a) .......................................................................................... 14

33 U.S.C. § 1344(f) .......................................................................................... 21

33 U.S.C. § 1362(7) .......................................................................................... 15

## REGULATIONS

33 C.F.R. § 328.3(a) ................................................................................... 7, 14, 15

33 C.F.R. § 328.3(b) ......................................................................................... 30

33 C.F.R. § 328.3(c) ........................................................................... 9, 14, 15, 21, 30

79 Fed. Reg. 22,188 (Apr. 21, 2014) ............................................................. 18-22

79 Fed. Reg. 61,590 (Oct. 14, 2014) ................................................................. 21

80 Fed. Reg. 37,054 (June 29, 2015) ........................................... 5, 10, 17, 25, 27, 29, 31

Plaintiffs' challenges to the Clean Water Rule have been pending for more than three years, and are the subject of hundreds of pages of briefing. Yet after all this time, Plaintiffs have yet to make an argument for why the Clean Water Rule should be vacated that has record or legal support. Plaintiffs' reply briefs are more of the same: they repeatedly mischaracterize the Rule and the case law, they ignore governing Fifth Circuit precedent, and they fail to respond to most of Defendant-Intervenors' ("Intervenors") arguments in their response and cross-motion. *See* Def.-Ints.' Cross-Mot. Summ. J. and Opp. to Pls.' Mots. Summ. J., ECF No. 168 ("Intervenors Br."). Plaintiffs' motions for summary judgment should be denied, and Intervenors' cross-motion should be granted.

The scientific record directly contradicts Plaintiffs' primary contention that the Rule covers waters lacking a significant nexus downstream. In their reply brief, Industry Plaintiffs suggest the science simply does not matter. *See* Plaintiffs' Reply in Supp. Mot. Summ. J., ECF No. 175 ("Industry Reply") at 21 (claiming this case is not about "scientific expertise"); *id.* at 23 (deriding citations to evidence as "[d]ancing around the text of the Act"); *id.* at 28 (accusing Intervenors of "trumpet[ing]" science). But science lies at the heart of this case. The Rule satisfies the Clean Water Act, under the governing legal standard, because it reaches waters that have significant biological, physical, and chemical effects downstream. That is, first and foremost, a *scientific* determination.

1

Plaintiffs also add nothing to their incorrect opening arguments about the supposed procedural deficiencies in the Rule. The final Rule was a "logical outgrowth" of the proposal, the public had ample opportunity to comment on the Science Report's findings, and the Agencies responded fully to public comments. Even assuming the Agencies violated the procedural requirements of the Regulatory Flexibility Act, Plaintiffs have not shown any such error to be prejudicial. And Plaintiffs' attempt to paint the Agencies' modest use of social media as demonstrating a "closed mind"—an argument not made in the opening briefs—fails to satisfy any part of the demanding "closed mind" standard.

Finally, Plaintiffs' constitutional arguments fail. The Rule is not vague, and it falls comfortably within Congress's Commerce Clause authority over both the channels of interstate commerce and economic activities affecting commerce.

## ARGUMENT

### I.   Plaintiffs' substantive attacks on the Clean Water Rule lack merit

#### A.   The *Rapanos* plurality opinion is neither controlling nor "better" than Justice Kennedy's concurrence

Not a single Court of Appeals has held that the *Rapanos* plurality opinion alone controls the meaning of "waters of the United States." The Courts of Appeals are divided between those finding Justice Kennedy's opinion alone controlling, and those finding that if *either* the test in Justice Kennedy's opinion *or* the test in the plurality's opinion is satisfied, there is a "water of the United

States." *See* Intervenors' Br. 11-12 & n.5. The Fifth Circuit has not expressly weighed in on this debate, *id.* at n.5, but there is no reason to think it would disagree with every other circuit court and find that *only* the plurality opinion determines the scope of the Clean Water Act.

State Plaintiffs concede that the *Rapanos* plurality opinion is not controlling. Reply to Fed. Defs.' Resp. to States' Mots., ECF No. 176 ("States Reply") at 22.[1] However, State Plaintiffs' concession renders their remaining argument confusing. If the *Rapanos* plurality is not controlling, what role is it supposed to play? Plaintiffs cannot be arguing that the Clean Water Rule should reach, in addition to waters covered by Justice Kennedy's opinion, waters covered by the plurality opinion as well (*but see* States Reply 22-23) — that would expand the reach of the Rule and thus be directly contrary to Plaintiffs' asserted interest in this case. On the other hand, if Plaintiffs are not arguing that the *Rapanos* plurality is controlling, or that it be used additively to Justice Kennedy's test, it is unclear what Plaintiffs are asking this Court to do with it.

State Plaintiffs imply that the Court should "consider" the plurality opinion in addition to the concurrence, States Reply 23, without explaining what they mean by that, citing Justice Stevens's *Rapanos* dissent. Justice Stevens in

---

[1] Industry Plaintiffs assert that Justice Kennedy's opinion is not controlling, but do not offer an alternative approach. *See* Industry Reply 23.

3

dissent explained that the United States could "elect" to prove Clean Water Act jurisdiction under *either* the plurality *or* the concurring opinions' tests. *Rapanos v. United States*, 547 U.S. 715, 810 n.14 (2006) (Stevens, J., dissenting). That gave the United States an "either/or" choice for enforcement. It does not mean that a published rule interpreting the scope of the Act must satisfy *both* opinions.

In any event, as explained previously, Justice Kennedy's test is far more faithful to the Clean Water Act and prior Supreme Court precedent than the plurality's. *See* Intervenors Br. 12. This is not what "Intervenors prefer," *contra* States Reply 22—it is what the Agencies decided when promulgating the Rule. *See* Technical Support Document (TSD) at 48 ("The key to the agencies' interpretation of the CWA is the significant nexus standard . . . refined in Justice Kennedy's opinion in *Rapanos*."), JA[20869].[2] Justice Kennedy's "significant nexus" standard is a permissible, if not controlling, interpretation of the Clean Water Act, and so the Rule's use of it must be upheld. *See BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 824-25 (5th Cir. 2004) (agency's reasonable interpretation of ambiguous statute will be upheld). Plaintiffs' arguments that the Rule fails the

---

[2] The Joint Appendix is scheduled to be filed after the completion of briefing. *See* Order at 2, ECF No. 154. This brief refers to record documents, the first time they are cited, using the last four or five digits of their EPA docket numbers, all of which begin with "EPA-HQ-OW-2011-0880-[xxxx]." Documents can be found by searching the full docket number, including the last four or five digits, on the government's website, www.regulations.gov.

plurality test are therefore irrelevant. *See*, *e.g.*, Industry Reply 29 (arguing that "non-wetland" waters should not be covered and relying solely on the *Rapanos* plurality—albeit a mischaracterization of that opinion[3]).

