United States District Court
Southern District of Texas
**ENTERED**
May 28, 2019
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al*, § <br> § <br> Plaintiffs, § <br> VS. § <br> § <br> UNITED STATES ENVIRONMENTAL § <br> PROTECTION AGENCY, *et al*, § <br> § <br> Defendants. § | CIVIL ACTION NO. 3:15-CV-00162 |

## MEMORANDUM OPINION AND ORDER

Before the Court are the Private Party Plaintiffs'[1] Motion for Summary Judgment (Dkt. 156) and the Plaintiff States'[2] Motion for Summary Judgment (Dkt. 157). After reviewing the motions, the responses, the replies, the *amici curiae* briefs, and the applicable law, the Court **GRANTS** the motions. Accordingly, the Court **ORDERS** that the "Clean Water Rule: Definition of 'Waters of the United States'" (the "Final Rule"), 80 Fed. Reg. 37,054 (June 29, 2015), be **REMANDED** to the appropriate administrative agencies for further proceedings consistent with this opinion. Furthermore, the Court **ORDERS** that the preliminary injunction issued by this Court on September 12, 2018 (Dkt. 140) remain in place pending the proceedings on remand.

---

[1] The Private Party Plaintiffs are the following groups: American Farm Bureau Federation; American Petroleum Institute; American Road and Transportation Builders Association; Association Of American Railroads; Leading Builders of America; Matagorda County Farm Bureau; National Alliance of Forest Owners; National Association of Home Builders; National Association of Manufacturers; National Cattlemen's Beef Association; National Corn Growers Association; National Mining Association; National Pork Producers Council; Port Terminal Railroad Association; Public Lands Council; Texas Alliance for Responsible Growth, Environmental and Transportation; and Texas Farm Bureau.

[2] The Plaintiff States are Texas, Louisiana, and Mississippi.

## Factual Background and Proceedings

In 1972, Congress passed the Clean Water Act ("the Act") with the stated objective of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To that end, the Act made it "unlawful" to "discharge…any pollutant" into "navigable waters," which were defined as "the waters of the United States, including the territorial seas." *Id*. § 1311(a); *id.* § 1362(12); *id.* § 1362(7). "Because many of the Act's substantive provisions apply to 'navigable waters,'" the definition of the "phrase 'waters of the United States' [effectively] circumscribes the geographic scope of the Act." *Nat'l Ass'n of Mfrs. v. Dep't of Defense*, 138 S. Ct. 617, 624 (2018). However, the Act does not define this phrase.

To "provide clarity and [] avoid confusion," the United States Army Corps of Engineers (the "Army Corps") first defined the phrase "waters of the United States" ("WOTUS") in 1986.[3] Since then, this definition has remained relatively unchanged. *See*

---

[3] The first definition of the phrase WOTUS, which has remained essentially unchanged until now, reads as follows:
  (a) The term "waters of the United States" means
    (1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;
    (2) All interstate waters including interstate wetlands;
    (3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:
      (i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or
      (ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or
      (iii) Which are used or could be used for industrial purpose by industries in interstate commerce;
    (4) All impoundments of waters otherwise defined as waters of the United States under the definition;
    (5) Tributaries of waters identified in paragraphs (a) (1)-(4) of this section;
    (6) The territorial seas;
    (7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a) (1)-(6) of this section.

58 Fed. Reg. 45,008, 45,036 (Aug. 25, 1993) (amending the definition of the phrase WOTUS to clarify that it does not include "prior converted cropland."). Yet, the idea of what is a WOTUS is still an unsettled question. Indeed, the Supreme Court has wrestled with providing a precise definition over the past 30 years. *See United States v. Riverside Bayview Homes*, 474 U.S. 121, 123 (1985); *see also Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 162 (2001); *see also Rapanos v. United States*, 547 U.S. 715, 719 (2006). To this day, the Circuits disagree as to how the phrase WOTUS should be interpreted. *See United States v. Robison*, 505 F.3d 1208, 1221 (11th Cir. 2007) (holding that Justice Kennedy's concurrence in *Rapanos* provided the controlling test for what is a navigable water under the Act); *United States v. Bailey*, 571 F.3d 791, 799 (8th Cir. 2009) (approving of the use of the plurality's opinion and the Kennedy opinion in *Rapanos* as the controlling test for determining what is a navigable water); *United States v. Chevron Pipe Line Co.*, 437 F. Supp. 2d 605, 613 (N.D. Tex. 2006) (applying pre-*Rapanos* Circuit precedent because it could not discern clear direction from *Rapanos*).