### B.   Plaintiffs misrepresent and try to evade the scientific evidence supporting the Rule's "significant nexus" findings

### 1.   The Rule's definition of tributary is not overbroad

Despite Industry Plaintiffs' claim that scientific evidence is not "[t]he point," Industry Reply 22, their arguments acknowledge otherwise. Their claims that the Rule reaches waters with "attenuated" connections to navigable waters, or that affect only in small measure "distant" features, *id.*, are scientific assertions—albeit without any science to support them. As previously explained, the evidence demonstrates that the Rule reaches waters with *significant*—not "attenuated"—downstream effects. *See*, *e.g.*, Science Report ES-2 (the Rule covers tributaries that have a "strong influence" on the integrity of downstream waters) JA[20859]; TSD at 242 (tributaries under the Rule demonstrate a flow duration and frequency that excludes waters lacking sufficient size and significance); Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg.

---

[3] Industry Plaintiffs argue that the *Rapanos* plurality found "[n]on-wetland waters" did not implicate the boundary-drawing problem identified in *Riverside Bayview*. Industry Reply 29. But the relevant distinction drawn by the plurality was between "isolated" and non-isolated waters; not between wetlands and non-wetlands. *See Rapanos*, 547 U.S. at 742 (plurality).

37,054, 37,058 (June 29, 2015) (adjacent waters are connected to waters downstream and protect those waters' chemical, physical, or biological integrity).

Plaintiffs utterly fail to refute the evidence showing that tributaries under the Rule meet the Supreme Court's standard for protection, which is that the *majority* of them have significant effects downstream. Even if one accepts the unsupported premise that the Clean Water Rule would cover the feature in "Figure 1," and that "Figure 1" lacks a significant nexus, *see* Industry Reply 24, a single example out of thousands of tributaries does not show that the *majority* of them lack a significant nexus—as required under *Riverside Bayview* and *Rapanos*. *See United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 135 n.9 (1985); *Rapanos*, 547 U.S. at 780-81 (Kennedy, J., concurring). In fact, *all* of Plaintiffs' arguments about tributaries should be rejected on this basis: Plaintiffs never even attempt to show that the *majority* of tributaries lack a significant nexus.[4]

Industry Plaintiffs also add nothing to their unfounded assertion that the ponds in *SWANCC* would be covered by the Clean Water Rule. In response to Intervenors' point that this assertion has no basis, Industry Plaintiffs cite nothing

---

[4] Industry Plaintiffs also have not substantiated their claim that the feature in "Figure 1" would be covered by the Rule. They quote an American Petroleum Institute comment, the cited portion of which cites nothing. *See* Industry Reply 24 (citing API Comments at 83, JA[15115]). It is fanciful for Industry Plaintiffs to describe the comment as something "the record shows." *Id.* Their comments may be in the record, but they are not record evidence—they are advocacy.

but their opening brief. Industry Reply 24. They say the ponds are fewer than 4,000 feet from a tributary, but that just means the ponds are not *categorically excluded* under the Rule—it does not mean they are protected. *See* 33 C.F.R. § 328.3(a)(8) (waters within 4,000 feet are "waters of the United States" *only if* they are found to have a "significant nexus" on a case-specific basis). Industry Plaintiffs also assume that under *SWANCC,* the ponds at issue would be outside the scope of the Act no matter what. Industry Reply 25. But the Court held only that the "Migratory Bird Rule"—adopted without notice-and-comment and premised on a connection to interstate commerce—did not bring the ponds within the scope of the Act. *See Solid Waste Agency of Northern Cook County (SWANCC) v. United States Army Corps of Eng'rs,* 531 U.S. 159, 163-64 & n.1, 174 (2001). The Court did not answer whether the Clean Water Rule—adopted after notice-and-comment, based on an extensive scientific record, and premised on significant connections to navigable waters—permissibly could do so.

Industry Plaintiffs claim that the Clean Water Rule covers tributaries in the arid West that lack "regular or significant flow." Industry Reply 26. But they point to no particular studies contradicting the Agencies' opposite finding (*see* Intervenors Br. 15-18) that arid-West tributaries *do* have a significant nexus downstream. Instead, Industry Plaintiffs engage in hand-waving: they refer to comment letters, to the titles of various scientific journals, and to Army Corps of

7

Engineers "studies" — without explaining how any one of them contradicts the Agencies' findings. Industry Reply 26-27. That is insufficient. If Plaintiffs believe there is a study that supports their arguments, it is incumbent on them to point to one. *Cf. Nicholas Acoustics & Specialty Co. v. H & M Constr. Co.*, 695 F.2d 839, 846-47 (5th Cir. 1983) ("We wish to emphasize most strongly that it is fool-hardy for counsel to rely on a court to find disputed issues of material fact not highlighted by counsel's paperwork . . . .").

Industry Plaintiffs' comments did not go "unaddressed" by the Agencies, *contra* Industry Reply 26-27. The Agencies explained why they disagreed with the comments, based on record evidence. *See, e.g.*, TSD at 242. Regarding arid-West tributaries, the Agencies explained:

> The agencies plan to continue to build on the more than a decade of effort spent improving the consistency and rigor of [ordinary high water mark (OHWM)] identifications, especially in the western US where two guidebooks for OHWM identification have already been developed . . . The Arid West OHWM manual was developed to address the identified challenges in low-gradient, alluvial ephemeral/intermittent channel forms, by using other features associated with the limits of the active floodplain (channel), which are easily identified in the field, less variable over time, and statistically linked to the hydrologic and hydraulic parameters of ephemeral and intermittent arid channel forms, to support the traditional OHWM indicators.

RTC Topic 8 at 346, JA[20872]. The Rule was based on evidence, and Plaintiffs' unsupported assertions have no purchase. *See BCCA*, 355 F.3d at 824 (agency decision will be upheld if agency examines data and gives rational explanation).