Against this backdrop, the Army Corps and the United States Environmental Protection Agency ("EPA") (collectively, "the Agencies") set out to "make the process of identifying 'waters of the United States' less complicated and more efficient." 79 Fed. Reg. 22,188, 22,190 (Apr. 21, 2014). The Agencies also wanted to ensure that the Act enabled jurisdiction over "a particular category of waters," which "either alone or in combination with similarly situated waters in the region, significantly affect[ed] the

---

51 Fed. Reg. 41,206, 41,250 (Nov. 13, 1986).

chemical, physical, or biological integrity of traditional navigable waters, interstate waters, or the territorial seas." *Id*. at 22,197. For these reasons, the Agencies jointly proposed a new definition of the phrase WOTUS in 2014 (the "Proposed Rule").[4] The technical basis for this newly Proposed Rule was a preliminary report drafted by the EPA that reviewed "more than a thousand publications from peer-reviewed scientific literature" and discussed the connected nature of the nation's waters (the "Draft Connectivity Report"). *Id*. at 22,197; Dkt. 180 at Tab M.

"Intend[ing] to…simpl[ify]" the previous definition of WOTUS, the Proposed Rule generally "separate[d] waters into three jurisdictional groups—waters that are categorically jurisdictional (*e.g.*, interstate waters)" ("Categorically Covered Waters"); "those that require a case-specific showing of their significant nexus to traditionally covered waters (*e.g.*, waters lying in the flood plain of interstate waters); and those that are categorically excluded from jurisdiction (*e.g.*, swimming pools and puddles)." *Nat'l Ass'n of Mfrs.*, 138 S. Ct. at 626. In furtherance of this goal, the Proposed Rule defined the term "adjacent"—which would be used in determining whether the Agencies have

---

[4] (a) For purposes of all sections of the Clean Water Act, 33 U.S.C. § 1251 et. seq. and its implementing regulations, subject to the exclusions in paragraph (b) of this section, the term ''waters of the United States'' means:
    (1) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;
    (2) All interstate waters, including interstate wetlands;
    (3) The territorial seas;
    (4) All impoundments of waters identified in paragraphs (a)(1) through (3) and (5) of this section;
    (5) All tributaries of waters identified in paragraphs (a)(1) through (4) of this section;
    (6) All waters, including wetlands, adjacent to a water identified in paragraphs (a)(1) through (5) of this section; and
    (7) On a case-specific basis, other waters, including wetlands, provided that those waters alone, or in combination with other similarly situated waters, including wetlands, located in the same region, have a significant nexus to a water identified in paragraphs (a)(1) through (3) of this section.
79 Fed. Reg. at 22,262-22,263 (for the Proposed Rule);

jurisdiction over "(6) [a]ll waters…adjacent" to a Categorically Covered Water—as meaning "bordering, contiguous or neighboring." 79 Fed. Reg. at 22,263. And in turn, the term "neighboring" was defined as "waters located within the *riparian area or floodplain* of a [Categorically Covered Water], or waters with a *shallow subsurface hydrologic connection or confined surface hydrologic connection* to such a jurisdictional water." *Id*. (italics added).

For three months after its publication, the Agencies allowed interested parties an opportunity to comment on the Proposed Rule and its jurisdictional grouping scheme. *See* Dkt. 180 at Tab J, Tab K, Tab L. After this notice-and-comment period closed, the Science Advisory Board issued its revisory comments for the Draft Connectivity Report. *See* 79 Fed. Reg. 63,594 (Oct. 24, 2014). In response, the Agencies reopened the comment period for the Proposed Rule for another month. *Id*. However, the Agencies declined to do the same after issuing the revised version of the connectivity report on January 15, 2015 (the "Final Connectivity Report"). 80 Fed. Reg. 2,100 (Jan. 15, 2015). This meant that the Proposed Rule was never open for public comment after the Final Connectivity Report was finalized.