Industry Plaintiffs cling to their discredited argument about the Rule's inclusion of ditches by asserting there was "no basis or evidence to support why ditches are covered at all." Industry Reply 27. That is untrue. Intervenors already explained (*see* Intervenors' Br. 19) that ditches were covered because many "function as tributaries and have a significant nexus to downstream waters, playing an important role in the physical, chemical, and biological integrity of these waters." RTC Topic 6 at 89, JA[20872]. That is why non-excluded ditches are covered if they function as tributaries. 33 C.F.R. § 328.3(c)(3). Industry Plaintiffs offer no response to this.

State Plaintiffs defend their reliance on certain Army Corps of Engineers studies by insisting that ordinary high water marks in arid streams do not indicate flow "frequency" or "when it occurred." States Reply 25-26. The source materials say otherwise. One of the cited Corps manuals, for instance, explains that ordinary high water marks in arid systems may be determined based on the active floodplain and correspond to a 5- to 10-year return interval, caused by normal discharge events that are "high-magnitude, short-duration." *See* Lichvar et al., *Distribution of Ordinary High Water Mark (OHWM) Indicators and Their Reliability in Identifying the Limits of "Waters of the United States" in Arid Southwestern Channels* 15-16 (2006), available at https://bit.ly/2ySr7VY. "This repeating series of moderate events represents the repeatable limits of 'ordinary'

discharges for arid western channels." *Id.* at 16. In short, ordinary high water marks in arid streams represent normal, repeating, relatively recent, significant discharge events. These are not "[h]istorical markers," *contra* States Reply 25.

### 2.    The Rule's definition of adjacency is not overbroad

Industry Plaintiffs assert that Intervenors did not "back . . . up" that waters in a floodplain are highly connected to rivers and tributaries. Industry Reply 28. In fact, Intervenors cited these sources: Science Report ES-2 to ES-3, ES-11, 2-12, 2-21, 4-1, 4-7, 4-39, 6-4, and TSD at 305 (*see* Intervenors' Br. 20-21). Other than the untrue assertion that the argument was not "backed up," Industry Plaintiffs have no response.

Industry Plaintiffs also repeat their refrain that the Agencies' choice of a 100-year floodplain was "arbitrary," Industry Reply 28, but wholly fail to address Intervenors' record-based and case-law-based explanation for why it was not. As previously explained, the Agencies chose the 100-year interval in part for reasons of clarity and administrability, *see* 80 Fed. Reg. at 37,083 ("the agencies chose the 100-year floodplain in part because FEMA and NRCS together have generally mapped large portions of the United States, and these maps are publicly available, well-known and well-understood"), which is not "arbitrary," *see WorldCom, Inc. v. FCC*, 238 F.3d 449, 459 (D.C. Cir. 2001); *Beazer E., Inc. v. EPA Region III*, 963 F.2d 603, 609 (3d Cir. 1992); *see also* Intervenors' Br. 23. Industry

10

Plaintiffs give no response, much less do they show that waters within a 100-year floodplain do not meaningfully affect downstream conditions.

Industry Plaintiffs also continue to attack the line drawn in the Clean Water Rule between waters categorically covered as "adjacent"—those within the 100-year floodplain and 1,500 feet of a primary water—and waters not covered categorically, but that may be protected after an individualized showing of significant nexus—those beyond 1,500 feet. Industry Plaintiffs describe this as treating features beyond 1,500 feet as not having significant effects, *see* Industry Reply 29, but that mischaracterizes the Rule. Waters beyond 1,500 feet *may* have significant effects downstream, but this must be found on a case-specific basis. Industry Plaintiffs likewise assert that "[t]he question is not whether features *within* the boundaries have been shown to 'significantly affect' the primary water," *id.*, but that makes no sense. That is *precisely* the question. The Rule finds waters "within the boundaries" have significant effects, and the question is whether that finding was reasonable. It was. *See* Intervenors' Br. 20-23.

Industry Plaintiffs also mischaracterize both the Rule and the law when they suggest the Agencies must justify the 1,500-foot boundary as a "magical" line between waters with and without significant impacts downstream. Industry Reply 29. Of course the Agencies never claimed the 1,500-foot boundary represented a stark distinction between waters with and without significant

11

impacts. *See* TSD at 301-02 ("The agencies are not determining that waters in the floodplain farther than 1,500 feet . . . never have a significant nexus. Rather, the agencies are using their technical expertise to promulgate a practical rule that draws reasonable boundaries in order to protect the waters that clearly have a significant nexus while minimizing uncertainty . . . ."). And this is perfectly appropriate under the law, which requires *reasonable* lines that align with the evidence—not *exact* lines that entail no under- or over-inclusiveness at all. *See WorldCom*, 238 F.3d at 462 (agency choice must be in a "zone of reasonableness," and need not be "precisely right" (internal quotation marks omitted)); *Beazer E.*, 963 F.2d at 609 (courts defer to agency line-drawing if "reasonable and consonant with Congress' intent"). The Rule satisfies that standard, and this remains unrebutted by Plaintiffs.[5]

Finally, Industry Plaintiffs claim that under the reasoning of *Riverside Bayview*, waters are not "inseparably bound up" with other waters based on

---

[5] The Sixth Circuit's stay order noted that the Agencies had not identified "specific scientific support" for the bright-line standards. Order of Stay 5, *In re Clean Water Rule*, No. 15-3799 (6th Cir. Oct. 9, 2015), ECF No. 64-2. To the extent the Sixth Circuit expected the Agencies to prove that the line should be at *exactly* 1,500 feet, that is not required by the law, as explained above. The Sixth Circuit's stay order was preliminary, and ultimately vacated for lack of jurisdiction (a fact unmentioned by Plaintiffs, *see* Industry Reply 29). *See* Order of Dismissal, *In re Clean Water Rule*, No. 15-3751 (6th Cir. Feb. 28, 2018), ECF No. 184-2.

connections like "sediment trapping" or "nutrient recycling." *See* Industry Reply

29-30. But *Riverside Bayview* found just these kinds of effects relevant:

> [T]he Corps has concluded that wetlands may serve to filter and
> purify water draining into adjacent bodies of water, . . . and to slow
> the flow of surface runoff into lakes, rivers, and streams and thus
> prevent flooding and erosion . . . . In addition, adjacent wetlands
> may "serve significant natural biological functions, including food
> chain production, general habitat, and nesting, spawning, rearing
> and resting sites for aquatic . . . species." . . . In short, the Corps has
> concluded that [adjacent] wetlands . . . may function as integral
> parts of the aquatic environment even when the moisture creating
> the wetlands does not find its source in the adjacent bodies of water.
> Again, we cannot say that the Corps' judgment on these matters is
> unreasonable, and we therefore conclude that a definition of "waters
> of the United States" encompassing all [adjacent] wetlands . . . is a
> permissible interpretation of the Act.