Almost six months after publishing the Final Connectivity Report, the Agencies released the Final Rule on June 29, 2015, which proposed a different definition of the phrase WOTUS.[5] Although generally similar to the Proposed Rule in that it defined the

---

[5] (a) For purposes of the Clean Water Act, 33 U.S.C. § 1251 et seq. and its implementing regulations, subject to the exclusions in paragraph (b) of this section, the term "waters of the United States" means:
    (1) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;
    (2) All interstate waters, including interstate wetlands;

phrase WOTUS in jurisdictional groups, the Final Rule departed from the Proposed Rule in at least one key respect. Namely, the Final Rule defined "adjacent waters" under the Act using distance-based criteria, rather than the ecologic and hydrologic criteria used in the Proposed Rule.

Specifically, the Final Rule, like the Proposed Rule, defined "adjacent" as "bordering, contiguous or neighboring." *Id*. at 37, 105. But, the Final Rule changed the definition of the term "neighboring" to mean "[a]ll waters located within 100 feet of the ordinary high water mark of a" Categorically Covered Water, "[a]ll waters located within the 100-year floodplain of a" Categorically Covered Water, and "[a]ll waters located within 1,500 feet of the high tide line of" either some Categorically Covered Waters or "1,500 feet of the ordinary high water mark of the Great Lakes." *See id*. This was the first time that the Agencies gave notice that they intended to define adjacency by precise numerical distance-based criteria—rather than the ecologic and hydrologic criteria in the Proposed Rule.

In the pending motions for summary judgment the Plaintiffs ask the Court to vacate the Final Rule because it violates (1) the Administrative Procedure Act (the "APA"), (2) the Act, (3) the Commerce Clause, and (4) the Tenth Amendment to the United States Constitution. Dkt. 156; Dkt. 157. The Court finds that the Final Rule violates the notice-and-comment requirements of the APA and therefore grants summary

---

(3) The territorial seas;
(4) All impoundments of waters otherwise identified as waters of the United States under this section;
(5) All tributaries, as defined in paragraph (c)(3) of this section, of waters identified in paragraphs (a)(1) through (3) of this section;
(6) All waters adjacent to a water identified in paragraphs (a)(1) through (5) of this section, including wetlands, ponds, lakes, oxbows, impoundments, and similar waters….
80 Fed. Reg. 37,054, 37,104 (June 29, 2015).

judgment in favor of the Plaintiffs on this ground alone. So being, the Court declines to address the substantive challenges to the Final Rule because they are premature at this time. For the following reasons, the Final Rule will be remanded to the appropriate administrative agencies for further proceedings consistent with this opinion.

## Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the context of a challenge under the APA, "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008). Thus, in evaluating a challenge under the APA on summary judgment, the court applies the standard of review from the APA. *See Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 627 (5th Cir. 2001); *see Tex. Oil & Gas Ass'n v. United States EPA*, 161 F.3d 923, 933 (5th Cir. 1998). Under the APA standard of review, a "reviewing court shall…hold unlawful and set aside agency action, findings, and conclusions found to be…without observance of procedure required by law." 5 U.S.C. § 706.

## Analysis

Plaintiffs assert that the Final Rule violates the notice-and-comment requirements of the APA because (1) the Final Rule's definition of "adjacent" was not a logical outgrowth of the Proposed Rule's definition, and (2) the Agencies denied interested

parties an opportunity to comment on the Final Connectivity Report, which serves as the technical basis for the Final Rule.[6] The Court agrees.

### A. Violations of the APA

Under the APA, agencies are required to publish "[g]eneral notice of proposed rule making[s]…in the Federal Register." *Id*. § 553(b). The notice must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id*. at § 553(b)(3). After notice has been given, the Agencies must then allow "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id*. at § 553(c).

Hardly trivial, these notice-and-comment "requirements are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union, UMW v. MSHA*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). Moreover, the notice-and-comment requirements assist in the substantive formation of a rule by ensuring "that the broadest base of information [is] provided to the agency by those most interested and perhaps best informed on the subject of the

---

[6] Plaintiffs also argue that the Final Rule violates the notice-and-comment requirements of the APA because the Final Rule excludes "farmland from the per se adjacent waters category, but not the per se tributary category, [which was] not part of the proposed version of the Rule…." Dkt. 157 at 39. The Court finds this argument unpersuasive. No such exemption existed under the prior rule. *See* 33 C.F.R. § 328.3(a)(5) (1987). Therefore, the Defendants did not violate the APA by preserving the status quo. *See New York v. United States EPA*, 413 F.3d 3, 44 (D.C. Cir. 2005) ("One logical outgrowth of a proposal is surely, as EPA says, to refrain from taking the proposed step.").

rulemaking at hand." *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616, 620 (5th Cir. 1994).