*Riverside Bayview*, 474 U.S. at 134–35. There is no reason why the Court would

have found water filtration and "food chain production" permissible

considerations in covering adjacent waters, but not sediment trapping and

nutrient recycling, as provided in the Rule. Industry Plaintiffs' claim is meritless.

### 3.    The Rule comports with Justice Kennedy's test

Industry Plaintiffs assert that under Justice Kennedy's *Rapanos* opinion, the

Agencies cannot regulate "drains, ditches, and streams remote from any

navigable-in-fact water and carrying only minor water volumes toward it."

Industry Reply 22-23 (quoting *Rapanos*, 547 U.S. at 781 (Kennedy, J., concurring)).

That misstates the opinion. Justice Kennedy said that the pre-Clean Water Rule

definition of tributary—which he found might cover "remote" features—

13

provided insufficient assurance that the wetlands adjacent to them "are likely to play an important role in the integrity of an aquatic system comprising navigable waters." *Rapanos*, 547 U.S. at 781 (Kennedy, J., concurring). The Clean Water Rule is directly responsive to that concern: the record demonstrates that wetlands adjacent to tributaries *are* likely to play an important role in the integrity of an aquatic system comprising navigable waters. *See* Intervenors' Br. 20-24.[6]

### C.   Plaintiffs' "interstate waters" challenge is meritless

Industry Plaintiffs' challenge to the Rule's coverage of interstate waters is time-barred, *see* Intervenors' Br. 27-28; Fed. Defs.' Resp. States' & Private Party Pls.' Mots. Summ. J. 19-21, ECF No. 170 ("Fed. Defs. Br."), but even if it were not, it is wrong on the merits. Industry Plaintiffs downplay the significance of a section of the Clean Water Act that applies to interstate waters, calling it "off-point." Industry Reply 25. But the provision demonstrates Congress's intent to continue to apply the Act to interstate waters. *See* 33 U.S.C. § 1313(a)(1) (state water quality standards "applicable to interstate waters" prior to 1972 "shall remain in effect" unless EPA requires revisions); *id.* § 1313(a)(2) (corresponding

---

[6] Industry Plaintiffs claim the Rule's definition of tributaries is "broader" than the definition analyzed in *Rapanos*. Industry Reply 30. That is not true. The pre-Rule definition had no limiting factors, *see* 33 C.F.R. § 328.3(a)(5) (2014), while the Rule's definition is narrower because it adds multiple conditions—a bed, banks, and ordinary high water mark, *see* 33 C.F.R. § 328.3(c)(3).

provision for "intrastate waters"). Industry Plaintiffs' observation, Industry Reply 25; Mot. for Summ. J. of Pls.' ("Industry Opening Br.") at 32, ECF No. 156, that in revising the Clean Water Act Congress used "navigable" instead of "interstate or navigable" falls short. First, Congress simultaneously defined "navigable waters" expansively to mean "waters of the United States," 33 U.S.C. § 1362(7), and second, there is no question Congress meant the revisions to expand—not shrink—the Act's scope. *See* Intervenors' Br. 28 (citing legislative history). Supreme Court opinions, too, treat federal law as applicable to interstate waters. *Id.* (describing cases).

### D.  The Clean Water Rule does not revive the "Migratory Bird Rule"

Industry Plaintiffs incorrectly characterize the Supreme Court opinion in *SWANCC* as holding that the Clean Water Act does not protect isolated ponds on the basis that they "serve as a habitat." Industry Reply 30. But *SWANCC* found that the ponds' provision of habitat for migratory birds was insufficient because there was no required connection to navigable waters, and so the Migratory Bird Rule "read[s] the term 'navigable waters' out of the statute." *SWANCC*, 531 U.S. at 171-72. The Clean Water Rule differs from the Migratory Bird Rule in precisely the relevant respect: it requires as evidence of biological connectivity a connection to *navigable* or interstate waters. *See* 33 C.F.R. § 328.3(a)(1)-(2), (a)(8), (c)(5)(ix). It does not read the word "navigable" out of the statute.

### E.   Plaintiffs cannot complain about Texas coastal prairie wetlands

Industry Plaintiffs say their claims about Texas coastal prairie wetlands are not waived, and point to two comment letters, Industry Reply 31, neither of which helps them. The comments question the Agencies' findings that Texas coastal prairie wetlands are similarly situated and have significant effects downstream. *See* Greater Houston Builders Ass'n (GBHA) Comments 5-7, JA[15465]; W. Houston Ass'n (WHA) Comments 6-9, JA[12753]. Those are not Industry Plaintiffs' arguments here. Industry Plaintiffs argue to this Court that (1) Texas coastal prairie wetlands are "not meaningfully defined," and (2) the Agencies cannot draw a line between Texas and Louisiana in categorizing the wetlands. *See* Industry Opening Br. 41-43. Neither argument appears in the comment letters, and so the arguments are waived in this Court. *See Koretoff v. Vilsack*, 707 F.3d 394, 398 (D.C. Cir. 2013). Industry Plaintiffs claim, in a parenthetical, that one of the comment letters said there was "no 'uniform approach' to defining" Texas coastal prairie wetlands, Industry Reply 31, but that is misleading. What the letter said is that a study had failed to take "a uniform approach" to selecting wetlands for that study. *See* GHBA Comments 5. That is not the same as Industry Plaintiffs' argument that the Clean Water Rule fails to "meaningfully define[]" Texas coastal prairie wetlands, *see* Industry Opening Br. 41.