An agency "undoubtedly has authority to promulgate a final rule that differs in some particulars from its proposed rule." *Small Refiner Lead Phase-Down Task Force v. United States Envtl. Prot. Agency*, 705 F.2d 506, 546 (D.C. Cir. 1983). "A contrary rule would lead to the absurdity that…the agency can learn from the comments on its proposals only at the peril of starting a new procedural round of commentary." *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 632 n.51 (D.C. Cir. 1973). "However, if the final rule deviates too sharply from the proposal, affected parties will be deprived of notice and an opportunity to respond to the proposal." *Small Refiner Lead Phase-Down Task Force*, 705 F.2d at 547. Thus, to comply with the mandates of the notice-and-comment requirement, the final rule must be a "logical outgrowth of the rule proposed." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007). Whether a final rule is a "logical outgrowth" of a proposed rule will turn on whether the interested parties "should have anticipated" the final rule from the proposed rule. *Small Refiner Lead Phase-Down Task Force*, 705 F.2d at 549. "The object, in short, is one of fair notice." *Long Island Care at Home, Ltd.*, 551 U.S. at 174.

Here, the Final Rule violated the APA's notice-and-comment requirements by deviating from the Proposed Rule in a way that interested parties could not have reasonably anticipated. Instead of continuing to use ecologic and hydrologic criteria to define "adjacent waters" as originally proposed, the summary judgment evidence reflects that the Final Rule abandoned this approach and switched to the use of distance-based

criteria. *See* 79 Fed. Reg. at 22,263; *c.f.* 80 Fed. Reg. at 37,105. This shift in terminology and approach led to the promulgation of a Final Rule that was different in kind and degree from the concept announced in the Proposed Rule.

Specifically, the Proposed Rule defined "adjacent waters" based on the presence of a "hydrologic connection" with a Categorically Covered Water or a Categorically Covered Water's "influence [on] the ecological processes and plant and animal community structure" of a potentially covered water. 79 Fed. Reg. at 22,263. The summary judgment evidence reflects that commentators to the Proposed Rule spent months evaluating the merits of this definition. However, in contrast, the Final Rule defined "adjacent waters" by proximity to Categorically Covered Waters:

> The term *adjacent* means bordering, contiguous, or neighboring…[and] the term *neighboring* means…[a]ll waters located within 100 feet [of a Categorically Covered Water]…[a]ll waters located within the 100-year floodplain [of a Categorically Covered Water]…[and a]ll waters located within 1,500 feet of the high tide line of" some Categorically Covered Waters or "1,500 feet of the ordinary high water mark of the Great Lakes….

80 Fed. Reg. at 37,105 (italics in original).

This change is significant—it alters the jurisdictional scope of the Act. *See Nat'l Ass'n of Mfrs.*, 138 S. Ct. at 624. As a result, the Final Rule was deprived of the benefit of comment "by those most interested and perhaps best informed on the subject of the rulemaking at hand." *Phillips Petroleum Co.*, 22 F.3d at 620. Indeed, the summary judgment evidence establishes that if interested parties had been notified of this change, the comments and evidence presented to the agencies would have been significantly and substantively different. Perhaps more importantly, those governed by the rule were

deprived of notice of a substantial change to our nation's environmental regulation scheme. *See Long Island Care at Home, Ltd.*, 551 U.S. at 174.

The Defendants' argument that a hydrologic and ecologic based definition for "adjacent waters" necessarily implies elements of "reasonable proximity" is unpersuasive. Dkt. 169 at 36. So too is the Defendants' argument that generally requesting comments regarding the merits of unspecified geographic limitations in the notice of proposed rulemaking provided adequate notice of the Final Rule. *Id*. at 37. Neither of these attempts at public notice is sufficiently specific to inform interested parties that the Agencies were considering the use of precise numerical distance-based criteria in the Final Rule to alter its jurisdictional scope. The APA does not envision requiring interested parties to parse through such vague references like tea leaves to discern an agency's regulatory intent regarding such significant changes to a final rule. Accordingly, the Court finds that the Final Rule was not a logical outgrowth of the Proposed Rule and that it was promulgated in violation of the APA.