16

Industry Plaintiffs do not respond to Intervenors' point (*see* Intervenors' Br. 33) that Plaintiffs suffer no injury from, and so cannot complain about, the Rule's exclusion of Louisiana coastal wetlands. *See* Industry Reply 31-32. And Industry Plaintiffs misunderstand the Rule's preamble in claiming that it describes Texas coastal prairie wetlands as in close proximity to "other" wetlands—implying that "other" wetlands might be those in Louisiana. *See* Industry Reply 31. The Agencies just meant that Texas coastal prairie wetlands are in close proximity to other *Texas coastal prairie wetlands*—i.e., they are in "close proximity to *each other*." 80 Fed. Reg. at 37,073 (emphasis added).

### F.      Waters can be both point sources and receiving waters

Industry Plaintiffs claim that the Clean Water Rule should not allow ditches to be both "point sources" and "waters of the United States," but they fail to reply to most of Intervenors' arguments on this issue. *See* Intervenors' Br. 33-35; Industry Reply 32. In fact, the Clean Water Act contemplates waters of the United States that may also be point sources, which is consistent with the Agencies' longstanding position and not contradicted by the *Rapanos* plurality. *See* Intervenors' Br. 34-35. Industry Plaintiffs' argument to the contrary is meritless.

II.     **Plaintiffs' procedural attacks on the Clean Water Rule lack merit**

    A.     **Plaintiffs' notice-and-comment arguments fail**

        1.     **Plaintiffs' logical outgrowth arguments fail**

Plaintiffs persist in mischaracterizing the record to argue that the Clean Water Rule was not a logical outgrowth of the proposal. The Agencies specifically requested and received comment on defining adjacent waters in terms of geographic distance. *See, e.g.*, 79 Fed. Reg. 22,188, 22,208 (April 21, 2014) (requesting comment on different ways to define "adjacent waters," including "establishing specific geographic limits" for using hydrological connections to determine adjacency, such as "distance limitations"). Having done so, it was at least "reasonably foreseeable," *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007), that the Agencies would include "specific geographic limits" or "distance limitations" to define the term. And Plaintiffs concede that the Agencies were not required to list in the proposed Rule the precise distances they ultimately settled on. Industry Reply 12 n.2; State Reply 7.

Industry Plaintiffs claim they "could not anticipate" the final Rule would include distance limitations at all, Industry Reply 11, but many commenters (including some Plaintiffs) did in fact anticipate it. The Agencies received a wide range of comments on that exact question, including some that opposed use of distance limits entirely, and others that proposed specific distances for the

18

Agencies to consider. Fed. Defs. Br. 26-28 (citing examples); Intervenors' Br. 37.

In fact, public commenters' "dominant request" on this topic was for the

Agencies "to identify specific limits." RTC Topic 3 at 18, JA[20872]. The APA

requires no more than "[g]eneral notice" of the terms or substance of a proposed

rule, 5 U.S.C. § 553(b)(3), and the comments filed on distance limitations show

that the Agencies provided adequate notice.

Plaintiffs claim that an agency may not "bootstrap" notice from the public

comments filed on a proposal, State Reply 16; Industry Reply 13, but that is not

what happened here. The comments are important because they prove the

adequacy of the Agencies' notice, not because the comments *themselves* provided

notice to the public. *See, e.g.*, *United Steelworkers of Am., AFL-CIO-CLC v. Schuylkill

Metals Corp.*, 828 F.2d 314, 318 (5th Cir. 1987) (finding that comments showed it

was "readily apparent" what was at issue). In other words, the scope and extent

of public comments regarding geographic limits—responding to the Agencies'

request for comment on "specific geographic limits"—demonstrates that there

was a fair opportunity for the public to weigh in on geographic limits.

State Plaintiffs are incorrect that the proposed Rule defined "adjacent"

exclusively in terms of "hydrologic" concepts, and not proximity or distance.

States Reply 8-9. The Agencies explained in the proposal that "adjacent" has

always included an element of physical proximity, 79 Fed. Reg. at 22,207, and

19

connections between waters may decrease as "the distance" between them increases, *id.* at 22,208. The Agencies also explained their intent to clarify the term "neighboring" (part of "adjacency") by better defining the "lateral reach" of the term. *Id.* at 22, 207. "Lateral reach" implies at least some element of physical distance, not just hydrology.

In their replies, Plaintiffs ignore two Fifth Circuit cases on point, cited in Intervenors' brief (Intervenors Br. 35), both of which cut against their arguments. In *United Steelworkers*, the Fifth Circuit held that an agency need not "spell out with particularity the proposed meaning" of a defined term, as long as the agency solicited comment on its "appropriate scope" generally. 828 F.2d at 318. And in *American Transfer & Storage Co. v. ICC*, 719 F.2d 1283 (5th Cir. 1983), the Fifth Circuit rejected an inadequate notice argument, even though the agency had deleted certain proposed requirements, noting that an agency may adopt a new rule "containing substantial differences from the one proposed and still have acted lawfully." *Id.* at 1303. Plaintiffs have no response to this circuit law.

Plaintiffs also continue to argue that the Rule's 4,000-foot cutoff for waters subject to a significant nexus analysis was not a logical outgrowth of the proposal. Industry Reply 14; State Reply 13-14. But since that change made the rule narrower than the proposal—it *excludes* from Clean Water Act protection

some waters that would otherwise have been subject to potential inclusion—it

benefits Plaintiffs, and they have no basis to challenge it. *See* Intervenors' Br. 38.

The State Plaintiffs' final argument—about the absence of a sweeping

agricultural exception from the definition of "tributaries," State Reply 20—is off-

base. The proposed rule never suggested such an exception, and the final Rule

likewise does not include one. There is no conceivable notice-and-comment

violation where the Agencies neither proposed nor finalized such an exception.[7]

### 2. Plaintiffs had a meaningful opportunity to comment on the Science Report

Industry Plaintiffs are wrong that they did not have an opportunity to

comment on the conclusions and methodology in the Science Report. The

Agencies solicited comment on both the draft Report and the Science Advisory

Board's review of it. 79 Fed. Reg. at 22,190, 22,195-96; 79 Fed. Reg. 61,590, 61,590-

91 (Oct. 14, 2014). The final Report merely supplemented the conclusions and

methodology presented in the draft; there was nothing new that required

another round of comment. None of Plaintiffs' examples show otherwise.