The Final Rule also violated the APA by preventing interested parties from commenting on the studies that served as the technical basis for the rule. As the courts have held, "[a]n agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary." *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 199 (D.C. Cir. 2007). Indeed, it is a "fairly obvious proposition that studies upon which an agency relies in promulgating a rule must be made available during the rulemaking in order to afford interested persons meaningful notice and an opportunity for

comment." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008). "The most critical factual material that is used to support the agency's position on review must have been made public in the proceeding and exposed to refutation." *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999).

Here, the Agencies failed to give commentators an opportunity to refute the most critical factual material used to support the Final Rule—the Final Connectivity Report. Indeed, the summary judgment record establishes that the Final Connectivity Report was the technical basis for the Final Rule and was instrumental in determining what changes were to be made to the definition of the phrase WOTUS:

> As noted earlier, the agencies interpret the scope of 'waters of the United States' protected under [the Act] based on the information and conclusions in [the Final Connectivity Report]….In light of this information, the agencies made scientifically and technically informed judgments about the nexus between the relevant waters and the significance of that nexus and conclude that 'tributaries' and 'adjacent waters,' each as defined by the rule, have a significant nexus such that they are 'waters of the United States' and *no additional analysis is required*.

80 Fed. Reg. at 37,065 (italics added). Commentators certainly are not expected to "have an opportunity to comment on every bit of information influencing an agency's decision." *Tex. Office of Pub. Util. Counsel v. FCC*, 265 F.3d 313, 326 (5th Cir. 2001). However, the Agencies' decision not to reopen the Proposed Rule for comment after the publication of the Final Connectivity Report prejudiced the ability of interested parties to (1) provide meaningful comments regarding the Final Rule's continuum-based approach to connectivity and (2) "mount a credible challenge" to the Final Rule. *See Am. Radio Relay League, Inc.*, 524 F.3d 227, 237-38. This prejudice is especially severe given the

substantive changes made between the Draft and Final Connectivity Reports. Dkt. 180 at Tab CCC (for the SAB's proposed changes to the Final Connectivity Report); Dkt. 180 at Tab H (for the Final Connectivity Report). Accordingly, depriving Plaintiffs of a meaningful "opportunity to comment" and possibly deconstruct the Final Connectivity Report violated the APA. *See Owner-Operator Indep. Drivers Ass'n*, 494 F.3d at 199.

### B. Remedy

Having found that the Final Rule violated the APA, the only remaining question is what remedy would be appropriate under the circumstances of this case. The Court finds that remand, not vacatur of the Final Rule as requested by Plaintiffs, is the appropriate remedy in this case. As the Fifth Circuit has made clear, "[o]nly in rare circumstances is remand for agency reconsideration not the appropriate solution." *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 238-39 (5th Cir. 2007). Especially where, as here, the Final Rule "is not sustainable on the basis of the administrative record, then the matter should be remanded to [the Agencies] for further consideration." *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 905 (5th Cir. 1983). Moreover, the Court finds that vacatur "would be disruptive," and there is a "serious possibility" that the Agencies will be able to resolve the notice-and-comment defects with the Final Rule if "given an opportunity to do so." *Cent. & S. W. Servs. v. United States EPA*, 220 F.3d 683, 692 (5th Cir. 2000). Indeed, the Court notes that the Agencies have already begun reviewing whether changes should be made to the Final Rule.[7] Therefore, the Court finds that

---

[7] EPA, Waters of the United States (WOTUS) Rulemaking, (May 23, 2019), https://www.epa.gov/wotus-rule (for an update on the EPA's current efforts to revise and repeal the Final Rule).

remand is the best remedy here as it will facilitate the Agencies' active attempts to improve on their work of protecting the environment and bringing predictability and clarity to the definition of the phrase WOTUS.

## Conclusion

For the foregoing reasons, the Court finds that the Final Rule violated the notice-and-comment requirements of the APA and therefore grants summary judgment in favor of the Plaintiffs on this ground.[8] The Court remands the Final Rule to the appropriate administrative agencies for proceedings consistent with this order. The injunction issued by this Court on September 12, 2018 (Dkt. 140) is to remain in place pending the proceedings on remand. All remaining pending motions are hereby denied as moot.

SIGNED at Galveston, Texas, this 28th day of May, 2019.

_____
George C. Hanks Jr.
United States District Judge

---

[8] Considering the Agencies' APA violations, the Court finds that it would be premature to address Plaintiffs' substantive challenges to the Final Rule and it declines to do so at this time. Dkt. 156; Dkt. 157. The Court will consider these arguments when an adequate record is developed after remand.