---

[7] State Plaintiffs distort two entirely different things relating to agriculture. The Clean Water Act's exemptions from *permitting* requirements for certain agricultural discharges, *e.g.*, 33 U.S.C. § 1344(f)(1)(A), are unaffected by the Clean Water Rule and still available for discharges to all kinds of waters, including tributaries. The Rule created an *additional* exclusion—from the definition of "adjacency"—for waters used in agriculture. 33 C.F.R. § 328.3(c)(1). Plaintiffs seek *yet another* exclusion—never proposed—from the definition of "tributaries."

First, as previously explained, the Science Report's "continuum-based approach" was not new. It was mentioned not only in the draft Report but in the proposed Rule itself. *See* 79 Fed. Reg. at 22,193 ("The relationship that waters can have to each other and connections downstream . . . is not an all or nothing situation;" "[t]here is a gradient in the relation of waters to each other, and this is documented in the [draft] Report."); Draft Science Report 3-4, 3-33, 4-21 to 4-23, 5-57, 6-3, JA[0004].

Nor were Plaintiffs deprived of the opportunity to comment on the issue of "man-made breaks" (*contra* Industry Reply 16-17)—that issue was raised in the draft Report, *see* Draft Science Report 3-47 to 3-50, and the final Report simply expands on the discussion. *See* Science Report 1-11 to 1-14, 2-44 to 2-47, 5-4 to 5-9.

Finally, Industry Plaintiffs are wrong that the final Report "added a new case study" on the connectivity of Southwestern intermittent and ephemeral streams, *contra* Industry Reply 15. That case study was in the draft Report too. *Compare* Draft Science Report 4-56 to 4-70 *with* Science Report B-37 to B-60.[8]

---

[8] Industry Plaintiffs mention 23 studies in the final Science Report as providing "new information," Industry Reply 15, out of the Report's more than 1,000 referenced studies. Plaintiffs never claim that this tiny fraction changed the Science Report's methodology or conclusions. They never say what the studies address, why they matter, or what Plaintiffs would have said about them.

None of these examples warrant another round of public comment. *See Solite Corp. v. EPA*, 952 F.2d 473, 484-85 (D.C. Cir. 1991) (holding that agency reliance on a supplemental science report citing additional data did not violate notice-and-comment provisions because the agency's "methodology remained constant, and because the added data was used to check or confirm prior assessments"); *Cmty. Nutrition Inst. v. Block*, 749 F.2d 50, 58 (D.C. Cir. 1984) ("It is impossible to perceive why correction of an asserted deficiency in earlier studies . . . should give rise to an additional opportunity to comment."); *Air Transp. Ass'n of Am. v. C.A.B.*, 732 F.2d 219, 224 (D.C. Cir. 1984) (holding that agency reliance on "internal staff studies" that were not made available for public comment did not violate the APA).

As the Fifth Circuit has held, "[t]he public need not have an opportunity to comment on every bit of information influencing an agency's decision." *Texas v. Lyng*, 868 F.2d 795, 799 (5th Cir. 1989). Plaintiffs are required to identify the specific new material they object to, show how they would have responded differently, and demonstrate that the failure to provide a new comment period prejudiced them. *See id*. at 799-800. Industry Plaintiffs do none of these things. They repeat the generic claim that they would have "expanded and refined" their criticisms, Industry Reply 16, which falls far short of the legal standard. *See Lyng*, 868 F.2d at 799-800; *see also Texas Office of Pub. Util. Counsel v. FCC*, 265 F.3d

23

313, 327 n.6 (5th Cir. 2001) (rejecting petitioners' complaint that they did not have an opportunity to comment on a late-filed study, because petitioners did not show "how the lack of opportunity to comment prejudiced them"). Plaintiffs' noncommittal language confirms that there was in fact nothing new in the final Report that they did not have an opportunity to comment on earlier.

Industry Plaintiffs ignore the two Fifth Circuit cases directly on point, *see Lyng*, 868 F.2d at 799-800; *Texas Office of Pub. Util. Counsel*, 265 F.3d at 326-27, and instead rely on two cases that were not cited in their opening brief. Both cases undercut their claims. In *United States v. Nova Scotia Food Products Corp.*, 568 F.2d 240 (2d Cir. 1977), unlike here, the FDA did not release *any* science at all. *Id.* at 251 ("[A]ll the scientific research was collected by the agency, and *none* of it was disclosed . . . ." (emphasis added)). The court did not hold that *supplementing* the science after the comment period violates the APA, but rather recognized that "a proceeding might never end" if later submissions required "a reply *ad infinitum*." *Id.* at 251 n.15. And in *Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995), the court held that an agency's failure to disclose a non-public report, which was "critical" to the challenged decision, violated the APA because the report did *not* simply "confirm or replace existing data" but provided "the *only* scientific information" on a central question. *Id.* at 1403 (emphasis added). By contrast, "[a]n agency may use supplementary data, unavailable during the

24

notice and comment period, that expands on and confirms information contained in the proposed rulemaking and addresses alleged deficiencies in the preexisting data, so long as no prejudice is shown." *Id*. at 1402 (internal quotation and alteration marks omitted). That is exactly what happened here.

### 3. Plaintiffs' complaints about the response to comments fail

The Agencies responded at length to comments received during the rulemaking. The response-to-comments requirement is not "particularly demanding," *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993), and the Agencies' 17-volume, 7,500-page response more than suffices to meet that standard, *see id.* (response should enable a court to see what major issues of policy were aired and why the agencies reacted as they did).

Contrary to Plaintiffs' claims, Industry Reply 17, the Agencies considered and responded to comments on permitting exemptions for agriculture, *see* 80 Fed. Reg. at 37,055; RTC Topic 6 at 30-31, Topic 7 at 311-12, and Topic 12 at 747, 751, 755-56, JA[20872], including the statute's "recapture" provision, *see* RTC Topic 12 at 554-55, 564, 608-09, 759, 763-64, 802-03. The Agencies also fully considered and responded to comments about the definition of tributaries and reliance on an ordinary high water mark in the arid West. Plaintiffs claim the Agencies lacked "engagement" with this issue, Industry Reply 18, but the record shows otherwise. *See* RTC Topic 8 at 314 (explaining that the Corps' "method

25

uses stream geomorphology and vegetation response to the dominant stream discharge and represents the most consistent and repeating pattern associated with 'ordinary' events representing [ordinary high water] in the arid west"); *id.* at 316-17 (directing commenters to "The Field Guide for the Identification of OHWM in the Arid West" for "additional, more specific guidance for identifying the OHWM within the arid west region"); *see also id.* at 346. The Science Report also includes an entire section discussing southwestern ephemeral and intermittent streams. Science Report B-37 to B-60.

It goes without saying that the Agencies were under no obligation to *agree* with commenters. *See FBME Bank Ltd. v. Mnuchin*, 249 F. Supp. 3d 215, 222 (D.D.C. 2017) ("There is no requirement . . . that an agency respond to significant comments in a manner that satisfies the commenter."). The Agencies were obligated merely to consider and respond to the comments, and they did.

### B.   The Agencies complied with the Regulatory Flexibility Act, and any procedural deficiency was harmless

The Agencies were required only to make a reasonable, good-faith effort to carry out the procedural steps in the Regulatory Flexibility Act (RFA). *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 625 (5th Cir. 2000). The Agencies did so: they concluded that because the Clean Water Rule is definitional only, it does not impose direct regulatory burdens on small entities, and therefore would not have a significant economic impact on a substantial number of small entities. *See*

26

5 U.S.C. § 605(b); 80 Fed. Reg. at 37,102; RTC Topic 11 at 113-15; *Am. Trucking Ass'ns v. EPA*, 175 F.3d 1027, 1045 (D.C. Cir. 1999) (agencies need not consider indirect regulatory burdens), *aff'd in part, rev'd in part on other grounds sub nom. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001). Industry Plaintiffs ignore this evidence and authority, and instead claim that the Agencies supplied only a conclusory justification. Industry Reply 20. But the record includes extensive discussion of the Agencies' decision and the basis for it, and addresses criticisms of the Agencies' choice of economic baseline. *See* RTC Topic 11 at 112-16, JA[20872].

Even if there were some deficiency in the Agencies' RFA analysis, it was harmless because of the Agencies' extensive outreach to small businesses and subsequent amendments to the Rule in response to the input they received. *See* Intervenors' Br. 44-45; 80 Fed. Reg. at 37,102. Industry Plaintiffs cite *Thompson v. Clark*, 741 F.2d 401 (D.C. Cir. 1984), but that case *upheld* agency action against an RFA challenge. *See id.* at 405-08 (interpreting an earlier version of the RFA). The sentence quoted by Plaintiffs does not address the rule of harmless error, as Plaintiffs suggest, but simply notes that courts can entertain an APA claim if an agency arbitrarily ignores comments addressing the impact of a rule on small businesses. *Id.* at 408. The court then rejected the APA claim in that case, *id.* at 408-10, making *Thompson* doubly unhelpful for Plaintiffs here.

27

Finally, Industry Plaintiffs cite *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506 (D.C. Cir. 1983), but the court there also rejected petitioners' RFA arguments, which it found to be "frivolous," holding that EPA's failure to analyze all relevant options in a regulatory flexibility analysis was "a purely technical flaw that does not affect the reasonableness of the final rule." *Id.* at 539.

## C.   The Agencies did not have a "closed mind" about the Rule

Industry Plaintiffs apparently concede that the anti-lobbying and anti-propaganda appropriations provisions do not create a cause of action. Industry Reply 18. Instead Plaintiffs make a new argument, which is that the Agencies' so-called "advocacy campaign" shows a "closed mind." *Id.* at 18-19.

This claim is waived, because Plaintiffs did not argue it in their opening brief. *See* Industry Opening Br. 24-26; *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010). Even if not, Plaintiffs do not come close to meeting the legal test for such a claim (which they never cite). Agency officials may have strong views on the proper course of public policy, and advocacy for those views by itself is not evidence of an unalterably closed mind. *See Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 488 (D.C. Cir. 2011); *C & W Fish Co. v. Fox, Jr.*, 931 F.2d 1556, 1564-65 (D.C. Cir. 1991). Plaintiffs cite *Iowa League of Cities v. EPA*, 711 F.3d 844, 871 (8th Cir. 2013), but the "closed mind" issue was never presented

28

there; the language Plaintiffs quote refers to the unrelated question of standing to challenge APA violations.

Here, the record shows that the Agencies did not approach the rulemaking with a closed mind. They spent years writing the Clean Water Rule, considered more than one million public comments, wrote a 7,500-page response to those comments, held more than 400 public meetings across the country, sought peer review of the scientific basis for the Rule, and revised the Rule in response to the comments. 80 Fed. Reg. at 37,057, 37,062, 37,082. By comparison, Plaintiffs' allegation of "unlawful advocacy" is based on a single Thunderclap message and blog post. This falls far short of proving a closed mind.

Finally, Plaintiffs claim in one sentence that these examples of social media "introduc[ed] elements" "without observance of procedure required by law." Industry Reply 19 (quoting 5 U.S.C. § 706(2)(D)). Industry Plaintiffs never say what procedures were supposedly disregarded. The claim is meritless.

## III.   The Clean Water Rule is constitutional

### A.   The Rule is not unconstitutionally vague

The Clean Water Rule's definition of "ordinary high water mark" is not unconstitutionally vague, and Industry Plaintiffs fail to meet their heavy burden to prove otherwise. *See Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 547, 555 (5th Cir. 2008) (rejecting a vagueness challenge and noting that pre-enforcement

vagueness claims are "often difficult, perhaps impossible"). Industry Plaintiffs declare that the Rule allows for "standardless discretion," Industry Reply 32, but they ignore the standards provided in both the text of the Rule and published guidance, *see* 33 C.F.R. § 328.3(c)(5)-(6); U.S. Army Corps of Engineers, Regulatory Guidance Letter No. 05-05 at 3 (Dec. 2005); *see* Intervenors' Br. 48. In addition, under the law it is perfectly appropriate for the Rule to allow for some flexibility in application. *See U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 737 (D.C. Cir. 2016).

Industry Plaintiffs also ignore Fifth Circuit caselaw applying an "exacting standard" and rejecting vagueness claims. *See City of El Cenizo v. Texas*, 890 F.3d 164, 190 (5th Cir. 2018). The Clean Water Rule is not "so standardless that it invites arbitrary enforcement," *id.* (citation and quotation omitted), nor is it "substantially incomprehensible" or "so indefinite that no one could know what is prohibited," *Roark & Hardee LP*, 522 F.3d at 551 (citation and quotation omitted). As noted before, the Fifth Circuit has twice upheld Clean Water Act jurisdictional determinations against vagueness challenges. *United States v. Lucas*, 516 F.3d 316, 328 (5th Cir. 2008); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 916-17 (5th Cir. 1983). Industry Plaintiffs respond to these latter cases by saying they were decided under the Clean Water Act's prior regulatory regime, Industry Reply 32, but that is no response at all. The prior regulatory

regime was even *less* clear than the Clean Water Rule, which adopted clearer definitions and more bright-line boundaries, *see* 80 Fed. Reg. at 37,055-56. Industry Plaintiffs claim that they "lack notice whether their lands may contain a jurisdictional water," Industry Reply 33, but have no support for that assertion.[9]

Finally, Plaintiffs argue that violating the Clean Water Act can trigger harsh penalties. Industry Reply 34. But Plaintiffs cite a case that affirms their right to challenge a Clean Water Act compliance order *before* any penalties accrue. *Sackett v. EPA*, 566 U.S. 120, 123, 129 (2012). Plaintiffs therefore are not at any risk of being harshly penalized solely because of claimed confusion about the Rule's application.

### B.    The Rule does not exceed the federal government's authority under the Commerce Clause

State Plaintiffs' Commerce Clause argument largely attacks a straw man. They offer no response to Intervenors' argument that the Clean Water Rule is a valid exercise of Commerce Clause authority over the "channels of interstate commerce," *i.e.*, navigable waters and those significantly impacting them. *See* Intervenors' Br. 51-52; *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536

---

[9] "Figure 5" in Industry Plaintiffs' opening brief does not show that the Rule lacks clarity, *contra* Industry Reply 34, let alone that it is unconstitutional. The Constitution does not require that one be able to discern from a snapshot whether a water is a regulated wetland.

(2012) (Congress may regulate both the channels of interstate commerce *and* activities that substantially affect interstate commerce). State Plaintiffs' reply does not dispute (*see* States Reply 26-28) that the Clean Water Rule is a valid exercise of that well-established constitutional authority. *See Rapanos*, 547 U.S. at 782-83 (Kennedy, J., concurring) (regulation of waters with a significant nexus to navigable waters raises no serious constitutional difficulty).

Instead, State Plaintiffs devote their reply to an attack on Intervenors' secondary argument that, to the extent the Rule applies to interstate waters not otherwise navigable, that too is a valid exercise of Commerce Clause authority over activities substantially affecting interstate commerce. *See* Intervenors' Br. 51-52 & n.18; States Reply 27-28. On this point, State Plaintiffs claim that the Rule falls outside such authority by regulating "non-economic activities." States Reply 27. But that argument is wrong and inconsistent with binding caselaw. Water pollution is an economic activity with economic consequences, and may be regulated as such. *See Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 282 (1981) (the Commerce Clause permits regulation of activities causing water pollution in more than one state); *Zabel v. Tabb*, 430 F.2d 199, 204 (5th Cir. 1970) ("[T]he destruction of fish and wildlife in our estuarine waters does have a substantial, and in some areas a devastating, effect on interstate commerce . . . [and] dredge and fill projects are activities which may tend to destroy the

32

ecological balance and thereby affect commerce substantially."); *see also SWANCC*, 531 U.S. at 193 (Stevens, J., dissenting) ("[T]he discharge of fill material into the Nation's waters is almost always undertaken for economic reasons.").

Even if, as Plaintiffs hypothesize, some instances of regulated activity under the Clean Water Rule do not by themselves substantially affect commerce, that does not render the Rule unconstitutional. The Clean Water Act is an "all-encompassing program of water pollution regulation." *City of Milwaukee v. Illinois*, 451 U.S. 304, 318 (1981). And "where a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence." *United States v. Lopez*, 514 U.S. 549, 558 (1995) (quotation omitted, emphasis removed); *see also Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 549 (opinion of Roberts, C.J.) (Congress's power is not limited to regulation of activity that "by itself" substantially affects interstate commerce).

Industry Plaintiffs also briefly assert that the Clean Water Rule violates the Commerce Clause, but do so simply by repackaging their argument that the Rule reaches waters without a significant nexus to navigable waters. *See* Industry Reply 34. For the reasons explained previously, *see supra* Part I(B); Intervenors' Br. 12-24, 51, that claim is meritless.

33

## C.      The Rule does not violate the Tenth Amendment

Finally, State Plaintiffs abandon, on reply, their Tenth Amendment argument that the Clean Water Rule improperly commandeers state resources or regulates states as states. But they maintain that the Rule requires them to "give up their long-cherished authority to regulate their own lands and waters." States Reply 29. The Rule requires no such forfeiture. As explained, the Clean Water Act limits the discharge of pollutants to waters covered by the Rule, but otherwise has no effect on land-use regulations. *See* Intervenors' Br. 54-55. Nor does the federal government's exercise of its Commerce Clause authority offend the Tenth Amendment. "The [Supreme] Court long ago rejected the suggestion that Congress invades areas reserved to the States by the Tenth Amendment simply because it exercises its authority under the Commerce Clause in a manner that displaces the States' exercise of their police powers." *Hodel*, 452 U.S. at 291.

## CONCLUSION

For the foregoing reasons, the Court should deny each of Plaintiffs' claims and uphold the Clean Water Rule.

Dated: December 21, 2018          Respectfully submitted,

/s/ Catherine Marlantes Rahm
Catherine Marlantes Rahm
Attorney in charge, admitted *pro hac vice*
Natural Resources Defense Council
40 West 20th Street
New York, NY 10011

34

Phone: (212) 727-4628/ Fax: (415) 795-4799
E-mail: crahm@nrdc.org

Aaron Colangelo
Admitted *pro hac vice*
Natural Resources Defense Council
1152 15th Street NW Suite 300
Washington, DC 20005
Phone: (202) 289-2376 / Fax: (415) 795-4799
E-mail: acolangelo@nrdc.org

*Counsel for Defendant-Intervenors Natural Resources
Defense Council and National Wildlife Federation*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 21, 2018, I electronically filed the

foregoing **DEFENDANT-INTERVENORS' REPLY IN SUPPORT OF CROSS-**

**MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the

CM/ECF system, which will cause a copy to be served upon counsel of record.

/s/ Catherine Marlantes Rahm